JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

# Exhibit 1

## Letter, Mansfield to Billington
## 3/15/05

5143 Yuma Street, NW
Washington, DC 20016
March 15, 2005

The Honorable James H. Billington                          **By hand**
The Librarian of Congress

Dear Dr. Billington:

I am writing because my informal efforts to resolve a matter of grave importance to me have failed. I have been performing work at the Senior Level for two years, yet my position remains classified at GS15.

- From September 2002 to July 2004, I served as Acting Director for Cataloging, a Senior Level position, on detail from my permanent position as Chief, Arts and Sciences Cataloging Division (ASCD).
- In April 2003, the Library's contract classification specialist recommended that the ASCD Chief position be classified at the Senior Level. As ASCD Chief, I have substantially the same duties and responsibilities as male division chiefs classified at the Senior Level.
- Since August 2004, I am assigned to collateral duties as Assistant Director for Bibliographic Access along with my position as ASCD Chief. There are two other male Assistant Directors in Library Services, both of whom occupy positions which are classified at the Senior Level. I directly supervise a Senior Level male employee.
- The Library's records will show that my performance has been consistently rated as outstanding.

My compensation at a lower grade for Senior Level work is clearly unfair and illegal. My pay is lower than that of employees of the opposite sex, while performance of my work requires skill, effort, and responsibility that is equal to that of Senior Level employees of the opposite sex, working under similar conditions in the same establishment. This is a continuing violation of the Equal Pay Act of 1963, as well as a violation of Title VII of the Civil Rights Act of 1964. I have suffered significant monetary damage as a result of the failure of the Library to remedy this situation.

As a member of Library management, I have no desire to see any adverse publicity fall on the Library. I want this matter to remain a private personnel matter and I want to negotiate a satisfactory resolution as expeditiously as possible. However, if I do not receive a response within 10 business days, I will assume there is no interest in resolving this matter privately. I look forward to hearing from you.

Sincerely,

Judith A. Mansfield

**156**

PENGAD 800-631-6989    EXHIBIT
26
2/13/07   nbr

JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

# Exhibit 2

# Affidavit of Judith Mansfield
# 1/25/06

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDITH A. MANSFIELD )<br><br>Plaintiff, )<br><br>v. )<br><br>JAMES H. BILLINGTON, )<br>LIBRARIAN OF CONGRESS, )<br><br>Defendant. ) | Civil Action No. 05-1790 (RMU)<br>Judge Ricardo M. Urbina |

### AFFIDAVIT OF JUDITH A. MANSFIELD

I, Judith A. Mansfield, being duly sworn, do hereby depose and say:

1.     In 2004, Deanna Marcum, the Associate Librarian for Library Services in the Library of Congress, began formulating plans to reorganize the Library Services unit.

2.     In or about May 2004, Ms. Marcum invited me to serve as Assistant Director in one of the new directorates in the Library Services unit.

3.     At that time, my permanent position was Chief of the Arts and Sciences Cataloging Division ("ASCD"), a position I have held since May 24, 1998, and was receiving a salary at the GS-15 level. However, I was serving as Acting Director for Cataloging.

4.     Based on Ms. Marcum's invitation and the recommendation of my supervisor, Beacher Wiggins, I accepted the invitation and became the Assistant Director for Bibliographic Access for the new Acquisitions and Bibliographic Access directorate in August 2004.

5.     At the same time, Steve Herman and Mark Dimunation were appointed Assistant Director for Collections Management and Assistant Director for Special Collections and Services, respectively.

6.     The Library, however, continued to pay me at the GS-15 level for performing my Assistant Director duties while it was paying Mr. Herman and Mr. Dimunation at the Senior Level, a higher pay rate, for performing the same work.

7.     In conversations during October 2004 to March 2005, I complained to Mr. Wiggins that the manner in which the Library compensated me in comparison to my male counterparts violated Title VII of Civil Rights Act and the Equal Pay Act.

8.     Having failed to obtain a resolution through my immediate supervisor, I complained directly to the Librarian of Congress in March 2005 that I was being paid less than males who performed the same work in violation of the Title VII of the Civil Rights Act and Equal Pay Act.

9.     Immediately following my complaint to the Librarian, my Assistant Director position was abolished, and I was returned to my prior position as ASCD Chief.

10.     I continue to serve as ASCD Chief and receive compensation at the GS-15 level.

10.     Contrary to the Librarian's current claims, the decision to abolish my Assistant Director position and return me to the ASCD Chief position was not merely a decision to laterally transfer me but a demotion.

11.     My duties as Assistant Director consumed my entire work day during the entire period in which I held that position. In fact, when I assumed the Assistant Director position, I assigned the ASCD Chief position to another Library employee, with the full knowledge and concurrence of my supervisor, Beacher Wiggins.

12.     As Assistant Director, I served as the immediate supervisor of the ASCD Chief, as well as the eight other division chiefs in the Acquisitions and Bibliographic Access directorate.

2

13.     My other duties as Assistant Director included, but were not limited to, the following:

    a.     oversight and administration of policies and programs, which are national and international in scope, in the nine Bibliographic Access divisions of the Acquisitions and Bibliographic Access directorate;

    b.     oversight of strategic planning and the implementation thereof for the nine Bibliographic Access divisions;

    c.     making personnel decisions, i.e., the hiring and promotion, of the nearly 550 employees in the Bibliographic Access divisions; and

    d.     management of the $40,000,000+ budget of the nine Bibliographic Access divisions.

14.     In contrast, my responsibilities as ASCD Chief were limited to management of the Arts and Sciences Cataloging Division, just one division in the Acquisitions and Bibliographic Access directorate.

15.     As ASCD Chief, I managed a smaller staff of approximately 75 members, as compared to the 550 staff members I managed as Assistant Director.

16.     The ASCD Chief position also involved management of a smaller budget, approximately $4.4 million, as compared to the budget of over $40 million that I managed as Assistant Director.

17.     Mr. Herman and Mr. Dimunation's Assistant Director positions were also abolished at the same time as my Assistant Director position.

18.     However, Mr. Herman and Mr. Dimunation continued to receive compensation at the Senior Level following this change in their duties.

19.    I received the documents set forth in Exhibits No. 1-5 from the Library of Congress

and, upon information and belief, they are authentic business records of the Library.

Further your affiant sayeth naught.

1/25/06
Date

Judith A. Mansfield

Subscribed and sworn before me on 25 day of January 2006 in Washington, D.C.

GAIL M. SPENCE
NOTARY PUBLIC DISTRICT OF COLUMBIA

My Commission expires: My Commission Expires May 14, 2010

4

JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

# Exhibit 3

## Plaintiff's Complaint
## 9/9/05

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDITH A. MANSFIELD<br>5143 Yuma Street, N.W.<br>Washington, D.C. 20016<br><br>      Plaintiff,<br><br>      v.<br><br>JAMES H. BILLINGTON,<br>LIBRARIAN OF CONGRESS,<br>101 Independence Ave, S.E.<br>Washington, D.C. 20540<br><br>      Defendant.<br><br>**Also Serve:**<br>Attorney General Alberto Gonzales<br>U.S. Department of Justice<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530<br><br>United States Attorney's Office<br>for the District of Columbia<br>ATTN: Civil Process Clerk<br>555 4th Street, N.W.<br>Washington, D.C. 20530 | Civil Action No.<br><br><br>__JURY DEMANDED__<br><br><br>CASE NUMBER  1:05CV01790<br><br>JUDGE: Ricardo M. Urbina<br><br>DECK TYPE: Employment Discrimination<br><br>DATE STAMP: 09/09/2005 |

## COMPLAINT
### (Sex Discrimination and Retaliation in Violation of Title VII of the
### Civil Rights Acts of 1964, as amended, and Equal Pay Act of 1963)

COMES NOW the Plaintiff, Judith A. Mansfield, by and through her attorneys, Webster,

Fredrickson & Brackshaw, and for her Complaint in the above-captioned action states to this

Honorable Court as follows:

### PARTIES

1.    Plaintiff Judith A. Mansfield is an adult female citizen of the District of Columbia

and has been employed by the Library of Congress continuously since 1969.

2.     Defendant James H. Billington is the Librarian of Congress, and he is sued in his official capacity.

## JURISDICTION

3.     Jurisdiction of this Honorable Court is invoked pursuant to 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 216(b).

4.     On April 18, 2005, Plaintiff Mansfield filed a formal Complaint of Discrimination with the Equal Employment Opportunity ("EEO") Complaints Office of the Library of Congress.

5.     With a letter dated June 14, 2005, the EEO Complaints Office served upon Plaintiff, by mail, a Library of Congress Final Decision, dismissing her complaint and informing Plaintiff of her right to file a civil action against the Librarian of Congress within 90 days of the date she received the decision.

6.     Plaintiff Mansfield filed the instant action within ninety (90) days of service of the Library of Congress Final Decision and notice of right to file a civil action.

7.     Plaintiff exhausted her administrative remedies.

## FACTS GIVING RISE TO RELIEF

8.     Since July 1, 1969, Plaintiff has been employed by the Library of Congress in a series of jobs of increasing skill and responsibility.

9.     Pursuant to a competitive selection process, Plaintiff became the Chief of the Arts and Sciences Cataloging Division, effective on May 24, 1998, at Grade GS-15. In this capacity, Plaintiff reported directly to Mr. Beacher Wiggins, a male employee of the Library of Congress who served as the Director for Cataloging and who was employed by the Library of Congress as a Senior Level employee in the Library's Senior Level Executive System.

2

10. In 2002, Mr. Wiggins was appointed Acting Associate Librarian for Library Services.

11. In September, 2002, Plaintiff Mansfield was promoted to the position of Acting Director for Cataloging for a period not to exceed 120 days and she was moved from the GS-15 pay level to the Senior Level pay plan for this same time period.

12. The Library's Senior Level Executive System has a minimum and maximum pay range as set by law. The minimum and maximum basic pay rates are linked to the General Schedule. Specifically, the minimum basic pay rate is 120 percent of the salary of a GS-15/1 for the SL-1 level, and the maximum basic pay rate is 162.44 percent of the salary of a GS-15/1 for the SL-4 level. The Senior Level Executive System provides for other forms of compensation as well.

13. At the end of the 120 day period, Defendant removed Plaintiff Mansfield from the Senior Level pay plan and returned Plaintiff to a GS-15 pay status. Despite the reduction in her pay, Plaintiff Mansfield continued to serve as Acting Director for Cataloging and perform all the duties of the position to which she had been appointed.

14. Throughout the time Plaintiff Mansfield held the position of Acting Director for Cataloging, Plaintiff performed the exact same duties as her male predecessor, Mr. Wiggins (who had been paid at the Senior Level), and the job required the same skill, effort, and responsibility as the job had required of Mr. Wiggins.

15. In February, 2004, Defendant returned Plaintiff to the Senior Level pay plan for a 120 day period ending in June, 2004. On June 9, 2004, Defendant returned Plaintiff to a GS-15 pay status, and Defendant has continued to pay her in that status.

16. At all times during which Plaintiff Mansfield served as Acting Director for Cataloging, including the two 120 day periods during which Plaintiff was paid on the Senior Level,

3

Plaintiff was paid well below the rate of her male predecessor and other male employees who performed similar duties.

17.    While she served as Acting Director for Cataloging, Plaintiff also retained her position as Chief of the Arts and Sciences Cataloging Division.

18.    In April 2003, a position classification specialist engaged by the Library completed an audit of the eight Division Chief positions in the Cataloging Directorate within Library Services of the Library of Congress.

19.    As a result of the audit, the position classification specialist determined that the position of Chief of the Arts and Sciences Cataloging Division was substantially equal in functional responsibilities, as well as budget, staff, and nature of managerial responsibility, to two other Division Chief positions within the Cataloging Directorate which were currently Senior Level positions. One of these Senior Level positions, Chief of the Regional and Cooperative Cataloging Division, is and was then held by Mr. John D. Byrum, Jr., a male who was paid substantially more than Plaintiff. The division chief positions held by Plaintiff and Mr. Byrum require substantially equal skill, effort, and responsibility.

20.    Following the audit, on April 25, 2003, the Acting Associate Librarian for Library Services recommended that the Library reclassify the position of Chief of the Arts and Sciences Cataloging Division (the position held by Plaintiff) to the Senior Level, because this position is substantially equal to the two other Division Chief positions within the Cataloging Directorate which were graded at the Senior Level.

21.    In July, 2003, the Library's Director of Human Resources decided to delay action on the request for reclassification. To date, the Library has not made a decision on the request for

4

reclassification. As a result, Plaintiff has been paid less than a male employee in a position requiring equal skill, effort, and responsibility.

22.    In August 2004, Defendant realigned Library Services, and three Assistant Directors were appointed to jobs with substantially similar duties. Plaintiff Mansfield was appointed Assistant Director for Bibliographic Access. Defendant appointed Steve Herman as Assistant Director for Collections Management and Mark Dimunation as Assistant Director for Special Collections and Services. Yet, Mr. Herman and Mr. Dimunation, two male employees of the Library, were paid at the Senior Level, while Plaintiff was paid at the GS-15 level.

23.    As an Assistant Director, Plaintiff Mansfield performed substantially the same job duties as Mr. Herman and Mr. Dimunation, and all three positions require the same skill, effort and responsibilities. Plaintiff has been paid far less than her male counterparts for the same work.

24.    In August, 2004, Plaintiff was informed that new position descriptions would be provided for the Assistant Director positions. In October, 2004, when no new position description had been provided, Plaintiff informed her supervisor, Mr. Wiggins, of this fact and the fact that the two male Assistant Directors were paid at the Senior Level. In a second conversation in October, 2004, Plaintiff Mansfield stated to Mr. Wiggins that paying her at the GS level while the two male Assistant Directors were paid at the Senior Level violates the Title VII of the Civil Rights Act and the Equal Pay Act. In subsequent conversations between October, 2004 and March 2005, Plaintiff stated to Mr. Wiggins that the manner in which the Library paid her in comparison to her male counterparts violated Title VII of the Civil Rights Act and the Equal Pay Act.

25.    On March 15, 2005, having obtained no resolution through her immediate supervisor, Plaintiff Mansfield hand delivered a letter to the Librarian of Congress in which she stated: "My

5

compensation at a lower grade for Senior Level work is clearly unfair and illegal. My pay is lower than that of employees of the opposite sex, while performance of my work requires skill, effort, and responsibility that is equal to that of Senior Level employees of the opposite sex, working under similar conditions in the same establishment. This is a continuing violation of the Equal Pay Act of 1963, as well as a violation of Title VII of the Civil Rights Act of 1964." Plaintiff also requested a response within 10 business days.

26.    Rather than remedy the unequal payment for equal work, on March 31, 2005, Defendant informed Plaintiff Mansfield that her position of Assistant Director was abolished, along with the other two Assistant Director positions.

27.    Since September of 2002, first as Acting Director for Cataloging and then as Assistant Director for Bibliographic Access, Plaintiff Mansfield has served as the immediate supervisor of Mr. Byrum, the male Chief of the Regional and Cooperative Cataloging Division and a Senior Level employee of the Library.

28.    As the immediate supervisor of this Senior Level male employee, Plaintiff's work has been substantially equal to that of an employee of the opposite sex and the performance of her job has required at least as much (if not more) skill, effort, and responsibility as the work required of Mr. Byrum. Throughout this period, Plaintiff has been paid substantially less than Mr. Byrum.

