UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
JUDITH A. MANSFIELD,            )
                                )
            Plaintiff,          )
                                )
      v.                        )      Civil Action No. 05-1790 (RMU/JMF)
                                )
JAMES H. BILLINGTON,            )
LIBRARIAN OF CONGRESS,          )
                                )
            Defendant.          )
_____)

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S PARTIAL
MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant, James H.

Billington, Librarian of Congress, moves for summary judgment on Plaintiff's claims brought

pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.,

("Title VII") because there are no genuine issues in dispute and Defendant is entitled to judgment

as a matter of law.  In addition, Defendant opposes Plaintiff's Motion for Partial Summary

Judgment for the reasons set forth below.

## II.    BACKGROUND

Plaintiff, Judith Mansfield, a GS-15 employee with the Library of Congress ("Defendant

or "Library") brought this suit pursuant to Title VII alleging that she was subjected to

discrimination based upon her sex and in retaliation for engaging in protected activity.[1]
Complaint at ¶ 3.

Plaintiff has been employed by the Library since 1969, and at all times relevant to this action her permanent position since 1998 has been Chief of the Arts and Sciences Cataloging Division ("ASCD") in the Cataloging Directorate of Library Services.  Complaint at  ¶¶ 8-9. Plaintiff alleges that because of her sex from 2002-2004 she was paid less than her male supervisor when she was detailed to act in his position while he was detailed to another position in Library Services.  Complaint, ¶ 16.  Plaintiff also alleges that during the period of her detail to her supervisor's position that because of her sex she was paid less than a male co-worker whom she supervised at the time.  Complaint ¶¶ 27-28.  Plaintiff additionally alleges that from August 2004 to March 2005, she was paid less than two male co-workers because of her sex when they were all assigned similar collateral duties during a realignment period.  Complaint, ¶ 23. Moreover, Plaintiff alleges that the Defendant retaliated against her in March 2005 when it removed the collateral duties from Plaintiff (as well as her two male co-workers) after she complained about having to perform the collateral duties for less pay than her male colleagues. Complaint ¶¶ 25-26.

### III.    FACTUAL BACKGROUND

The Library of Congress is the largest Library in the world and houses over 130 million items, including books and other printed materials, maps, sound recordings, photographs, and manuscripts.  Marcum Decl. ¶ 1.  The Library employs over 4,000 full-time staff in seven major

---

[1] Plaintiff's claims for retaliation under the Equal Pay Act, 29 U.S.C. § 216(b), were dismissed by the Court on June 1, 2006.  See Docket Entry No. 19.  As a result, they are not addressed herein.

service units.  Id.  The majority (almost 2,500) of the Library's employees work in the Library

Services unit.  Id.  ¶ 2, see also Marcum Depo. at 6:7-8.  The head of Library Services is the

Associate Librarian for Library Services.  Marcum Depo. at 6:3-8.  The current Associate

Librarian for Library Services is Deanna Marcum.  Id.  Ms. Marcum was selected and appointed

to her position in August of 2003.  Id.  Ms. Marcum is in the Senior Level ("SL") pay grade, a

pay scale that has some similarity to the Senior Executive Service pay scale in the Executive

Branch of the Federal Government.  Marcum Depo. at 9:20-22; Hanratty Decl. ¶ 4.

At all times relevant to this action, Plaintiff's permanent position of record has been

Chief of the ASCD, GS-15.  Plaintiff was promoted to pay grade GS-15 in 1998, when she

applied and was selected to her current position as Chief of ASCD by the then Director for

Cataloging, Beacher Wiggins.  Wiggins Depo. at 116:10-22; Mansfield Depo. at 69:9-22.   At the

time, the Cataloging Directorate was one of seven directorates within Library Services.  Marcum

Depo. at 13:15-14:16.  When Plaintiff was selected as Chief of the ASCD in 1998, she worked

under Mr. Wiggins as an Automated Operations Coordinator, pay grade GS-13, Step 10.

Wiggins Decl. ¶ 6, fn.1.

In September 2002, then Associate Librarian for Library Services, Winston Tabb, retired.

Mr. Tabb was Mr. Wiggins' direct supervisor.[2]  Id. at ¶ 4.  The Library assigned Mr. Wiggins as

Acting Associate Librarian for Library Services until the process for selecting Mr. Tabb's

replacement was completed.  Id.; see also Wiggins Depo. at 50:18-51:1.  Consequently, Mr.

Wiggins sought volunteers to perform the duties of Acting Director for Cataloging  while he

---

[2] As one of the seven directors in the Library Services at the time, the Director for Cataloging
reported directly to the Associate Librarian for Library Services.

performed duties of Acting Associate Librarian for Library Services.  Wiggins Depo. at 52:14-54:21.  From the volunteers, Mr. Wiggins assigned Plaintiff to be the Acting Director for Cataloging.  Id.  Pursuant to Library personnel regulations, temporary promotions can last a maximum of 120 days.  Wiggins Depo. at 39:10-14, 42:13-43:14; Hanratty Depo. at 51:21-52:12; Library of Congress Regulation ("LCR") 2017-2.1, § 13.  Accordingly, in consideration of Plaintiff performing duties as Acting Director for Cataloging, and consistent with Library regulations, Mr. Wiggins temporarily promoted Plaintiff to the Senior Level pay grade for a period of 120 days.  Wiggins Depo. at 54:1-55:11.

Plaintiff was initially detailed to the duties of Acting Director for Cataloging for the period of September of 2002 until August 2004.  Mansfield Depo. at 175:9-16; Wiggins Depo. at 74:13-16.  After the end of her initial 120-day appointment, Mr. Wiggins decided that he wanted Plaintiff to continue performing the duties of Acting Director, because the search for Mr. Tabb's replacement was not completed and Mr. Wiggins was still performing the duties of Acting Associate Librarian and other duties.  Wiggins Depo. at 62:7-63:12; Wiggins Decl. ¶ 9.  Also, Mr. Wiggins wanted Plaintiff to continue as Acting Director because he was pleased with her performance as Acting Director during her initial 120-day assignment and because he wanted the continuity of a single manager leading the Cataloging directorate during his absence.  Id.  In February of 2004, Mr. Wiggins again promoted Plaintiff to the SL pay grade for a period of 120 days based upon her on-going performance of higher-graded duties as Acting Director.  Mansfield Depo. at 171:15-174:12.  In June 2004, Plaintiff's second temporary promotion period ended.

Prior to becoming Acting Associate Librarian, Mr. Wiggins had requested that Human Resources Services ("HRS") upgrade all the GS-15 Cataloging Chief positions, including Plaintiff's, under his supervision to the SL. Wiggins Depo. at 119:9-121:7. At the time, two of the Cataloging Chief's positions were classified at the SL, and six of the Cataloging Chief's positions, including Plaintiff's, were classified at the GS-15 pay grade level.[3] Classifier's Report; Mansfield Depo. at 115:15-20. As a result of Mr. Wiggins' request, in 2003 the Library's HRS hired a private contractor-classifier to undertake a classification review of the Cataloging Chief's positions. Mansfield Depo. at 119:7-13; Wiggins Depo. at 120:2-121:3. Upon concluding his review, the contractor-classifier recommended that three of the GS-15 positions (including Plaintiff's position) be upgraded to the Senior Level. Classifier's Report. During HRS' review of Mr. Wiggins request to upgrade the Cataloging Chief positions to the Senior Level, in August 2003, the Library selected and appointed Deanna Marcum as the new Associate Librarian for Library Services and Mr. Wiggins' term as Acting Associate Librarian for Library Services ended. Marcum Depo. at 5:20-22; Wiggins Depo. at 7:7-8:2.

