# MANSFIELD DEPOSITION

                                                                           1

                    IN THE UNITED STATES COURT

                       OF FEDERAL CLAIMS


- - - - - - - - - - - - - - x
JUDITH A. MANSFIELD,         :
        Plaintiff,           :  Civil Action No.
    v.                       :  05-472C
THE UNITED STATES,           :
        Defendant.           :
- - - - - - - - - - - - - - x

                              Tuesday, April 17, 2007
                              Washington, D.C.


    Deposition of JUDITH A. MANSFIELD, commencing at 9:38 a.m., held at the The Library of Congress, 101 Independence Avenue, S.E., Washington, D.C., before Keith Wilkerson, a notary public in and for the District of Columbia.

**Page 66**

1  A. Yes.
2  Q. And is that your name listed under the
3  Name column?
4  A. Yes.
5  Q. And under the nature of the action
6  recommended, it says change to lower grade?
7  A. Yes.
8  Q. And the date of the request is January
9  16, 1998?
10 A. Yes.
11 Q. And under the From column, it's from an
12 Administrative Librarian, Assistant Chief, ASCD,
13 Arts and Sciences Cataloging Division, to
14 Librarian, Automated Operations Coordinator. Is
15 that correct?
16 A. Yes.
17 Q. And was that a change to a lower grade?
18 A. Yes.
19 Q. Why was there a change to a lower grade?
20 A. It was the termination of the detail.
21 Q. So the detail terminated?
22 A. Right.

**Page 67**

1  Q. And you went back to the Automated
2  Operations Coordinator position?
3  A. Correct.
4  Q. And who was your supervisor at that time?
5  A. When I went back, I think the next person
6  that went in was Margaret Detwiler, the next person
7  who went in as Assistant Chief.
8  Q. I'd like to show you a document that I'd
9  like marked as Library Exhibit No. 27.
10             (Library Exhibit No. 27
11             was marked for identification.)
12 Q. Would you take a look at that document?
13 Is this a Notification of Personnel Action?
14 A. Yes.
15 Q. And is that your name under the Name
16 column?
17 A. Yes.
18 Q. And the effective date is February 8th,
19 1998?
20 A. Yes.
21 Q. And it says under the nature of the
22 action, change to a lower grade?

**Page 68**

1  A. Yes.
2  Q. And again it's from the Administrative
3  Librarian, Assistant Chief, Arts and Sciences
4  Division, to Librarian, Automated Operations
5  Coordinator?
6  A. Well, it says Administrative Librarian,
7  Assistant Chief, Arts and Sciences Cataloging
8  Division to Librarian, Automated Operations
9  Coordinator.
10 Q. And is this the Notification of Personnel
11 Action related to Library Exhibit No. 26?
12 A. Yes.
13 Q. And so this action actually occurred at
14 that time?
15 A. Yes.
16 Q. Are you making a claim in either your
17 case in the District Court or the Court of Claims
18 against the Library for that change to a lower
19 grade?
20 A. No.
21 Q. I'd like to show you a document that we'd
22 like marked as Library Exhibit No. 28.

**Page 69**

1             (Library Exhibit No. 28
2             was marked for identification.)
3  Q. Take a look at that document. Is this a
4  Personnel Action Recommendation?
5  A. Yes.
6  Q. And is that your name under the Name
7  column?
8  A. Yes.
9  Q. And at the top it says Received, and the
10 date is May 14th, 1998?
11 A. Yes, and Director of Personnel is
12 underneath that.
13 Q. And is the nature of the action a
14 promotion?
15 A. Yes.
16 Q. And the promotion is from what?
17 A. It is from Librarian, Automated
18 Operations Coordinator.
19 Q. To?
20 A. Administrative Librarian, Chief, ASCD.
21 Q. And what grade is that?
22 A. 15.

**Page 98**

1 procedures would be for the standards that the
2 Library of Congress promulgates, and our records
3 reflect those standards.
4     Q. How many other chief's positions are
5 there in cataloging?
6     A. Cataloging no longer exists. It's now
7 Acquisitions and Bibliographic Access.
8     Q. Let's go back to the period of 1997 to
9 2002. Did cataloging exist during that period?
10     A. Yes.
11     Q. How many chief's positions were there?
12 Do you know?
13     A. There were eight.
14     Q. And who occupied those eight positions?
15     A. In which year, '97 or 2002?
16     Q. Let's do 2002. Well, let me go back to
17 '97.
18     A. Regene Ross was Chief of Social Sciences
19 Cataloging Division. John Byrum was Chief of
20 Regional and Cooperative Cataloging Division. Jeff
21 Heynen was Chief of History and Literature
22 Cataloging Division. Sue Vita was Chief of Special

**Page 99**

1 Materials Cataloging Division. David Smith was
2 Chief of Decimal Classification Division. John
3 Celli was Chief of Cataloging in Publication
4 Division. Barbara Tillett was Chief of Cataloging
5 Policy and Support Office. How many have I done?
6     Q. I think you got them all.
7     A. And in '97 there was no Chief of Arts and
8 Sciences Cataloging Division.
9     Q. Let's go to the period of time that there
10 was a request for a desk audit of the position, of
11 the chief's position, the recommendation. What
12 year was that?
13     A. Which one? The one that was made by
14 Beacher?
15     Q. Well, let me back up. Was there another
16 one that was made?
17     A. That's what I was referring to earlier.
18 I think there was one earlier.
19     Q. When was that?
20     A. Before I became chief.
21     Q. So before you became chief in 1998?
22     A. Right.

**Page 100**

1     Q. Was there an audit?
2     A. I cannot be sure, Jessie, I cannot be
3 sure, but I think so.
4     Q. Do you know the results of that audit?
5     A. That's what I think I know, but I'm not
6 sure.
7     Q. Tell me what the results were.
8     A. That they would not be -- I think
9 Mr. Wiggins had recommended them for SL, and I
10 think that the answer was no. Well, I know it was
11 no because I didn't get it.
12     Q. Sometime prior to you becoming the chief
13 Mr. Wiggins recommended it. Who would he have made
14 that recommendation to, if you know?
15     A. Well, I assume HR, but other than that, I
16 don't know.
17     Q. Would it have been five years prior to
18 that?
19     A. I don't know.
20     Q. You don't have any idea of when it was,
21 but you do recall or you believe that it was done?
22     A. I believe so.

**Page 101**

1     Q. And the answer back was no?
2     A. Right. That's my understanding.
3     Q. And at the time of that request by
4 Mr. Wiggins, was Barbara Tillett a chief?
5     A. I don't know.
6     Q. You don't know?
7     A. You mean when he requested it?
8     Q. Yes.
9     A. I don't know.
10     Q. Was John Byrum a chief at that time?
11     A. Yes.
12     Q. So Byrum was a chief?
13     A. Yes.
14     Q. Was Sue Vita a chief?
15     A. She had been a chief for some time, and
16 so had John Byrum, since they were both chiefs
17 before '92, and I became a chief in '98.
18     Q. So Sue Vita would have been?
19     A. Yes.
20     Q. And the only person you're uncertain
21 about is Barbara Tillett?
22     A. Correct.