## COUNT I
### (Sex Discrimination in Violation of
### Title VII of the Civil Rights Act of 1964, as amended)

29.    Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-28 of this Complaint with the same force and vigor as if set out here in full.

30.    Defendant failed to pay Plaintiff salary and benefits equal to those of Defendant's

male employees, who have had and have jobs that are similar or substantially similar in terms of required skill, effort, and responsibility to those of Plaintiff, because of her sex in violation of 42 U.S.C. 2000e-2(a)(1).

31.    As a direct and proximate result of Defendant's unlawful acts and failures to act, Plaintiff Mansfield suffered and continues to suffer lost earnings and benefits and distress.

### COUNT II
### (Retaliation in Violation of
### Title VII of the Civil Rights Act of 1964, as amended)

32.    Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-31 of this Complaint with the same force and vigor as if set out here in full.

33.    Plaintiff engaged in protected activity when she asserted her right to receive a salary and benefits equal to those of Defendant's male employees, who have had and have jobs that are similar or substantially similar in terms of required skill, effort, and responsibility as those of Plaintiff.

34.    Defendant abolished Plaintiff's position as Assistant Director for Bibliographic Access because she had engaged in protected activity and opposed Defendant's illegal conduct.

35.    Defendant's discriminatory employment acts against Plaintiff constitute unlawful retaliation in violation of 42 U.S.C. § 2000e-3(a).

36.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff Mansfield suffered and continues to suffer lost earnings and benefits and distress.

## COUNT III
### (Retaliation in Violation of
### the Equal Pay Act of 1963)

37.    Plaintiff incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-36 of this Complaint with the same force and vigor as if set out here in full.

38.    Plaintiff engaged in protected activity when she asserted her right to receive a salary and benefits equal to those of Defendant's male employees, who have had and have jobs that are similar or substantially similar in terms of required skill, effort, and responsibility as those of Plaintiff.

39.    Defendant abolished Plaintiff's position as Assistant Director for Bibliographic Access because she had engaged in protected activity and opposed Defendant's illegal conduct.

40.    Defendant's willful and discriminatory employment acts against Plaintiff constitute unlawful retaliation in violation of 29 U.S.C. § 215(a)(3).

41.    As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff Mansfield suffered and continues to suffer lost earnings and benefits and distress.

\*          \*          \*

WHEREFORE, the premises considered, Plaintiff Mansfield respectfully prays that this Honorable Court:

1.     Enter judgment on her behalf against Defendant;

2.     Award Plaintiff Mansfield back pay and other benefits, liquidated damages, and all other damages as appropriate;

3.     Instate Plaintiff Mansfield into the Senior Level Executive Service retroactively with all attendant benefits, and award front pay until Defendant instates Plaintiff into an appropriate position;

4.     Award Plaintiff Mansfield her court costs, expenses, attorneys' fees, prejudgment interest and post-judgment interest;

5.     Declare that Defendant's conduct is in violation of the Title VII of the Civil Rights Act of 1964, as amended;

6.     Declare that Defendant's conduct is in violation of the Equal Pay Act of 1963, 29 U.S.C. § 215(a)(3);

7.     Award Plaintiff compensation for any additional tax burden that will be incurred were it not for the discriminatory treatment to which she was subjected; and

9

8.   Grant such other relief as this Court deems just and proper.

Respectfully submitted,

Judith A. Mansfield

WEBSTER, FREDRICKSON & BRACKSHAW

Bruce A. Fredrickson #933044

Cedar P. Carlton #480255
1775 K Street, N.W.
Suite 600
Washington, D.C. 20006
(202) 659-8510
(202) 659-4082 (Fax)

Attorneys for Plaintiff

## VERIFICATION

I, Judith A. Mansfield, being duly sworn on oath, do hereby state that I have read the foregoing Complaint and that it is true to the best of my knowledge, information, and belief.

Judith A. Mansfield

Subscribed and sworn to before me
this 9th day of September, 2005.

_____
Notary Public

My Commission Expires: 5|31|06

11

## JURY DEMAND

Plaintiff demands a trial by jury on all issues contained herein.

Bruce A. Fredrickson  #933044
1775 K Street, N.W.
Suite 600
Washington, D.C. 20006
(202) 659-8510
(202) 659-4082 (Fax)

Attorney for Plaintiff

12

JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

# Exhibit 4

Excerpt
Annual Report
9/30/04

ANNUAL REPORT

of the District of Columbia

JM000153

# APPENDIX K. STAFF CHANGES

## APPOINTMENTS

Terry Bickham was appointed director of Operations Management and Training in the Office of the Librarian on August 22.

Carolyn Brown was appointed director for Collections and Services on July 2.

Carroll V. Clark was appointed Systems Engineering Group leader in Information Technology Services on September 5.

Jeffrey Cole was appointed acting Reengineering Program manager in the Copyright Office on September 5.

Mary Jane Deeb was appointed head, Near East Section, African and Middle Eastern Division, on July 25.

Mark Dimunation was appointed assistant director for Special Collections on July 2. He also continued as chief of the Rare Book and Special Collections Division.

Mark DiNapoli was appointed assistant chief of the Copyright Licensing Division on June 13.

Hirad Dinavari was appointed reference librarian for the Iranian world, effective November 17.

Robert Dizard was appointed deputy associate librarian for Library Services on May 24.

Elmer Eusman was appointed assistant to the director of preservation on April 4.

Allene F. Hayes was appointed digital projects coordinator, Acquisitions and Bibliographic Access Directorate, on February 22.

Steven Herman was appointed assistant director for collections management on July 2. He also continued as chief of the Collections Access, Loan, and Management Division.

Georgia Higley was appointed head of the Newspaper Section on November 30.

Julia Huff was appointed acting chief operating officer of the Copyright Office on May 30.

Angela Kinney was appointed chief of the Social Sciences Cataloging Division on May 30.

Diane Kresh was appointed director of the Veterans History Project in May.

Everette Larson was appointed head of the Hispanic Reading Room on March 7.

Nancy Lev-Alexander was appointed section head for preventive conservation on August 8.

Mary Levering was appointed director of Integrated Support Services on September 15.

Judith Mansfield was appointed assistant director for bibliographic access on July 2. She also continued as chief of the Arts and Sciences Cataloging Division.

Dennis McGovern was appointed chief of the Decimal Classification Division on May 16.

Kathryn Mendenhall was appointed chief of the Cataloging Distribution Service on January 11.

Michael Moodie was appointed deputy director of the National Library Service for the Blind and Physically Handicapped in January.

Jean Moss was appointed digital projects coordinator in the National Library Services for the Blind and Physically Handicapped on July 25.

Debra Murphy was appointed diversity coordinator for the Veterans History Project during the year.

Henry Rossman was appointed director for Technology Policy in Library Services on July 2.

Tanya Sandros was appointed associate general counsel in the Copyright Office on August 22.

Donna Scheeder was appointed director, Law Library Services, in the Law Library on April 4.

JM000154

Ruth Scovill was appointed director of the newly established National Audio-Visual Conservation Center Transition Program Office in March.

Larry Stafford was appointed director of special programs in the Office of the Librarian on September 6.

Charles Stanhope was appointed director of the Development Office in November.

Mark Strattner was appointed acting chief of the Collections Services Division in the Law Library on July 11.

Sara Striner was appointed head of the Government Publications and Periodicals Section, Serial and Government Publications Division, on November 30.

Carolyn Sturtevant was appointed BIBCO coordinator for the Program for Cooperative Cataloging on September 26.

Dianne van der Reyden was appointed acting director for preservation on July 2.

James Vassar was appointed acting assistant chief of the Copyright Office Examining Division on September 5.

Beacher Wiggins was appointed director for acquisitions and bibliographic access on July 2. Before that appointment, he had served as acting deputy associate librarian for Library Services.

### RESIGNATIONS

Ellen McCulloch Lovell, director of the Veterans History Project, resigned from the Library in February to become president of Marlboro College in Vermont.

Mark Roosa, director of preservation, resigned on July 7 to become dean of libraries at Pepperdine University.

### RETIREMENTS

Maryle Ashley, leader of Systems Development Group 2 in Information Technology Services, retired on July 2.

Rosemarie Clemandot, chief of collection services in the Law Library, retired on August 8.

Nancy Davenport, director for acquisitions, retired from the Library on July 2 to become president of the Council on Library and Information Resources.

Tao-Tai Hsia, chief of the Eastern Law Division for the Law Library, retired on January 2.

Kim Moden, special events officer, retired on September 3.

Margaret Whitlock, chief of collection services for the law, retired on April 2.

### DEATHS

Yoko Akiba, a reference librarian in the Japanese Section, Asian Division, died on February 10.

Florene Dusty, a senior cataloger in the Arts and Sciences Cataloging Division, died on October 28.

Cynthia Johanson, assistant chief of the Regional and Cooperative Cataloging Division, died January 14.

Basil Malish, an acquisitions specialist in the Anglo/American Acquisitions Division, died January 14.

Carl Peterson, a preservation microfilm processor in the Preservation Reformatting Division, died on February 9.

Charles Sens, a specialist in the Music Division, died on August 23.

Gerald Wager, head of the Rare Book Reading Room, died on February 5.

JM000155



JM000156

JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

# Exhibit 5

# Memorandum, Marcum to Directors and Division Chiefs 4/13/05

# *Memorandum*

LIBRARY OF CONGRESS

DATE:  April 13, 2005

TO        :   Directors and Division Chiefs

FROM    :   Deanna Marcum, ALLS

SUBJECT :   Structure of Directorates

When we realigned Library Services last July, I mentioned that the organizational structure would be adjusted as needed. We were trying something new and we would adjust as experience required. At my suggestion, the directors of Acquisitions and Bibliographic Access and Collections and Services named three division chiefs to take on collateral duties as assistant directors, but these positions have not worked out as intended, so I have eliminated the three coordinating positions. I have asked the directors of the two largest units to look anew at the organizational structure that best fits the directorate's needs. The result is likely to be that more high-level staff will be asked to take on collateral duties. We will continue to monitor the workloads of the directorates and make structural changes as needed.

121



JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

# Exhibit 6

# Memorandum from Carroll
# 8/6/04

**From:**      James Frederick Carroll
**To:**         Weekly News
**Date:**      Fri, Aug 6, 2004 11:39 AM
**Subject:**   Friday's News — 6 August 2004

Friday's News - 6 August 2004

---

Dear Colleagues,
This has been a maintenance week--meetings to learn more about the
work of the divisions in our Partnerships and Outreach Program,
meetings with division chiefs to work on specific projects, meetings
to consider budget needs. It has been a luxury to catch up on
paperwork.

I met with the clerks of the House and Senate Appropriations
Committees this week to inform them of the realignment of Library
Services.

I am pleased with the response we have received from the budget and
planning system. Many of the division chiefs have begun using the
system for keeping us informed and all are now involved in thinking
through the budget requirements for 2005.

The directors have made decisions about the assistant directors (all
of whom have collateral division chief duties).
I am pleased to announce these appointments:
Beacher Wiggins will serve as acting Assistant Director for Acquisitions.
Judy Mansfield is the Assistant Director for Bibliographic Access.
Steve Herman is the Assistant Director for Collections Management.
Mark Dimunation is the Assistant Director for Special Collections and Services.

I am grateful to each of these assistant directors for taking on
additional responsibilities.  Attached is an organization chart showing the names of the Directors and
Assistant Directors.

I shall be here all next week. We'll be saying farewell to the summer
interns, but it appears that they have had a superb experience at the
Library. I am particularly grateful to Jennifer Somosky for the care she has
taken to make the internships meaningful.  I am hosting a retirement
lunch next Monday for George Farr, the director of preservation and access at
NEH, who has been a staunch advocate of preservation work of
libraries around the country.

Best wishes,
Deanna

--
Deanna B. Marcum
Associate Librarian for Library Services
dmarcum@loc.gov
(202)707-6240



# Library Services

**Associate Librarian for Library Services**
**Deanna Marcum**
**Deputy Associate Librarian for Library Services**
**Robert Dizard, Jr.**

- ○ Administrative Services
- ○ National Audio-Visual Conservation Center
- ○ American Folklife Center

## Acquisitions & Bibliographic Access
**Beacher Wiggins, Director**

**Acquisitions**
**Assistant Director**
**Beacher Wiggins, Acting**

Acquisitions Fiscal Office

African/Asian Acquisitions &
Overseas Operations Division

Anglo-American Acquisitions Division

European and Latin American
Acquisitions Division

Serial Record Division

**Bibliographic Access**
**Judy Mansfield, Assistant Director**

Arts & Sciences Cataloging Division

Cataloging Distribution Service

Cataloging in Publication Division

Cataloging Policy & Support Office

Decimal Classification Division

History & Literature Cataloging Division

Regional & Cooperative
Cataloging Division

Social Sciences Cataloging Division

Special Materials Cataloging Division

Instructional Design
& Training Division

## Collections & Services
**Carolyn Brown, Director**

**General Collections & Services**

Asian Division

African and Middle Eastern Division

European Division

Federal Research Division

Hispanic Division

Humanities & Social Sciences Division

**Collections Management**
**Steve Herman, Assistant Director**

Baseline Inventory Program

Collections Access, Loan &
Management Division

Digital Reference Team

Photoduplication Service

**Special Collections & Services**
**Mark Dimunation, Assistant Director**

Children's Literature Center

Geography & Map Division

Manuscript Division

Motion Picture, Broadcasting
and Recorded Sound Division

Music Division

Prints & Photographs Division

Rare Book and Special
Collections Division

Science, Technology &
Business Division

Serial & Government
Publications Division

## Partnerships & Outreach Programs
**Deanna Marcum, Acting Director**

Business Enterprises

Center for the Book

Federal Library and Information
Center Committee

Interpretive Programs Office

National Library Service for the
Blind & Physically Handicapped

Office of Scholarly Programs

Publishing Office

Retail Marketing Office

Veterans History Project

Visitor Services Office

## Preservation
**Dianne van der Reyden, Acting Director**

Binding & Collections Care Division

Conservation Division

Preservation Reformatting Division

Preservation Research
& Testing Division

Mass Deacidification Program

National Digital Newspaper/
US Newspaper Program

## Technology Policy
**Henry Roseman, Acting Director**

Automation Planning & Liaison Office

ILS Program Office

Network Development &
MARC Standards Office

**July 2004**

JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

.

# Exhibit 7

## Excerpts
## Deposition fo Mark Dimunation
## 2/9/07

**Page 1**

UNITED STATES COURT OF FEDERAL CLAIMS

------------------------------X

JUDITH A. MANSFIELD,            :

   Plaintiff : Civil Action

   v.        : No. 05-472C

THE UNITED STATES OF AMERICA,  : Judge Williams

   Defendant :

------------------------------X

Deposition of MARK G. DIMUNATION

Washington, D.C.

Friday, February 9, 2007

2:00 p.m.

Job No.: 1-96378

Pages 1 - 101

Reported by: Nancy Bond Rowland

**Page 2**

Deposition of MARK G. DIMUNATION, held at the offices of:

Webster, Fredrickson & Brackshaw
1775 K Street, N.W.
Suite 600
Washington, D.C.

Pursuant to agreement, before Nancy Bond Rowland, Registered Professional Reporter and Notary Public in and for the District of Columbia.