Accordingly, shortly after Ms. Marcum's appointment in August 2003, the Director of HRS, Teresa Smith, submitted the contractor-classifier's recommendation upgrades to Ms. Marcum for review and approval. Marcum Depo. at 75:14-16. Upon completion of her review,

---

[3] There were eight cataloging divisions, each headed by a Chief, in Library Services. Six of the eight Cataloging Chief positions were occupied during the time Plaintiff was Acting Director and the incumbents were: Plaintiff (GS-15), Chief of the ASCD; John Byrum (SL), Chief of the Regional Cooperative Cataloging Division; Barbara Tillett (SL), Chief of the Cataloging Policy and Support Office; Susan Vita (SL), Ms. Vita's position of record was Whole Book Implementation Leader, but she encumbered the position of Chief of the Special Materials Cataloging Division at the time; Jeffrey Heynen (GS-15), Chief of the History and Literature Cataloging Division, and John Celli (GS-15), Chief of the Cataloging in Publication Division. Mansfield Depo. at 98:18-99:5. The two GS-15 positions of Chief of the Decimal Classification Division and Chief of the Social Sciences Classification Division were vacant during this period. Prior to Plaintiff's assignment as Acting Director however, these two positions had been occupied by a male and a female, respectively. Mansfield Depo. at 98:18-99:5; 113:1-9; 126:3-7.

Ms. Marcum declined to approve the request because she concluded that she did not want to add any additional SL positions to Library Services' management structure before she completed her planned realignment of Library Services, and she did not believe that Library Services' budget could support the addition of any new SL positions.  Id; see also Marcum Decl. ¶ 8.  Ms. Marcum, therefore, did not approve any of the recommended upgrades to SL for the three Cataloging Chiefs.  Marcum Depo. at 72:5-16; 76:3-15.

In September of 2004, Ms. Marcum decided to implement her planned realignment of Library Services.  Marcum Depo. at 18:3-6. As part of her realignment, Ms. Marcum decided to create five directorates that would oversee the operations of Library Services.  Marcum Depo. at 16-19.  Mr. Wiggins and Carolyn Brown (another SL manager in Library Services) were assigned as Directors of the two largest newly created directorates, Acquisitions and Bibliographic Access ("ABA") and Collections Services ("CS"), respectively.  Marcum Depo. at 45:16-46:2; Wiggins Depo. at 75:19-81:18.  At their request, Ms. Marcum gave Mr. Wiggins and Ms. Brown permission to temporarily create and to assign collateral duties to employees within their directorates who were willing to volunteer to assist the Directors in the performance of their duties.  Marcum Depo. at 119:22-120:17; Wiggins Depo. at 87:12-88:2.  Based upon Plaintiff's past performance and her expressed interest in voluntarily performing collateral duties, Mr. Wiggins recommended to Ms. Marcum that Plaintiff be assigned additional duties as Assistant Director for Bibliographic Access.  Ms. Marcum, therefore, assigned the Assistant Director for Bibliographic Access duties to Plaintiff.  Wiggins Depo. at 87:18-88:2.  Ms. Brown recommended Steve Herman (Chief of the Collections Access, Loan and Management Division) and Mark Dimunation (Chief of the Rare Book and Special Collections Division) for assignment

to the collateral duties as Assistant Director of Collections Management and Assistant Director of Special Collections and Services, respectively. Marcum Depo. at 120:11-17. Based upon their subject-matter knowledge, interest in performing the additional duties, and the recommendation of Ms. Brown, Ms. Marcum approved Mr. Herman and Mr. Dimunation's assignment to the Assistant Director collateral duties under the supervision of Ms. Brown. Marcum Depo. at 121:21-124:13, 128:16-129:18. When assigned their collateral duties, Mr. Herman and Mr. Dimunation already held permanent SL positions. Dimunation Depo. at 88:9-10; Herman Depo. at 7:15-20; Wiggins Depo. at 96:2-15. When assigned her collateral duties, Plaintiff at all times relevant to this action, except during the two 120-day details to the Senior Level, held a GS-15 position.

Shortly after being assigned the collateral duties of Assistant Director, Plaintiff expressed to Mr. Wiggins her disappointment that the Assistant Director duties did not have a permanent position description and an upgrade to the SL. Mansfield Depo. at 193:4-19. Therefore, Mr. Wiggins continued his effort to make the collateral duties permanent and renewed his effort to have Plaintiff appointed to a SL position. Wiggins Depo. at 92:18-95:9. As part of his effort, in January 2005, Mr. Wiggins encouraged and assisted in the preparation of a position description for the Assistant Director duties and he presented the position description to Ms. Marcum for review. Id. at 94:21-95:19, 105:10-20, 110:18-11:22, 177:5-178:4. Ms. Marcum, however, was adamant that the Assistant Director duties were strictly collateral duties and that she did not want to create any new SL positions because of budgetary constraints and the ongoing realignment of Library Services. Marcum Depo. at 133:21-134:2, 144:3-19, 146:21-147:1. Therefore, no

permanent position description for Plaintiff's Assistant Director collateral duties was approved
and Plaintiff remained in her permanent position at the GS-15 pay grade.

In a letter dated March 15, 2005, Plaintiff delivered a letter to the Librarian of Congress
and to the Associate General Counsel of the Library's Office of General Counsel, complaining
about her compensation at the GS-15 pay grade while performing collateral duties as Assistant
Director that were similar to the Assistant Director collateral duties being performed by male
colleagues who were paid at the SL pay grade (of their permanent positions).  Complaint ¶ 25;
March 15, 2005, letter.  In her March 15, 2005, letter Plaintiff stated that "if she did not receive a
response within 10 business days, she [would] assume there is no interest in resolving this matter
privately."  Id.  Shortly after receipt of the letter to the Librarian, the Associate General Counsel,
Jessie James, met with Ms. Marcum and informed her of Plaintiff's letter.  James Decl.¶ 5;
Marcum Depo. at 149:21-150:6.  During his meeting with Ms. Marcum, Mr. James presented
three options available to Ms. Marcum to cure Plaintiff's complaint:  (1) return Plaintiff
exclusively to the duties of her permanent position as Chief of the ASCD and allow Mr. Herman
and Mr. Dimunation to continue performing collateral duties as Assistant Directors; (2) create a
permanent position for Plaintiff at the SL pay grade; or (3) end the Assistant Director collateral
duties for Plaintiff, Mr. Herman, and Mr. Dimunation.  James Decl.¶ 6; Marcum Depo. 157:22-
158:22.  After consulting further with her senior staff, Ms. Marcum decided that the most
equitable option was to end the collateral duty assignments for all three Assistant Directors.
Marcum Depo. at 160:19-161:15; 178:22-183:14.  Accordingly, in April 2005, the Assistant
Director collateral duties ceased and Plaintiff, Mr. Dimunation, and Mr. Herman returned to their

permanent positions and duties in Library Services.  Plaintiff filed her complaint in this Court on

April 14, 2005.  See Docket Entry No. 1.

### IV.    STANDARDS OF REVIEW

**A.  Summary Judgment (Fed.R.Civ.P. 56)**

Summary judgment may be granted when the pleadings and evidence demonstrate that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment

as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Taylor v. Small, 350 F.3d

1286, 1290 (D.C. Cir. 2003); Diamond v. Atwood, 43 F.3d 1538, 1540 (D.C. Cir. 1995).  A

genuine issue is one that could change the outcome of the litigation.  See Anderson v. Liberty

Lobby, Inc, 477 U.S. 242, 243 (1986).  While all evidence and the inferences drawn therefrom

must be considered in the light most favorable to the nonmoving party, see Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the nonmoving party - when faced

with a summary judgment motion - has the burden of establishing more than the "mere existence

of a scintilla of evidence" demonstrating a genuine issue in dispute for purposes of defeating the

moving party's motion.  See Lester v. Natsios, 290 F.Supp.2d 11, 19-20 (D.D.C. 2003), citing

Anderson v. Liberty Lobby, 477 U.S. at 255.  "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted."  Id. at 249-50.  As the Supreme

Court has stated, "[o]ne of the principle purposes of the summary judgment rule is to isolate and

dispose of factually unsupported claims or defenses."  Celotex, 477 U.S at 323-24.

**B.    Discrimination Claims Under Title VII**

In Fogg v. Gonzales, 492 F.3d 447 (D.C. Cir. 2007), the D.C. Circuit held, *inter alia*, that

the 1991 amendments to Title VII codified two alternative ways of establishing liability for

intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was a "substantial factor" in the employment decision. Id. at 451. Under either theory, plaintiff must demonstrate discrimination by a preponderance of the evidence[4] and may rely on direct or circumstantial evidence to meet that burden. Desert Palace, Inc. v. Costa, 539 U.S. 90, 92-102 (2003).