**102**

1  Q. So John Byrum was a senior level at that
2  time?
3  A. Yes. I'm assuming that, Jessie, because
4  if I found out right after I became chief I assume
5  that the request was within five years, so I'm
6  going on that assumption. I probably shouldn't be
7  answering these questions.
8  Q. That's all right. I won't hold you
9  accountable. So Sue Vita was an SL?
10 A. I don't know.
11 MR. FREDRICKSON: Can you pin down the
12 time frame better than that?
13 Q. I'd like to show you a document which
14 we're about to mark as Library Exhibit 32.
15       (Library Exhibit No. 32
16       was marked for identification.)
17 Q. Would you take a look at the document
18 that is marked as Library Exhibit 32? What is
19 that?
20 A. It's a Notice of Personnel Action.
21 Q. And who is that Notice of Personal Action
22 for?

**103**

1  A. John Byrum.
2  Q. And under the column Nature of Action it
3  says promotion. Is that correct?
4  A. Yes.
5  Q. And the date is at the bottom in column
6  34?
7  A. Yes, the date of the action.
8  Q. And the date of the action is May 20th,
9  1985. Is that correct?
10 A. Yes. That's what it says.
11 Q. And in the From column it says
12 Administrative Librarian, Chief?
13 A. Yes.
14 Q. And what is the Desc.?
15 A. Descriptive.
16 Q. Cataloging Division?
17 A. Yes.
18 Q. And it's also listed him as a chief at
19 that point. Is that correct?
20 A. Yes.
21 Q. And his grade at that point is a 15. Is
22 that not correct?

**104**

1  A. Yes.
2  Q. And he's promoted to an Administrative
3  Librarian, Chief, Descriptive Cataloging, GS-16?
4  A. Yes.
5  Q. So he was a GS-16 in 1985 according to
6  this document. Is that correct?
7  A. Yes.
8       (Library Exhibit No. 33
9       was marked for identification.)
10 Q. This document is marked as Library
11 Exhibit No. 33. Take a look at that document.
12 A. Okay.
13 Q. Is that a Notification of Personnel
14 Action?
15 A. Yes.
16 Q. Is that notification for John Byrum?
17 A. Yes.
18 Q. And under Nature of Action it says pay
19 adjustment. Is that correct?
20 A. Yes.
21 Q. And the effective date is May 5th, 1991?
22 A. Yes.

**105**

1  Q. And in the From column it lists GS-16.
2  Is that correct?
3  A. Yes.
4  Q. And in the To column it lists SL, which
5  is senior level. Is that correct?
6  A. Yes, for the pay plan.
7  Q. And at the bottom, in column 45, can you
8  tell us what that reads?
9  A. Action reflects the establishment under
10 Section 102 of the Federal Employees Pay
11 Comparability Act of 1990 (Public Law 101-509) of a
12 new, ungraded senior-level pay system for positions
13 formerly at GS-16, 17, and 18. An employee's
14 salary will not necessarily change under the new
15 system.
16 Q. So this was the conversion of Mr. Byrum's
17 position from a 16 to an SL. Is that correct?
18 A. Yes. That's what it appears to be.
19 Q. So as of 1991 he was an SL. Is that
20 correct?
21 A. Yes.
22 Q. And looking under the To column, he was

**Page 110**

1  A. Yes.
2  Q. So I'm going to ask again. The request
3  by Mr. Wiggins, would it have been made sometime
4  prior to Barbara Tillett became an SL?
5  A. I don't know that.
6  Q. You don't know?
7  A. I don't know. I don't have any knowledge
8  of when he made that request. I only really have
9  knowledge that it was denied.
10 Q. Byrum was an SL, according to your
11 testimony, and Vita was an SL at the time, but you
12 don't know whether Tillett was at the time of the
13 audit that he asked for that was declined. Is that
14 correct?
15 A. I don't know.
16 Q. Let's go to the second audit.
17 A. The 2003 audit?
18 Q. Yes. What was your title at that time?
19 A. I was the Acting Director for Cataloging.
20 Q. And who made the request?
21 A. Mr. Wiggins.
22 Q. And he made that request to whom?

**Page 111**

1  A. HR.
2  Q. And who was the head of HR at the time?
3  A. Teresa Smith.
4  Q. And he requested specifically what?
5  A. He submitted a revised position
6  description and asked for it to be classified, I
7  think.
8  Q. To what grade?
9  A. I actually don't recall if he requested a
10 grade.
11 Q. So he just requested that it be
12 classified?
13 A. I don't recall.
14 Q. You don't recall what he submitted and
15 what his request was?
16 A. No, I don't.
17 Q. What did —
18 A. But I think that — what I think might be
19 helpful to you is I think that the way the position
20 description was drafted was — I think you have to
21 try and figure it out in advance, because I think
22 it was drafted as an SL.

**Page 112**

1  Q. So it was drafted as an SL?
2  A. Right.
3  Q. And at the time that it was drafted how
4  many chief's positions were there?
5  A. Eight.
6  Q. And was the Regional and Cooperative
7  Cataloging Division one of the chief's positions?
8  A. Yes.
9  Q. And the chief of that division was John
10 Byrum?
11 A. Right.
12 Q. And John Byrum had an SL position at that
13 point?
14 A. Yes.
15 Q. And the Cataloging Policy and Support
16 Division was headed by Barbara Tillett?
17 A. Yes.
18 Q. And Barbara Tillett in 2003 was an SL?
19 A. Yes.
20 Q. And the Social Sciences Cataloging
21 Division, was that vacant?
22 A. I'm not sure what division you mean.

**Page 113**

1  Q. Was there a vacant position?
2  A. At that time there were two.
3  Q. Which two? Was Decimal Classification
4  one?
5  A. Yes.
6  Q. And what was the other?
7  A. Social Sciences.
8  Q. And so those two positions were vacant?
9  A. Yes.
10 Q. And the History and Literature Cataloging
11 Division was headed by Jeff Heynen?
12 A. Yes.
13 Q. And Jeff Heynen was a GS at what grade?
14 A. 15.
15 Q. And you headed up the Arts and Sciences
16 Cataloging Division.
17 A. That was my permanent position.
18 Q. Even though you were on detail at that
19 point to the director, the acting director
20 position.
21 A. Yes.
22 Q. And you were and are a GS-15?

**114**

1  A. Yes.
2  Q. And Sue Vita headed up the Special
3  Materials Cataloging Division.
4  A. Yes.
5  Q. And she was an SL?
6  A. Yes, but the chief's PD was not.
7  Q. The chief's PD was not?
8  A. No.
9  Q. What does that mean?
10 A. She did not actually occupy the Special
11 Materials Cataloging Division, the PD.
12 Q. But she performed the functions of the
13 chief?
14 A. Yes.
15 Q. So she was the Chief of Special Materials
16 Cataloging Division, but she occupied a position as
17 Supervisory Librarian, Whole Book Implementation
18 Leader?
19 A. Correct. That's my understanding,
20 anyway.
21 Q. And did all of the chiefs perform the
22 same duties?

**115**

1  A. Pretty much. If you look particularly at
2  the Special Cataloging Division, Regional and
3  Social Sciences, Cataloging in Publication had a
4  different kind of focus, because that was mostly a
5  library technician kind of operation, and then
6  decimal classification selectively applied decimal
7  numbers to the materials that were cataloged by the
8  other divisions.
9  Q. Let me interrupt you one second and ask a
10 question. I left one person out. The Cataloging
11 in Publication Division --
12 A. That's John Celli.
13 Q. So John Celli was a 15?
14 A. Yes.
15 Q. So there were three 15s, two positions
16 weren't filled, and three SLs?
17 A. That sounds right to me.
18 Q. So there were three SLs, three 15s, and
19 two positions that were not filled.
20 A. Right.
21 Q. And you were explaining that they all
22 perform pretty much the same function.