**Page 3**

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

   BRUCE A. FREDRICKSON, ESQUIRE
   WEBSTER, FREDRICKSON & BRACKSHAW
   1775 K Street, N.W., Suite 600
   Washington, D.C. 20006
   (202) 659-8510

ON BEHALF OF DEFENDANT:

   DOUGLAS K. MICKLE, ESQUIRE
   UNITED STATES DEPARTMENT OF JUSTICE
   Commercial Litigation/National Courts
   1100 L Street, N.W., Room 4062
   Washington, D.C. 20005
   (202) 307-0383

   JESSIE JAMES, JR., ESQUIRE
   JULIA DOUDS, ESQUIRE
   LIBRARY OF CONGRESS
   101 Independence Avenue, S.E.
   Washington, D.C. 20540
   (202) 707-7464

**Page 4**

C O N T E N T S

EXAMINATION OF MARK G. DIMUNATION    PAGE

By Mr. Fredrickson    5, 96

By Mr. James    95

E X H I B I T S

(Retained by counsel)

DEPOSITION EXHIBIT    PAGE

21 - Position Description.    81

22 - Optional Application for Federal Employment.  85
   Bates no. 000814 - 815

23 - Notification of Personnel Action.    87
   Bates no. 001060

24 - Notification of Personnel Action.    89
   Bates no. 001010

5

1      PROCEEDINGS
2      MARK G. DIMUNATION
3    having been duly sworn, testified as follows:
4      EXAMINATION BY COUNSEL FOR PLAINTIFF
5    BY MR. FREDRICKSON:
6    Q  Could you state your name please?
7    A  Mark Dimunation.
8    Q  And are you employed?
9    A  Yes, I am.
10   Q  Where do you work?
11   A  Library of Congress.
12   Q  And how long have you been at the Library of
13   Congress?
14   A  Nine years.
15   Q  What job do you currently hold?
16   A  I am chief of the Rare Book and Special
17   Collections Division.
18   Q  Could you give me an overview of your career
19   since you started at the Library of Congress?
20   A  I'm sorry, my what?
21   Q  Could you give me an overview of your career
22   at the Libary of Congress?

6

1    A  Of my career?
2    Q  Right.
3    A  What do you mean by that?
4    Q  What jobs have you held at the Library of
5    Congress?
6    A  Describe my positions?
7    Q  Yes, that's a simpler way to do it. Have you
8    held more than one job there?
9    A  No. I've always been chief of the Rare Books
10   since the day I arrived.
11   Q  Okay. And what year did you start?
12   A  1998.
13   Q  Has your position changed over time?
14   A  Maybe in responsibilities but not in
15   description.
16   Q  Okay. What do you do as the chief of the
17   Rare Book and Special Collections?
18   A  Rare Book and Special Collections Division.
19   Q  Division.
20   A  As a Special Collections chief I'm
21   responsible for the rare book collection, the nation's
22   rare book collection, which is currently about 800,000

7

1    which makes it the largest in North and South America.
2    I'm responsible at a curatorial and subject specialist
3    level as a level of expertise. I'm responsible for the
4    security, the delivery, the access, and the
5    interpretation of the nation's rare book collection, to
6    researchers in the division and to the nation as a
7    whole.
8       I oversee all other subject specialists who
9    are in subject categories of curatorial control. I'm
10   responsible for the Public Services operations of the
11   division, reference and the reading rooms. I oversee
12   the in-house processing. I select and develop and
13   guide the digital programs and the representation of
14   all rare materials for the Library of Congress.
15      I as a chief, in essence like a team leader,
16   would also be responsible for the routine kinds of
17   things like personnel, hiring, budget, facilities.
18      I serve at the request of the librarian to
19   represent the Library, and I represent the Library of
20   Congress in national and international issues regarding
21   antiquarian materials in general and specifically rare
22   books.

8

1       I oversee through dotted line relationships
2    the purchase of rare book materials. With one team I
3    have dotted line relationship with the cataloging team
4    which catalogues my rare books for me and then
5    preservation for the care of the collections.
6    Q  What do you mean when you say you had, I'm
7    not sure I caught the phrase, but dotted line
8    authority?
9    A  They don't report to me but I control the
10   policy. That is I shape the cataloging profile that
11   another team does. I determine the preservation
12   profile for my materials that another team carries out.
13   I determine how we buy and have books delivered to us
14   that another team carries out.
15   Q  When you say cataloging profile, what do you
16   mean by that?
17   A  How you describe a rare book using certain
18   categories for online information, the level of
19   description.
20   Q  When you use the term preservation profile,
21   what do you mean by that?
22   A  Establish the criteria for how my books are

65

1 accurate? Less than a year.
2    Q Well, I think I could probably pinpoint with
3 some reference to a document. I wanted to see what you
4 recalled.
5    A I did one cycle of performance evaluations.
6    Q And when you say that, what do you mean by
7 that?
8    A Performance evaluations are done on an annual
9 basis. As assistant director I did one cycle. So that
10 would suggest to me that it's somewhere between a year
11 and just up to the second round of appraisals.
12    Q Okay. When you say you did a cycle of
13 performance evaluations, do you mean for the division
14 chiefs within your unit?
15    A As assistant director I did the appraisals
16 for the chiefs in Special Collections.
17    Q Okay. What was involved in that performance
18 evaluation process for the division chiefs?
19    A It grew out of the monthly meetings with each
20 of the chiefs which was why that meeting was organized
21 around the principles of the evaluation. My
22 responsibility was to write the narrative based on the

66

1 goals and objectives, that structure, that level of
2 performance evaluation, performance goals really, did
3 the entire narrative, discussed it with Carolyn Brown
4 who was the director of Collections and Services, and
5 then participated in the actual interview with the
6 chief and the director regarding their performance
7 evaluation. I suggested rankings that were then
8 approved or altered by Carolyn Brown.
9    Q Okay. And who did your performance
10 evaluation when you were assistant director?
11    A Carolyn Brown.
12    Q And was your performance evaluated with
13 regard to your performance as assistant director?
14    A There was a separate document regarding my
15 assistant directorship.
16    Q Let me see if I understand what you said.
17 Miss Brown did your performance evaluation as chief of
18 the Rare Book Division when you were also serving as
19 assistant director, is that right?
20    A Yes.
21    Q And then there was a second performance
22 evaluation done with respect to your performance as the

67

1 assistant director?
2    A More of an addendum. Yes.
3    Q Okay. And that was also done by Miss Brown?
4    A Yes, as I recall.
5    Q Okay. Would that be something that would be
6 in your personnel file?
7    A Probably.
8    Q Is that where everyone's evaluations are
9 normally kept by the Library?
10    A I have never seen my personnel file, so I
11 can't answer that question.
12    Q Okay. Fair enough. How did it come to be
13 that your role as assistant director ended?
14    A I was informed that I would no longer be
15 serving as assistant director by Deanna Marcum in a
16 meeting.
17    Q Do you remember when the meeting occurred?
18    A Not by date I don't, no.
19    Q Sometime in 2005?
20    A Yes.
21    Q Who was present at the meeting?
22    A Steve Herman, myself, Deanna Marcum.

68

1    Q Was Miss Brown there as well?
2    A I don't recall her being there. It's quite
3 possible she was there.
4    Q How did the meeting start? Do you remember
5 it?
6    A It was very short. Deanna ran the meeting.
7 Deanna said that she was calling us in to inform us
8 sadly that we were to not be operating any longer under
9 the position of assistant director for Special
10 Collections.
11    Q Did she explain why?
12    A She said that there had been an objection
13 raised by another staff member regarding the rank of
14 the assistant directorships, and that in order to
15 respond to the situation that she was terminating all
16 of the positions.
17    Q Did she identify the individual?
18    A I don't recall whether she did or not, but
19 since Steve Herman and I were both there, one naturally
20 assumed it was Judy.
21    Q Judy Mansfield?
22    A Yes.

69

1    Q  Okay.  Do you remember anything else that
2    Miss Marcum said at the meeting?
3       A  I don't recall the precise words.  I believe
4    there was a sentiment that she felt this was
5    unfortunate in terms of the fact that we had been doing
6    good work.  I believe that's it.
7       Q  Did you ever get any feedback from Miss
8    Marcum as to your performance as an assistant director?
9       A  Verbal.
10      Q  And what did Miss Marcum say?
11      A  It was based on particular aspects of
12   performance, not in the sense as I recall an official
13   performance conversation.  More like you did a great
14   job with the embassy.  Read the report on the Special
15   Collections meeting regarding space, I think that's a
16   big issue.
17      Q  Was Miss Marcum's feedback about your
18   performance as assistant director positive then?
19      A  For me?
20      Q  Yes.
21      A  Yes.
22      Q  Did Miss Marcum ever express any negative

70

1    sentiments about your performance as assistant
2    director?
3       A  Not that I can recall.
4       Q  Okay.  Do you remember anything you said at
5    the meeting where Miss Marcum announced that the
6    assistant director positions were going to be
7    eliminated?
8       A  Yes.  I said I was extremely disappointed.
9       Q  Why did you say that?
10      A  Because I was extremely disappointed.
11      Q  Okay.  Why were you extremely disappointed?
12      A  Because it eliminated an important position
13   in terms of Special Collections in the nation's
14   library.  This was an important change for Special
15   Collections and was much revered nationwide, number
16   one.
17         Number two, it took away from me an
18   opportunity to do really important programmatic work at
19   a higher level of collection development and public
20   outreach.
21         And number three, I couldn't quite see why
22   removing two extremely active and qualified people was

71

1    solving the problem anywhere.
2       Q  And were you referring to yourself and Mr.
3    Herman?
4       A  Yes.
5       Q  And did Miss Marcum say anything when you
6    said you were extremely disappointed?
7       A  She apologized and said that this was the
8    solution that seemed appropriate given the issue a
9    hand.
10      Q  Is that the way she put it?
11      A  I can't recall how she said it directly.
12   That's how I received it.
13      Q  Okay.  Do you remember anything that Mr.
14   Herman said at the meeting?
15      A  Steve as I recall was much quieter, though
16   visibly upset.  Both of us were quite surprised that
17   this was the nature of the meeting.
18      Q  Why were you surprised?
19      A  Didn't see it coming.  Had no idea.
20      Q  Do you remember anything else about the
21   meeting, anything else said?
22      A  There was reference to counsel, advice of

72

1    counsel, or there was some reference to counsel as if
2    Deanna had somehow or another talked to counsel.  I
3    took by that she meant OGC, Office of General Counsel.
4    There was clarification of what that meant.  I think I
5    asked "What does this mean?"  We were told that we
6    would not be coming to directors meetings, but that she
7    would like to be able to call upon us to do additional
8    work for her if it became necessary.
9       Q  Did Miss Marcum say anything else when you
10   said "What does this mean"?
11      A  I don't recall anything else.  It was a
12   shock.  This meeting was a shock.  So what I remember
13   mostly is just being really pissed off.  But I don't
14   recall any further clarification, I think in part
15   because being told that you no longer will be attending
16   the directors meetings pretty much puts it into light
17   as to what it meant.
18      Q  What did it mean to you that you would no
19   longer be attending the directors meetings?
20      A  It meant the assistant directorships did not
21   exist any longer, that the collateral assignment was
22   over with, and that we would be reporting to Carolyn

89

1    MR. FREDRICKSON: May I have this marked as
2 Plaintiff's Exhibit Number 24 please.
3    (Deposition Exhibit 24 was marked for
4 identification and was retained by counsel.)
5 BY MR. FREDRICKSON:
6    Q I'm going to have handed to you Plaintiff's
7 Exhibit Number 24, and ask you to examine it if you
8 would. Are you familiar with Plaintiff's Exhibit
9 Number 24?
10    A Yes.
11    Q That's a Notification of Personnel Action for
12 you with an effective date of January 9, 2005, is that
13 right?
14    A Yes.
15    Q Do you remember were you the assistant
16 director at this point in time?
17    A I don't recall.
18    Q Okay. Let me come back to that. Am I
19 correct that you were paid a total salary with locality
20 adjustment of $149,200 in January 2005?
21    A Yes.
22    Q Did you have any compensation provided to you

90

1 by the Library of Congress over and above the $149,200
2 per year; in other words, bonus or anything like that?
3    A For 2005?
4    Q Right.
5    A No, not that I recall. A bonus?
6    Q When you're an SL employee I understand you
7 have a performance appraisal system, is that right?
8    A Yes.
9    Q And you're rated in different elements, is
10 that right?
11    A Yes.
12    Q Four different elements if I'm not mistaken?
13    A Yes.
14    Q And are there cash awards that are connected
15 with the ratings given to you in the performance
16 evaluation system for SL employees?
17    A Yes. I see what you're asking me. I don't
18 recall in 2005. Yes, I've had superior rankings, so I
19 suspect money has come, but that's not reflected in my
20 salary. I see what you're asking me. I believe I
21 probably did in 2005.
22    Q Is the number that appears on Plaintiff's

91

1 Exhibit Number 24, $149,200, was that at the cap for
2 employees at the Library of Congress at the time, do
3 you know?
4    A I have no idea.
5    Q Were you considered an SL level IV employee
6 at that point in time in January of 2005?
7    A I have no idea.
8    Q I'm going to hand you what's been marked as
9 Plaintiff's Exhibit Number 16 from a prior deposition,
10 and ask you to examine it if you would. Have you had a
11 chance to read Plaintiff's Exhibit Number 16?
12    A Yes, I have.
13    Q And Plaintiff's Exhibit Number 16 is a
14 memorandum dated April 13th, 2005 to the directors and
15 division chiefs from Deanna Marcum, is that right?
16    A Yes.
17    Q And it's regarding the elimination of the
18 assistant director positions, isn't it?
19    A Yes.
20    Q Now, you remember when I asked you in January
21 2005 whether you were still the assistant director?
22    A Yes.

92

1    Q Looking at Plaintiff's Exhibit Number 16,
2 does that help tell you whether you were an assistant
3 director in January of 2005?
4    A It suggests that I probably was. Yes.
5    Q Did you see Plaintiff's Exhibit Number 16,
6 that is the April 13, 2005 memo from Deanna Marcum in
7 April of 2005?
8    A Yes.
9    Q Do you remember seeing it?
10    A Yes.
11    Q What was your reaction to it?
12    A I was infuriated.
13    Q Why?
14    A Because it's not the truth.
15    Q How so?
16    A I was given no indication whatsoever that my
17 position had not worked out as intended.
18    Q Did you do anything about that?
19    A No.
20    Q Why not?
21    A Because I'm a member of the Library, and if
22 this is what the Library Services felt it needed to

DEPOSITION OF MARK G. DIMUNATION
Case 1:05-cv-01790-RMC CONDUCTED ON FRIDAY, FEBRUARY 09, 2007 Document 23-27 Page 37 of 63

25 (Pages 97 to 100)

97

1    A  Yes. Classification: GS, SL.

2    Q  Okay. And when you say it was a complaint by

3  the other assistant director, you mean Judy Mansfield?

4    A  Yes.

5    MR. FREDRICKSON: Nothing further.

6    MR. JAMES: Nothing.

7    (Signature having not been waived, the

8  deposition of Mark G. Dimunation was concluded at 4:15

9  p.m.)