In the absence of direct evidence, plaintiff may attempt to establish that she was the victim of intentional discrimination on the basis of her sex by relying on circumstantial evidence analyzed using the scheme first set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).[5] Under that scheme, the plaintiff must first, by a preponderance of the evidence, establish a prima facie case of discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). If the employee succeeds, the employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action. See McDonnell Douglas, 411 U.S. at 802. Once it is established that both parties have met their respective burdens of production (i.e., plaintiff by presenting a prima facie case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant. Hicks, 509 U.S. at 510.

---

[4] "Preponderance of the evidence" means such evidence as, when weighed against that opposing it, has the more convincing force that something is so. Hopkins v. Price Waterhouse, 737 F. Supp. 1202 (D.D.C. 1990), aff'd, 920 F.2d 967 (D.C. Cir. 1990); Metropolitan Stevedore Company v. Rambo, 521 U.S. 121, 137 n.9 (1997). "[W]hen the evidence is evenly balanced, the [party with the burden of persuasion] must lose." Id.

[5] Reliance on the McDonnell Douglas scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability. See Fogg v. Gonzales, 492 F.3d 447, 451 n.*

Then, the plaintiff must establish, by a preponderance of the evidence, that sex was a motivating factor for any employment practice. Desert Palace, 539 U.S. at 101 (citing 42 U.S.C. § 2000e-2(m)).

Alternatively, plaintiff can meet the ultimate burden by demonstrating that the defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action. St. Mary's Honor Ctr., 509 U.S. at 515-18. This is a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor. In the single motive case Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), Justice O'Connor recognized occasions where summary judgment would be appropriate:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Id. at 148.

Whichever standard is employed, plaintiff fails to meet her burden of coming forward with evidence to create a triable issue. As demonstrated below, the undisputed facts illustrate that plaintiff is unable to establish that discrimination was a motivating factor, much less that it was the sole motivating factor.

The fundamental requirement, however, is that the *prima facie* case, without additional proof to the contrary, give rise to an inference that the defendant's conduct was discriminatory.

See Simens v. Reno, 960 F.Supp 6, 8-9 (D.D.C. 1997).  As a general matter, therefore, to

establish a *prima facie* case of discrimination based on sex under Title VII, a plaintiff must

demonstrate by a preponderance of the evidence that (1) she was a member of a protected group,

(2) an adverse employment action took place, and (3) the unfavorable action gives rise to an

inference of discrimination.  Stella v. Mineta, 284 F.3d 135, 145 (D.C. Cir. 2002).   The focus for

summary judgment - or trial if summary judgment has not been sought or is denied - is whether

discrimination can be inferred from "the combination of (1) the plaintiff's *prima facie* case; (2)

any evidence the plaintiff presents to attack the employer's proffered explanation for its actions;

and (3) any further evidence of discrimination that may be available to the plaintiff (such as

independent evidence of discriminatory statements or attitudes on the part of the employer) or

any contrary evidence that may be available to the employer (such as evidence of a strong track

record in equal opportunity employment)."  Aka v. Washington Hosp. Center, 156 F.3d 1284,

1289 (D.C. Cir. 1998).   Although a plaintiff need not present evidence in each of these

categories to avoid summary judgment, id., a plaintiff is obligated to present *substantial* and

*credible* evidence of discrimination in order to survive a motion for summary judgment.  See

Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting [some] conclusory allegations

as true, therefore, would defeat the central purpose of the summary judgment device, which is to

weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); Carpenter

v. Federal Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (if plaintiff merely shows that

the legitimate nondiscriminatory reason offered by the employer is a pretext for a decision

intending to cover up an unsavory reason -- but one that is not illegal under the

antidiscrimination law,  the plaintiff is not entitled to try issues of fact, and summary judgment

for the employer is appropriate.); Hastie v. Henderson, 121 F.Supp.2d, 72, 77 (D.D.C. 2000)

aff'd, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001)("To defeat a motion for summary

judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal

speculation, but rather must point to 'genuine issues of material fact in the record.'"); Woodruff

v. DiMario, 164 F.Supp. 2d 1, 5 (D.D.C. 2001).[6]

## C.    Retaliation Claims Under Title VII

Title VII provides, in pertinent part, that it is unlawful for an employer to discriminate

against an employee because the employee "has opposed any practice made an unlawful

employment practice by [Title VII], or because [the employee] has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title

VII]."  42 U.S.C. § 2000e-3(a).  A *prima facie* case alleging retaliation or reprisal under Title VII

is established when the plaintiff demonstrates that (1) she engaged in protected behavior; (2) she

was subject to an adverse action by her employer or other conduct that might deter a reasonable

worker from making a complaint of discrimination; and (3) there is a causal link between the

adverse action and the protected activity.  Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C.

Cir. 2006); see also Burlington Northern & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2414-15

(2006) ("We agree with the formulation set forth by the . . . District of Columbia Circuit[] [in

Rochon].").  Relevant here, the alleged adverse action must be material, i.e., the alleged

retaliatory act must cause injury or harm to a plaintiff such that a reasonable worker would be

---

[6]  Additionally, there will be "instances where, although the plaintiff has established a *prima facie* case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."  Weigert v. Georgetown University, 120 F.Supp.2d 1, 22 (D.D.C. 2000)(quoting Reeves v. Sanderson Plumbing Co., 530 U.S. 133 (2000)).

dissuaded from making a charge of discrimination. <u>Burlington Northern</u>, 126 S.Ct. at 2414-15

("The anti-retaliation provision protects an individual not from all retaliation, but from retaliation

that produces an injury or harm."). If the plaintiff is able to establish a *prima facie* case of

retaliation, the analysis then follows as that for a discrimination claim, <u>i.e.</u>, plaintiff has the

burden of proving that defendant's actions were not taken for the reasons offered, but instead, for

a retaliatory purpose.   <u>See</u>, <u>e.g.</u>, <u>Freedman v. MCI Telecommunications Corp.</u>, 255 F.3d 840,

844-845 (D.C. Cir. 2001).

## V.    <u>ARGUMENT</u>

**A.    Plaintiff Is Time Barred From Raising Any Discrimination Claims Arising From Her Duties As Acting Director For Cataloging.**

Plaintiff did not timely file a complaint of sex discrimination alleging a disparity in pay

between herself and Beacher Wiggins or John Byrum while she was assigned duties as Acting

Director for Cataloging from September 2002 to June 2004. A plaintiff is time barred from

raising a claim of sex discrimination under Title VII where the allegedly discriminatory pay at

issue occurred outside the limitations period for filing a complaint. <u>Shea v. Rice</u>, 409 F. 3d 448,

455 (D.C. Cir. 2005), citing <u>Bazemore v. Friday</u>, 478 U.S. 385 (1986) (employee may recover for

discriminatorily low pay received **within the limitations period** because each paycheck

constitutes a discrete discriminatory act), and <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S.

101 (2002) (rejecting continuing violation theory because "discrete discriminatory acts are not

actionable if time barred, even when they are related to acts alleged in timely [and subsequently]

filed charges."). Plaintiff did not file any complaint of discriminatory pay with her agency until

she wrote a letter to the Librarian of Congress on March 15, 2005, wherein she complained that

-14-

her GS-15 pay was lower than that of male colleagues who were paid at the Senior Level ("SL") pay grade and who allegedly performed similar duties.  Complaint at ¶ 25.[7]

Specifically, Plaintiff alleges that she was paid less than her supervisor, the Director for Cataloging (Beacher Wiggins), while she was assigned to his position as Acting Director for Cataloging from September of 2002 to September 2004.  Complaint at ¶¶ 10-17 & 30.  Plaintiff also alleges that during the same time period while she was Acting Director for Cataloging she was paid less than a male colleague, John Byrum, who she had to supervise in her capacity as Acting Director even though her duties and responsibilities allegedly required "equal skill, effort, and responsibility…"  Complaint at ¶¶ 27-28 & 30.  Plaintiff however, was assigned duties as Acting Director for Cataloging in September 2002 while her supervisor, Beacher Wiggins, the incumbent Director for Cataloging, was himself assigned duties to the vacant position of Associate Librarian for Library Services.  Complaint at ¶¶ 10-11; Wiggins Depo. at 53:2-11. Plaintiff's assignment as Acting Director for Cataloging ceased no later than September of 2004. Wiggins Depo. at 66:4-14 and 67:13-20; Marcum Depo. at 18:21-19:1.[8]  The Library's regulations require that an employee file a complaint of discrimination with the Library's EEOCO, "not later than 20 workdays after the date of the alleged discriminatory matter."  Library of Congress Regulation ("LCR") 2010-3.1, Section 4.A and 6.E.[9]

_____

[7] Plaintiff first submitted a formal complaint to the Library's Equal Employment and Opportunity Complaints Office ("EEOCO") on April 18, 2005.  Complaint, ¶ 4.