**116**

1  A. Well, the four that I described, we would
2  have had the most similar duties.
3  Q. And what three were those?
4  A. The four that are most aligned. We all
5  do cataloging, but the four that are most aligned
6  are History and Literature, Social Sciences, Arts
7  and Sciences, and -- now I can't do the listing.
8  Q. They were Regional Cataloging, Cataloging
9  Policy and Support, History and Literature, Arts
10 and Sciences, and Special Material Cataloging.
11 A. I was comparing Special Materials,
12 Regional, History and Literature, and Arts and
13 Sciences, so anything that I said about my job
14 previously would really apply to any of those
15 chiefs. John Celli's position was different in
16 that he was serving more as the liaison between the
17 publishing community and the Library for that
18 program, and his staff was largely technician
19 staff.
20    I described the Decimal Classification
21 Division. We all worked in concert with
22 cataloging, Cataloging Policy and Support, because

**117**

1  we were feeding, you know, policy changes to that
2  office, which would incorporate them into the
3  documentation.
4  Q. So Byrum, Heynen, you, and Vita performed
5  the same type of functions.
6  A. Right.
7  Q. So you were pretty much doing the same
8  thing. What was Tillett doing that was different
9  than what you did?
10 A. Well, she didn't have actual catalogers
11 in her division. We fed work to her and her
12 division fed work to her. She ran the low-level
13 maintenance function of people who just went in and
14 did data entry. Once we proposed changes they
15 would do the data entry to effect the changes, and
16 then she has a body of specialists who write
17 documentation. They do training and that sort of
18 thing.
19 Q. And Decimal Classification, do they do
20 any cataloging?
21 A. They classify selectively, because
22 they're an arm of Forest Press, which publishes the

**126**

1    was an SL.
2    A.  Yes.
3    Q.  And the Social Sciences Cataloging
4    Division chief's position was vacant.
5    A.  Yes.
6    Q.  Was that also a 15 if it had been filled?
7    A.  Yes.
8    Q.  The Special Materials Cataloging Division
9    was headed by Sue Vita, who was also a chief, and
10   she was an SL.
11   A.  Yes, but in her chief's position.
12   Q.  I understand that.  I'd like to show you
13   a document that I'd like marked as Library Exhibit
14   37.
15          (Library Exhibit No. 37
16           was marked for identification.)
17   Q.  You were telling us what the findings and
18   recommendation was.
19   A.  Right.
20   Q.  And the recommendation was what? Which
21   positions?
22   A.  Well, let's look at the document and see

**127**

1    what it says.
2    Q.  Okay.
3    A.  On the next to the last page -- it looks
4    like 28 might be your page number.  The findings
5    and conclusions seem to be recommended there.
6    Q.  And what are the findings?
7    A.  I can read this to you.  It says:  The
8    first six positions noted above --
9    Q.  Which were which positions?
10   A.  The Regional and Cooperative Cataloging
11   Division, the Cataloging Policy and Support
12   Division, the Social Sciences Cataloging Division,
13   the History and Literature Cataloging Division, the
14   Arts and Sciences Cataloging Division, and the
15   Special Materials Cataloging Division.
16         He says:  The first six positions noted
17   above manage divisions with substantial resources,
18   i.e., diverse functional responsibilities, a
19   multi-million dollar budget, and large staffs.
20   This diversity requires exceptional administrative
21   skill to coordinate and integrate the various
22   functions and resolve broad internal management

**128**

1    issues, for example managing change, internal
2    restructuring of functions, automation, cost
3    reduction, and initiating, changing, or
4    discontinuing ongoing projects.  Those positions
5    are recommended for consideration for elevation to
6    senior level.
7          The final two positions differ
8    significantly from the first six in terms of scope
9    and complexity of functions managed.  Although the
10   Cataloging in Publication Division has an improved
11   staff of 62, no more than 10 are professional
12   librarians; most are library technicians at grade
13   GS-9 or below.  This does not support level 5-5 for
14   Difficulty of Work Directed.
15   Q.  What happened with that recommendation?
16   A.  Which recommendation?
17   Q.  The recommendation that the top six --
18   well, you already had the regional cataloger that
19   was an SL already.
20   A.  Yes.
21   Q.  And you had Sue Vita and Barbara Tillett
22   who were SLs.

**129**

1    A.  Yes.
2    Q.  So under this recommendation, your
3    position and that of Heynen and the social sciences
4    cataloging positions, they would have been elevated
5    to SL if the recommendation had been accepted.
6    Correct?
7    A.  Yes.
8    Q.  Was the recommendation accepted?
9    A.  I did not know until later that it was
10   not.
11   Q.  And were you told why it wasn't accepted?
12   A.  No.
13   Q.  And who did you learn later from that the
14   recommendation was not accepted?
15   A.  Actually through discovery.
16   Q.  Through discovery?  You did not have a
17   conversation with Mr. Wiggins concerning the
18   elevation to the SL position?
19   A.  Not the final decision, no.  I was never
20   told.
21   Q.  Did you have a conversation with him in
22   which he told you of any of the prior decisions

**170**

1   A. Yes.
2   Q. And it's a termination of detail under
3   the nature of the action.
4   A. Yes.
5   Q. And the effective date is November 9th,
6   2003.
7   A. Yes.
8   Q. And this sends you back to the position
9   of Chief of the Arts and Sciences Cataloging
10  Division.
11  A. Yes.
12  Q. Did you go back to the Arts and Sciences
13  Cataloging Division on November 9th, 2003?
14  A. No.
15  Q. What duties were you performing on
16  November the 10th, 2003?
17  A. Acting Director for Cataloging.
18  Q. Did you complain when you received this
19  notification?
20  A. I want to say something about these
21  notifications. We receive these anywhere between
22  six months to a year after the approval date.

**171**

1   Q. But you did receive them?
2   A. I don't recall receiving this one. I do
3   recall receiving this one.
4   Q. Which one?
5   A. I do not recall receiving Exhibit 47. I
6   do recall receiving Exhibit 46 because it was so
7   unusual.
8   Q. But your name is listed on Exhibit 47.
9   Is that correct?
10  A. It is, but that's not -- just because
11  somebody says this piece of paper was issued on a
12  certain date, one should not assume that employees
13  receive them anywhere near that date. They come in
14  sometimes up to a year later.
15  Q. I'd like to show you a document that we'd
16  like marked as Library Exhibit 48.
17             (Library Exhibit No. 48
18             was marked for identification.)
19  Q. Would you take a look at that document,
20  please? This is a Notification of Personnel
21  Action.
22  A. Yes.