99

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2    I, Nancy Bond Rowland, Registered

3  Professional Reporter, the officer before whom the

4  foregoing proceedings were taken, do hereby certify

5  that the foregoing transcript is a true and correct

6  record of the proceedings; that said proceedings were

7  taken by me stenographically and thereafter reduced to

8  typewriting under my supervision; and that I am neither

9  counsel for, related to, nor employed by any of the

10  parties to this case and have no interest, financial or

11  otherwise, in its outcome.

12    IN WITNESS WHEREOF, I have hereunto set my

13  hand and affixed my notarial seal this 15th day of

14  February 2007.

15

16  My commission expires:

17  October 31, 2009

18

19

20  _____

21  NOTARY PUBLIC IN AND FOR THE

22  DISTRICT OF COLUMBIA

98

1    ACKNOWLEDGMENT OF DEPONENT

2    I, Mark G. Dimunation, do hereby acknowledge

3  that I have read and examined the foregoing testimony,

4  and the same is a true, correct and complete

5  transcription of the testimony given by me and any

6  corrections appear on the attached Errata Sheet signed

7  by me.

8

9  _____

10  (DATE)          (SIGNATURE)

100

1    E R R A T A   S H E E T

2    IN RE: Mansfield v. USA

3  RETURN BY: _____

4  PAGE LINE  CORRECTION AND REASON

5  ___ ___ _____

6  ___ ___ _____

7  ___ ___ _____

8  ___ ___ _____

9  ___ ___ _____

10  ___ ___ _____

11  ___ ___ _____

12  ___ ___ _____

13  ___ ___ _____

14  ___ ___ _____

15  ___ ___ _____

16  ___ ___ _____

17  ___ ___ _____

18  ___ ___ _____

19  ___ ___ _____

20  ___ ___ _____

21  ___ ___ _____

22  (DATE)      (SIGNATURE)

JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

# Exhibit 8

## Excerpts
## Deposition of Steven Herman
## 1/31/07

**1**

1  UNITED STATES COURT OF FEDERAL CLAIMS
2
3
4  ------------------------------X
5  JUDITH A. MANSFIELD,      :
6          Plaintiff : Civil Action
7       v.       : No. 05-472C
8  THE UNITED STATES OF AMERICA,  : Judge Williams
9          Defendant :
10 ------------------------------X
11
12
13      Deposition of STEVEN J. HERMAN
14          Washington, D.C.
15        Wednesday, January 31, 2007
16          9:40 a.m.
17
18
19
20 Job No.: 1-95857
21 Pages 1 - 81
22 Reported by: Nancy Bond Rowland

**3**

1         A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF:
3      BRUCE A. FREDRICKSON, ESQUIRE
4      WEBSTER, FREDRICKSON & BRACKSHAW
5      1775 K Street, N.W., Suite 600
6      Washington, D.C. 20006
7      (202) 659-8510
8
9  ON BEHALF OF DEFENDANT:
10     DOUGLAS K. MICKLE, ESQUIRE
11     UNITED STATES DEPARTMENT OF JUSTICE
12     Commercial Litigation/National Courts
13     1100 L Street, N.W., Room 4062
14     Washington, D.C. 20005
15     (202) 307-0383
16
17     JESSIE JAMES, JR., ESQUIRE
18     JULIA DOUDS, ESQUIRE
19     LIBRARY OF CONGRESS
20     101 Independence Avenue, S.E.
21     Washington, D.C. 20540
22     (202) 707-7464

**2**

1      Deposition of STEVEN J. HERMAN, held at the
2  offices of:
3
4      Webster, Fredrickson & Brackshaw
5      1775 K Street, N.W.
6      Suite 600
7      Washington, D.C.
8
9      Pursuant to agreement, before Nancy Bond
10 Rowland, Registered Professional Reporter and Notary
11 Public in and for the District of Columbia.
12
13
14
15
16
17
18
19
20
21
22

**4**

1            C O N T E N T S
2  EXAMINATION OF STEVEN J. HERMAN        PAGE
3   By Mr. Fredrickson           5
4
5
6            E X H I B I T S
7         (Retained by counsel)
8  DEPOSITION EXHIBIT              PAGE
9  10 - Personnel Action Recommendation.      33
10 11 - Notification of Personnel Action.      35
11     Bates no. 001081
12 12 - Position Description.           37
13     Bates no. 001592 - 001601
14 13 - E-mail dated 8/6/04.           46
15 14 - Notification of Personnel Action.      65
16 15 - 2004 Performance Appraisal.       67
17     Bates no. 001207 - 001208
18 16 - Memo dated 4/13/05.          74
19     Bates no. 121
20
21
22

5

1  PROCEEDINGS
2  STEVEN J. HERMAN
3  having been duly sworn, testified as follows:
4  EXAMINATION BY COUNSEL FOR PLAINTIFF
5  BY MR. FREDRICKSON:
6  Q  Could you state your name please?
7  A  Steven, S-t-e-v-e-n, middle initial J,
8  Herman, H-e-r-m-a-n.
9  Q  And where do you work?
10  A  Library of Congress.
11  Q  What's your position with the Library of
12  Congress?
13  A  Chief - Collections, Access, Loan, and
14  Management Division.
15  Q  When did you start working at the Library of
16  Congress?
17  A  December 24th, 1973. Christmas Eve 1973.
18  Q  You worked one day and you had a day off?
19  A  No. Actually I didn't work that day. It was
20  a Monday, and it was my reporting day, and it was the
21  time of the gas crisis and all the long lines, and so
22  they closed the government both the Monday before

6

1  Christmas and the Monday before New Year's because of
2  the gas crisis. So I actually started work on
3  Wednesday, but I got paid on Monday, but just had the
4  next Monday and Tuesday off for New Year's. But I
5  digress.
6  Q  What a great start.
7  A  Yes, it was actually.
8  Q  Good timing. Could you give me an overview
9  of your career at the Library of Congress in terms of
10  position and progression?
11  A  At the Library of Congress?
12  Q  Right.
13  A  Sure. I was hired as the assistant for
14  Network Support at what is now the National Library
15  Service for the Blind and Handicapped. I came to the
16  Library as a GS-13. That was the initial grade of the
17  position. And I was in that position until January
18  31st, 1977 when I came to — There have been a number
19  of changes in the division, but it's basically the
20  same. It was called the Stack and Reader Division at
21  that time. It was a promotion to a GS-14.
22  Q  What was your position in Stack and Reader?

7

1  A  Chief. I was chief of the division.
2  Q  In the first job you held, the Network
3  Support, was that a chief position as well?
4  A  No. It was just called assistant for Network
5  Support. It was under the chief for Network
6  Development. It was kind of an assistant to him.
7  Q  All right. So you first became a division
8  chief in 1977?
9  A  In 1977, right. Then the division was
10  reorganized in 1978. There was a major Library
11  reorganization, and the division became the Collections
12  Management Division. And then about five years ago
13  there was another reorganization, and it became the
14  Collections, Access, Loan, and Management Division.
15      During that time the position was first
16  upgraded with some additional responsibilities to a
17  GS-15, and most recently about eight years ago in I
18  think March of '99 it was upgraded to senior level
19  which is the current grade of the position. So that's
20  close to eight years as a senior level position.
21  Q  You say that the reorganization occurred and
22  the division became the Collections, Access, Loan, and

8

1  Management Division about five years ago. Can you
2  pinpoint in time a little better when that might have
3  been?
4  A  I think it was January — Well, I think it
5  was approved in January 2001. So five or six years
6  ago. I think it was 2001 was the initial approval from
7  the deputy librarian for the proposal. Actually we're
8  still in the process. It's a transition. It's a very
9  long transition, but it became the Collections, Access,
10  Loan, and Management Division rather than the
11  Collections Management Division in 2001. I'm pretty
12  sure that is what it was.
13  Q  Okay. Was there a substantive change in 2001
14  from the perspective of your job?
15  A  There was some restructuring, but I think the
16  major thing was that actually two divisions merged into
17  one, the Collections Management Division and there was
18  a separate Loan Division at that point. The chief of
19  the Loan Division was retiring, and there's always been
20  kind of a very close link of activities between the
21  Collections Management and the Loan functions, and so
22  the decision was made to merge the two into one

41

1  books, not with documents.
2      MR. FREDRICKSON: You have a volunteer for
3  the job.
4      MR. JAMES: I mean, we'll check, but it may
5  not be there.
6      MR. FREDRICKSON: Okay. Thank you.
7      MR. JAMES: As a matter of fact, you have the
8  management document person for that this afternoon.
9      MR. FREDRICKSON: All right.
10     MR. JAMES: You can ask him.
11 BY MR. FREDRICKSON:
12     Q  Let me ask you this, shifting gears a little
13 bit. Did there come a point in time when you became an
14 assistant director in another reorganization that
15 occurred in around 2004?
16     A  Yes.
17     Q  How did that come about?
18     A  How did it come about? There was an
19 organization chart that was put out by Library
20 Services. There was a reorg. or realignment of Library
21 Services, and in there there were a number of
22 directors, and under a number of those directors there

42

1  were assistant directors in some of the largest
2  directorates.
3      And so I was called in by Deanna Marcum, and
4  she asked me if I'd be interested in assuming the
5  assistant director position for -- I don't have the
6  chart. I think it was assistant director for
7  Collections Management is what the formal title was.
8  It showed that there would be I think three or four
9  programs under Collections Management including the
10 Baseline Inventory Program, Photoduplication Service,
11 Digital Reference Team, and Collections, Access, Loan,
12 and Management Division, CALM.
13     I don't remember the whole discussion, but it
14 was a collateral duty. It was not a separate job.
15 There was never any discussion of moving out of CALM,
16 chief of CALM, and doing something. These were kind of
17 in addition to the regular position that I was in.
18     I was thrilled to do this because I really
19 enjoy planning, managing. I've been in this job for 30
20 years, and I really love being able to be part of
21 planning, brainstorming. And one of the perks of being
22 an assistant director was being part of what they

43

1  called the directors group where they meet every week,
2  and that was supposedly the group that Deanna chaired
3  that really would be able to brainstorm and talk
4  through things and come up with plans for the future
5  and all that. So probably the greatest incentive for
6  me was being able to be part of this planning group and
7  this program group.
8      So I said Great. This sounds fantastic. I
9  was thrilled. You know, yes. So that was the way it
10 came about. I think that was also the meeting I
11 actually found out who the director would be, my boss
12 would be at that point, Carolyn Brown.
13     So that was how it came about, but it was
14 clear that these were not standalone jobs, that these
15 were collateral duties, because I asked that because I
16 really loved what I was doing and didn't want to move
17 out of my division either, out of CALM, because I was
18 involved in so much. So this was not an either/or.
19 This was kind of an additional part of this.
20     Q  And it was Miss Marcum that asked you to be
21 the assistant director?
22     A  Yes.

44

1      Q  Did you immediately accept?
2      A  Oh, yeah. Yes.
3      Q  And why do you say that "Oh, yeah"?
4      A  Because I really wanted it, because I really
5  was thrilled to be offered it, because I thought it
6  would be great to do.
7      Q  Because you'd be part of the upper echelon of
8  the Library's management?
9      A  Yes. I had been kind of with the two
10 directors before Carolyn, one of the senior chiefs, so
11 I had been involved in a lot. And once again, just the
12 nature of my position in the largest division and was
13 involved with very high visibility things like security
14 and inventory management and space, kind of pretty much
15 had an unofficial role kind of helping out, kind of
16 substituting, going to meetings with my boss to do
17 presentations. I did a lot of the budget development
18 and presentations for some of the programmatic things.
19     And so I was kind of hoping that when the new
20 administration came in which was Deanna and Bob when
21 there was a change, that there would be a seat for me
22 somewhere in this to continue to do some of the

45

1  planning and programmatic things that I really love
2  doing and have been doing for close to 30 years.
3      So when she offered me this and said that
4  this would involve coming to directors meetings and all
5  that which I thought was kind of the place where all
6  the action took place, the real programmatic and
7  discussion and planning, I was thrilled.
8      Q  And when you say Deanna and Bob, who are you
9  referring to?
10     A  I'm sorry. Deanna Marcum who was the
11 associate librarian for Library Services. Actually I
12 don't think Bob was there yet, Bob Dizard, D-i-z-a-r-d,
13 who's the deputy associate librarian. This meeting was
14 only with Deanna. It was not with Bob.
15     Q  All right. And I think you said it would be
16 when you became the assistant director, you thought
17 you'd be involved in the directors meetings, is that
18 right?
19     A  Yes.
20     Q  And I think the phrase you used was that was
21 where you thought all the action took place?
22     A  Well, yes. I mean, a lot of the program

46

1  planning, the brainstorming, the presentations of
2  different things, things I really wanted to be involved
3  with, cutting edge, you know, that type of thing, and
4  be a part of that.
5      MR. FREDRICKSON: May I have this marked as
6  Plaintiff's Exhibit Number 13 please.
7      (Deposition Exhibit 13 was marked for
8  identification and was retained by counsel.)
9  BY MR. FREDRICKSON:
10     Q  Have you had a chance to look at Plaintiff's
11 Exhibit Number 13?
12     A  Yes.
13     Q  Plaintiff's Exhibit Number 13 is an e-mail
14 that is titled Weekly News, is that right?
15     A  Yes.
16     Q  And does this document announce your becoming
17 assistant director for Collections Management?
18     A  Yes.
19     Q  Does that help pinpoint the time frame of
20 when you became the assistant director?
21     A  Yes.
22     Q  When was that?

47

1      A  August 6th, 2004.
2      Q  And page 2 of Plaintiff's Exhibit 13 has an
3  organizational chart. Is that the organizational chart
4  you referred to before?
5      A  Yes.
6      Q  It says in the lower right-hand corner there
7  on page 2 of Plaintiff's Exhibit Number 13, it says
8  July 2004. Do you see that?
9      A  Yes.
10     Q  Now, this has got the layout of the new
11 organization for Library Services, is that right?
12     A  Yes.
13     Q  Is that what came to be, was this the new
14 organization for Library Services in the summer of 2004
15 then?
16     A  Yes.
17     Q  Am I right there, I'm looking at the second
18 column from the left there, you fell in the Collections
19 and Services column, is that right?
20     A  Yes.
21     Q  What is that unit called, Collections and
22 Services, was it a directorate?

48

1      A  Directorate.
2      Q  Directorate. Okay. So you were the
3  assistant director for Collections Management within
4  the Collections and Services Directorate, is that
5  right?
6      A  Yes.
7      Q  Okay. Now, underneath your title which says
8  Collections Management, Steve Herman, assistant
9  director, it's got four items, right?
10     A  Yes.
11     Q  Okay. Baseline Inventory Program was one.
12 Do you see that?
13     A  Yes.
14     Q  What was that?
15     A  That's the eight-year inventory effort that
16 was being coordinated that I had written the proposal
17 for that we got the eight-year funding from Congress to
18 do the inventory of the 17 million items in the general
19 collections law library and area studies collections.
20     Q  When you became assistant director, how many
21 staff members worked within your unit in Collections
22 Management?