[8]  The position of Director for Cataloging no longer existed once Ms. Marcum realigned Library Services and merged the Cataloging Directorate into the new Acquisitions and Bibliographic Access Directorate.

[9]  By statute, the Librarian of Congress is required to exercise the authority granted to the Equal Employment Opportunity Commission.  See 42 U.S.C. § 2000e-16(b).  In accordance with that statute, the Librarian of Congress has promulgated LCR 2010-3.1, entitled Resolution of Problems, Complaints and Charges of Discrimination in Library Employment and Staff Relations Under the Equal Employment Opportunity Program.  As such, a complaint that the Library engaged in discrimination is untimely unless the complainant consults with an EEO counselor at the

Because Plaintiff did not file a complaint of discrimination with the Library until (at the earliest) March of 2005, her claim based on allegedly discriminatory pay she received while performing duties as Acting Director for Cataloging is time-barred.  Brown v. Gen. Serv. Admin., 425 U.S. 820, 833-35 (1976) ("a federal employee may assert a Title VII complaint in court only after a timely complaint has been presented administratively to the agency involved."). Any allegedly discriminatory pay that Plaintiff received during the period in which she was assigned duties as Acting Director for Cataloging - from September 2002 to September 2004 - are discrete acts that are well outside the Library's 20-day limitations period for filing a complaint of discrimination.   Therefore, Plaintiff cannot "breathe new life" into the alleged discriminatory paychecks she received while performing duties as Acting Director for Cataloging by alleging that they were part of some larger pattern of discrimination to which she was subjected by the Library up to when she submitted her complaint to the Librarian in March of 2005 (by which time she had been performing the collateral duties of Assistant Director for Bibliographic Access since September of 2004 and, as discussed below, during which she also claims the Library paid her in a discriminatory manner).  Shea, 409 F.3d at 454.  Rather, the only discrete acts of allegedly discriminatory pay that are actionable are those related to Plaintiff's duties and pay during the 20-day limitations period prior to her March 15, 2005, letter to the Librarian.  Hence, Plaintiff's claims related to her allegedly being sexually discriminated against

---

Library within the 20-day period.  See Howard v. Evans, 193 F. Supp. 2d 221, 228 (D.D.C. 2002), citing Brown v. Gen. Serv. Admin., 425 U.S. 820, 833-35 (1976)).

with regards to her pay--while she was assigned to duties as Acting Director for Cataloging--is not actionable.

**B.**     **Even Assuming That Plaintiff's Claims Are Not Time Barred With Respect To The Period During Which She was Assigned Duties as Acting Director For Cataloging, She Cannot Establish A *Prima Facie* Case of Sex Discrimination As A Result Of Being Paid Less than Her Male Colleagues.**

Plaintiff cannot establish an inference of discrimination merely because she was paid less than Beacher Wiggins and John Byrum while she was performing the duties of Acting Director for Cataloging.  In order to establish a *prima facie* case of discrimination under Title VII, Plaintiff must demonstrate that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  George v. Leavitt, 407 f. 3D 405, 412 (D.C. Cir. 2005)(quoting Stella v. Minetta, 284 F. 3d 135, 145 (D.C. Cir. 2002)(quoting Brown v. Brody, 199 F. 3d 446, 452 (D.C. Cir. 1999).  A plaintiff may satisfy the third prong of the above test by, "demonstrating that she was treated differently from similarly situated employees who are not part of the protected class."  Id (citing to Holbrook v. Reno, 196 F. 3d 255, 261 (D.C. Cir. 1999).  To prove that she is similarly situated to a male employee, a plaintiff must also demonstrate that "all of the relevant aspects of her employment situation were 'nearly identical' to those of the male employee to which she is comparing herself."  Holbrook, 196 F.3d at 261 (citing to Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F. 3d 1507, 1514 (D.C. Cir. 1995)).  Plaintiff was not similarly situated to either Mr. Wiggins or Mr. Byrum, the two male colleagues to which she compares herself with respect to her claims of disparate pay while assigned duties of Acting Director for Cataloging.

Plaintiff's employment situation, at the time she assumed the duties of Acting Director for Cataloging in September of 2002, was in no way "nearly identical" to that of Mr. Wiggins. When Mr. Wiggins assigned the Plaintiff to the duties of Acting Director for Cataloging, Mr. Wiggins' permanent position (Director for Cataloging) was classified at the SL pay grade while Plaintiff's permanent position (Chief of the ASCD) was classified at the GS-15 pay grade.  In addition, Mr. Wiggins had been Director for Cataloging (and consequently in the SL pay grade) since his selection to the position in 1997--five years before Plaintiff assumed the duties as Acting Director for Cataloging.  Moreover, Plaintiff herself had only reached the GS-15 pay grade in 1998, after she applied and was selected to her permanent position as Chief of the ASCD (which had been Mr. Wiggins' permanent position, also at the GS-15 pay grade, from 1992 to 1997).  Wiggins Depo. at 116:10-22; Mansfield Depo. at 69:9-22.  Additionally, Mr. Wiggins was Plaintiff's supervisor at the time he assigned her the Acting Director for Cataloging duties (and had been since he selected her for the position of Chief of ASCD in 1998) and he remained her supervisor while she was Acting Director for Cataloging (in his role as Acting Associate Librarian for Library Services).

Mr. Byrum's employment situation was also in no way "nearly identical" to that of Plaintiff at the time she assumed the duties of Acting Director for Cataloging.  Mr. Byrum had been a cataloging Chief since before 1985—13 years before Plaintiff became a cataloging Chief in 1998; also in 1985, he was promoted to the GS-16 pay grade.  Mansfield Depo. at 102:17-104:6; Byrum SF-50.  In May of 1991, Mr. Byrum's GS-16 pay grade was converted to the SL

pay grade by act of Congress.  Id at 104:10-105:22; Byrum SF-50.[10]  Plaintiff only assumed

duties as a Cataloging Chief in 1998 and her position, unlike Mr. Byrum's, was classified at the

GS-15 pay grade.  While Plaintiff alleges that her supervision of Mr. Byrum, while she was

performing the duties of Acting Director for Cataloging, somehow infers discrimination in pay

(since she was paid for part of the time that she was performing duties as Acting Director at the

pay grade of her permanent GS-15 Chief of ASCD position), the facts show otherwise.

While it would appear, at first blush, unusual for a GS-15 to supervise a SL employee, it

was not something that was particular to Plaintiff's situation.  Indeed, Mr. Wiggins, who—as

noted above--had been the Chief of ASCD before Plaintiff was selected to the position, had

similarly been tasked as Acting Director for Cataloging from 1995 to 1997.  Mr. Wiggins, who at

the time was also paid at the pay grade of his permanent Chief of ASCD position (i.e. at the GS-

15 pay grade) for part of the time he was Acting Director, also supervised Mr. Byrum--who was

at all times after 1991 at the SL pay grade—and the other SL and GS-15 Chiefs in Cataloging.

Moreover, the ranks of the Cataloging Chiefs in Library Services was not the bastion of male

domination and oppression that Plaintiff would have the Court believe; rather, three females

(including Plaintiff) occupied three of the eight Cataloging Chief positions at all times relevant to

these proceedings.  Indeed, two of these females, Susan Vita and Barbara Tillett, were—like Mr.