**172**

1   Q. And it's to you.
2   A. Yes.
3   Q. And it says promotion NTE, June 8th,
4   2004.
5   A. Yes.
6   Q. And the effective date is February 8th,
7   2004.
8   A. Yes.
9   Q. This promotes you, looking at column 7,
10  from a GS-15 to an SL.
11  A. Yes.
12  Q. And you at the time were being promoted
13  from the Chief of the Arts and Science Cataloging
14  Division to the acting Director for Cataloging.
15  Correct?
16  A. That's what it appears to say.
17  Q. And you continued to perform those duties
18  for the acting director position?
19  A. Yes.
20  Q. And you didn't complain when you received
21  this one?
22  A. No.

**173**

1       MR. FREDRICKSON: Is this a good time for
2   a break?
3       MR. JAMES: Yes.
4       (Recess.)
5   Q. I'd like to show you a document that we'd
6   like marked as Library Exhibit 49.
7             (Library Exhibit No. 49
8             was marked for identification.)
9   Q. Would you take a look at that document?
10  A. Yes.
11  Q. This is a Notification of Personnel
12  Action.
13  A. Yes.
14  Q. And column 1 has your name. Correct?
15  A. Yes.
16  Q. And the nature of the action is a change
17  to a lower grade.
18  A. Yes.
19  Q. And the effective date is June 9, 2004.
20  A. Yes.
21  Q. And under column 7 it says that you are
22  an Administrative Librarian, Director for

Page 174

1 Cataloging. Is that acting director?
2   A. Yes.
3   Q. And your grade at that point is an SL?
4   A. Yes.
5   Q. And the To column is back to the Chief of
6 Arts and Sciences, Cataloging Division.
7   A. Yes.
8   Q. And the grade is GS-15.
9   A. Yes.
10  Q. And on June 9th, 2004 were you still
11 performing the duties of the acting director?
12  A. Yes.
13  Q. And did you continue to perform them
14 after June 9th, 2004?
15  A. Yes.
16  Q. When did you cease performing those
17 duties?
18  A. I ceased performing those duties in April
19 2005.
20  Q. So you performed those duties until April
21 of 2005?
22  A. Yes. There was a different title

Page 175

1 assigned to the duties.
2   Q. And did you complain to Mr. Wiggins about
3 this notification and this appointment?
4   A. No.
5   Q. Did you complain to Ms. Marcum?
6   A. No.
7   Q. Did you complain to anyone?
8   A. No.
9   Q. After April, you said, of 2005, you
10 ceased performing the duties of the acting
11 director. Is that correct?
12  A. Yes. It was called something else at
13 that point.
14  Q. What was it called at that point?
15  A. Assistant Director for Bibliographic
16 Access.
17  Q. So it was assistant director position.
18 How did that come about?
19  A. On August 6th, 2004 Deanna Marcum
20 appointed me to be Assistant Director for
21 Bibliographic Access, that continued, and I had
22 been acting Director for Cataloging up until August

Page 176

1 5th, 2004. On August 6th, 2004 I kept on doing the
2 same duties but I was called Assistant Director for
3 Bibliographic Access.
4   Q. So the duties of the director or the
5 duties of the chief?
6   A. I continued doing the duties of Director
7 for Cataloging.
8   Q. And you continued that until April of
9 2005?
10  A. Yes.
11  Q. And what happened in April of 2005?
12  A. Well, something happened before April.
13  Q. What happened before April?
14  A. On March 31st you called me and told me
15 that the positions would be abolished.
16  Q. Which positions would be abolished?
17  A. The assistant director positions would be
18 abolished, and on April 13th Deanna Marcum issued a
19 memo saying that the positions would be abolished.
20  Q. The chief position, how did it come about
21 that you were appointed to that position in August?
22  A. Assistant director?

Page 177

1   Q. Yes.
2   A. In April of 2004 Deanna Marcum called me
3 into her office and showed me an organization chart
4 because she was realigning Library Services and
5 said, you know, I'd like for you to do this job,
6 you're the right person at the right time to do
7 this job, and she called it at that point Assistant
8 Director for Cataloging.
9   Q. And you were doing the director's duties
10 at that time?
11  A. Yes.
12  Q. Who was doing the duties of the Chief of
13 the Arts and Sciences Cataloging Division?
14  A. You mean who was on — let's see. In
15 April 2004 I don't recall.
16  Q. But you weren't doing them.
17  A. No.
18  Q. So when did you cease doing them?
19  A. I had ceased doing the chief's duties in
20 September of 2002, except for actually it was only
21 one pay period that I was not doing the acting
22 director duties. Regardless of what the paper

## Page 178

1 says, there was only one pay period in this whole
2 time when I wasn't acting Director for Cataloging.
3    Q. So between September of 2002 and April of
4 2004 you continued to do the duties of the acting
5 director?
6    A. Yes.
7       MR. FREDRICKSON: Did you say '04 or '05?
8       MR. JAMES: '04.
9       THE WITNESS: You're talking about when I
10 had the conversation with Deanna Marcum about doing
11 the assistant director job?
12    Q. Yes.
13    A. That's correct.
14    Q. So you continued until that time?
15    A. Right.
16    Q. And you were not doing the duties of the
17 Chief, Arts and Sciences Cataloging Division?
18    A. Correct. It was a full time job.
19    Q. And so in April of 2004 did you have a
20 conversation with Mr. Wiggins about the assistant
21 positions?
22    A. Yes. After Ms. Marcum spoke to me I

## Page 179

1 spoke to Mr. Wiggins about it.
2    Q. And when did that conversation occur?
3    A. There's documentation that would probably
4 kind of pinpoint it, but I'm pretty sure the
5 conversation with Deanna was on April 28th, and
6 then I would not have let a lot of time elapse, so
7 I would think that within one week I would have
8 spoken to Mr. Wiggins and gotten back to Ms. Marcum
9 regarding her job offer.
10    Q. And what did Mr. Wiggins tell you?
11    A. He was very pleased that she had asked me
12 to take this on, because she was merging -- in the
13 org chart she showed me that she was merging
14 acquisitions and cataloging and Mr. Wiggins was to
15 be director of both of those directorates. She was
16 merging two directorates into one, and I would
17 continue as Assistant Director for Cataloging.
18       I think the thrust of the conversation
19 probably for me was around whether I would have
20 diminished responsibilities because I didn't really
21 want -- you know, I'd been doing all the decision
22 making and all the budget and everything, and I

## Page 180

1 didn't want to have to do a lesser role in relation
2 to those divisions. There was going to be an
3 additional division in my area, and I didn't want
4 to have that authority taken away.
5       So while I don't recall the words, I know
6 what I was thinking, and so Mr. Wiggins and I had
7 talked, and I went away from that conversation
8 satisfied that my authority would not be
9 diminished.
10    Q. Did Mr. Wiggins tell you that you were
11 going to receive a promotion to an SL as a result
12 of accepting that appointment?
13    A. No.
14    Q. Did Mrs. Marcum tell you that you were
15 going to receive a promotion to an SL?
16    A. No.
17    Q. Did anyone tell you that?
18    A. No.
19    Q. Did Mr. Wiggins tell you that you were
20 going to receive any additional pay?
21    A. No. Prior to the time, no.
22    Q. Did Mrs. Marcum tell you that you were