69

1    A  No.
2    Q  Is outstanding the top?
3    A  Outstanding is the top.
4    Q  How does successful fit in the scheme?
5    A  It's the middle.
6    Q  The middle. Do you know how many levels
7    there are?
8    A  Outstanding, there's something above
9    successful, there's successful, marginal, and
10   unsatisfactory. I don't know if it's four or five
11   ratings, but outstanding is the top.
12   Q  I believe I understood what you said, but I
13   just want to check and see if this is the way it
14   worked. Am I right that your bonus was determined by
15   how you are rated on these four elements set forth in
16   the performance appraisal?
17   A  Yes.
18   Q  So it's just math from once your supervisor
19   sets the various -- rated you in the various elements,
20   it was just math to figure out what your bonus was, is
21   that right?
22   A  My understanding is there was a certain

70

1    number of dollars for an outstanding, a certain number
2    of dollars for an exceeds, successful, whatever the
3    terminology is. Each of those had a certain dollar
4    value for each factor attached to it that determined
5    the additional money in addition to your base salary.
6    Q  Okay. Did you think that the performance
7    evaluations you received for your performance in 2004
8    was an accurate performance assessment?
9    A  Yes.
10   Q  After the assistant director positions were
11   abolished, did you ever get back to attending the
12   directors meetings?
13   A  No.
14   Q  How do you feel about that?
15   A  Upset, annoyed, angry, not happy.
16   Q  Okay.
17   A  I've attended a few only because there have
18   been a couple of times I was acting when Jeremy was not
19   there and was acting. If he wasn't there on a Tuesday,
20   I attended in his place, but not in my position or
21   anything like that.
22   Q  Why do you feel angry?

71

1    A  Because I really enjoyed doing it, and I
2    worked hard, and I worked hard when I was in the
3    position, and I enjoyed it, and I liked doing that, and
4    I was not happy that it was terminated and through
5    nothing that I did. I worked really hard to justify
6    the faith that she had in assigning these and, you
7    know, I was angry that this was taken away from me
8    because nothing I did and nothing I could change or
9    modify.
10   Q  Since you are no longer the assistant
11   director, are you involved at the same level that you
12   were when you were assistant director, for example, the
13   strategic planning of the Library Services?
14   A  No.
15   Q  Any new programmatic developments, are you
16   involved in that as you were when you were assistant
17   director?
18   A  No.
19   Q  Is there anything else you can think of that
20   you've lost out on as a result of the position of
21   assistant director being abolished?
22   A  Well, status, certain recognition among peers

72

1    that I had done a good job and was recognized. As I
2    said, there was a certain level of embarrassment
3    because there was still this thing looming as to why
4    these positions was abolished, and all of us were very
5    reluctant certainly to just say because somebody had
6    complained, and so we try to say it was a difference
7    of — You know, people would approach and say What did
8    you do or this kind of thing.
9       So in addition to the whole planning and
10   being that avenue, I mean, once again people remember
11   that we were in these positions and now we're not in
12   these positions, and there's never I think been any
13   open discussion of why, and so there's still this thing
14   about what did we do wrong type thing.
15   Q  How do you feel when somebody approaches you
16   and asks you about what happened?
17   A  I mean, it's less now than it was the first
18   month or two when all kinds of rumors were flying, Gee,
19   it was you who did this, you know, that kind of thing.
20   So there's less of it now, but I still feel the loss of
21   something that I really enjoy doing.
22   Q  What were the rumors that you were referring

73

1 to?

2 A Well, there were rumors what did we do wrong.

3 The assumption is somebody did something wrong. All of

4 a sudden after less than a year, the positions that

5 were there aren't there, and there's an announcement

6 that comes out just really saying we're reassessing. I

7 can't remember the exact words, but this was just one

8 model and we're looking at other models, and I'm saying

9 Gee, doesn't look good, and people said what really

10 happened or what went on or why did she abolish these

11 positions. It put Mark and me certainly in a very

12 difficult position. There was a status part of this

13 and a recognition part of it, and it was gone.

14 Q When you accepted the position of assistant

15 director, did anybody tell you that you'd be assistant

16 director for any kind of time period or anything like

17 that?

18 A No.

19 Q Did anybody suggest that it was just a

20 temporary assignment as assistant director?

21 A No.

22 MR. FREDRICKSON: I'd like to take a short

74

1 break, ten minutes, to review my notes. I think I've

2 gotten through most of the questions I wanted to ask

3 you, but I always like to take a bit of time and make

4 sure, if you'll bear with me.

5 THE WITNESS: Okay.

6 (Recess)

7 MR. FREDRICKSON: May I have this marked as

8 Plaintiff's Exhibit Number 16 please.

9 (Deposition Exhibit 16 was marked for

10 identification and was retained by counsel.)

11 BY MR. FREDRICKSON:

12 Q Have you had a chance to read Plaintiff's

13 Exhibit Number 16?

14 A Yes.

15 Q Have you seen it before?

16 A Yes.

17 Q Can you tell me what Plaintiff's Exhibit

18 Number 16 is?

19 A It's an announcement from the associate

20 librarian, Deanna Marcum, to the directors and division

21 chiefs in which she's saying that the assistant

22 directors are no longer going to be there and they're

75

1 going to look at other options.

2 Q You had mentioned that when an announcement

3 went out, you were disappointed with it?

4 A Yes.

5 Q Is this the announcement you're referring to,

6 that is the document marked as Plaintiff's 16?

7 A Yes.

8 Q What disappointed you about the announcement

9 that's been marked as Plaintiff's Exhibit Number 16?

10 A I was hoping there would be something more

11 personal there about the job we had done in the past

12 and thanking the people who had done it by name for

13 doing this kind of thing, and I found it to be somewhat

14 bureaucratic and impersonal as far as what we had

15 really tried to do in taking those jobs very seriously,

16 and to try to make it a little more personal as far as

17 positive for the three people who had done this, and we

18 found this to be somewhat more impersonal.

19 Q I believe you said earlier that some people

20 had maybe asked you or suggested perhaps that maybe you

21 had done something wrong in the position of assistant

22 director, is that right?

76

1 A Yes.

2 Q Let me direct your attention to the third

3 sentence there in Plaintiff's Exhibit Number 16. It

4 says "At my suggestion the directors of Acquisitions

5 and Bibliographic Access and Collections and Services

6 name three division chiefs to take on collateral duties

7 as assistant directors, but these positions have not

8 worked out as intended, so I have eliminated the three

9 coordinating positions." On that particular sentence,

10 what was your reaction to that?

11 A Didn't like it.

12 Q Why is that?

13 A Because it made it sound like we did

14 something wrong. It just invites people to speculate

15 on what has not worked out as intended meant, and I

16 think it was a very unfortunate choice of words for us

17 personally because it invited a lot of questions and

18 issues as to why they didn't work out as intended, and

19 we had worked very hard to make these work and thought

20 they were working successfully.

21 MR. FREDRICKSON: Okay. Thank you. I don't

22 have anything further.

77

1        MR. JAMES: We don't have anything, and we'll

2    read.

3        (Signature having not been waived, the

4    deposition of Steven J. Herman was concluded at 11:30

5    a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

79

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Nancy Bond Rowland, Registered

3    Professional Reporter, the officer before whom the

4    foregoing proceedings were taken, do hereby certify

5    that the foregoing transcript is a true and correct

6    record of the proceedings; that said proceedings were

7    taken by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am neither

9    counsel for, related to, nor employed by any of the

10    parties to this case and have no interest, financial or

11    otherwise, in its outcome.

12        IN WITNESS WHEREOF, I have hereunto set my

13    hand and affixed my notarial seal this 6th day of

14    February 2007.

15

16    My commission expires:

17    October 31, 2009

18

19

20    _____

21    NOTARY PUBLIC IN AND FOR THE

22    DISTRICT OF COLUMBIA

78

1        ACKNOWLEDGMENT OF DEPONENT

2        I, Steven J. Herman, do hereby acknowledge

3    that I have read and examined the foregoing testimony,

4    and the same is a true, correct and complete

5    transcription of the testimony given by me and any

6    corrections appear on the attached Errata Sheet signed

7    by me.

8

9    _____    _____

10    (DATE)            (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

80

1        E R R A T A  S H E E T

2    IN RE: Mansfield v. USA

3    RETURN BY: _____

4    PAGE LINE CORRECTION AND REASON

5    ___ ___ _____

6    ___ ___ _____

7    ___ ___ _____

8    ___ ___ _____

9    ___ ___ _____

10    ___ ___ _____

11    ___ ___ _____

12    ___ ___ _____

13    ___ ___ _____

14    ___ ___ _____

15    ___ ___ _____

16    ___ ___ _____

17    ___ ___ _____

18    ___ ___ _____

19    ___ ___ _____

20    ___ ___ _____

21    ___ ___ _____

22    (DATE)        (SIGNATURE)

JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

# Exhibit 9

## Excerpts
## Deposition of Judith Mansfield
## 4/17/07

1

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS


- - - - - - - - - - - - - - - x

JUDITH A. MANSFIELD,                    :

       Plaintiff,               :    Civil Action No.

    v.                              :    05-472C

THE UNITED STATES,                      :

      Defendant.                   :

- - - - - - - - - - - - - - - x

                  Tuesday, April 17, 2007

                  Washington, D.C.


     Deposition of JUDITH A. MANSFIELD,

commencing at 9:38 a.m., held at the The Library of

Congress, 101 Independence Avenue, S.E.,

Washington, D.C., before Keith Wilkerson, a notary

public in and for the District of Columbia.

Case 1:05-cv-01790-RMU    Document 23-2    Filed 09/20/2007    Page 48 of 63

---

**206**

1  at the same rate that Mr. Herman and Mr. Dimunation
2  were being paid when they were first in the
3  assistant director's position?
4      A.  Yes.
5      Q.  So you believe that in that capacity the
6  three of you were doing the same thing?
7      A.  Yes.
8      Q.  Now, you also believe that, based on your
9  expert's findings, that you should have been paid
10  at the same rate as Mr. Herman and Mr. Dimunation
11  when they were in their chief's position and you
12  were in your Chief of the Arts and Sciences
13  Cataloging Division. Is that correct?
14      A.  Yes.
15      Q.  So tell me, in the second capacity, when
16  you are in your chief's capacity, what duties did
17  you perform that were the same or similar to those
18  performed by Mr. Herman and Mr. Dimunation when
19  they were in their chief's positions?
20      A.  I'm not qualified to answer that
21  question.
22      Q.  So you're not qualified. Let me ask you

---

**207**

1  this --
2      A.  I don't have their information or their
3  PDs.
4      Q.  I'd like to have this document marked as
5  Library Exhibit No. 54.
6          (Library Exhibit No. 54
7          was marked for identification.)
8      Q.  Take a look at Library Exhibit 54. What
9  is Library Exhibit 54?
10      A.  It's the old position description for the
11  Chief of the Arts and Sciences Cataloging Division.
12      Q.  And was that your position at the time?
13      A.  Yes.
14      Q.  Let's go to the page that's listed as
15  page 15. Let's go to the first category, which
16  says Supervision Received. What in this paragraph
17  are the same as the duties performed by Mr. Herman
18  and Mr. Dimunation?
19      A.  As I said, I cannot answer these
20  questions because I don't know their duties as
21  chief.
22      Q.  So how is it that you're basing your

---

**208**

1  claim that you were discriminated against on the
2  basis of your sex and that it's a violation of the
3  Equal Pay Amendment?
4          MR. FREDRICKSON:  You mean other than
5  what she's already said today?
6          MR. JAMES:  Yes.
7          MR. FREDRICKSON:  You may answer.
8      A.  I know about what they do as assistant
9  directors. I cannot address their positions as
10  chief and compare them to my position. I'm only
11  citing the report of the expert.
12      Q.  So you're not relying on a comparison of
13  the position descriptions themselves?
14      A.  I think the expert probably relied on --
15      Q.  Other than what the expert has told you
16  and prepared, do you have any other information
17  upon which you are relying to say that you
18  performed the same duties as Mr. Herman and
19  Mr. Dimunation?
20      A.  No.
21      Q.  Nothing else?
22      A.  No, not when we were chiefs.

---

**209**

1          (Recess.)
2      Q.  Did you at some point go to the EEO
3  office, the Library's EEO office?
4      A.  Yes.
5      Q.  When did you go?
6      A.  After March 31st.
7      Q.  When after March 31st?
8      A.  I don't recall the date.
9      Q.  Why do you remember that it was after
10  March 31st?
11      A.  Because that's the date you called and
12  said to me, I'm calling about your letter, your
13  request is denied, and the positions are being
14  abolished.
15      Q.  And when you say "your request", is this
16  the request that was made in your letter to the
17  Librarian?
18      A.  I assumed that's what you were referring
19  to, the letter to the Librarian.
20      Q.  And when did you send your letter to the
21  Librarian? Do you recall?
22      A.  I delivered it to his office on March

---

Mansfield, Judith A.                                      April 17, 2007
Washington, DC

54  (Pages 210 to 213)

---

**210**

1   16th.
2     Q.  So you delivered the letter to the
3   Librarian on March 16.
4     A.  Yes.
5     Q.  And you were informed by me on March
6   31st --
7     A.  It was the 30th or 31st.
8     Q.  -- that the decision had been made to
9   abolish the positions.
10    A.  Yes.
11    Q.  And so the next day or the day after you
12  went to the EEO office?
13    A.  I don't know.  I would have to refresh my
14  memory with documentation.  It was in a relatively
15  short time span.
16    Q.  Would it have been a week?
17    A.  I don't know.
18    Q.  Two weeks?
19    A.  I don't know.
20    Q.  And did you at any time speak to Mrs.
21  Marcum about your concerns?
22    A.  No.

---

**211**

1     Q.  Did you speak to anyone other than
2   Mr. Wiggins about your concerns?
3     A.  No, but when I went to the EEO office the
4   gentleman there talked to me a little bit.
5     Q.  About?
6     A.  About the complaint.
7     Q.  And was that the initial counseling that
8   one would receive when they file an EEO complaint?
9     A.  I don't remember.
10    Q.  You also stated that you believed that
11  the removal of the collateral duties of assistant
12  directors, that that was discriminatory based on
13  your sex.  Is that your claim?
14    A.  The claim states that the removal was
15  retaliation for complaining about my pay.
16    Q.  So the removal is not discriminatory,
17  it's retaliatory?
18        MR. FREDRICKSON:  Objection.  I think the
19  question may call for a legal conclusion, but you
20  can attempt to answer it.
21    A.  I believe it was also discriminatory.
22    Q.  How was it discriminatory?

---

**212**

1     A.  Because I complained about unequal pay
2   and, rather than remedying the situation, they
3   abolished the job.
4     Q.  Were you being paid additional monies for
5   the duties of assistant director?
6     A.  No.
7     Q.  How long did you perform the duties of
8   assistant director?
9     A.  I performed the duties for which I was
10  not paid as director and assistant director for two
11  and a half years.
12    Q.  The duties of assistant director --
13    A.  They were the same as the duties of
14  acting director, so it was two and a half years.
15    Q.  The duties that you were performing
16  similar to those of Mr. Dimunation and Mr. Herman
17  were the same as when Ms. Marcum created the
18  assistant director positions?
19    A.  The duties that I performed as assistant
20  director were the same duties that I performed as
21  acting director for cataloging, and so the job
22  lasted two and a half years.