Byrum—graded at the SL pay grade,[11] and Plaintiff--like Mr. Wiggins did between 1995 and

1997--also supervised these additional two SL positions in her capacity as Acting Director for

Cataloging.  Mansfield Affidavit ¶ 12.

---

[10] Mr. Byrum's position, along with all GS-16, 17, and 18 positions, was converted to the SL as a result of the
Federal Employees Pay Comparibility Act of 1990.  Mansfield Depo. at 105:7-18.

[11] See note 3 above.

Not only does Plaintiff's employment situation during the time she was Acting Director for Cataloging (and throughout her tenure at the Library) not support an inference of discrimination but, the Library's actions during the same period relating to its treatment of Plaintiff also does not imply that its decisions were rooted in sex discrimination. Mr. Wiggins, Plaintiff's supervisor at all times relevant to these proceedings, hired Plaintiff to replace him as Chief of the ASCD in 1998. Wiggins Depo. at 116:10-22; Mansfield Depo. at 69:9-22. Plaintiff's selection resulted in a promotion for her from the GS-13 pay grade to the GS-15 pay grade. As discussed below, Mr. Wiggins was also responsible for initiating a classification review and recommending that Plaintiff's position as Chief of the ASCD, along with all six cataloging Chief positions, should be reclassified to the SL pay grade. Moreover, during all times relevant to these proceedings Plaintiff has received Commendable to Outstanding performance evaluations and awards and Mr. Wiggins recommended (and the Library approved) two temporary promotions to the SL for Plaintiff while she was assigned the duties of Acting Director for Cataloging. Mansfield Evaluations; Wiggins Depo. at 54:1-55:11; Mansfield Depo. at 171:15-174:12. In fact, Plaintiff believes that Mr. Wiggins has been honest in all of his dealings with her and "has the highest integrity." Mansfield depo. at 200:1-9. Under the "same-actor inference," situations like the one alleged by Plaintiff, where the allegedly discriminatory actor (Mr. Wiggins) has previously selected the complainant for favorable treatment, creates a very strong inference that the actor holds no discriminatory animus and the plaintiff in such situations must present correspondingly stronger evidence of bias in order to prevail. Coghlan v. American Seafoods Co., 413 F. 3d 1090, 1097 (9th Cir. 2005). Plaintiff cannot show any such

-20-

bias on the part of any actor, Wiggins or otherwise, during the period that she was assigned the duties of Acting Director for Cataloging.

Accordingly, Plaintiff cannot show that her employment situation was nearly identical to that of her male colleagues so as to establish that the Library's treatment of her, as compared to her male colleagues, was biased on account of her sex. Moreover, she cannot even establish that any of the Library's actions, independent of how she was treated by the Library in comparison to male collegues, was motivated by discriminatory animus or motivated by Plaintiff's sex.

**C.     Even Assuming That Plaintiff Can Establish A *Prima Facie* Case of Sex Discrimination For the Period During Which She Was Assigned and Performed Duties As Acting Director For Cataloging, Defendant Had Legitimate, Non-Discriminatory Reasons For Paying Her Less than Her Male Colleagues During This Period.**

The Library had legitimate non-discriminatory reasons for the manner in which it compensated Plaintiff while she was assigned the duties of Acting Director for Cataloging. First, Plaintiff was only entitled to the pay of her permanent position while she was performing the higher-graded duties of Acting Director for Cataloging. A federal employee like Plaintiff is generally entitled only to the salary of her appointed position, even though higher-level duties are performed. United States v. Testan, 424 U.S. 392, 406 (1976); see also Matter of Griffin, 1993 WL 522128 (Comp. Gen., December 8, 1993) (employee who performed higher-graded duties for two-year period not entitled to salary of higher grade unless she is actually promoted). Second, an employee in the Library's Human Resources Services ("HRS"), Dennis Hanratty, was solely responsible for setting Plaintiff's pay (and all other persons recommended for temporary promotion to the SL pay grade) during those periods in which Plaintiff was temporarily promoted to the SL pay grade. Hanratty Depo. at 8:18-9:21; Wiggins Depo. at 55:3-15; Wiggins Decl., ¶ 3.

Mr. Hanratty explained in detail the non-discriminatory factors that he took into account in setting Plaintiff's temporary SL pay, as well as that of all other Library employees recommended for promotion to the SL pay grade.  Hanratty Depo. at 49:19-50:17: 59:1-64:18; see also Hanratty Decl. ¶¶ 6-7, 9 and LCR 2017-2.1, Section 13.

Specifically, with respect to Plaintiff's temporary promotion to the SL during her assignment as Acting Director for Cataloging, HRS looked at Plaintiff's then current salary and applied a reasonable percentage increase.  Hanratty Depo. at 50:3-11.  There is absolutely no evidence that the method employed by Mr. Hanratty to set Plaintiff's pay was in any way motivated by discriminatory animus or singled out Plaintiff for disparate treatment.  Moreover, as both Mr. Hanratty and Mr. Wiggins explained, temporary promotions at the SL are limited at the Library to 120 days per calendar year and a person temporarily promoted is automatically placed back in their permanent pay grade at the end of the 120-day period by the Library's HRS. Hanratty Depo. at 51:15-55:1; Wiggins Depo. at 15:10-14, 68:8-17; Hanratty Decl., ¶ 5. Therefore, not only was Plaintiff only entitled to the pay of her permanent position while she was performing the higher-graded duties of Acting Director for Cataloging, she was also given two temporary promotions to the SL pay grade, her temporary SL pay was set by the Library's HRS (and specifically by someone, Mr. Hanratty, to whom no discriminatory motive can be assigned), and her temporary promotion would have been automatically terminated by HRS at the conclusion of the 120-day period established by Library regulation and practice.  These facts all establish legitimate, non-discriminatory reasons for the amount of compensation received by Plaintiff during her tenure as Acting Director for Cataloging.

Third, the refusal of the Library to reclassify Plaintiff's position to the SL pay grade was also premised on legitimate, non-discriminatory reasons. As noted above, Mr. Wiggins was responsible for first recommending, in 2003, that the GS-15 cataloging Chief positions under his supervision (including Plaintiff's position) be upgraded to the SL pay grade and submitted a request to the Library's HRS to initiate a classification review of these positions. Wiggins Depo. at 119:2-121:10, 146:20-147:2, 152:19-153:1. At the time he submitted the request that the GS-15 cataloging Chief positions merited upgrade to SL, Mr. Wiggins was still performing the duties of Acting Director for Library Services. A contractor-classifier retained by the Library's HRS concluded that Plaintiff's GS-15 position, along with those of Chief of the History and Literature Cataloging Division (headed by John Heynen) and Chief of the Social Sciences Cataloging Division (vacant at the time) should be reclassified to the SL pay grade. See Classifier's Report, *passim*. But although Mr. Wiggins, and certainly Plaintiff with respect to her position, were convinced that the cataloging Chief positions merited promotion to the SL, the then Director for HRS, Teresa Smith, was not convinced. Mr. Wiggins noted that both the HRS Director and Deputy Librarian had to approve such upgrades in order for them to become effective and Ms. Smith expressed concerns about the impact that adding three additional SL positions would have on the Library's budget. Wiggins Depo. at 129:20-132:2. As such, Ms. Smith explained to Mr. Wiggins that she would have discussions with Executive-level staff at the Library before making a final decision. Id.

In August 2003, Deanna Marcum was selected and appointed to the permanent position of Associate Librarian for Library Services. Marcum Depo. at 5:22. Shortly after her appointment to the position, Ms. Marcum and Ms. Smith discussed the pending recommendation

for reclassification involving the GS-15 cataloging Chiefs.  Id at 70:11-72:16.  As she had done

with Mr. Wiggins, Ms. Smith informed Ms. Marcum that she did not agree with the

recommendation of the contractor-classifier and Mr. Wiggins that the cataloging Chief positions

should be upgraded to SL.  Id. at 75:18-77:20.  Ms. Marcum decided not to proceed with the

recommended reclassifications until "I better understood the kind of organizational structure we

were going to need and then take a look at what was required and what sort of person needed to

be in that position."  Id. at 76:10-15.   Based on her discussion with Ms. Marcum, Ms. Smith

wrote to Mr. Wiggins explaining that no action would be taken on the recommended

reclassification of the cataloging Chief positions.  Memo from Teresa Smith; Marcum Depo. at

72:9-74:8; see also Wiggins Depo. at 132:9-15.[12]   Ms. Marcum's decision to not have Plaintiff's

position, and the other GS-15 cataloging Chief positions upgraded to the SL pay grade, was a

perfectly legitimate, non-discriminatory business decision for an employer to take under the

circumstances.  Ms. Marcum was relatively new to the position of Associate Librarian for Library

Services when she decided to not move forward with the recommended upgrades based on her

discussions with the HRS Director, Teresa Smith.  As noted above, both Mr. Wiggins and Ms.