## Page 181

1 going to be receiving additional pay?
2    A. No.
3    Q. Were you going to say something?
4    A. There was e-mail communication between
5 Mr. Wiggins and Ms. Marcum about the position
6 descriptions for the assistant directors and the
7 pay, but I am not sure if I saw that at that time
8 or if it came out later. I don't recall.
9    Q. But you don't know whether you saw it at
10 that time?
11    A. I'm not sure that I saw it at that time.
12    Q. But you don't recall discussing receiving
13 any additional pay for doing those duties?
14    A. That's correct.
15    Q. Were you told that those duties were
16 collateral?
17    A. Yes.
18    Q. So you were told that they were
19 collateral?
20    A. Eventually. It didn't come out that they
21 were collateral until very close to the time --
22 they were independent positions, the way it was

**Page 182**

1  presented to me in April, and it didn't come out
2  until very close to August, or maybe July, that
3  they would be collateral.
4      Q. So this was just before the actual
5  appointment?
6      A. Right.
7      Q. And what was your understanding of the
8  duties when they told you that they would be
9  collateral?
10     A. What was my understanding of the duties?
11 My understanding was that I was to be Chief of the
12 Arts and Sciences Cataloging Division and, in
13 essence, be Director for Cataloging, both of which
14 were full-time jobs.
15     Q. And at no additional pay?
16     A. At no additional pay. Well, I did not
17 know there would not be additional pay. No one had
18 told me there would be additional pay, but I didn't
19 know that there would not be.
20     Q. You thought you would be paid additional
21 pay?
22     A. I assumed so, yes.

**Page 183**

1      Q. And did you ask?
2      A. I don't think so, no.
3      Q. So you didn't ask Mr. Wiggins?
4      A. I may have, but I don't recall, so it's
5  just better to say no.
6      Q. I'd like to show you a document that
7  we're going to mark as Library Exhibit No. 50.
8           (Library Exhibit No. 50
9           was marked for identification.)
10     Q. Would you take a look at that document?
11 Have you seen it before?
12     A. Yes. This is familiar to me.
13     Q. And the first paragraph says that the
14 directors are to let Deanna know by next week their
15 views on the assistant director positions and that
16 Diana's preference is that the assistant directors
17 serve in the capacity with collateral duties. Was
18 this your understanding also?
19     A. Yes. This is the time frame that I was
20 talking about that I would have received this
21 message.
22     Q. This is an e-mail from Mr. Wiggins dated

**Page 184**

1  Thursday, July 15, 2004 7:09 a.m. or p.m., I don't
2  know which, and the subject is Directors Meeting
3  Update.
4       When you received this did you complain
5  to Mr. Wiggins about not receiving any additional
6  pay?
7      A. This doesn't address pay.
8      Q. So you didn't complain to him about that
9  when you received it?
10     A. No.
11     Q. Did you complain about doing those duties
12 as collateral duties?
13     A. I'm sure that I mentioned that they were
14 two full-time jobs, as he well knew. I didn't
15 really have to tell him that. He'd been Chief of
16 ASCD and Director of Cataloging, so he knew how
17 much work it was.
18     Q. But did you complain to him other than
19 complaining that it was two full-time jobs?
20     A. I would call that a complaint.
21     Q. I would like to show you a document that
22 I'll have marked Exhibit 51.

**Page 185**

1           (Library Exhibit No. 51
2           was marked for identification.)
3      Q. Take a look at that document, please.
4  Are you familiar with this document?
5      A. Yes.
6      Q. And what is this?
7      A. This is a letter from Deanna Marcum to
8  the staff of Library Services.
9      Q. And it says Friday's News, August 6th,
10 2004. Could you go to the fourth paragraph?
11     A. Yes.
12     Q. And in the fourth paragraph it says: The
13 directors have made decisions about the assistant
14 directors (all of whom have collateral division
15 chief duties). Again, is this consistent with your
16 understanding?
17     A. No.
18     Q. It isn't?
19     A. No. The Associate Librarian made
20 decisions about the assistant directors, not the
21 directors.
22     Q. This is a letter from her to her

### Page 186

1  colleagues. Is that not correct?
2  A. And this is a letter to the entire staff.
3  Q. Right. And in this letter she says the
4  directors have made decisions about the assistant
5  directors.
6  A. In my case my director did not make the
7  decision. Deanna Marcum made the decision.
8  Q. Meaning Mr. Wiggins didn't decide?
9  A. As his Assistant Director for
10 Bibliographic Access, no, he did not. Ms. Marcum
11 asked me to do the job.
12 Q. When you received this did you tell
13 anyone that this statement was incorrect?
14 A. Of course not.
15 Q. Did you discuss it with Mr. Wiggins and
16 say, Mr. Wiggins, this statement is incorrect?
17 A. No.
18 Q. And it also mentions in here that the
19 duties are collateral. Was that your
20 understanding?
21      MR. FREDRICKSON: That's not quite
22 consistent with what the document says.

### Page 187

1       MR. JAMES: I'll read the paragraph in
2  its entirety: The directors have made decisions
3  about the assistant directors (all of whom have
4  collateral division chief duties).
5  Q. Is that your understanding about the
6  portion in parentheses?
7  A. Yes.
8  Q. I'd like to show you a document that
9  we'll mark Library Exhibit 52.
10           (Library Exhibit No. 52
11            was marked for identification.)
12 Q. Take a look at Exhibit 52.
13 A. Yes.
14 Q. Do you know what that is?
15 A. Yes.
16 Q. What is it?
17 A. It's an organization chart.
18 Q. And is this an organization chart for
19 Library Services?
20 A. Yes.
21 Q. And what's the date of the organization
22 chart?

### Page 188

1  A. July 2004.
2  Q. Have you seen it previously?
3  A. Yes.
4  Q. And this came about as a result of the
5  reorganization by Mrs. Marcum?
6  A. Yes.
7  Q. And are the directors listed anywhere on
8  this chart?
9  A. Yes.
10 Q. Where are they?
11 A. Beacher Wiggins is listed as acting
12 assistant director for acquisitions.
13 Q. Could you tell me where you're reading
14 that from?
15 A. Starting at the top left, under
16 Acquisitions and Bibliographic Access. He's listed
17 Beacher Wiggins, Director, then Acquisitions,
18 Assistant Director, Beacher Wiggins, Acting. And
19 then you go down to Bibliographic access, Judy
20 Mansfield, Assistant Director. Then you go over to
21 Collections and Services. You have Collections
22 Management, Steve Herman, Assistant Director.

### Page 189

1  Q. And under Collection Services Carolyn
2  Brown is listed as Director?
3  A. Yes.
4  Q. And Steve Herman is listed as the
5  Collections Management —
6  A. Assistant Director.
7  Q. And going across to the next column, the
8  third column from the left —
9  A. Well, we haven't finished the second
10 column. Special Collections and Services, Mark
11 Dimunation, Assistant Director.
12 Q. And were there any other assistant
13 directors?
14 A. No.
15 Q. So there were only three assistant
16 directors?
17 A. Well, no, there were four. Mr. Wiggins
18 was acting Assistant Director for Acquisitions,
19 Judy Mansfield was Assistant Director for
20 Bibliographic Access, Steve Herman was Assistant
21 Director for Collections Management, and Mark
22 Dimunation was Assistant Director for Special

**Page 190**

1  Collections and Services.
2  Q. So did you meet with Mr. Wiggins,
3  Mr. Herman, and Mr. Dimunation as assistant
4  director?
5  A. Only in the context of the directors
6  meetings. Other than that it would have been
7  topics as needed.
8  Q. So were there regular set meetings?
9  A. Of directors?
10 Q. Of directors.
11 A. Assistant directors attended the meetings
12 with -- actually, the Associate Librarian called
13 meetings of directors, and assistant directors were
14 included in those meetings. They were held on
15 Tuesday at 1:30.
16 Q. And did you and Mr. Herman and
17 Mr. Dimunation have separate meetings?
18 A. No.
19 Q. So there were no separate meetings
20 between the three of you?
21 A. Correct. Do you mean standing separate
22 meetings?