---

**213**

1     Q.  And what was it that you were no longer
2   receiving when Mrs. Marcum made the decision to
3   abolish that position, those duties?
4     A.  I was demoted.  I no longer had
5   responsibility for a $44 million budget and went
6   down to a $4.4 million budget.  I had first line
7   supervisors reporting to me.  I had 70 staff
8   reporting to me instead of 550 staff.  I no longer
9   had oversight of national programs, the program for
10  cooperative cataloging and the cataloging and
11  publication program.  I no longer sat in on the
12  directors meetings.  I lost a lot.
13    Q.  And what other damages did you have as a
14  result of the removal of those duties?
15    A.  I can't think of anything else right now.
16    Q.  There is nothing else that you can think
17  of?
18    A.  The damage was the embarrassment and the
19  humiliation in removing me from my duties for no
20  cause.
21    Q.  When you wrote your letter to the
22  Librarian, was it your belief that the only action

---

Henderson Legal Services
202-220-4158

214

1  that Mrs. Marcum could take was to promote you?
2      A.  That is not what that letter stated.
3      Q.  Was it your belief that the only action
4  that Mrs. Marcum could take was to create an
5  assistant director's position description?
6      A.  I stated no specific remedy to my
7  complaint in that letter.
8      Q.  So what action did you want Mrs. Marcum
9  to take?
10     A.  I was willing to negotiate that with
11 Library management.
12     Q.  And what did you expect Library
13 management to do?
14     A.  I did not know what to expect Library
15 management would do.  Maybe you could tell me.
16     Q.  You talked about budgets, that you had
17 responsibility for budgets during the period of
18 time that you were Chief of the Arts and Sciences
19 Cataloging Division, that you had responsibility
20 for budgets.
21     A.  Right.
22     Q.  And also when you were the acting

215

1  Director for Cataloging you had budgetary
2  responsibilities.
3      A.  Yes.
4      Q.  When Mr. Wiggins told you that Mrs.
5  Marcum had budgetary concerns, what did you
6  understand that to mean?
7      A.  I don't recall his saying that she had
8  budgetary concerns.  She said that she did not want
9  to add to the salary base, that she wanted to have
10 the flexibility to spend money on other things.
11 One example of other things that she might spend
12 money on was the rebuilding and redecoration of the
13 suite of offices, her suite of offices.
14     Q.  And did you discuss those concerns with
15 Mrs. Marcum at any point?
16     A.  No.
17     Q.  Did you discuss them with Mr. Wiggins --
18     A.  My concerns about the --
19     Q.  -- the budgetary concerns?
20     A.  No.  My impression from Mr. Wiggins was
21 he didn't feel there were any budgetary concerns.
22 The issue of budget didn't come up that way.  It

216

1  was that Mrs. Marcum didn't want to add to the
2  salary base.
3      Q.  And did it come up in any other context?
4      A.  Not in relation to any of these
5  discussions.
6      Q.  Not in relation to any of the --
7      A.  Not in relation to any of my concerns.
8          MR. JAMES:  I don't have anything else.
9          MR. FREDRICKSON:  No questions.  She
10 would like to read and sign.
11         (Whereupon, at 4:02 p.m. the taking of
12 the deposition was concluded.)
13             (Signature not waived.)
14
15
16  _____
17        JUDITH A. MANSFIELD
18
19 Subscribed and sworn to and before me
20 this _____ day of _____, 20____.
21
22  _____
23        Notary Public

JUDITH A. MANSFIELD v. JAMES H. BILLINGTON, LIBRARIAN OF CONGRESS
Civil Action No. 05-1790

# Exhibit 10

## Excerpts
## Deposition of Deanna Marcum
## 2/13/07

Case 1:05-cv-01790-RMU DEPOSITION OF DEANNA B. MARCUM
CONDUCTED ON TUESDAY, FEBRUARY 13, 2007 Document 53-2 Filed 09/20/2007 Page 52 of 63

1 (Pages 1 to 4)

1

```
 1    UNITED STATES COURT OF FEDERAL CLAIMS
 2
 3
 4   -----------------------------X
 5   JUDITH A. MANSFIELD,        :
 6          Plaintiff : Civil Action
 7     v.        : No. 05-472C
 8   THE UNITED STATES OF AMERICA,  : Judge Williams
 9          Defendant :
10   -----------------------------X
11
12
13        Deposition of DEANNA B. MARCUM
14          Washington, D.C.
15        Tuesday, February 13, 2007
16          10:00 p.m.
17
18
19
20   Job No.: 1-95858
21   Pages 1 - 226
22   Reported by: Nancy Bond Rowland
```

2

```
 1        Deposition of DEANNA B. MARCUM, held at the
 2   offices of:
 3
 4     Webster, Fredrickson & Brackshaw
 5     1775 K Street, N.W.
 6     Suite 600
 7     Washington, D.C.
 8
 9        Pursuant to agreement, before Nancy Bond
10   Rowland, Registered Professional Reporter and Notary
11   Public in and for the District of Columbia.
```

3

```
 1         A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3     BRUCE A. FREDRICKSON, ESQUIRE
 4     WEBSTER, FREDRICKSON & BRACKSHAW
 5     1775 K Street, N.W., Suite 600
 6     Washington, D.C. 20006
 7     (202) 659-8510
 8
 9   ON BEHALF OF DEFENDANT:
10     DOUGLAS K. MICKLE, ESQUIRE
11     UNITED STATES DEPARTMENT OF JUSTICE
12     Commercial Litigation/National Courts
13     1100 L Street, N.W., Room 4062
14     Washington, D.C. 20005
15     (202) 307-0383
16
17     JESSIE JAMES, JR., ESQUIRE
18     JULIA DOUDS, ESQUIRE
19     LIBRARY OF CONGRESS
20     101 Independence Avenue, S.E.
21     Washington, D.C. 20540
22     (202) 707-7464
```

4

```
 1   ALSO PRESENT: Ethan Stone
 2
 3
 4         C O N T E N T S
 5   EXAMINATION OF DEANNA B. MARCUM        PAGE
 6     By Mr. Fredrickson          5
 7     By Mr. James          216
 8
 9
10         E X H I B I T S
11        (Retained by counsel)
12   DEPOSITION EXHIBIT          PAGE
13   25 - E-mail dated 5/4/04.          48
14     Bates no. 155
15   26 - Letter dated 3/15/05.          149
16     Bates no. 156
17   27 - Declaration of Deanna B. Marcum.        201
18     Bates no. 1 - 6
19
20
21
22
```

Case 1:05-cv-01790-RMU    DEPOSITION OF DEANNA B. MARCUM    Filed 09/20/2007    Page 53 of 63
CONDUCTED ON TUESDAY, FEBRUARY 13, 2007

2 (Pages 5 to 8)

---

5

1    PROCEEDINGS

2    DEANNA B. MARCUM

3    having been duly sworn, testified as follows:

4    EXAMINATION BY COUNSEL FOR PLAINTIFF

5    BY MR. FREDRICKSON:

6    Q   Could you state your name please?

7    A   Deanna Marcum.

8    Q   And do you work?

9    A   Do I work?

10   Q   Yes.

11   A   Yes.

12   Q   Where do you work?

13   A   The Library of Congress.

14   Q   What's your position at the Library of

15   Congress?

16   A   I'm the associate librarian for Library

17   Services.

18   Q   Associate librarian --

19   A   For Library Services.

20   Q   -- for Library Services.  And for how long

21   have you had that position?

22   A   Since August 11th, 2003.  Three and a half

---

6

1    years.

2    Q   What do you do in that position?

3    A   I head the Library part of the Library of

4    Congress.  The component parts are the Congressional

5    Research Service, the Copyright Office, and the

6    Library, and I'm the head of the Library.

7    Q   Okay.  And how big a unit is the Library

8    Services at the Library of Congress now?

9    A   There are about 2,500 staff.

10   Q   And do you have an annual budget?

11   A   Yes.

12   Q   What's the approximate budget for Library

13   Services?

14   A   For Library Services about $200 million.

15   Q   Can you tell me a little bit more

16   specifically what your duties are as the associate

17   librarian for Library Services?  Give me the broad

18   overview, and I might pick up some detail from there.

19   A   Okay.  It is my job to think about the future

20   and position the 53 divisions within Library Services

21   to move into that future.  I set the policies.  I plan

22   the new activities.  I've led the strategic planning

---

7

1    work.  I have five directors who report to me and a

2    deputy, and they then manage the 53 divisions.

3    Q   Okay.  And who do you report to?

4    A   To Dr. Billington, the librarian.

5    Q   At one point there was a deputy librarian?

6    A   Right.

7    Q   Is there a deputy librarian there now?

8    A   The deputy librarian retired.  There's a

9    chief operating officer, and I work very closely with

10   her, but my direct reporting relationship is to the

11   librarian.

12   Q   And when there was a deputy librarian, who

13   did you report to in that time frame?

14   A   That was a kind of joint reporting.  I met

15   with Dr. Billington every Thursday, and we went through

16   all of my agenda items.  I met with the deputy at his

17   request.

18   Q   Okay.

19   A   So the reporting box is the librarian of

20   Congress, deputy librarian, so I worked with both of

21   them.

22   Q   Okay.  And who was the deputy librarian?

---

8

1    A   Donald Scott.

2    Q   Who is the COO?

3    A   Joanne Jenkins.

4    Q   And that's chief operating officer?

5    A   Chief operating officer.

6    Q   And who were the five directors that report

7    to you?

8    A   They are Dianne van der Reyden who is the

9    director of Preservation.  You want me to spell these

10   names?  Would that help you?

11   Q   Sure.

12   A   v-a-n d-e-r R-e-y-d-e-n.  She's the director

13   of Preservation.  Kathryn Mendenhall with a K,

14   K-a-t-h-r-y-n, Mendenhall is serving in an acting

15   position filling two directorates.  She is the acting

16   director for Partnerships and Outreach and the acting

17   director for Technology Policy.

18   Q   So Miss Mendenhall is the director for

19   Partnerships and Outreach, and she's also serving as

20   acting director for --

21   A   She's serving in an acting capacity in the

22   two.

---

129

1   positions?

2       A   I had spoken with Mr. Dimunation very early

3   in my thinking about the possibility of being the

4   director of Collections and Services, and we had

5   concluded I think mutually that he is such a wonderful

6   specialist -- he's a rare book specialist and deeply

7   involved in that field -- that it would be a waste for

8   him to spend all of his time on management.

9       Q   So you had him in mind for the position that

10  Miss Brown actually got?

11      A   Originally, yes.

12      Q   I see.  He wanted to do less management, more

13  what?

14      A   The dilettante work that he does.  He's

15  interested in everything.  He really wanted to be more

16  involved with scholars, with poets, with rare book

17  dealers.  He had built up all of those connections over

18  the years and wanted to continue them.

19      Q   So when you spoke to Mr. Dimunation about the

20  possibility of maybe him being the director for

21  Collections and Services, I gather he declined, is that

22  true?

130

1       A   Well, I didn't offer him the position.  We

2   simply talked about it.  You know, do you think this

3   would be a good fit.  I think we concluded after

4   discussing this for a while that that probably wasn't

5   the best use of his talent.

6           So in subsequent conversations I talked with

7   him about this assistant director role, and we talked

8   about in a way this allowed him to have both things.

9   It allowed him to have more influence in the

10  directorate, but it also kept him well grounded in his

11  field.

12      Q   And when you say more influence in the

13  directorate, what do you mean?  How would being the

14  assistant director provide Mr. Dimunation an

15  opportunity to have more influence in the directorate?

16      A   Well, I expected that Miss Brown would meet

17  with the assistant directors and talk about things in

18  the various areas, and that he would have a seat at her

19  table, to use my earlier metaphor, more than he would

20  as a division chief.

21      Q   I see.  So in other words, you expected that

22  Mr. Dimunation would have the opportunity to have more

131

1   influence in determining the future direction of the

2   Library in the collections area?

3       A   Well, he would at least be privy to the

4   conversations about those matters.

5       Q   I'm assuming you didn't want somebody there

6   sitting at the meetings with their mouth shut the whole

7   time, so they'd contribute to the conversation?

8       A   They'd contribute.

9       Q   In that regard would you agree he'd have the

10  opportunity, Mr. Dimunation would have the opportunity

11  to contribute to developing the course of the future

12  direction of the Library?

13      A   Yes.

14      Q   And with Mr. Dimunation did you also not say

15  to him anything like this assistant director position

16  will be a job of limited duration, it will only be

17  three months or six months or a year or anything like

18  that.  Am I right about that?

19      A   Right.  I told him the same thing I told Mr.

20  Herman, that I wanted to try this to see how it worked,

21  but we did not talk about a limit of time.

22      Q   Okay.  Did you have a conversation with Miss

132

1   Mansfield about the possibility of her being the

2   assistant director?

3       A   I think according to the e-mail the date was

4   in May, we had had that discussion.  That was the only

5   discussion we had about it.  All subsequent discussions

6   about that were with Miss Mansfield and Mr. Wiggins.

7       Q   Okay.  So have you remembered anything else

8   about your conversation with Miss Mansfield about the

9   assistant director position other than what you've

10  already told me about today?

11      A   It was not a conversation, but in one of the

12  division chiefs meetings which I had once a month, I

13  meet with all the 53 division chiefs, and in one of

14  those meetings she asked the question would there be

15  position descriptions for the assistant directors, but

16  that's the only other question I recall from her about

17  the role.

18      Q   Do you remember when that meeting took place,

19  the division chiefs meeting?

20      A   I don't.  It was not long after this chart

21  was released, and I think there were a fair number of

22  questions among staff about the reporting

DEPOSITION OF DEANNA B. MARCUM
Case 1:05-cv-01790-RMU Document 33-7 Filed 09/20/2007 Page 55 of 63
CONDUCTED ON TUESDAY, FEBRUARY 13, 2007

38 (Pages 149 to 152)

149

1  seen or otherwise?
2      A  Well, it was a week or two -- It was in close
3  proximity to the time when Miss Mansfield wrote a
4  letter to Dr. Billington and placed it under Jessie
5  James' door.
6      Q  So a week or two before that?
7      A  Yes.
8      Q  All right.  Bear with me a moment.
9          MR. FREDRICKSON:  May I have this marked as
10  the next exhibit please.
11      (Deposition Exhibit 26 was marked for
12  identification and was retained by counsel.)
13  BY MR. FREDRICKSON:
14      Q  What I've had handed to you is Plaintiff's
15  Exhibit Number 26.  I'd ask you if you would read
16  through that if you would please.
17      A  Okay.
18      Q  Have you had a chance to read Plaintiff's
19  Exhibit Number 26?
20      A  Yes.
21      Q  Is Plaintiff's Exhibit Number 26 a letter
22  from Miss Mansfield to Dr. Billington that you

150

1  referenced earlier in your testimony?
2      A  Yes.
3      Q  So this is the letter that was given to
4  Dr. Billington and, as you described it I think, placed
5  under Jessie James' door?
6      A  That's correct.
7      Q  All right.  And when did you first see
8  Plaintiff's Exhibit Number 26?
9      A  I first heard about it in a telephone call.
10  I was traveling at the time and my deputy, Mr. Dizard,
11  called to tell me that Mr. James had brought this
12  letter to his attention.
13      Q  What did Mr. Dizard say about it, say about
14  the letter?
15      A  He wanted me to know about it just to make
16  sure I was informed, and then when I returned from
17  wherever I was, I met with the Office of General
18  Counsel about this.
19      Q  Okay.  Did you get a description from Mr.
20  Dizard of the letter in that conversation?
21      A  He read it to me.
22      Q  Okay.  And when did Mr. Dizard read the

151

1  letter that's been marked Plaintiff's Exhibit Number 26
2  to you?
3      A  It was the day it was received.  I think that
4  was the day.
5      Q  The letter is dated March 15th, 2005, right?
6      A  Yes.
7      Q  Okay.  So you believe that you heard about
8  the letter from Mr. Dizard on March 15th, 2005?
9      A  I heard about it the day it was delivered to
10  Mr. James, and I don't know if March 15th is the day it
11  was delivered to him or if it was the day it was
12  written.  I just don't know.
13      Q  All right.  Does the time frame, middle of
14  March, seem consistent with your recollection as to
15  when you first heard of the letter that's been marked
16  as Plaintiff's Exhibit Number 26?
17      A  Yes.
18      Q  Okay.  What did you say to Mr. Dizard in that
19  conversation?
20      A  We'll need to meet about this as soon as I'm
21  back with OGC, the Office of General Counsel.
22      Q  And did Mr. Dizard say anything else?