Marcum recalled, Ms. Smith also put forth perfectly legitimate, non-discriminatory reasons for

delaying action on the recommended upgrades—she was concerned about the impact that the

recommended upgrades would have and wanted to get further input from Library management

regarding such upgrades.  Considering that a defendant's burden of production with respect to

putting forth a legitimate, non-discriminatory reason for the contested employment decision is

---

[12] The contractor-classifier's review had also included a recommendation that several GS-14 Assistant Chief positions in Cataloging also be upgraded to the GS-15 pay grade.  Wiggins Depo. at 186:187:6-14.  This was all part of an extensive effort and campaign to upgrade the classification positions within the Cataloging directorate. Memorandum from Judith Mansfield to Towanda McLeod dated October 29, 2002.

"exceedingly light," the Library has more than satisfied this burden.  Paul v. Cohen, 1998 WL 351581 at *4 (D.D.C. June 24, 1998) (quoting Turnes v. AmSouth Bank, N.A., 36 F. 3d 1057, 1061 (11th Cir. 1994)).  Nor can Plaintiff point to any factors involved in Ms. Smith's or Ms. Marcum's decision-making that would in any way indicate that their reasons were pretext to mask sexual discrimination.

Indeed, the decision to not upgrade the GS-15 cataloging Chief positions affected not only Plaintiff's position but, that of a male cataloging Chief (Jeffrey Heynen) as well;[13] there is no evidence that Plaintiff can point to that either Ms. Smith or Ms. Marcum (who was relatively new to her position when she made the decision to not move forward with the recommended reclassifications), both females, harbored any discriminatory animus towards Plaintiff on account of her sex.  Moreover, the very person who first initiated and supported the recommended reclassification of Plaintiff's (and the other cataloging Chief positions) was Plaintiff's male supervisor, Mr. Wiggins.

Considering the above factors, there is absolutely no evidence that the Defendant's business decisions, with respect to Plaintiff's compensation while she was Acting Director for Cataloging and to not reclassify Plaintiff's permanent position to the SL pay grade, were in any way motivated by discriminatory animus based on Plaintiff's sex or that the Defendant's stated reasons for its employment decisions with respect to Plaintiff's pay and pay grade were a pretext for sex discrimination.

---

[13] The third GS-15 cataloging Chief position recommended for reclassification to the SL pay grade was vacant at the time.

**D.     Plaintiff Cannot Establish a *Prima Facie* Case of Sex Discrimination With Respect to Her Pay While Performing Duties as Assistant Director for Bibliographic Access from September 2004 to June 2005.**

Plaintiff cannot establish an inference of discrimination merely because she was paid less than Mark Dimunation, Steve Herman, and John Byrum while she was assigned to collateral duties as Assistant Director for Bibliographic Access.   As noted above, in order to establish a *prima facie* case of discrimination under Title VII, Plaintiff must demonstrate that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.  George v. Leavitt, 407 F. 3d 405, 412 (D.C. Cir. 2005)(quoting Stella v. Minetta, 284 F. 3d 135, 145 (D.C. Cir. 2002)(quoting Brown v. Brody, 199 F. 3d 446, 452 (D.C. Cir. 1999).  For a plaintiff to satisfy the third prong of the above test, she must demonstrate, "that she was treated differently from similarly situated employees who are not part of the protected class."  Id. (citing Holbrook v. Reno, 196 F. 3d 255, 261 (D.C. Cir. 1999)).  Once again, to show that she is similarly situated to a male employee, a plaintiff must also demonstrate that "all of the relevant aspects of her employment situation were 'nearly identical' to those of the male employee to which she is comparing herself."  Holbrook, 196 F.3d at 261 (citing to Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F. 3d 1507, 1514 (D.C. Cir. 1995)).

Plaintiff was not similarly situated to Mr. Byrum, Mr. Dimunation, or Mr. Herman, the three male colleagues to which she compares herself with respect to her claims of disparate pay while performing the duties of Assistant Director for Bibliographic Access.  As pointed out above, Mr. Byrum's employment situation was in no way "nearly identical" to that of Plaintiff at the time she assumed the duties of Assistant Director for Bibliographic Access.  Mr. Byrum had

been promoted to the GS-16 pay grade in 1985, 13 years before Plaintiff was promoted to the GS-15 pay grade as a result of her applying for and being selected to her permanent position of Chief of the ASCD. Mansfield Depo. at 102:17-104:6. In May of 1991, Mr. Byrum's GS-16 pay grade was converted to the SL pay grade. Id. at 104:10-105:22; Byrum SF-50.[14] Moreover, as also pointed out above, while it would appear unusual for a GS-15 to supervise a SL employee as Plaintiff did while she was Acting Director for Cataloging and Assistant Director for Bibliographic Access, it was not something that was particular to Plaintiff's situation since Mr. Wiggins (Plaintiff's direct supervisor at all times relevant to these proceedings) had similarly been tasked to supervise SL employees while in his previous permanent positions as a GS-15. See supra. As such, Mr. Wiggins had also supervised Mr. Byrum--who was at all times after 1991 at the SL pay grade—and the other SL and GS-15 Chiefs in Cataloging (including the two female SL cataloging Chiefs, Ms. Tillett and Ms. Vita). Wiggins Decl. ¶ 16; Mansfield Affidavit ¶ 12.

        Mr. Dimunation and Mr. Herman also had employment situations that were notably dissimilar to that of Plaintiff's when they were assigned collateral duties, along with Plaintiff, as Assistant Directors in the fall of 2004.[15] First, both Mr. Dimunation and Mr. Herman both worked in the Collections and Services Directorate headed by Carolyn Brown, a Directorate outside of the Cataloging Directorate--headed by Mr. Wiggins--in which Plaintiff worked. Marcum Depo. at 119:3-120:10. Mr. Dimunation was a rare book specialist and Mr. Herman's main job focus was collections security, storage, and accessibility. Dimunation Depo. at 6:9-9:6,

---

[14] See footnote 10, supra.

[15] Mr. Dimunation assumed duties as Assistant Director for Special Collections and Services and Mr. Herman assumed collateral duties as Assistant Director for Collections Management. Complaint at ¶ 22.

Herman Depo. at 16:1-20:18.  Mr. Dimunation applied for and was selected as Chief of the Rare

Book and Special Collections Division within Library Services, a SL position, in 1998.

Dimunation Depo. at 6:9-12; 88:8-9; Dimunation SF-50.  Mr. Dimunation was hired by the then

Director for Public Services Collections, Diane Kresh.  Id. at 9:7-18.[16]   Mr. Herman first came

to work at the Library in 1973, when he was hired to a GS-13 position in the Library's National

Library Service for the Blind and Handicapped.  Herman Depo. at 5:15-6:17.  Mr. Herman

subsequently changed positions and along the way received promotions to the GS-14 and GS-15

pay grades between 1977 and 1999.  Id at 6:17-7:20.  In March of 1999, Mr. Herman's

permanent position as Chief of the Collections, Access, Loan, and Management Division was

reclassified to the SL pay grade.  Id at at 6:17-7:20, 9:4-6, 21:17-22.  Mr. Herman's supervisor in

1999, Diane Kresh, recommended and initiated a successful reclassification of Mr. Herman's

position based on the accrual of additional responsibilities that Mr. Herman's position had

assumed over the years.  Id at 22:1- 24:19; Herman SF-50. Therefore, even assuming, as Plaintiff

posits, that she allegedly performed duties of "equal skill, effort, and responsibility…[but,] was

paid far less than her male counterparts [i.e. Dimunation and Herman] for the same work," while

performing the duties of Assistant Director, these allegations alone, even if true, do not infer

discrimination.  Complaint at ¶¶ 21, 23, and 30.  Mr. Dimunation and Mr. Herman's employment

situations were not "nearly identical" to Plaintiff's considering that both men (just like Mr.