**Page 191**

1  Q. Correct.
2  A. No, there were no standing separate
3  meetings of the three of us.
4  Q. So the only time the three of you met as
5  assistant directors would have been at the
6  directors meetings?
7  A. Yes, and on topics as needed. We have
8  intersections in our work, and so we would get
9  together to talk about those intersections.
10 Q. I'd like to show you that we'll mark as
11 Library Exhibit 53.
12            (Library Exhibit No. 53
13            was marked for identification.)
14 Q. Would you take a look at what's been
15 marked as Library Exhibit 53?
16 A. Yes.
17 Q. Are you familiar with this document?
18 A. Yes. It's the same as document No. 51.
19 Q. Just in a different format?
20 A. Yes.
21 Q. And if you go to the fourth paragraph, it
22 makes the same statement again about the assistant

**Page 192**

1  directors and collateral duties.
2  A. Yes.
3  Q. Now, you believe that you should, as the
4  assistant director, that you should have been paid
5  at the same salary or SL salary that Mr. Herman and
6  Mr. Dimunation was paid at? Is that correct?
7  A. Yes.
8  Q. Tell me why.
9  A. We were performing substantially equal
10 duties. We were in charge of several divisions
11 each. We were in charge of their budgeting. The
12 division chiefs reported to us. We engaged in our
13 own high level activities in terms of strategic
14 planning.
15       In my case, I know that Mr. Herman wanted
16 to start strategic planning with his group, and so
17 he came to consult with me about how to do that and
18 I showed him how we had done it and the methodology
19 that we had used. We attended the directors
20 meetings together. I don't know what all of their
21 special projects were for their directorates.
22       I was continuing with all the duties I

**Page 193**

1  had performed as director for cataloging, so in
2  fact I should have been paid the same as
3  Mr. Wiggins for doing those duties.
4  Q. And when did you first voice your
5  concerns about not being paid at the same rate that
6  Mr. Herman and Mr. Dimunation were being paid?
7  A. I know for sure on October 18th, 2004.
8  Q. And to whom did you voice those concerns?
9  A. Beacher Wiggins.
10 Q. And did you tell anyone else in October
11 of 2004 other than Mr. Wiggins that you believed
12 that you should have been paid at the same rate
13 that Mr. Herman and Mr. Dimunation were being paid?
14 A. No.
15 Q. And what specifically did you tell
16 Mr. Wiggins?
17 A. On October 18th?
18 Q. On October 18th.
19 A. I told him that I was paid -- I think I
20 told him that -- there are notes. I told him that
21 they were paid at the SL level and I was not.
22 Q. And that's all?

## Page 194

1   A. It was in the context of my position
2   description. That's all I said about pay.
3   Q. So you said they were paid at SL and you
4   were not?
5   A. Yes.
6   Q. Did you say anything else?
7   A. No, not on October 18th.
8   Q. Did you tell Mrs. Marcum in October of
9   2004 that they were SL, meaning Herman and
10  Dimunation, and you were not?
11  A. No.
12  Q. What if anything did Mr. Wiggins say when
13  you told him that?
14  A. He said that he would talk to Ms. Marcum.
15  Q. And did he subsequently talk to her about
16  that?
17  A. Yes.
18  Q. And when did that conversation occur?
19  A. On October 18th.
20  Q. And so you told him on the 18th and he
21  had a conversation with her on the 18th?
22  A. Yes.

## Page 195

1   Q. And when did he tell you the substance of
2   that conversation he had with her?
3   A. On the 18th.
4   Q. And what did he tell you on that date?
5   A. He said that she had said that there
6   would be no problem with rewriting my PD or
7   whatever and that there would be no problem with
8   getting me paid at SL.
9   Q. And did that occur?
10  A. No.
11  Q. When was the next time you had a
12  conversation with Mr. Wiggins about not being paid
13  at the same level that Mr. Dimunation and
14  Mr. Herman were being paid?
15  A. October 25th.
16  Q. So on the 25th of October you had a
17  conversation with Mr. Wiggins?
18  A. Yes.
19  Q. Did you have a conversation with anyone
20  else?
21  A. No.
22  Q. And what was the substance of that

## Page 196

1   conversation?
2   A. I pointed out that it was – I think I
3   might have used the words that it was possible that
4   the Library was in violation of the Equal Pay Act.
5   Q. And you said that to Mr. Wiggins?
6   A. I said that to Mr. Wiggins.
7   Q. And what did Mr. Wiggins say, if
8   anything?
9   A. I don't recall, but my notes would
10  refresh my memory because I made notes of that
11  meeting.
12  Q. You don't recall what he said?
13  A. No. In that time frame he said he would
14  be working on the PD or asking someone to work on
15  the PD or something like that.
16  Q. And this was the PD for which position?
17  A. Well, I was a little confused about that,
18  because on November 1 he asked for a copy of the
19  chief position description that had been
20  submitted – the ASCD chief position description
21  that had been submitted, because he was working
22  with Jim Carroll, because that would be the best

## Page 197

1   place to start and he would add all the assistant
2   director duties to the PD. Then the story changed,
3   but I don't think I was in the loop on what exactly
4   happened. What was the original question? Did I
5   answer your original question?
6   Q. Yes, I think you did. When did the story
7   change?
8   A. About the PD?
9   Q. About the PD.
10  A. In January I was told that a PD had been
11  crafted and I was given a copy of it, but it wasn't
12  a collateral duty PD.
13  Q. And that was January of –
14  A. 2005.
15  Q. So in January of 2005 you were given a
16  PD?
17  A. No, a draft.
18  Q. So a draft PD. And you were given it by
19  whom?
20  A. By Mr. Wiggins.
21  Q. And what happened with that PD?
22  A. Nothing. It was forwarded to Deanna

**198**

1 Marcum.
2   Q. And what did Mrs. Marcum do, if anything,
3 with the PD?
4   A. I don't know specifically.
5   Q. And when was it forwarded to Mrs. Marcum?
6   A. I believe on January 13th.
7   Q. And it would have been forwarded to Mrs.
8 Marcum by whom?
9   A. By Mr. Wiggins.
10   Q. And did Mr. Wiggins tell you that he
11 forwarded the draft position description for the
12 assistant directors to Mrs. Marcum?
13   A. Yes.
14   Q. And did you have a conversation with
15 Mr. Wiggins after that about a position description
16 for the assistant directors?
17   A. I believe so. The only one I knew about
18 was the one he was working on for me, so you can't
19 say assistant directors in the plural, because I
20 have no knowledge of that.
21   Q. So you don't know whether Mr. Herman and
22 Mr. Dimunation wanted position descriptions?