152

1      A  No.  We talked about other matters that had
2  come up during the day.  That's all.
3      Q  Did you discuss any of the points raised by
4  the letter that's been marked as Plaintiff's Exhibit
5  Number 26?
6      A  I made some comment about this is the first
7  time I've heard of this.
8      Q  Well, am I right that you said it was a
9  little bit before this letter that you had had a
10  discussion with Beacher Wiggins about pay equity?
11      A  Yes.  I was referring to I didn't know what
12  the informal efforts to resolve the matter, I didn't
13  know what the informal efforts were.  They had not
14  included me, whatever they were.
15      Q  I see.  Okay.  That's what you're referring
16  to?
17      A  That's what I'm referring to.
18      Q  But prior to March 15th, 2005 or mid March
19  2005 I gather Mr. Wiggins had raised the issue of pay
20  equity with you on behalf of Miss Mansfield?
21      A  I didn't know if it was on his behalf or on
22  hers.  He didn't say I'm raising this for Miss

DEPOSITION OF DEANNA B. MARCUM
Case 1:05-cv-01790-RMU  CONDUCTED ON FRIDAY, FEBRUARY 9, 2007  Page 56 of 63
Document 23-3   Filed 09/20/2007

39 (Pages 153 to 156)

**153**

1  Mansfield. He just said I think you need to look at
2  the possibility of a pay equity problem.
3  Q  I was trying to just get a sense of the
4  timing though. This conversation you had with Mr.
5  Wiggins where he said I think there might be a pay
6  equity issue with respect to Miss Mansfield, that's a
7  conversation you had with Mr. Wiggins prior to
8  receiving the letter that's dated March 15th, 2005 that
9  is marked as Plaintiff's Exhibit Number 26?
10  A  That's correct.
11  Q  And you think it was about a week or two, is
12  that what you said?
13  A  A week or two before that.
14  Q  Did you do anything as a result of your
15  conversation with Mr. Wiggins a week or two before the
16  letter of March 15th, 2005?
17  A  I asked Mr. Carroll to find the regulations
18  pertaining to pay equity so I would know exactly what
19  was being referred to.
20  Q  Okay. And did he provide you with anything,
21  Mr. Carroll that is?
22  A  He provided the definition of pay equity that

**154**

1  had come through legislation, but it wasn't terribly
2  helpful. I couldn't see how that connected to what was
3  being said to me by Mr. Wiggins.
4  Q  So did Mr. Carroll show you the Equal Pay
5  Act?
6  A  Yes.
7  Q  Did Mr. Carroll explain any of that to you?
8  A  Well, I didn't think I needed an explanation
9  of that. That was very much a part of my formative
10  years when I was working on affirmative action a long
11  time ago. So I thought I knew that legislation pretty
12  well. I didn't know if there were other regulations
13  that I didn't know about.
14  Q  So way back when you were in jobs prior to
15  even coming to the Library of Congress, you knew about
16  the Equal Pay Act?
17  A  Yes.
18  Q  And had studied it when you were affirmative
19  action officer at --
20  A  University of Kentucky.
21  Q  -- University of Kentucky, is that true?
22  A  That's correct.

**155**

1  Q  So you had actually known about the Equal Pay
2  Act and familiarized yourself with it I gather back in
3  the early '70s?
4  A  Yes.
5  Q  What did you understand the Equal Pay Act to
6  require?
7  A  Very simply, equal pay for equal work.
8  Q  Do you remember anything else about your
9  conversation with Mr. Carroll when he brought you the
10  Equal Pay Act?
11  A  No, I don't.
12  Q  Did he bring you -- Did Mr. Carroll bring you
13  anything else other than the Equal Pay Act itself?
14  A  No.
15  Q  No Library of Congress regulation or anything
16  like that?
17  A  No.
18  Q  Did you do anything other than ask Mr.
19  Carroll about -- I can't remember what you asked Mr.
20  Carroll?
21  A  Pay equity or the regulations regarding pay
22  equity that I need to know.

**156**

1  Q  Did you ask him to do anything else other
2  than look to see if there were any pay equity
3  regulations at the Library?
4  A  No.
5  Q  When Mr. Carroll came back and provided you
6  with a copy of the Equal Pay Act, did you take any
7  action as a result of that?
8  A  No.
9  Q  Now, before this letter that's been marked as
10  Plaintiff's Exhibit Number 26, the March 15th, 2005
11  letter from Miss Mansfield to Dr. Billington, did you
12  do anything else between the time that Mr. Wiggins
13  spoke to you about pay equity and the time that the
14  letter came?
15  A  The only thing I did is write pay equity at
16  the bottom of my list of things to talk to him about
17  when we next met to find out more about what he meant.
18  Q  What do you mean by your list? You keep a To
19  Do list or something?
20  A  I keep a list of things I want to talk to
21  each of the directors about. I just have a folder with
22  their names in it.

Case 1:05-cv-01790-RMU DEPOSITION OF DEANNA B. MARCUM
CONDUCTED ON TUESDAY, FEBRUARY 13, 2007 Filed 09/20/2007 Page 57 of 63

40 (Pages 157 to 160)

157

1 Q So did you meet with the Office of General
2 Counsel about the letter?
3 A Yes.
4 Q When was that?
5 A I think this was at the end of a week if I
6 remember correctly, and it was early the next week, the
7 beginning of the next week.
8 Q Who was present at the meeting?
9 A Mr. James and Mr. Ovelio and Miss Douds. It
10 might have been just the two. I don't know if Miss
11 Douds was there the first meeting. Can I ask you if
12 you were there?
13 Q Not at the moment.
14 A Not at the moment. I think it was actually
15 Mr. James and Mr. Ovelio when he first met.
16 Q Would it be Ovelio Riviello?
17 A Yes. Yes. Ovelio is his first name. I
18 apologize.
19 Q I don't know what your position is on that,
20 but I think I do need to ask what was said in the
21 meeting.
22 A I asked them what are my options when I am

158

1 given this kind of letter, and we talked about the
2 options that were available to me. And I was very
3 disturbed that I was in effect being accused of
4 discrimination. That bothered me a lot. And I was
5 concerned that this had gone to this stage and I had
6 not heard anything about it from Miss Mansfield. So I
7 was still trying to figure out what to do.
8     The legal counsel described the solutions
9 available to me. One is to simply end the assistant
10 director positions since they hadn't been formal
11 positions in the first place and just call them all
12 done.
13     Another option was to send Miss Mansfield
14 back to her division chief position leaving Mr.
15 Dimunation and Mr. Herman in place.
16     And a third option was to go back and look at
17 position descriptions to see if I wanted to create
18 formal positions that we can move senior level people
19 without any formal process. But since Miss Mansfield
20 was a GS-15, in order for her to have a senior level
21 position, we would have to post it, and she would be in
22 a competitive process.

159

1 Q Okay. And what else did you say at the
2 meeting?
3 A I just asked procedural questions. You know,
4 when this kind of letter was received, where does it
5 go, what happens. I hadn't had anything like this
6 happen before. I didn't know the process. So I asked
7 those kinds of questions.
8 Q And what did you learn?
9 A Well, Mr. James pointed out this last
10 paragraph, that she was giving us ten days for an
11 informal resolution, and after that she would
12 apparently be taking this to a lawyer is what it
13 appeared to be.
14 Q Okay. What else did you learn in asking
15 about the procedural questions?
16 A I'm not sure. I don't know that I noted
17 anything else.
18 Q Did you make any notes of the meeting?
19 A No.
20 Q Did you make up any notes after the meeting?
21 A No.
22 Q Have you typed up any memorandum that

160

1 concerns the meeting that would reflect the content of
2 the meeting?
3 A No.
4 Q Have you seen any notes of the meeting?
5 A No.
6 Q Have you seen any summary of what happened at
7 the meeting, anything like that?
8 A No.
9 Q When you met was it just you and Mr. James
10 and Mr. Riviello as best you recall today?
11 A I think that's correct.
12 Q And I gather there may or may not have been
13 another attorney in the room?
14 A Later on there was. Whether or not there was
15 that day, I don't know.
16 Q All right. But on your side of the equation
17 you didn't bring in somebody else from your staff to
18 sit in on the meeting or anything like that?
19 A I had the deputy, Robert Dizard, there.
20 Q He was there as well?
21 A He was there as well.
22 Q Okay. Did you take any action after the

Case 1:05-cv-01790-RMU   DEPOSITION OF DEANNA B. MARCUM
CONDUCTED ON TUESDAY, FEBRUARY 13, 2007   Document 23-7   Filed 09/20/2007   Page 58 of 63

41 (Pages 161 to 164)

161

1  meeting was over?
2     A  After thinking about it, really going through
3  the options, I decided I would end all of the acting
4  director positions and just eliminate all of them.
5     Q  You said you would eliminate all of the
6  acting directors. Do you mean assistant director
7  positions?
8     A  Acting assistant director positions, yes.
9     Q  In other words, you decided to eliminate the
10  positions of assistant director for Bibliographic
11  Access, the assistant director for Collections
12  Management, and the position of assistant director for
13  Special Collections and Services, those three
14  positions?
15     A  Correct.
16     Q  Okay. And did you meet with Mr. Herman about
17  the elimination of the assistant director position?
18     A  I met with -- First I met with the directors
19  and told them what I was doing and why.
20     Q  Now when you say directors, who do you mean?
21     A  I mean Mr. Wiggins, Miss van der Reyden, Mr.
22  Rossman, Miss Brown.

162

1     Q  Was this a special meeting or was it one of
2  your regular directors meetings?
3     A  It was a special meeting.
4     Q  And how long after you had met with the
5  Office of General Counsel was this meeting with the
6  directors?
7     A  It was within a day or two.
8     Q  Okay. And what did you say at the meeting of
9  these directors?
10     A  I told them that I was very sorry to say that
11  at least one of the assistant directors was unhappy
12  with the arrangement and considered it discriminatory.
13  I had considered the options, and I had concluded that
14  it was best to simply eliminate those positions, but I
15  wanted to hear from them, if they had other thoughts
16  about that.
17        And we talked about how well -- It turned
18  into a much broader conversation of how well this was
19  working in the first place. Mr. Wiggins thought it was
20  working well, and he was sorry to see this end.
21  Carolyn Brown thought it was not working very well, and
22  she thought she would prefer another arrangement

163

1  anyway. So it was okay with her. The other directors
2  who didn't have assistant directors said very little.
3  It was a sad day for all of us.
4     Q  Why was that?
5     A  That this had been the approach taken.
6     Q  What do you mean by that?
7     A  That Miss Mansfield hadn't spoken to me or to
8  Mr. Dizard about this but had simply written a letter.
9  We were sorry we hadn't had more communication about
10  this.
11     Q  With Miss Mansfield?
12     A  Yes.
13     Q  Or do you mean from Miss Mansfield?
14     A  From her.
15     Q  Okay.
16     A  It was a very big surprise, so we were all
17  kind of adjusting to what we would do next.
18     Q  Okay. Did Carolyn Brown say anything as to why
19  she thought the arrangement was not working well?
20     A  What she told me confidentially is that the
21  two who had been named as assistant directors in her
22  area were so knowledgeable that she often felt excluded

164

1  from the conversation. That they had been there a long
2  time. They knew a great deal. She felt a little bit
3  as if they had inside information, and she thought it
4  might work better to have more distributed
5  responsibilities among the chiefs for her.
6     Q  And how long had Miss Brown been at the
7  Library of Congress?
8     A  Well, she had been there at least since 1993
9  because I think she was -- She had been there just a
10  short while when I arrived in 1993. I don't know how
11  long. It was before that but not a long time before
12  that.
13     Q  Sounds like what you're describing to me is a
14  separate conversation you had with Miss Brown apart
15  from the other directors.
16     A  That's correct.
17     Q  Have I got a grip on that?
18     A  That's correct.
19     Q  Let's finish that, tell me what else she
20  said, and then we'll come back to the directors meeting
21  because I want to pick up what she said at the
22  directors meeting. So tell me what else Miss Brown

Case 1:05-cv-01790-RMU   DEPOSITION OF DEANNA B. MARGUM   Filed 09/20/2007   Page 59 of 63
CONDUCTED ON TUESDAY, FEBRUARY 13, 2007

43 (Pages 169 to 172)

169

1  to proceed basically?

2  A  Right.

3  Q  Okay. Did you have another meeting with Mr.

4  Wiggins where you had a discussion with him at greater

5  length concerning this issue?

6  A  We met every Tuesday, so our subsequent

7  conversations took place in that context. I asked him

8  as we looked at options, I asked him since there were

9  three senior level people in the former Cataloging

10  Directorate, if he felt so strongly that it be a senior

11  level person, why he didn't want to just bring one of

12  them into the organizational structure since that would

13  have been -- then there wouldn't have been these

14  levels, the difficulties created by different levels.

15  He did not want to do that. He wanted Miss Mansfield

16  to be in the position. And nothing changed really. We

17  just had the same conversation we had had.

18  Q  Did he explain why he wanted Miss Mansfield

19  in the position?

20  A  Only to say that he thought she was the best

21  person.

22  Q  Okay. Did you make any adjustments to help

170

1  the workload of Mr. Wiggins in the position of the

2  director for Acquisitions and Bibliographic Access?

3  A  I asked the two affected directors to come

4  back to me with a plan for how the workload would be

5  distributed and what they wanted to do. I left it to

6  them to decide. He came back with the plan that they

7  would simply divide the coordinating duties equally

8  among the division chiefs, and they would handle it

9  that way.

10  Q  Okay. Is that what happened?

11  A  As far as I know. I mean, I don't go to that

12  level of detail now, so I don't know. But he seems to

13  be handling the workload fine, so I assume that is

14  working.

15  Q  What were the duties that you discussed with

16  Mr. Wiggins would be divided among the division chiefs?

17  What kinds of things are you talking about?

18  A  I was most concerned -- I don't know what

19  duties he was talking about. What I was concerned

20  about is that because Acquisitions and Cataloging had

21  been separate, I was very anxious to have good

22  cross-communication, and I wanted to be sure there were

171

1  people looking at how to combine these divisions more

2  effectively, and that was my concern and what I talked

3  with him about.

4  Q  Okay. Did you have a meeting with either Mr.

5  Herman or Mr. Dimunation concerning the elimination of

6  the assistant director positions?

7  A  Yes. I met with each of them.

8  Q  In separate meetings?

9  A  In separate meetings.

10  Q  Tell me about your meeting with Mr. Herman

11  regarding the elimination of the assistant director

12  position.