---

[16]  The Public Service Collections Directorate was one of seven directorates, including the Cataloging Directorate
headed by Mr. Wiggins, in Library Services at the time that Ms. Marcum assumed duties as Associate Librarian for
Library Services.  The Public Services Directorate was folded into the new Collections and Services Directorate,
headed by Carolyn Brown, during the reorganization of Library Services that began in September of 2004 and which
resulted in the whittling down of the Library Services directorates from seven to five.

Byrum) were in permanent positions at the SL pay grade when they were assigned collateral duties as Assistant Directors in September of 2004.

Therefore, not only was Plaintiff's employment situation in no way "nearly identical" to that of Mr. Dimunation and Mr. Herman when they were each assigned to collateral duties as Assistant Director but also, none of the facts which resulted in Mr. Dimunation and Mr. Herman being at the SL pay grade when they were assigned (and while they performed) the collateral duties of Assistant Director in any way indicates that sex discrimination was behind their permanent positions being classified at the SL pay grade. Both men were either hired into positions that were already classified at the SL pay grade (Dimunation) or their supervisor (unlike Plaintiff's supervisor) was successful in making the case that the employee's accrual of duties over time merited classification at the SL (Herman). Both men were in permanent SL positions several years before they were assigned to the Assistant Director collateral duties in September 2004 and well before Ms. Marcum (who Plaintiff credits with responsibility for not compensating her at the same level as her male colleagues when they each were assigned Assistant Director collateral duties and who was, as further discussed below, responsible for again rebuffing Mr. Wiggins' efforts to upgrade Plaintiff's pay grade from GS-15 to SL while Plaintiff was performing the collateral duty of Assistant Director for Bibliographic Access) was appointed to the position of Associate Librarian for Library Services. While Plaintiff may quibble that Mr. Herman's reclassification was approved and hers was not, the fact remains that both efforts to reclassify these positions were taken four years apart, the disapproval of Plaintiff's upgrade was accompanied by the disapproval of two other GS-15 cataloging Chief positions (one held by a male and the other vacant at the time), and two different Associate Librarians for

-29-

Library Services were involved in each reclassification.[17]  In short, the facts and circumstances surrounding both reclassification efforts are completely different and devoid of any inference that Mr. Herman was favored because he was male and Plaintiff disfavored or targeted because she is a female.

Therefore, Plaintiff cannot show that her employment situation was "nearly identical" to that of Mr. Dimunation, Mr. Herman, or Mr. Byrum so as to establish an inference of sex discrimination based on the pay disparity between them while she was performing collateral duties as Assistant Director for Bibliographic Access.  To the contrary, the evidence shows that Mr. Dimunation and Mr. Herman were in permanent SL positions when they, like Plaintiff, were asked and volunteered to accept collateral Assistant Director duties in September 2004.   The evidence further shows that gender played no role in Mr. Dimunation's, Mr. Herman's, and Mr. Byrum's attainment of permanent positions at the SL pay grade.  More importantly however, there is no evidence which in any way gives rise to an inference that Plaintiff's employment situation (e.g. her pay status as a GS-15), while she was performing the collateral duty of Assistant Director, was a result of sex discrimination.

**E.    Even Assuming That Plaintiff Can Establish A *Prima Facie* Case of Sex Discrimination For the Period During Which She Was Assigned and Performed Collateral Duties As Assistant Director For Bibliographic Access, Defendant Had Legitimate, Non-Discriminatory Reasons For Paying Defendant Less Than Her Male Colleagues During This Period.**

The Library had legitimate, non-discriminatory reasons for the manner in which it compensated Plaintiff while she was performing the duties of Assistant Director for

---

[17] Mr. Winston Tabb was the Associate Librarian for Library Services who approved Mr. Herman's reclassification to the SL pay grade in 1999 and preceded Ms. Marcum as Associate Librarian.  See Herman SF-50 [Exhibit 19].

Bibliographic Access.  First, as noted above, Plaintiff is mistaken in believing that merely because a federal employee performs collateral duties or duties of a higher-graded position that she is entitled to higher pay.  A federal employee like Plaintiff is generally entitled only to the salary of her appointed position, even though higher-level duties are performed.  United States v. Testan, 424 U.S. 392, 406 (1976); see also Matter of Griffin, 1993 WL 522128 (Comp. Gen., December 8, 1993)(employee who performed higher-graded duties for two-year period not entitled to salary of higher grade unless she is actually promoted).

Second, although Mr. Wiggins drafted and presented to Ms. Marcum a proposal to upgrade (to SL pay grade) and make permanent Plaintiff's collateral duties as Assistant Director, Ms. Marcum had legitimate, non-discriminatory reasons for rejecting such a proposal.   Ms. Marcum stated that budget constraints and the ongoing reorganization of Library Services discouraged her from approving Mr. Wiggins' plan.  Marcum Depo. at 64:12-66:9, 67:2-18, 126:6-11, 144:5-19.  As Ms. Marcum further testified, Library Services budget has been "flat" since she was appointed in 2003, she has added no SL positions since she took over as Associate Librarian, SL positions that became vacant as a result of retirements have been left unfilled, and simply "I had no money."  Marcum Depo. at 44:8-11, 65:7-66:9, 108:11-109:1, 216:4-217:22.  While Mr. Wiggins, who supported Plaintiff's efforts to get her position upgraded, was again disappointed by Ms. Marcum's decision, he acknowledged that Ms. Marcum expressed concerns at the time about the Library Services budget in rejecting his proposal and he further conceded that although the proposal was only for Plaintiff's position, such a proposal would have had an "impact across the service unit, [since] a single instance is generally the beginning of a pattern…".  Wiggins Depo. at 95:10-97:11.  The Director for HRS, Mr. Hanratty, also seconded

the budget concerns expressed by Ms. Marcum stating that, "budgets really have gotten tighter and tighter and tighter…" across the Library and in order to maintain the same level of operations and cost-of-living increases programs mandated by Congress the size of the Library work force has been reduced by approximately 20% in the last 15 years.  Hanratty Depo. at 41:1-44:20.

Therefore, Ms. Marcum had perfectly legitimate non-discriminatory business reasons for not upgrading Ms. Marcum's collateral duty assignment as Assistant Director to a permanent SL position.  Moreover, the testimony of Mr. Hanratty and Mr. Wiggins supports Ms. Marcum's contention that budgetary reasons and the ongoing reorganization of Library Services were the reasons why she rejected Mr. Wiggins' efforts to upgrade and make permanent Plaintiff's collateral duty assignment and Plaintiff can present no evidence that these reasons were really a pretext to mask sex discrimination.  Cf. Hazen Paper Company v. Biggens, 507 U.S. 604, 608, 610-13 (1993) ("Because age and years of service are analytically distinct, an employer can take account of one while ignoring the other, and thus it is incorrect to say that a decision based on years of service is necessarily "age based.").

**F.    Plaintiff Cannot Show That The Library's Reasons For Returning Her To The Duties Of Her Permanent Position In March of 2005 Were Motivated By Retaliation Or That The Library's Proffered Reasons For Returning Her To The Duties Of Her Permanent Position Were A Pretext For Retaliation.**

As delineated above, for retaliation claims under Title VII, the *prima facie* requirements are slightly different than in a disparate treatment claim. To establish a *prima facie* case of retaliation, Plaintiff must show that (1) she engaged in some form of protected activity; (2) she was subjected to an adverse personnel action or some other action that would dissuade a reasonable person from pursuing an EEO complaint subsequent to, or contemporaneously with,

such protected activity; and (3) a causal connection exists between the protected activity and the adverse employment action.  Rochon, 438 F.3d at 1219-20; Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2002); Jones v. Washington Metropolitan Area Transit Authority, 205 F.3d 428, 433 (D.C. Cir. 2000).  Defendant concedes that Plaintiff is able to show that she engaged in protected activity as a result of her March 2005 letter which she delivered to the Librarian of Congress complaining about her compensation at her GS-15 pay grade while performing collateral duties as Assistant Director that were similar to the Assistant Director collateral duties being performed by male colleagues who were paid at the SL pay grade (of their permanent positions).  However, Plaintiff falters because she cannot show that the Library returning her exclusively to the duties of her permanent position amounts to an adverse employment action.  Moreover, Plaintiff falters because there is no causal connection between her delivery of a letter to the Librarian and the Library removing her collateral Assistant Director duties and returning her to her permanent position.