**199**

1   A. No, I don't.
2   Q. But you wanted one.
3   A. Yes, I did --
4   Q. And --
5   A. -- based on the August 6th e-mail, where
6 Deanna Marcum said our position descriptions would
7 be rewritten.
8   Q. And Mr. Wiggins was assisting you in that
9 effort?
10   A. He was doing it.
11   Q. He was drafting the position?
12   A. Right. I had nothing to do with it.
13   Q. Do you believe that Mr. Wiggins ever told
14 you a lie?
15   A. No.
16   Q. Do you have any reason to believe that
17 Mr. Wiggins at any time attempted to mislead you
18 about being promoted to an SL?
19   A. No.
20   Q. So do you have any reason to distrust any
21 of the statements that Mr. Wiggins made to you?
22   A. No.

**200**

1   Q. So you believe that he was telling you
2 the truth at all times?
3   A. Yes.
4   Q. And do you believe Mr. Wiggins to be an
5 honest person?
6   A. Yes.
7   Q. And you've known him to be honest in all
8 of his dealings with you?
9   A. Yes. He has the highest integrity.
10   Q. Did there come a time when you learned
11 there would not be a position description for the
12 assistant director position?
13   A. Not explicitly.
14   Q. Not explicitly. Could you explain to me
15 what you mean by that?
16   A. Well, nothing ever happened with the
17 position description that Mr. Wiggins forwarded to
18 Deanna Marcum, so I made an assumption.
19   Q. Did Mr. Wiggins ever tell you that it
20 wasn't going to happen?
21   A. No.
22   Q. He never told you that?

**201**

1   A. No.
2   Q. During this period of time, and I know we
3 talked about your complaints to Mr. Wiggins
4 earlier, did you complain to him during this period
5 of time? And we're talking March-April of 2005.
6   A. Yes.
7   Q. And when did you complain to him in
8 March-April of 2005?
9   A. Well, I don't recall a complaint in
10 April, but in March we again discussed -- may I
11 back up to a previous question?
12       In February Beacher Wiggins told me that
13 Deanna Marcum had said that she was concerned about
14 any addition to the salary's base, and the position
15 description with the collateral duties in it for me
16 would have reflected some kind of increase in the
17 salary base. I just wanted to be sure that you
18 knew that.
19       But I was not told that she was not
20 approving it; I was just told that she had a
21 concern. And in March I had encouraged Mr. Wiggins
22 to share with Deanna Marcum the fact that I felt

202

1   that there was an Equal Pay Act violation.
2          Could you ask your question again because
3   I'm getting off topic?
4      Q. My question to you, which you came close
5   to answering, is: When did you complain in
6   March-April, that time frame?
7      A. March 8th is the only time I recall.
8   There had been previous instances of complaints.
9      Q. Did you at any time complain to Mrs.
10  Marcum?
11     A. No. I offered to speak to her about my
12  situation, and Mr. Wiggins said that he wanted to
13  handle my concerns, and he was my supervisor.
14     Q. And so you trusted him to handle this?
15     A. Yes.
16     Q. And did he at any time tell you that he
17  did not believe the assistant chief positions were
18  going to come to fruition?
19     A. The assistant director positions?
20     Q. Yes. I'm sorry.
21     A. It's hard to remember all these titles.
22  No, he never told me that.

203

1         MR. FREDRICKSON: Are you asking about
2   the position description again as opposed to the
3   position?
4         MR. JAMES: I'm asking about the
5   position.
6         THE WITNESS: I'm sorry. I thought you
7   were asking about the position description. No, he
8   never told me that.
9      Q. Did he tell you about the position
10  description, that it would never come to fruition?
11     A. No.
12     Q. And I take it the basis of your belief
13  that there was an equal pay violation as well as a
14  sex discrimination claim is because you believe you
15  should have been paid at the same rate of pay that
16  Mr. Herman and Mr. Dimunation were being paid. Is
17  that correct?
18     A. That's partially correct, yes.
19     Q. Well, could you correct me?
20     A. And also it's because I should have been
21  paid the same as Mr. Wiggins, my predecessor.
22     Q. And so you believe you should have been

204

1   paid at the same rate that Mr. Wiggins was?
2      A. And Mr. Herman and Mr. Dimunation.
3      Q. And you believe the duties that you were
4   performing were the same as those that were being
5   performed by Mr. Herman and Mr. Dimunation?
6      A. They were substantially equal. They were
7   not exactly the same.
8      Q. So can you tell me, when you say
9   substantially equal but not the same, what you mean
10  by that?
11     A. Well, I oversaw a different program than
12  they were overseeing. Mr. Herman dealt with
13  managing the desks and interlibrary loan, and I
14  believe he had photo duplication, which is part of
15  the loan program at the Library of Congress.
16  Mr. Dimunation was responsible for the substantive
17  area of the special format collections, rare books
18  and maps, that sort of thing.
19     Q. So if I took your position description
20  and went through your position description, would I
21  find duties in your position description that
22  Mr. Dimunation and Mr. Herman were performing?

205

1      A. There was no assistant director position
2   description for any of us, so I don't know that you
3   could go through the position description.
4      Q. Well, let me make certain I understand.
5   So is it your claim that you should have been paid
6   at the same rate that Mr. Herman and Mr. Dimunation
7   were paid because of the work that you did as
8   assistant director, or was it because of the other
9   work that they did?
10        MR. FREDRICKSON: I'll object to the form
11  of the question because it may call for a legal
12  conclusion, but you can attempt to answer it.
13     A. The original claim had to do with the
14  assistant director positions.
15     Q. You said the original claim. Is there
16  more than the original claim?
17     A. Well, the expert, Mr. Perloff, also
18  looked at the chief PDs for rare book collections
19  and access and loan management, Steve Herman's
20  chief job and my chief job.
21     Q. Is your claim for the denial of equal pay
22  based on your belief that you should have been paid

**206**

1  at the same rate that Mr. Herman and Mr. Dimunation
2  were being paid when they were first in the
3  assistant director's position?
4     A. Yes.
5     Q. So you believe that in that capacity the
6  three of you were doing the same thing?
7     A. Yes.
8     Q. Now, you also believe that, based on your
9  expert's findings, that you should have been paid
10 at the same rate as Mr. Herman and Mr. Dimunation
11 when they were in their chief's position and you
12 were in your Chief of the Arts and Sciences
13 Cataloging Division. Is that correct?
14    A. Yes.
15    Q. So tell me, in the second capacity, when
16 you are in your chief's capacity, what duties did
17 you perform that were the same or similar to those
18 performed by Mr. Herman and Mr. Dimunation when
19 they were in their chief's positions?
20    A. I'm not qualified to answer that
21 question.
22    Q. So you're not qualified. Let me ask you

**207**

1  this --
2     A. I don't have their information or their
3  PDs.
4     Q. I'd like to have this document marked as
5  Library Exhibit No. 54.
6         (Library Exhibit No. 54
7         was marked for identification.)
8     Q. Take a look at Library Exhibit 54. What
9  is Library Exhibit 54?
10    A. It's the old position description for the
11 Chief of the Arts and Sciences Cataloging Division.
12    Q. And was that your position at the time?
13    A. Yes.
14    Q. Let's go to the page that's listed as
15 page 15. Let's go to the first category, which
16 says Supervision Received. What in this paragraph
17 are the same as the duties performed by Mr. Herman
18 and Mr. Dimunation?
19    A. As I said, I cannot answer these
20 questions because I don't know their duties as
21 chief.
22    Q. So how is it that you're basing your

**208**

1  claim that you were discriminated against on the
2  basis of your sex and that it's a violation of the
3  Equal Pay Amendment?
4     MR. FREDRICKSON: You mean other than
5  what she's already said today?
6     MR. JAMES: Yes.
7     MR. FREDRICKSON: You may answer.
8     A. I know about what they do as assistant
9  directors. I cannot address their positions as
10 chief and compare them to my position. I'm only
11 citing the report of the expert.
12    Q. So you're not relying on a comparison of
13 the position descriptions themselves?
14    A. I think the expert probably relied on --
15    Q. Other than what the expert has told you
16 and prepared, do you have any other information
17 upon which you are relying to say that you
18 performed the same duties as Mr. Herman and
19 Mr. Dimunation?
20    A. No.
21    Q. Nothing else?
22    A. No, not when we were chiefs.