13  A  I tried to keep that meeting as neutral as I

14  could. I told him that there had been a complaint by

15  Miss Mansfield of discrimination, and that I was

16  concerned enough about that that I thought for now at

17  least we would simply eliminate the assistant director

18  positions. And that I was sorry to tell him this, but

19  it would be effective immediately.

20  Q  And what did Mr. Herman say?

21  A  He was angry. He really couldn't understand

22  that. He thought it was going to be an impossible job

172

1  for Carolyn Brown to manage without assistant

2  directors. He asked a number of questions about how

3  would we proceed. I told him we were still working on

4  that, but that I wanted to let him know what was

5  happening.

6  Q  Okay. Do you remember anything else about

7  your meeting with Mr. Herman?

8  A  No.

9  Q  And then am I right that you had a separate

10  meeting as you recall with Mr. Dimunation?

11  A  Yes.

12  Q  Okay. And what did you say to Mr. Dimunation

13  in that meeting?

14  A  I said basically the same thing. His

15  question was how will we notify the staff. He was very

16  concerned about that. And I agreed to have both Mr.

17  Dimunation and Mr. Herman review the memo that I would

18  eventually prepare to send to the staff.

19  Q  Did Mr. Herman explain -- I'm sorry. Did Mr.

20  Dimunation explain the nature of his concern about the

21  notice to the staff?

22  A  I think he was concerned that this was all so

**177**

1  was also, we were under a lot of pressure then to
2  develop new security procedures for the collections,
3  and Mr. Herman had a lot of expertise there. So he was
4  working primarily in those areas.
5      And Mr. Wiggins was using Miss Mansfield's
6  expertise to direct cataloging, and she I think had no
7  involvement at all as far as I could see anyway in the
8  acquisition side of things or the broader issues of the
9  directorate.
10     Q  Let me go back to Mr. Dimunation. Wasn't
11  part of his job as a division chief for Rare Book to be
12  involved in donor and collections?
13     A  Right but only for Rare Book.
14     Q  And with respect to Mr. Herman, wasn't his
15  division chief job, a good part of it, focused on the
16  storage situation for collections?
17     A  It was for the General Collections only. So
18  he took on a much broader role in looking at the
19  requirements for Special Collections and Area Studies.
20  So it was a considerably broadened scope.
21     Q  It was broadened, but wasn't his collections
22  that he was responsible for as division chief by far

**178**

1  the largest of the collections within the broader scope
2  of his assistant director positions?
3      A  No. The Special Collections are much larger.
4      Q  Okay. Can you give me a sense of the volumes
5  there?
6      A  We have 132 million items in the Library.
7  About 30 million of those are in the General
8  Collections. And 102 million or now 105 million, it
9  grows enormously, are in Special Collections.
10     Q  Okay. When you were deciding whether to
11  eliminate the assistant director positions, did you
12  talk to Dr. Billington?
13     A  No.
14     Q  Did you inform Dr. Billington about the
15  decision to terminate the assistant director positions?
16     A  No.
17     Q  Was Mr. Scott at the Library at this point in
18  time --
19     A  Yes.
20     Q  -- in March/April of 2005?
21     A  He was.
22     Q  Okay. Did you talk to Mr. Scott about

**179**

1  eliminating the assistant director positions?
2      A  Yes.
3      Q  Was that a meeting with just the two of you?
4      A  Yes.
5      Q  And what did you say to Mr. Scott in that
6  meeting?
7      A  I told him how -- I first showed him the
8  organizational chart. He had seen the earlier
9  realignment chart and had approved that, and so I
10  brought that with me. I told him that he would
11  probably recall that I said this was an experiment, I
12  will see how it works, and it hadn't worked very well,
13  and I was sorry to report that and told him what had
14  happened.
15     Q  What do you mean when you say that, what had
16  happened?
17     A  I told him that we had received the letter
18  from Miss Mansfield, that I had consulted with OGC, I
19  had consulted with the directors, and had concluded
20  that the way to proceed was to eliminate the assistant
21  director positions. He wanted to know how I proposed
22  to handle the workload, and I described what the

**180**

1  directors had proposed to me, and he said that sounded
2  reasonable, and I should proceed.
3      Q  Okay. Now, this conversation you had with
4  Mr. Scott, was that before you eliminated the assistant
5  director positions?
6      A  Yes. It was before I sent out the
7  announcement.
8      Q  And was Miss Smith still the director for
9  Human Resources at that point in time?
10     A  Let's see. I believe she was still there. I
11  believe that's right.
12     Q  Okay. Did you speak to Miss Smith, that's
13  Teresa Smith, the director of Human Resources, before
14  you eliminated the assistant director positions?
15     A  No, I didn't. It's conceivable that Mr.
16  Dizard consulted with her.
17     Q  Was there any particular reason you did not
18  consult the director of Human Resources before
19  eliminating the assistant director positions?
20     A  I didn't because in my view these were
21  informal positions. They weren't an established part
22  of the organizational structure, and I thought I had

Case 1:05-cv-01790-RMU   DEPOSITION OF DEANNA B. MARGUM   Document 23-2   Filed 09/20/2007   Page 61 of 63
CONDUCTED ON TUESDAY, FEBRUARY 13, 2007

48 (Pages 189 to 192)

189

1  would have to go back and look at what the actual
2  ratings were.
3     Q  And how about Mr. Herman, was there any
4  negative criticism of Mr. Herman's performance in his
5  performance appraisal with respect to his assistant
6  director duties?
7     A  No.
8     Q  The directors meeting where you discussed
9  elimination of the assistant directors, was that the
10  first time that you had heard that there was any
11  problem with the assistant directors on the Collections
12  and Services side?
13     A  What I had heard from Dr. Brown earlier is
14  that she was concerned that her communication style
15  wasn't the best. She worried that she wasn't
16  communicating as effectively as she might have with her
17  assistants. She had raised with me — I can remember
18  one instance in which she thought Mr. Herman had spoken
19  on her behalf when it wasn't quite his responsibility
20  to do so.
21     But mostly she was asking me how I would
22  handle that situation. It wasn't a complaint as much

190

1  as a kind of vexation on her part. She wanted to do a
2  better job, and she was trying to figure out better
3  ways to communicate.
4     Q  Was that early on in the time frame that the
5  assistant director positions existed or can you place
6  it in time at all?
7     A  I don't know when it was.
8     Q  And did you do anything as a result of your
9  conversation with Miss Brown?
10     A  I talked with her about how to communicate
11  with them just pointing out that she's quiet and waits
12  until she hears all of the evidence, and they have
13  opinions before they even know what the question is.
14  So maybe it was trying to just say to them I'm going to
15  talk about this, and then I'd like to hear from you,
16  just something that simple.
17     Q  So in other words, you offered Miss Brown
18  some advice on how to deal with it?
19     A  Some advice on how to deal with it.
20     Q  You don't remember doing anything else?
21     A  No.
22     Q  Okay. How did the Library communicate to

191

1  Miss Mansfield that the assistant director position was
2  eliminated?
3     A  Mr. Wiggins told her.
4     Q  Did you direct Mr. Wiggins to do that?
5     A  Yes.
6     Q  What did you say to Mr. Wiggins?
7     A  I told him that he would need to let Miss
8  Mansfield know that we were abolishing the assistant
9  director positions, and that she would be the division
10  chief for Arts and Sciences cataloging.
11     Q  Did you tell Mr. Wiggins to explain why that
12  had happened or anything like that?
13     A  I don't think I asked him to explain why. I
14  don't remember asking him to explain why. I told him
15  that I did not think I should have a conversation with
16  her since she had filed a complaint, and I wanted to
17  make sure the process was handled properly. I don't
18  remember having any other — I don't think we discussed
19  anything more.
20     Q  At the point in time when you were telling
21  Mr. Wiggins to tell Miss Mansfield that the position is
22  being eliminated, did it occur to you that probably

192

1  she'd want to know why?
2     A  I was sure that she would know why.
3     Q  And what do you mean by that?
4     A  When Mr. Wiggins told her what the plan was
5  and I had indicated that I was concerned about being
6  accused of discrimination, I didn't think we could
7  continue, I thought she would understand exactly what
8  that meant.
9     Q  Okay. Do you remember anything else about
10  your conversation with Mr. Wiggins concerning his
11  talking to Miss Mansfield?
12     A  No. I'm trying to go back and replay all of
13  this. I don't remember anything else.
14     Q  Okay. Did Mr. Wiggins come to you and report
15  back Here's how my conversation went with Miss
16  Mansfield, anything like that? Did you get a report
17  back from him?
18     A  Mr. Wiggins was less than happy with me at
19  the moment, so our conversations tended to be rather
20  brief. So he reported back that he had done that, and
21  I asked if he had made the appropriate assignments
22  within the directorate. He said yes, they were taking

Case 1:05-cv-01790-RMU  DEPOSITION OF DEANNA B. MARCUM
CONDUCTED ON TUESDAY, FEBRUARY 13, 2007  Document 23-2  Filed 09/20/2007  Page 62 of 63

49 (Pages 193 to 196)

193

1  care of it. Our conversations were really abbreviated
2  about this subject.
3     Q  Did Mr. Wiggins report Miss Mansfield's
4  reaction when Mr. Wiggins informed her that the
5  assistant director position was going to be eliminated?
6     A  No, he did not.
7     Q  I gather you didn't ask?
8     A  I didn't ask. I assume it was not a happy
9  day for her either.
10    Q  I'm going to hand you what's been marked as
11 Plaintiff's Exhibit Number 16 in another deposition,
12 and ask you to examine it.
13    You had spoken earlier about making an
14 announcement concerning the elimination of the
15 assistant director positions, and I've handed you a
16 document that's been marked as Plaintiff's Exhibit
17 Number 16 which is a memo to the directors and division
18 chiefs from you dated April 13th, 2005, is that right?
19    A  Yes.
20    Q  Now, is Plaintiff's Exhibit Number 16 the
21 announcement that you had made mention of?
22    A  There are two things about this that concern

194

1  me. One is my signature isn't on it, so I think this
2  is the draft, because I would have signed this. And I
3  know that both Mr. Dimunation and Mr. Herman had some
4  problem with the phrase "but these positions have not
5  worked out as intended." I may be wrong about this,
6  but I believe that that phrase was modified before this
7  was sent out.
8     MR. FREDRICKSON:  Okay. Do you have any
9  wisdom on this issue because I don't believe there's
10 been anything turned over other than this document on
11 that issue.
12    MR. JAMES:  We can check.
13    THE WITNESS:  I could be wrong.
14    MR. FREDRICKSON:  It's been a while.
15    THE WITNESS:  It has been a while, but it's
16 very unlikely that this is the final draft since it
17 isn't signed.
18    MR. JAMES:  We can check, and we'll see.
19    MR. FREDRICKSON:  Thank you.
20 BY MR. FREDRICKSON:
21    Q  But you knew I guess that the phrase "these
22 positions have not worked out as intended" did not sit

195

1  well with Mr. Dimunation nor Mr. Herman, is that right?
2     A  I knew that very well.
3     Q  How did you know that very well?
4     A  They told me directly.
5     Q  What was the nature of the concern that they
6  expressed or how did they tell you?  What did they say?
7     A  They were deeply concerned that this would
8  appear to be an indictment of the performance of all
9  three of the assistant directors, and their contention
10 was there had been one problem identified. They were
11 happy. They thought it was working very well. They
12 didn't like this.
13    Q  Okay. When you say that they thought that
14 there had been one problem identified, what did you
15 mean by that?
16    A  That one person believed she had been
17 discriminated against.
18    Q  Did you draft the document that's been marked
19 as Plaintiff's Exhibit Number 16?
20    A  Yes, I did.
21    Q  And did you draft it in April of 2005?
22    A  I'm assuming I did. Yes, I must have.

196

1     Q  You believe so?
2     A  I believe so, yes.
3     Q  Where it says To Directors and Division
4  Chiefs on Plaintiff's Exhibit Number 16, the memo
5  that's dated April 13th, 2005, who were the directors
6  and division chiefs who were referred to there?
7     A  The directors are the five that I mentioned
8  earlier in the realigned organization. Do you want me
9  to name them again?
10    Q  It might be clearer if you did.
11    A  Okay. Beacher Wiggins, Carolyn Brown, Henry
12 Rossman, Dianne van der Reyden, and I was an acting
13 director so I was included in that, and the deputy
14 Robert Dizard. And the division chiefs, I won't be
15 able to give you names because there are 53 of them,
16 but the chiefs of all of the divisions within Library
17 Services.
18    Q  Okay. Was there another announcement that
19 was circulated more broadly than to the directors and
20 division chiefs that announced the elimination of the
21 assistant director positions?
22    A  No.

221

1    A  No.
2    Q  Did you have anything to do with Mark
3  Dimunation?
4    A  No.
5    Q  Did you have anything to do with any of the
6  other individuals that are SLs in Library Services,
7  their appointment?
8    A  The only one is Robert Dizard.  He was
9  already a senior level in Copyright, and I did work out
10  the transfer to Library Services.
11    Q  But you didn't make him an SL?
12    A  I did not make him a senior level person.
13    Q  Have you made anyone in Library Services
14  during your tenure an SL?
15    A  No.  Anyone who wasn't already a senior level
16  person.
17    Q  Okay.  Finally, in the decision to abolish
18  the acting assistant director positions, did you make
19  that decision based upon Mrs. Mansfield's gender?
20    A  No.
21    Q  Did you terminate the position solely because
22  she complained?

222

1    A  No.
2    Q  Did you terminate that position because of
3  Mr. Herman's gender?
4    A  No.
5    Q  Or Mr. Dimunation's gender?
6    A  No.
7    MR. JAMES:  You asked my other questions, so
8  that's it.
9    MR. FREDRICKSON:  I don't have anything
10  further.  Based on my comment earlier though, I do I
11  guess reserve the right to ask additional questions
12  based on additional production of documents, but I
13  don't know that we'll need to get to that.
14    MR. JAMES:  We've agreed on that.  We'll
15  produce whatever we have, and we'll see from there.
16    MR. FREDRICKSON:  Good.
17    MR. JAMES:  We'll read.
18    (Signature having not been waived, the
19  deposition of Deanna B. Marcum was concluded at 5:30
20  p.m.)
21
22

223

1    ACKNOWLEDGMENT OF DEPONENT
2    I, Deanna B. Marcum, do hereby acknowledge
3  that I have read and examined the foregoing testimony,
4  and the same is a true, correct and complete
5  transcription of the testimony given by me and any
6  corrections appear on the attached Errata Sheet signed
7  by me.
8
9  _____    _____
10    (DATE)                (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

224

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2    I, Nancy Bond Rowland, Registered
3  Professional Reporter, the officer before whom the
4  foregoing proceedings were taken, do hereby certify
5  that the foregoing transcript is a true and correct
6  record of the proceedings; that said proceedings were
7  taken by me stenographically and thereafter reduced to
8  typewriting under my supervision; and that I am neither
9  counsel for, related to, nor employed by any of the
10  parties to this case and have no interest, financial or
11  otherwise, in its outcome.
12    IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal this 25th day of
14  February 2007.
15
16  My commission expires:
17  October 31, 2009
18
19
20  _____
21  NOTARY PUBLIC IN AND FOR THE
22  DISTRICT OF COLUMBIA