Returning Plaintiff exclusively to the duties of her permanent position does not constitute an adverse employment action.  As Plaintiff herself concedes, after speaking with Ms. Marcum about taking on the Assistant Director duties, Ms. Marcum explained to the Library Services staff that the Assistant Director duties were going to be collateral duties.  Mansfield Depo. at 181:15-182:6.  At no time did the Library appoint Plaintiff to the Assistant Director duties on a permanent basis nor did Ms. Marcum ever promise Ms. Mansfield that her [Plaintiff's] collateral duty as Assistant Director would be made permanent.  While Mr. Wiggins tried to have Plaintiff's position upgraded by initiating the drafting of a position description for Plaintiff's Assistant Director duties and presenting the position description to Ms. Marcum in January 2005,

Ms. Marcum explained to him that she did not want to do this since the reorganization of Library Services was still ongoing and budgetary constraints precluded her from creating new permanent SL positions.  Wiggins Depo. at 94:21-95:19, 105:10-20, 110:18-11:22, 177:5-178:4; Marcum Depo. at 133:21-134:2, 144:3-19, 146:21-147:1.  While Plaintiff laments that after having the Assistant Director collateral duties removed she "suffered diminishment in her supervisory duties, budgetary responsibility, and overall influence on Library Services," these were merely temporary entitlements, the removal of which cannot constitute and adverse employment action.  As this Court in Forkkio noted, by reversion to one's permanent position an employee (such as Plaintiff) does not, "lose a term or condition of employment to which he had anything but a temporary entitlement."  Forkkio v. Tanoue, 131 F. Supp. 2d 36, 42 (D.D.C. 2001).  Moreover, Plaintiff returned to her permanent position as Chief of the ASCD, the duties and salary of which were not reduced, diminished, or otherwise changed in any manner when the Library removed Plaintiff's collateral duties as Assistant Director.

Even assuming that the Plaintiff can show that the Library's removal of her Assistant Director collateral duties was an adverse action, the Library had legitimate, non-retaliatory reasons for rejecting Plaintiff's demand to be compensated the same as her Assistant Director male colleagues.  In order to establish the causal connection component of a Title VII case, Plaintiff must show that the Library removed her Assistant Director collateral duties on account of her engaging in protected activity and not for some legitimate reason, "such as rejecting the employee's demand because it is unreasonable."  Paquin v. Fed. Nat. Mtg. Ass'n, 119 F. 3d 23, 31-32 (D.C. Cir. 1997).  The Library had legitimate non-retaliatory reasons for rejecting Plaintiff's demand that she be compensated at the SL pay grade.  Ms. Marcum testified that upon

-34-

receiving notice of Plaintiff's letter to the Librarian she met with attorneys in the Library's General Counsel's Office ("OGC") as to what her options were.[18]  Marcum Depo. at 157:1-158:7; see also James Decl. ¶ 5.  Mr. James advised Ms. Marcum that she had three options:  (1) return Plaintiff to her permanent position as Chief of the ASCD and allow Mr. Herman and Mr. Dimunation to continue performing collateral duties as Assistant Directors; (2) create a permanent position for Plaintiff at the SL pay grade; or (3) end the Assistant Director collateral duties for Plaintiff, Mr. Herman, and Mr. Dimunation.  Id. at 157:22-158:22; see also James Decl. ¶ 6.  Mr. James presented the three options to Ms. Marcum based upon his thirty-plus years of background and experience in personnel law.  James Decl. ¶ 7.  Based upon his background and experience, he believed these options are an appropriate, legal and viable way of addressing a claim of allegedly performing higher graded duties without compensation brought by an employee.[19]  Id.  After consulting further with her senior staff, Ms. Marcum decided that the most equitable option was to end the collateral duty assignments for all three Assistant Directors and return them exclusively to their permanent positions.  Id. at 160:22-163:3, 179:15-180:2.  Ms. Marcum's decision was informed by her desire to be fair by not singling out just one Assistant Director (i.e., Plaintiff) for reversion to the duties of their permanent position and largely by the

_____

[18] Plaintiff provided the March 15, 2005 letter to the Office of the Librarian and to Jessie James, Associate General Counsel, Office of General Counsel.  After reviewing the March 15, 2005, letter from Plaintiff, Mr. James contacted Ms. Marcum to notify her of the letter and explain the options available to Ms. Marcum to cure Plaintiff's complaint.

[19] Indeed, Plaintiff's own expert, Stephen H. Perloff, who has 27 years of experience in personnel rules and regulations, concedes that the Library was not required to promote Plaintiff after she complained about her compensation, but had other choices at its disposal.  Specifically, he testified that the Library had the option of taking away the alleged grade-enhancing duties from Plaintiff.  Perloff Depo. at 40-41:17; 45:11-18.

budgetary issues that had constrained her from approving Plaintiff's upgrade to SL in the past. Id. at 182:6-10.

Plaintiff's motion relies entirely upon the proximity in time for the causal link, but the responsiveness of the Library is, without more, simply not probative of retaliation. Although the Supreme Court in Clark Cty. School Dist. v. Breeden, 532 U.S. 268, 273-74 (2001), acknowledged that three months between the protected activity and the challenged action can give rise to an inference of causation, it did not hold that proximity in time alone entitles plaintiffs to judgment in their favor. The connection in time between the complaint and its resolution is logical.

There is absolutely no evidence, save for Plaintiff's musings that she and the other Assistant Directors were unhappy with Ms. Marcum's decision and the timing of Ms. Marcum's decision to return them all to the duties of their permanent positions, that in any way can show that Ms. Marcum's decision was motivated by a desire on the part of Ms. Marcum to retaliate against Plaintiff for delivering her [Plaintiff's] letter to the Librarian. To the contrary, the evidence shows that Ms. Marcum (like any responsible manager) was no doubt concerned by the allegations of legal wrongdoing expressed in Plaintiff's letter but, there is not a scintilla of evidence that Plaintiff can present, other than her own assertions, that Ms. Marcum's decision was motivated by anything more than a desire to do the appropriate thing by removing those duties which Plaintiff in her letter claimed she should be compensated for at the SL pay grade. While one of the options presented to Ms. Marcum was to upgrade Plaintiff's position to the SL pay grade, Ms. Marcum made a legitimate choice to reject this proposal as unreasonable in light of her budgetary concerns at the time. As noted above, such concerns were not illegitimate or

pretextual in light of the serious budgetary concerns that Ms. Marcum, Mr. Hanratty, and Mr. Wiggins had acknowledged had been taking place since before Ms. Marcum assumed her duties as Associate Librarian in 2003.

Therefore, Plaintiff cannot establish that the Library's reasons for removing her collateral duties as Assistant Director and returning her exclusively to the duties of her permanent position was because of an illegitimate reason. Moreover, Plaintiff cannot establish that the Library's reasons for removing her collateral Assistant Director duties was really a pretext for retaliation.

## VI. <u>Conclusion</u>

For the reasons stated herein, defendant respectfully requests that the Court grant his Motion for Summary Judgment and, based on such, dismiss Plaintiff's complaint in entirety and with prejudice.

Dated:  November 1, 2007.

Respectfully submitted,


_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney

 /s/ _____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

 /s/ _____
JANE M. LYONS, D.C. Bar # 451737
Assistant United States Attorney
555 4th Street, N.W - Room E4822.
Washington, D.C.  20530
(202) 514-7161
(202) 514-8780 (facsimile)


-37-

Of Counsel:
Julia Douds, Assistant General Counsel
Evelio Rubliella, Assistant General Counsel
Office of General Counsel, Library of Congress