**209**

1     (Recess.)
2     Q. Did you at some point go to the EEO
3  office, the Library's EEO office?
4     A. Yes.
5     Q. When did you go?
6     A. After March 31st.
7     Q. When after March 31st?
8     A. I don't recall the date.
9     Q. Why do you remember that it was after
10 March 31st?
11    A. Because that's the date you called and
12 said to me, I'm calling about your letter, your
13 request is denied, and the positions are being
14 abolished.
15    Q. And when you say "your request", is this
16 the request that was made in your letter to the
17 Librarian?
18    A. I assumed that's what you were referring
19 to, the letter to the Librarian.
20    Q. And when did you send your letter to the
21 Librarian? Do you recall?
22    A. I delivered it to his office on March

Mansfield, Judith A.  April 17, 2007
Washington, DC

54 (Pages 210 to 213)

Page 210

1  16th.
2  Q. So you delivered the letter to the
3  Librarian on March 16.
4  A. Yes.
5  Q. And you were informed by me on March
6  31st --
7  A. It was the 30th or 31st.
8  Q. -- that the decision had been made to
9  abolish the positions.
10 A. Yes.
11 Q. And so the next day or the day after you
12 went to the EEO office?
13 A. I don't know. I would have to refresh my
14 memory with documentation. It was in a relatively
15 short time span.
16 Q. Would it have been a week?
17 A. I don't know.
18 Q. Two weeks?
19 A. I don't know.
20 Q. And did you at any time speak to Mrs.
21 Marcum about your concerns?
22 A. No.

Page 211

1  Q. Did you speak to anyone other than
2  Mr. Wiggins about your concerns?
3  A. No, but when I went to the EEO office the
4  gentleman there talked to me a little bit.
5  Q. About?
6  A. About the complaint.
7  Q. And was that the initial counseling that
8  one would receive when they file an EEO complaint?
9  A. I don't remember.
10 Q. You also stated that you believed that
11 the removal of the collateral duties of assistant
12 directors, that that was discriminatory based on
13 your sex. Is that your claim?
14 A. The claim states that the removal was
15 retaliation for complaining about my pay.
16 Q. So the removal is not discriminatory,
17 it's retaliatory?
18     MR. FREDRICKSON: Objection. I think the
19 question may call for a legal conclusion, but you
20 can attempt to answer it.
21 A. I believe it was also discriminatory.
22 Q. How was it discriminatory?

Page 212

1  A. Because I complained about unequal pay
2  and, rather than remedying the situation, they
3  abolished the job.
4  Q. Were you being paid additional monies for
5  the duties of assistant director?
6  A. No.
7  Q. How long did you perform the duties of
8  assistant director?
9  A. I performed the duties for which I was
10 not paid as director and assistant director for two
11 and a half years.
12 Q. The duties of assistant director --
13 A. They were the same as the duties of
14 acting director, so it was two and a half years.
15 Q. The duties that you were performing
16 similar to those of Mr. Dimunation and Mr. Herman
17 were the same as when Ms. Marcum created the
18 assistant director positions?
19 A. The duties that I performed as assistant
20 director were the same duties that I performed as
21 acting director for cataloging, and so the job
22 lasted two and a half years.

Page 213

1  Q. And what was it that you were no longer
2  receiving when Mrs. Marcum made the decision to
3  abolish that position, those duties?
4  A. I was demoted. I no longer had
5  responsibility for a $44 million budget and went
6  down to a $4.4 million budget. I had first line
7  supervisors reporting to me. I had 70 staff
8  reporting to me instead of 550 staff. I no longer
9  had oversight of national programs, the program for
10 cooperative cataloging and the cataloging and
11 publication program. I no longer sat in on the
12 directors meetings. I lost a lot.
13 Q. And what other damages did you have as a
14 result of the removal of those duties?
15 A. I can't think of anything else right now.
16 Q. There is nothing else that you can think
17 of?
18 A. The damage was the embarrassment and the
19 humiliation in removing me from my duties for no
20 cause.
21 Q. When you wrote your letter to the
22 Librarian, was it your belief that the only action

**214**

1  that Mrs. Marcum could take was to promote you?
2      A. That is not what that letter stated.
3      Q. Was it your belief that the only action
4  that Mrs. Marcum could take was to create an
5  assistant director's position description?
6      A. I stated no specific remedy to my
7  complaint in that letter.
8      Q. So what action did you want Mrs. Marcum
9  to take?
10     A. I was willing to negotiate that with
11 Library management.
12     Q. And what did you expect Library
13 management to do?
14     A. I did not know what to expect Library
15 management would do. Maybe you could tell me.
16     Q. You talked about budgets, that you had
17 responsibility for budgets during the period of
18 time that you were Chief of the Arts and Sciences
19 Cataloging Division, that you had responsibility
20 for budgets.
21     A. Right.
22     Q. And also when you were the acting

**215**

1  Director for Cataloging you had budgetary
2  responsibilities.
3      A. Yes.
4      Q. When Mr. Wiggins told you that Mrs.
5  Marcum had budgetary concerns, what did you
6  understand that to mean?
7      A. I don't recall his saying that she had
8  budgetary concerns. She said that she did not want
9  to add to the salary base, that she wanted to have
10 the flexibility to spend money on other things.
11 One example of other things that she might spend
12 money on was the rebuilding and redecoration of the
13 suite of offices, her suite of offices.
14     Q. And did you discuss those concerns with
15 Mrs. Marcum at any point?
16     A. No.
17     Q. Did you discuss them with Mr. Wiggins --
18     A. My concerns about the --
19     Q. -- the budgetary concerns?
20     A. No. My impression from Mr. Wiggins was
21 he didn't feel there were any budgetary concerns.
22 The issue of budget didn't come up that way. It

**216**

1  was that Mrs. Marcum didn't want to add to the
2  salary base.
3      Q. And did it come up in any other context?
4      A. Not in relation to any of these
5  discussions.
6      Q. Not in relation to any of the --
7      A. Not in relation to any of my concerns.
8         MR. JAMES: I don't have anything else.
9         MR. FREDRICKSON: No questions. She
10 would like to read and sign.
11        (Whereupon, at 4:02 p.m. the taking of
12 the deposition was concluded.)
13        (Signature not waived.)
14
15 _____
16        JUDITH A. MANSFIELD
17
18 Subscribed and sworn to and before me
19 this _____ day of _____, 20____.
20
21 _____
22     Notary Public