# UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF COLUMBIA

—————————————————————
JUDITH A. MANSFIELD       )
                      )
      Plaintiff,      )
                      )
      v.           )     Civil Action No. 05-1790 (RMU/JMF)
                      )
JAMES H. BILLINGTON,    )
LIBRARIAN OF CONGRESS,   )
                      )
      Defendant.    )
—————————————————————)

## PLAINTIFF JUDITH A. MANSFIELD'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully submitted,

WEBSTER, FREDRICKSON, HENRICHSEN, CORREIA & PUTH, P.L.L.C.

—————————————————————
      ***/s/   Bruce A. Fredrickson***
Bruce A. Fredrickson  #933044
Cedar P. Carlton # 480255
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510
(202) 659-4082 (fax)

Attorneys for Plaintiff Mansfield

December 4, 2007

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Acting Director for Cataloging. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      B.    Assistant Director for Bibliographic Access. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      C.    Chief of the Arts and Sciences Cataloging Division. . . . . . . . . . . . . . . . . . . 4

      D.    Supervisor to Senior Level employee. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PROCEDURAL POSTURE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

LEGAL STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      I.    Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      II.    Sex Discrimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      III.    Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      I.    PLAINTIFF ESTABLISHES A *PRIMA FACIE* CASE OF SEX
          DISCRIMINATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

      II.    THE LIBRARY HAS DENIED MS. MANSFIELD SENIOR LEVEL
          PAY ON ACCOUNT OF HER SEX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          A.    In the absence of sex discrimination, Ms. Mansfield would have
               been paid at the Senior Level in her position as Assistant Director
               for Bibliographic Access. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

              1.    The Assistant Director for Bibliographic Access position
                    was the same as the Director for Cataloging Position. . . . . . . . 14

2.    The Assistant Director for Bibliographic Access (Director for Cataloging) position was a Senior Level position requiring performance of senior level duties.. . . . . . . . . . . . . . . . . . . . . . . 15

3.    Ms. Mansfield was officially appointed to the Assistant Director for Bibliographic Access position. . . . . . . . . . . . . . . 15

4.    The Library paid Beacher Wiggins at the Senior Level when he served as Director for Cataloging. . . . . . . . . . . . . . . . . . . . 16

5.    The Library's treatment of Dimunation and Herman provides further evidence of sex discrimination. . . . . . . . . . . . 18

a)    As an Assistant Director, Ms. Mansfield Had Far Greater Responsibilities Than Her Male Counterparts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

b)    Ms. Mansfield's Assistant Director position was already Senior Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

c)    Ms. Mansfield's Chief Position should have been Senior Level. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.    The Library took away Ms. Mansfield's Assistant Director for Bibliographic Access Position because she is a woman who complained... . . . . . . . . . . . . . . 23

C.    The Library's refusal to pay Ms. Mansfield at the Senior Level when she returned exclusively to her division chief position constitutes sex discrimination.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III.    MS. MANSFIELD IS ENTITLED TO SUMMARY JUDGMENT ON HER RETALIATION CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A.    The Library's actions constitute illegal retaliation.. . . . . . . . . . . . . . . . . . . . 28

B.    The causal connection is established as a matter of law.. . . . . . . . . . . . . . . 30

C.    Termination of Ms. Mansfield's position constitutes an adverse action.. . . . 34

IV.    A JURY COULD FIND THE LIBRARY'S EXPLANATIONS TO BE PRETEXT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**A.**   **The Library's budget could sustain increasing Ms. Mansfield's pay to the Senior Level.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**B.**   **"Ongoing Reorganization" fails to explain the Library's refusal to pay Ms. Mansfield the value of her Senior Level work.** . . . . . . . . . . . . . . . . . . . . . 41

**C.**   **The Library is not entitled to any inferences on summary judgment.** . . . . . . 43

**V.**   **CONCLUSION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## TABLE OF AUTHORITIES

### CASES

*Aka v. Washington Hosp. Center*,
    156 F.3d 1284 (D.C. Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26, 28, 44**

*Alungbe v. Board of Trustees of Connecticut State University (CSU) System*,
    283 F.Supp.2d 674 (D.Conn. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

*Brown v. Henderson,*
    257 F.3d 246 (2d Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*Burlington Northern & Sante Fe Railway Co. v. White,*
    126 S.Ct. 2405 (2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11, 30, 34, 35, 38**

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32, 33**

*Connecticut v. Teal,*
    457 U.S. 440 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **27**

*Czekalski v. Peters,*
    475 F.3d 360 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10, 13**

*E.E.O.C. v. Joe's Stone Crab, Inc.*,
    220 F.3d 1263 (11 Cir. 2000).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

*E.E.O.C. v. White and Son Enterprises,*
    881 F.2d 1006 (11th Cir. 1989).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

*Farias v. Instructional Systems, Inc.,*
    259 F.3d 91 (2d Cir. 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11, 33**

*Forkkio v. Tanoue,*
    131 F.Supp.2d 36 (D.D.C. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **34, 36, 37**

*Furnco Construction Co. v. Waters,*
    438 U.S. 567 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

*George v. Leavitt,*
    407 F.3d 405 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13, 16**

*Gipson v. Wells Fargo,*
    460 F.Supp.2d 15 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

*Hunt v. Cromartie,*
    526 U.S. 541 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

*International Bhd. of Teamsters v. United States,*
    431 U.S. 324 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

*Johnson v. United States Capitol Police Board,*
    2005 WL 1566392(D.D.C.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **17, 18**

*Josey v. John R. Hollingsworth Corp.,*
    996 F.2d 632 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

*Lathram v. Snow,*
    336 F.3d 1085 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **21**

*Lee v. Winter,*
    439 F.Supp.2d 82 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

*Mastro v. Potomac Electric Power Co.,*
    447 F.3d 843 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

*McDonnell Douglas Corp. v. Green,*
    411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

*Miller-El v. Dretke,*
    545 U.S. 231(2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**

*National R.R. Passenger Corp. v. Morgan,*
    536 U.S. 101 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

*Paquin v. Federal National Mortgage Assn.,*
    119 F.3d 23 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **37**

*Passer v. American Chemical Society,*
    935 F.2d 322 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11, 33, 37**

*Pedreya v. Cornell Prescription Pharmacies, Inc.,*
    465 F. Supp. 936 (D. Co. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30, 32**

*Reeves v. Sanderson Plumbing Products, Inc.,*
    530 U.S. 133 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9, 11, 40**

*Roberts v. Houston County Board of Education,*
    819 F.Supp. 1019 (M.D. Ala 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **30**

*Rubinstein v. Administrators of Tulane Educational Fund,*
    218 F.3d 392 (5ᵗʰ Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **32, 33**

*Saunders v. George Washington University,*
    768 F.Supp. 854 (D.D.C. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

*Sheridan v. E.I. DuPont de Nemours and Co.,*
    100 F.3d 1061 (3d Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

*Sparks v. Pilot Freight Carriers, Inc.,*
    830 F.2d 1554 (11ᵗʰ Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

*Stella v. Minetta,*
    284 F.3d 135 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10, 12**

*Swierkiewcz v. Sorema N.A.,*
    534 U.S. 506 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

*Texas Dep't of Community Affairs v. Burdine,*
    450 U.S. 248 (1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

*U.S. Postal Serv. Bd. of Governors v. Aikens,*
    460 U.S. 711(1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

*United States v. Testan,*
    424 U.S. 392 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **26**

*Vaughn v. Edel,*
    918 F.2d 517 (5ᵗʰ Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

*Villines v. United Bhd. of Carpenters and Joiners of America, AFL-CIO,*
    999 F.Supp. 97 (D.D.C. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **11**

*Weissman v. Dawn Joy Fashions, Inc.*,
        214 F.3d 224 (2d. Cir.  2000)............................................... **32**

*Wexler v. White's Fine Furniture, Inc.*,
        317 F.3d 564 (6th Cir. 2003)............................................ **43**

*Willingham v. Ashcroft*,
        226 F.R.D. 57 (D.D.C. 2005)............................................ **17**

*Zervas v. District of Columbia*,
        1992 WL 232089 (D.D.C. 1992)....................................... **32**

## STATUTES, RULES, AND REGULATIONS

Fed. R. Civ. P. 56.................................................... **9, 31, 43**

42 U.S.C. § 2000e................................................... **5, 10, 11**

29 U.S.C. § 201....................................................... **5**

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| JUDITH A. MANSFIELD | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )       Civil Action No. 05-1790 (RMU/JMF) |
| | ) |
| JAMES H. BILLINGTON, | ) |
| LIBRARIAN OF CONGRESS, | ) |
| | ) |
| Defendant. | ) |

_____)

**PLAINTIFF JUDITH A. MANSFIELD'S OPPOSITION TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Judith A. Mansfield has almost 40 years of experience at the Library of Congress, and throughout her career, Ms. Mansfield has performed in an outstanding manner. For many years and continuing through the present day, the Library has called upon Ms. Mansfield to perform "senior level" work in several different capacities. Yet, the Library has repeatedly denied Ms. Mansfield senior level pay. Instead, with the exception of two brief periods, the Library has paid Ms. Mansfield at the rate of a GS level employee, a rate of pay substantially below the rate of a Senior Level employee. Ms. Mansfield's male colleagues have received Senior Level pay for duties that are substantially the same as those performed by Ms. Mansfield. The defendant has provided a number of excuses for this ongoing situation, but a jury is likely to find the Library's pattern of withholding Senior Level pay from Ms. Mansfield compelling evidence of sex discrimination.

## STATEMENT OF FACTS

On March 16, 2005, Ms. Mansfield submitted a letter to the Honorable James H. Billington, the Librarian of Congress, in which she complained of sex discrimination. (*See* Exhibit ("Ex.") 25.) Specifically, Ms. Mansfield complained that she had been performing the same duties as male employees of the Library, but continually been paid less, in violation of "Title VII of the Civil Rights Act of 1964" and "the Equal Pay Act of 1963." (*Id.*) Among other things, Ms. Mansfield complained that she held an Assistant Director position along side two male Assistant Directors who were paid more. (*See id.*) In response to Ms. Mansfield's complaint, Defendant **abolished** Ms. Mansfield's position as Assistant Director for Bibliographic Access fifteen days after she had complained to the Librarian. (Ex. 5 at 171, 178-80; Ex. 4 at 209-10; Ex. 8 ¶26.)

Upon losing her Assistant Director position, Ms. Mansfield returned to her position as Division Chief of the Arts and Sciences Cataloging Division. (Ex. 9 ¶9.) As a result, Ms. Mansfield suffered a diminution of her supervisory duties, a reduction in her budgetary responsibility, and an overall loss of influence in determining the direction of Library Services. (Ex. 4 at 212-13.) While Assistant Director, Ms. Mansfield supervised nine divisions and a staff of 550 employees, compared to supervising one division and a staff of approximately 75 as Division Chief. (Ex. 9 ¶¶12-15.) While Assistant Director, Ms. Mansfield managed a budget of over $40 million, compared to a budget of $4.4 million as Division Chief. (*Id.* ¶16.) Furthermore, while Assistant Director, Ms. Mansfield participated in directors meetings whereas she did not have such an opportunity to participate in the overall management of Library Services as Division Chief. (Ex. 4 at 212-13; Ex. 3 at 42-46.)

In her letter to the Librarian of Congress, Ms. Mansfield referred to the longstanding sex discrimination she had encountered in a number of different positions she had held. More

particularly, Ms. Mansfield identified four different circumstances in which she has performed the same work but been paid less than her male counterparts.

A.    **Acting Director for Cataloging.**  In September 2002, Ms. Mansfield was promoted to Acting Director for Cataloging and served in that capacity for nearly two years.  (Ex. 35 ¶¶7-10.) The Library compensated her male predecessor, Beacher Wiggins, at the Senior Level[1] but paid Ms. Mansfield at the Senior Level for only two 120-day periods.  (*See id.*)  All other times during which she served in this position, Ms. Mansfield was paid at the GS-15 level.  (*See id.* ¶9.)  The Library claims that its personnel regulations prohibited it from compensating Ms. Mansfield at the Senior Level for more than 120 days per year.  (Def. Mem. at 22.)  However, the Library clearly did not follow its own regulations when it elected to keep Ms. Mansfield in a Senior level position for more than 120 days.  (Ex. 2 at 53-54.)  Thus, contrary to its regulations,  the Library obtained Ms. Mansfield's services for this Senior Level position, but failed to pay her at the Senior Level.

B.    **Assistant Director for Bibliographic Access.**  In August 2004, Library Services created and filled three Assistant Director positions within Library Services as part of a reorganization. (Ex. 22.)  Ms. Mansfield was appointed to the position of Assistant Director for Bibliographic Access – essentially the Director for Cataloging under a new title. (Ex. 22**;** ex. 7 at 87; ex. 5 at 115-116.)  Despite the appointment, the Library failed to compensate Ms. Mansfield at the Senior Level in the same manner the Library had compensated Mr. Wiggins when he held the same

---

[1]The Library's Senior Level Executive System has a minimum and maximum pay range as set by law.  The minimum and maximum basic pay rates are linked to the General Schedule. Specifically, the minimum basic pay rate is 120 percent of the salary of a GS-15/1 for the SL-1 level, and the maximum basic pay rate is 162.44 percent of the salary of a GS-15/1 for the SL-4 level.  The Senior Level Executive System provides for other forms of compensation as well. *See* PA 133-35, Library of Congress Regulation ("LCR") 2017-2.1, Section 14.

position as the Director for Cataloging. *See infra* Part II.A.4.

As a part of the same reorganization, Steve Herman and Mark Dimunation were appointed Assistant Director for Collections Management and Assistant Director for Special Collections and Services, respectively. (Ex. 22; ex. 35 ¶14.) However, Defendant knowingly compensated Ms. Mansfield at the GS-15 level, substantially less than the two male employees who were being paid at the Senior Level. (Ex. 8 ¶22; ex. 9 ¶¶5-6.) After Ms. Mansfield complained that she was being paid less than the male employees, the Library eliminated her Assistant Director position and returned Ms. Mansfield exclusively to her position as Chief of the Arts and Sciences Cataloging Division ("ASCD") . (Ex. 26; ex. 9 ¶21.) The Library also abolished the other two Assistant Director positions. (*Id.*)

**C.**     **Chief of the Arts and Sciences Cataloging Division.** Ms. Mansfield has served as the ASCD Chief since May 1998 and continues in this capacity today. (Exs. 16-17.) More than **four and a half years** ago, the Library conducted a classification review of Ms. Mansfield's ASCD Chief position, which determined that Ms. Mansfield's position was improperly classified at the GS-15 level and should be classified at the Senior Level. (Exs. 19-20.) John Byrum, a male employee doing the same work for the Library as Chief of the Regional and Cooperative Cataloging Division, has been paid as a Senior Level employee, far more than Ms. Mansfield. (Ex. 12 ¶3; ex. 17; ex. 19; ex. 28.) The Library ignored the findings of its classification review and made no adjustment to Ms. Mansfield's salary or grade level. (Ex. 21; ex. 8 ¶21; ex. 34 ¶¶7-8.)

**D.**     **Supervisor to Senior Level employee.** As further evidence of the unfair manner in which the Library paid Ms. Mansfield, the Library continued to pay Ms. Mansfield at the GS-15 level while she served as the immediate supervisor of a Senior Level male employee. (Ex. 35 ¶16.) While

she served as Acting Director for Cataloging, and subsequently, as Assistant Director for Bibliographic Access, she acted as the immediate supervisor to John Byrum, the Chief of the Regional and Cooperative Cataloging Division.  (*See id.*)  In these capacities, Ms. Mansfield performed equal, if not more, work than her male counterpart but was paid substantially less.  (Ex. 10 at p.4; ex.18; ex. 29; *see also* Ex. 12 ¶3.)

## PROCEDURAL POSTURE

Ms. Mansfield filed sex discrimination and retaliation claims under both Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and the Equal Pay Act (EPA), which is a part of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*  Due to jurisdictional constraints, Ms. Mansfield was required to file her EPA wage discrimination claims in the United States Court of Federal Claims and her Title VII sex discrimination and retaliation claims in this Court.  Ms. Mansfield's EPA claims have now been resolved, but the resolution of those claims has implications for the Title VII claims pending in this Court.

More particularly, the United States moved for summary judgment on the EPA claims in the U.S. Court of Federal Claims, and that motion was denied.  The parties then engaged in discovery, while no discovery was taken in the instant Title VII case.  Upon completion of discovery, the parties settled all the EPA claims, including specifically Ms. Mansfield's claim that "the Library of Congress violated the Equal Pay Act in the manner in which the Library paid her for her services as Acting Director for Cataloging and as Assistant Director for Bibliographic Access."  *See* Settlement Agreement and Stipulation Regarding Back Pay.  (Ex. 13, Attachment A ¶1.)  As a result of the settlement, Ms. Mansfield's salary history for the period of September 22, 2002 until April 30, 2005 has been reconstructed, the United States paid Ms. Mansfield back pay and liquidated damages for

5

that period, and the parties agreed that Ms. Mansfield has no remaining back pay claims in this case under Title VII for this period. (*Id.* at ¶¶4-5.) With regard to the facts relating to Ms. Mansfield's appointment as the Assistant Director for Bibliographic Access, what remains after the resolution of the EPA claims are Ms. Mansfield's claims for back pay and compensatory damages which result from the Library's termination of her position as Assistant Director as a result of her gender and her complaint of discrimination.[2] In addition, Ms. Mansfield's claims based upon the discriminatory manner in which the Library compensated her for her Senior Level work she performed as the ASCD Chief remain viable as well.

In the instant matter, on December 15, 2005, the defendant filed a motion to dismiss or in the alternative for summary judgment on Ms. Mansfield's Title VII sex discrimination and retaliation claims, as well as the EPA retaliation claims set forth in the complaint. This court denied that motion in large part, but the court did grant the motion to dismiss Ms. Mansfield's EPA retaliation claim then pending in this action.[3] Regarding the Title VII claims, this Court ruled that, taking the facts pled in the complaint as true, Ms. Mansfield had stated a claim for retaliation since the reduction of her supervisory duties "can constitute an adverse employment action" and "the adverse personnel action

---

[2] Oddly, the Library devotes the majority of its argument to the claims, now settled, that Ms. Mansfield was discriminated against on account of her gender with respect to her service as the Acting Director for Cataloging. *See* Def. Mem. at 14-25. The events relating to her service in this capacity provides evidence of discrimination (*see, e.g., National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (pre-limitations evidence may be used to prove claim)), but Ms. Mansfield's back pay claims for this period are no longer actionable, having been resolved through settlement.

[3] The Court found that the plaintiff must file a formal complaint in order to engage in protected activity under the EPA. Memorandum Opinion of June 1, 2006, at 12-15. The Court recognized and the defendant conceded that "the plaintiff's letter to her supervisor is protected activity under Title VII." *Id.* at 12, n. 3.

6

took place in sufficiently close temporal proximity to establish causation." Memorandum Opinion of June 1, 2006, at 10-11.

Without the benefit of any additional discovery in the instant case, the defendant now moves for summary judgment on all of the plaintiff's Title VII claims. Given the undisputed facts established through discovery in the EPA case, on September 20, 2007, Ms. Mansfield filed her own Motion for Partial Summary Judgment on her Title VII retaliation claims. The briefing should be completed on that motion by December 4, 2007.

## SUMMARY OF ARGUMENT

Ms. Mansfield contends that the Library discriminated against her when it refused to pay her at the Senior Level for the work that she performed as the Assistant Director for Bibliographic Access. When the Library appointed Ms. Mansfield to the Assistant Director position, she continued to be responsible for the duties she performed as the Acting Director for Cataloging. The Library admits she performed Senior Level duties in both positions and that she succeeded a male (Mr. Wiggins) who performed the very same work. The Library further concedes that Ms. Mansfield was paid at the GS level in these positions, while Mr. Wiggins was paid as a Senior Level employee. In its brief, the defendant completely ignores Mr. Wiggins as a comparator to Ms. Mansfield in the Assistant Director position despite the fact that they performed the same services, with the Library paying Ms. Mansfield far less for the same work.

The Library instead merely attempts to distinguish the duties of two other male assistant directors within Library Services (Steve Herman and Mark Dimunation) who were placed at the same level within the Library's organizational hierarchy and did much of the work that Ms. Mansfield did as an assistant director. Ironically, Ms. Mansfield's duties as an assistant director actually exceeded

those of her male counterparts since Ms. Mansfield actively managed nine divisions within Library Services (one more than even Mr. Wiggins had been responsible for) which demanded Ms. Mansfield's full time and attention. In contrast, Mr. Herman and Mr. Dimunation were simply required to serve in a coordinating capacity as assistant directors which did not require them to delegate their division chief duties to a subordinate employee. Due to the demands of the assistant director position to which Ms. Mansfield was appointed, the Library assigned another employee to handle Ms. Mansfield's division chief duties so that she could carry out her duties an assistant director. Despite these facts, the Library paid these male employees at the Senior level, as it did Mr. Wiggins, while Ms. Mansfield was paid lesser compensation.

The Library principally contends that "budgetary constraints and the ongoing reorganization of Library Services" justified its treatment of Ms. Mansfield. (Def. Mem. at 31.) However, Library Services had an annual budget of $200 million and the Library estimated the cost of elevating Ms. Mansfield to the Senior Level at no more than $8,000 - $13,000 per year. A jury could well find the Library's explanation implausible and an excuse for paying Ms. Mansfield less than her male counterparts for the same work on account of her gender. With regard to the supposed "ongoing reorganization," Ms. Mansfield undisputedly worked at the Senior Level for two and half years without the compensation (with the exception of two brief periods) and, after Ms. Mansfield's appointment to the assistant director position, no further reorganization of Library Services occurred until Ms. Mansfield complained to the top official at the Library that she was being paid unfairly on account of her sex. Given this evidence, a jury could well find that the Library's explanation is a pretext for sex discrimination. Thus, the defendant's motion for summary judgment must be denied.

When Ms. Mansfield complained of sex discrimination, the Library abolished her job fifteen

8

days later. The Library's own management officials concede that her job and those of the other two assistant directors were eliminated due to her complaint. Without denying the cause and effect of her complaint and the Library's response, the defendant claims that the position was not permanent and its $200 million budget would not support addition of another Senior Level position at the cost of no more than $13,000 per year. Neither of these explanations undermine in any way the undisputed fact that the Library took away her position (permanent or not – and the plaintiff has supplied ample evidence to dispute this contention) in direct response to her complaint. Therefore, the plaintiff is entitled to summary judgment on the retaliation count as a matter of law.

## LEGAL STANDARDS

### I.      Summary Judgment

To establish a basis for summary judgment, the moving party must show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 ( c). When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Whether a defendant's statements are worthy of credibility are genuine issues of material fact properly assigned to a jury. *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006). In ruling on a motion for summary judgment, a trial court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151.

### II.     Sex Discrimination

Under Title VII of the Civil Rights Act of 1964, "it shall be an unlawful employment practice

for an employer" to "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment" because of her sex. 42 U.S.C. § 2000e-2. In proving a case of discrimination, a plaintiff must first establish a *prima facie* case of discrimination under the *McDonnell Douglas* burden-shifting framework. *See Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)). A plaintiff establishes a *prima facie* case of discrimination when she demonstrates that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination. *See Stella v. Minetta*, 284 F.3d 135, 145 (D.C. Cir. 2002). The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977). Indeed, "the elements of the *prima facie* case must be adapted to the context of the particular employment decision at issue." *Saunders v. George Washington University*, 768 F.Supp. 854, 866 (D.D.C. 1991).

After a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason' for the adverse action.'" *Czekalski,* 475 F.3d at 363. On summary judgment, once the defendant proffers a nondiscriminatory explanation for the adverse action, it has "'done everything that would be required of [it] if the plaintiff had properly made out a *prima facie* case." *Id.* at 364 (citing *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983). "At that point, 'whether the plaintiff really did so is no longer relevant,' and the only question is 'whether the defendant intentionally discriminated against the plaintiff.'" *Id.* The

question becomes whether "a reasonable jury could conclude from all of the evidence that the adverse decision was made for a discriminatory reason." *Id.* at 363. A "plaintiff's *prima facie* case, combined with sufficient evidence to find the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148.

## III.    Retaliation

Under Title VII, an employer may not discriminate against an individual because she has opposed discriminatory employment practices. *See* 42 U.S.C.A. § 2000e-3(a). To prevail on a retaliation claim, an employee must establish: (1) that she engaged in activity protected under Title VII; (2) that her employer took an adverse employment action against her; and (3) that the adverse action was causally related to her protected conduct. *Lee v. Winter*, 439 F.Supp.2d 82, 85 (D.D.C. 2006). Complaining of discrimination constitutes protected activity under Title VII. *See, e.g., Villines v. United Bhd. of Carpenters and Joiners of America, AFL-CIO*, 999 F.Supp. 97, 105-06 (D.D.C. 1998). An employee suffers an adverse action where "a reasonable employee would have found the challenged action materially adverse" such that it "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern & Sante Fe Railway Co. v. White*, 126 S.Ct. 2405, 2415 (2006). To establish causation, an employee need only show that she was "penalized" or suffered an adverse action due to her protected conduct. *Passer v. American Chemical Society*, 935 F.2d 322, 330 (D.C. Cir. 1991); *Farias v. Instructional Systems, Inc.,* 259 F.3d 91, 100-01 (2d Cir. 2001) (retaliatory finding rests on "cause and effect").

## ARGUMENT

## I.    PLAINTIFF ESTABLISHES A *PRIMA FACIE* CASE OF SEX DISCRIMINATION

Ms. Mansfield establishes a *prima facie* case of sex discrimination because the Library of

Congress underpaid her in such a way that gives rise to an inference of discrimination. *See Stella*, 284 F.3d at 145 (*prima facie* case requires showing that a member of a protected class suffered an adverse action that gives rise to an inference of discrimination.) As a woman, Ms. Mansfield is a member of a protected class. Defendant does not challenge that Ms. Mansfield suffered an adverse action with respect to her pay. Additionally, Defendant subjected Ms. Mansfield to an adverse action when it took away her Assistant Director for Bibliographic Access position and denied her the opportunity to earn the pay that she deserved in that position.

Defendant only challenges Ms. Mansfield's ability to establish an inference of discrimination. At the *prima facie* stage, however, the plaintiff merely has the burden (which is not onerous) to provide sufficient evidence upon which a fact finder could infer that the employer based its decision on the plaintiff's protected class. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Furnco Construction Co. v. Waters*, 438 U.S. 567, 576 (1978). Moreover, the methods of proof are flexible. *Stella*, 284 F.3d at 145 (citing *Swierkiewcz v. Sorema N.A.*, 534 U.S. 506 (2002)) ("the requirements of the *prima facie* case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic'")).

Ample evidence in the record gives rise to an inference of discrimination:

- The Library refused to pay Ms. Mansfield at the senior level even though she held multiple senior level positions. *See infra* Part II.

- The Library paid several male employees at the Senior Level for work that was identical, substantially similar, or at a lower level in comparison to Ms. Mansfield's work. *See infra* Part II.A.

- The Library's conduct in abolishing Ms. Mansfield's job could reasonably be viewed as an admission of sex-based discrimination. *See infra* Part II.B.

- The Library abolished Ms. Mansfield's job in order to avoid paying her at the

Senior Level. *See infra* Part II.C.

Therefore, a jury could reasonably infer that the Library refused to pay Ms. Mansfield commensurate with the value of her work because she is woman.

Furthermore, where Defendant has already put forth alleged nondiscriminatory reasons for its conduct, the question of whether Ms. Mansfield has put forth a *prima facie* case is "no longer relevant" and the evidence of her *prima facie* case is more appropriately considered as "'part of the . . . evidence [the court] must consider in addressing th[e] question' of whether she has created a genuine issue of gender discrimination." *Czekalski*, 475 F.3d at 364 (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)). As shown below, ample record evidence raises a genuine issue for trial on Ms. Mansfield's gender discrimination claims.

## II.    THE LIBRARY HAS DENIED MS. MANSFIELD SENIOR LEVEL PAY ON ACCOUNT OF HER SEX.

Had Defendant paid Ms. Mansfield at the Senior Level for her work as Assistant Director for Bibliographic Access, Ms. Mansfield would be still be earning Senior Level pay today. Instead, Defendant refused to pay Ms. Mansfield at the Senior Level and then abolished her position as Assistant Director for Bibliographic Access because Ms. Mansfield is a woman who complained of sex discrimination. [4]

### A.    In the absence of sex discrimination, Ms. Mansfield would have been paid at the

_____

[4]Moreover, in losing her Assistant Director position on account of her sex and discrimination complaint, Ms. Mansfield has suffered the emotional indignity associated with discrimination and retaliation since March 30, 2005 to the present. Because Ms. Mansfield already obtained her back pay for her loss up through April 2005, Ms. Mansfield only seeks economic damages from May 2005 through the present. With respect to her compensatory damages, however, Ms. Mansfield seeks recovery from February 23, 2005 through the present (the statutory period arising twenty workdays before Ms. Mansfield submitted her March 15, 2005 letter to the Librarian (*accord* Def. Mem. at 16).)

**Senior Level in her position as Assistant Director for Bibliographic Access.**

As Assistant Director for Bibliographic Access, Ms. Mansfield held a senior level position, but was paid as at GS-15 level. A jury could readily find that the Library refused to pay Ms. Mansfield at the Senior Level–the level of her position–because she is female. The position of Assistant Director for Bibliographic Access was an official appointment to a senior level position that effectively extended Ms. Mansfield's role as Director for Cataloging for Library Services. Similarly situated male employees were paid at the senior level for work that was identical, substantially similar, or lower level in comparison to Ms. Mansfield's Assistant Director position. The circumstances of the Library's decision to eliminate Ms. Mansfield's position reflect "consciousness of guilt" with respect to her pay. Moreover, the Library offers pretextual reasons for denying Ms. Mansfield compensation at the Senior Level.

> **1.      The Assistant Director for Bibliographic Access position was the same as the Director for Cataloging Position.**

In September 2002, the Library appointed Ms. Mansfield to the position of Acting Director for Cataloging. Ms. Mansfield held this position until August 5, 2004. (Ex. 4 at 175.) On August 6, 2004, the Library officially appointed Ms. Mansfield as Assistant Director for Bibliographic Access. (Exs. 22-24.) In practice, Ms. Mansfield's Assistant Director position was the same as the Director for Cataloging position. Ms. Mansfield continued to carry out the same duties as she had performed as Acting Director for Cataloging. (Ex. 7 at 85-88; ex. 5 at 145; ex. 12 ¶12.) Indeed, "Bibliographic Access" is another term for "cataloging." (Ex. 5 at 55). Ms. Mansfield served as Assistant Director for Bibliographic Access until April 2005. (Ex. 4 at 174-75.) As such, Ms. Mansfield fulfilled the Director for Cataloging duties for the Library of Congress for 2.5 years.

14

### 2. The Assistant Director for Bibliographic Access (Director for Cataloging) position was a Senior Level position requiring performance of senior level duties.

The Library classified the position of Director for Cataloging that Ms. Mansfield assumed on an acting basis in 2002 at the Senior Level. (Ex. 12 ¶8; ex. 18.) In this acting position, Ms. Mansfield carried out the "same kinds of tasks and had the same responsibilities" as her male predecessor, Wiggins, who was paid at the Senior Level in that position. (Ex. 7 at 56-57.) Therefore, Ms. Mansfield's Assistant Director position was Senior Level because it was the same position as the Director for Cataloging position. As her direct supervisor testified, the Assistant Director for Bibliographic Access position required the same level of skill, ability, and responsibility as other senior level management positions within the Library of Congress. (*Id.* at 90.) Therefore, in carrying out the functions of the Director for Cataloging (as Assistant Director for Bibliographic Access), Ms. Mansfield was fulfilling a role and performing duties within Library Services that had already been rated by the Library at the senior level. (Ex. 12 ¶8.)

### 3. Ms. Mansfield was officially appointed to the Assistant Director for Bibliographic Access position.

Ms. Mansfield's appointment to the position of Assistant Director for Bibliographic Access was official. On August 6, 2004, Ms. Marcum sent out an announcement of the assistant director appointments. (Ex. 22.) Immediately thereafter, Ms. Marcum sent the following email message:

> Dear Mark, Steve, and Judy,
> I am pleased that your appointments are now *official*, and I welcome all of you to the next directors' meeting on Tuesday August 10. . . . I am asking Jim Carroll to take care of re-writing [position descriptions] to include the assistant director duties.

(Ex. 23. (emphasis added).) Indeed, Ms. Mansfield was informed that her official Library of Congress position description would be changed to include her Assistant Director for Bibliographic Access

duties. (Ex. 11 at pp. 4-5.) In the Library's Annual Report for the fiscal year ending September 30, 2004, Appendix K listed the "staff changes." Included among the staff changes was the announcement that "Judy Mansfield was appointed assistant director for bibliographic access." (Ex. 24.) Furthermore, the Library treated Ms. Mansfield's appointment "as it would any official, non-temporary appointment." (Ex. 11 at p.53.) Therefore, Ms. Mansfield's appointment to the Assistant Director for Bibliographic Access position was an official appointment resulting in a staff change worthy of announcement to the entire Library and the public at large.

### 4.    The Library paid Beacher Wiggins at the Senior Level when he served as Director for Cataloging.

The Library paid Wiggins more than Ms. Mansfield for identical Senior Level work. Indeed, in direct contrast to its treatment of Ms. Mansfield, the Library paid Wiggins at the Senior Level when he became the Director for Cataloging. The determination of "whether two employees are similarly situated ordinarily presents a question of fact for the jury." *George v. Leavitt*, 407 F.3d 405, 414-15 (D.C. Cir. 2005)). In comparing Ms. Mansfield's salary history to that of Wiggins, a jury could find that the Library refused to pay Ms. Mansfield at the Senior Level because she is a woman.

In 1992, Wiggins became the Chief of the Arts and Sciences Cataloging Division and received GS-15 level pay. (Ex. 7 at 7, 19-20.) From 1995 to 1997, Wiggins served as Acting Director for Cataloging. (Ex. 7 at 7-8, 22; ex. 33.) In 1997, Wiggins took over the position of Director for Cataloging, no longer on an "acting" basis. (Ex. 7 at 7-8.) At this point, Wiggins received an increase in his salary to the Senior Level. (Ex. 7 at 48.)

Similarly, in 1998, Ms. Mansfield became the Chief of the Arts and Sciences Cataloging Division and received GS-15 level pay. (Ex. 8 ¶9.) From 2002 to 2004, Ms. Mansfield served as

Acting Director for Cataloging. (Ex. 11 at pp. 3-4.)  In 2004, Ms. Mansfield took over the position

of Director for Cataloging, no longer on an "acting" basis under the new title of Assistant Director

for Bibliographic Access.  (*Id.* at 4-5.)  Yet, Ms. Mansfield did not receive Senior Level pay when

she assumed the exact same position that enabled Wiggins to receive Senior Level pay.  (*Id.* at 4.)

As the following table illustrates, the similarity in the two career trajectories will likely

convince a jury that Wiggins and Ms. Mansfield were similarly situated in all material respects.  "'It

suffice[s] to show that the plaintiff[s] and the comparator were 'similarly situated in all *material*

respects'– not in all respects.'"  *Johnson v. United States Capitol Police Board*, 2005 WL 1566392

at *3 (D.D.C.)(quoting *Willingham v. Ashcroft*, 226 F.R.D. 57, 62 (D.D.C. 2005))(emphasis added):

| Beacher Wiggins | Judy Mansfield |
| --- | --- |
| Division Chief, Arts & Sciences Cataloging (1992-1997) GS-15 Pay | Division Chief, Arts & Sciences Cataloging (1998-Present) GS-15 Pay |
| Acting Director for Cataloging (1995-1997) GS-15/Senior Level Pay | Acting Director for Cataloging (2002-2004) GS-15/Senior Level Pay[5] |
| Director for Cataloging (1997-2002) Senior Level Pay | Director for Cataloging ("Assistant Director for Bibliographic Access") (2004-2005) GS-15 Pay |

In sum, Wiggins was given the Senior Level grade when he obtained the position that Ms.

Mansfield later assumed.  Ms. Mansfield, by contrast, was not given Senior Level pay even though

---

[5]The defendant suggests that it treated Ms. Mansfield in accordance with it regulations and practice in limiting her Senior Level pay to two 120 day periods. Def. Mem. at 4. However, the Library deviated from this supposed practice with regard to Mr. Wiggins who was paid at the Senior Level for half his time spent as Acting Director for Cataloging (Ex. 33), thus providing further evidence of sex discrimination.

17

the Library appointed her to the same position. Particularly in light of Wiggins' treatment, therefore, a jury could conclude that Ms. Mansfield's ascension to a Senior Level position was not accompanied by a corresponding increase to the Senior Level pay scale because she is a woman. "Disparate treatment of similarly situated employees is the very essence of discrimination." *Gipson v. Wells Fargo*, 460 F.Supp.2d 15, 30 (D.D.C. 2006). Thus, a jury will likely determine that the Library's refusal to pay Ms. Mansfield the value of her work constitutes sex discrimination.

> **5.      The Library's treatment of Dimunation and Herman provides further evidence of sex discrimination.**

The difference in treatment between Ms. Mansfield and her fellow assistant directors, Dimunation and Herman, further reveals sex-based wage discrimination. While Defendant seeks to differentiate the "employment situations" of Herman and Dimunation from Ms. Mansfield's circumstances, Defendant fails to differentiate the *relevant* factors of the three assistant directors. Indeed, Ms. Mansfield need not show "identical circumstances" with Dimunation and Herman. *Johnson*, 2005 WL 1566392 at *3. As the Supreme Court has noted, requiring comparators to be "cookie cutters" of one another would foreclose protection against discrimination. *Miller-El v. Dretke*, 545 U.S. 231, 247, fn. 6 (2005). Rather, Ms. Mansfield must be able to convince a jury that she and the other two assistant directors were similarly situated in "material" or "relevant" respects.

> a)      **As an Assistant Director, Ms. Mansfield had far greater responsibilities than her male counterparts.**

Defendant contends that Ms. Mansfield's duties were not comparable to those of the male assistant directors, Steve Herman and Mark Dimunation, who were appointed at the same time as she was but were paid at the Senior Level. (*See* Def. Mem. at 27-30.) However, genuine disputes of material fact exist as to this issue, and the weight of the evidence shows that, in fact, Ms. Mansfield

18

carried far more responsibility in her assistant director position than either of these men.  Both Mr.
Wiggins and Ms. Marcum acknowledged as much.  Thus, summary judgment must be denied.

The assistant director positions were created to help manage the two largest directorates within
Library Services: (1) Acquisitions & Bibliographic Access and (2) Collections & Services.  (Ex. 7
at 80;ex. 22 at p. 2 (organizational chart).)  Each directorate was headed by a Director, and two
assistant director positions were created within each directorate to assist the Director.  (Ex. 7 at 82-84;
ex. 22 at p. 2.) The four assistant directors[6] were organizationally on the same level.  (*Id.*)  All the
assistant directors participated in the same directors' meetings and served as part of the upper echelon
of the Library Services management team.  (Ex. 3 at 42-45; ex. 5 at 115-116.)  At the directors'
meeting, these upper level mangers, including the assistant directors, all participated in the "program
planning, strategic planning . . . [j]ust a pretty broad gamut of policy, planning, some sensitive issues
about where [the Library is] going with personnel and other things and budget, planning budget, and
all of those things . . ." (Ex. 3 at 54.)  As Mr. Herman put it, this was the "kind of place where all the
action took place, the real programmatic and discussion and planning . . . ." (Ex. 3 at 45.)

Ms. Mansfield interacted with the other assistant directors several times per month and
explained:

> We were performing substantially equal duties.  We were in charge of several
> divisions each.  We were in charge of their budgeting.  The division chiefs reported
> to us.  We engaged in our own high level activities in terms of strategic planning.

(Ex. 4 at 192.)

Mr. Wiggins conceded that the specific position to which Ms. Mansfield was appointed, the
Assistant  Director  for  Bibliographic  Access,  required  the  same  level  of  skill,  ability,  and

---

[6] Wiggins served as acting Assistant Director for Acquisitions.  (*Id.*)

19

responsibility as other SL level managers within the Library of Congress. (Ex. 7 at 90.) As a result

of this belief, Mr. Wiggins went to Ms. Marcum and tried to have Ms. Mansfield's position upgraded

to the Senior Level. (*Id.* at 105-107.) As Mr. Wiggins testified:

> I know during one meeting I pointed out that **of the three
> assistant directors, Miss Mansfield's was the only one that wasn't
> senior level**. I thought based on the work I was assigning her, that she
> was doing work that merited such a position. So that would have been
> the tenor of the discussions I would have had with [Ms. Marcum]
> along the way.

(*Id.* at 106-107 (emphasis added).) Despite the defendant's claim that the three assistant director

positions were not comparable, Mr. Wiggins did not see it that way, given the argument he made to

Ms. Marcum, and a jury could readily accept Mr. Wiggins' testimony over the arguments raised by

the defendant.

Indeed, testimony from both Mr. Wiggins and Ms. Marcum demonstrates that Ms. Mansfield's

position demanded far more responsibility than her male counterparts who served as assistant

directors: Mr. Herman and Mr. Dimunation simply served in a coordinating capacity as assistant

directors, while Ms. Mansfield managed the cataloging functions of the nine divisions within her

purview. (Ex. 5 at 144-145.)  Ms. Mansfield did more than just coordinate but rather actually

managed the day-to-day activities of the Bibliographic Access sub-directorate. (*Id.*; ex. 7 at 116.)

Ms. Marcum explained that Mr. Wiggins used Ms. Mansfield's services in a manner that was

different from how the other assistant directors were used: "[I]n having Miss Mansfield serve as the

assistant  director for Bibliographic Access, [Mr. Wiggins] was really continuing her role as acting

director for Cataloging, and he was not using her in this more coordinating role that I had imagined

the directors would use." (Ex. 5 at 145.) And as Ms. Marcum herself acknowledged, the Director

for Cataloging was a Senior Level rated job when Ms. Mansfield performed as Acting Director for two years prior to assuming the position as Assistant Director for Bibliographic Access. (*Id.* at 204.)

Moreover, the responsibilities assigned to Ms. Mansfield dwarfed those assigned to Mr. Herman, in particular. As assistant director, Ms. Mansfield had nine divisions under her command (as did Mr. Dimunation), while Mr. Herman was assigned only four. (Ex. 22 at p. 2; ex. 3 at 48.) In terms of staff supervision, Ms. Mansfield held a far more responsible position, with 550 employees under her direction, in comparison with 260-280 employees under the direction of Mr. Herman. (Ex. 4 at 213; ex. 3 at 48-49.) Finally, Ms. Mansfield's assistant director position was so all-consuming that another Library employee was assigned to handle her division chief duties, while this kind of assignment was not required for Mr. Herman (nor for Mr. Dimunation) to handle his assistant director duties. (Ex. 5 at 145-146.)

> **b)    Ms. Mansfield's Assistant Director position was already Senior Level.**

Surprisingly, the Library justifies its payment of Dimunation at the Senior Level because he was hired into a position that was "already classified at the SL pay grade." (Def. Mem. at 29.) As shown above, Ms. Mansfield's Assistant Director position was the Director for Cataloging position with a new name. Since the Director for Cataloging position was also "already classified at the SL pay grade (Ex. 12 ¶6)," a jury could readily infer sex discrimination where the Library denied Ms. Mansfield Senior Level pay for her work in a position that had already been rated at the Senior Level. *See Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003) (jury could infer discrimination based on employer's deviation from business practice).

> **c)    Ms. Mansfield's Chief Position should have been Senior Level.**

The Library seeks to justify the disparate pay because both Dimunation and Herman were

already in permanent positions at the Senior Level pay grade when they were appointed to their assistant director positions. (Def. Mem. at 28-29.) Yet, the Library cannot justify one discriminatory pay arrangement with another. Ms. Mansfield's Chief Position also should have been at the senior level. (Ex. 6 at 33, 81-82; ex.10 at p.1-2; exs. 19-20.) Moreover, while the Defendant attempts to justify the senior level pay of Dimunation and Herman, a jury could view the same evidence as indication of sex discrimination.

The Library hired Mr. Dimunation at the Senior Level to serve as a Division Chief in March 1998 and his salary jumped from $61,680 to $93,357, (Exs. 30-31), a percentage increase far exceeding the Library's normal range for an outside hire. (Ex. 2 at 66-69 ("the more normal range is probably in that 5 to 10 percent range.") When Ms. Mansfield was appointed Chief of the Arts and Sciences Cataloging Division in the Library Services, also in 1998, after almost 30 years of service to the Library, Ms. Mansfield was not placed at the Senior Level and her salary only increased from $72,758 to $77,798. (Ex. 16.) Although they both became Division Chiefs in 1998, Ms. Mansfield managed a division with a larger staff and budget than Mr. Dimunation as Division Chief of the Rare Book and Special Collections Division, and yet he was given the Senior Level designation. (Ex. 20 at 2; ex. 24.)

Similarly, Mr. Herman had more seniority in his Senior Level position because Defendant administratively adjusted Mr. Herman's salary from the GS-15 level to the Senior Level when it was determined that there was an accretion of duties to his position as Chief of the Collections Management Division in Library Services in 1999. (Ex. 32.) In contrast, when the Library's classification review determined that Ms. Mansfield was performing Senior Level duties in her position, a position she had held since May 1998, Defendant refused to upgrade her position to the

22

Senior Level.  Defendant remained content with allowing Ms. Mansfield to perform the Senior Level duties without the Senior Level pay.

The Library's attempt to justify the increase in Herman's pay begs the question.  The Library states that Herman's supervisor "was successful in making the case the employee's accrual of duties over time merited classification at the SL."  (Def. Mem. at 29.)  Yet, Ms. Mansfield's supervisor forcefully supported her increase to Senior Level pay.  (Ex. 7 at 141-42, 153-55.).  That Herman successfully received a pay increase, while Ms. Mansfield did not, could further convince a jury that the Library resisted paying Ms. Mansfield at the Senior Level because she is a woman.

**B.    The Library took away Ms. Mansfield's Assistant Director for Bibliographic Access Position because she is a woman who complained.**

A jury could reasonably interpret the Library's act of abolishing the assistant directorships as an admission that Ms. Mansfield's sex discrimination claim was valid.  If the Library believed–what it argues here–that paying Ms. Mansfield at the GS-15 as Assistant Director for Bibliographic Access was nondiscriminatory, the Library could have allowed Ms. Mansfield to continue in that position after she complained.  Instead, the Library took the drastic measure of abolishing the assistant directorships entirely.  A jury could conclude that, as with "flight from the scene of a crime," the Library's effort to discard the set-up entirely evidences "consciousness of guilt."  *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1069 (3d Cir. 1996).  Once Ms. Mansfield exposed the Library's sex discrimination, the Library took only two weeks to disown an arrangement that had been in place for seven months.  A jury could view such hasty action as "fleeing" from a practice the Library knew was discriminatory.  Therefore, Defendant's own response to Ms. Mansfield's sex discrimination complaint belies any attempt it makes here to argue that the arrangement was non-

23

discriminatory.

Indeed, the Library's course of action after receipt of Ms. Mansfield's complaint could communicate to a reasonable jury that the Library abolished Ms. Mansfield's position to avoid liability for sex discrimination.  After consultations with Counsel, the Library did not even consider the option of continuing the *status quo.*  (Def. Mem. at 35 (considering three options only: (1) "return Plaintiff to her permanent position; (2) create a permanent position for Plaintiff at the SL pay grade; or (3) end the Assistant Director collateral duties for Plaintiff, Mr. Herman, and Mr. Dimunation.") That the Library found the *status quo* unworkable once Ms. Mansfield complained could communicate that the Library found merit to Ms. Mansfield's claims.  A jury could, thus, reject the Library's efforts to argue otherwise now.

From this evidence, a jury could further infer that Ms. Mansfield lost her position as Assistant Director for Bibliographic Access because she is a woman.  Had Ms. Mansfield been a male employee and submitted the same complaint, she would not have lost her position since the Library would not have feared sex discrimination liability if Ms. Mansfield had been a male.  Thus, a jury could find that the Library abolished Ms. Mansfield's position because of her sex.  *See, e.g., Vaughn v. Edel*, 918 F.2d 517, 522-23 (5th Cir. 1990) (subjecting employee to adverse action based on fear of race discrimination liability constitutes race-based disparate treatment).  Where Ms. Mansfield would not have suffered an adverse action, but for her sex, the Library's actions constitute sex discrimination.

C.   **The Library's refusal to pay Ms. Mansfield at the Senior Level when she returned exclusively to her division chief position constitutes sex discrimination.**

In her letter dated March 15, 2005, Ms. Mansfield specifically highlighted for the Library that her GS-15 pay as Division Chief was one of several discriminatory pay arrangements giving rise to

sex discrimination under Title VII.  (Ex. 25.)  She pointed out that, as ASCD Chief, she had "substantially the same duties and responsibilities as male division chiefs classified at the Senior Level" and that "the Library's own contract specialist had recommended two years earlier "that the ASCD Chief position be classified at the Senior Level." (*Id.*) As a result of this and other inequities in her pay, Ms. Mansfield requested to "negotiate a satisfactory resolution as expeditiously as possible."  (*Id.*)  Instead of attempting to negotiate a resolution, the Library eliminated the assistant director positions in an effort to provide an excuse for denying Ms. Mansfield Senior Level pay.

Yet, the Library's new excuse–that Ms. Mansfield was exclusively a Division Chief–was also discriminatory.  Two years earlier, Ms. Mansfield's Division Chief position had been rated at the Senior Level by a classifier hired by the Library. (Exs. 19-20.)  Ms. Mansfield had spent the previous 2.5 years gaining experience performing Senior Level work for the Library (ex. 4 at 213), while several male employees were receiving Senior Level pay for comparable division chief work as explained below.  Under these circumstances, a jury could find the Library's refusal to upgrade her position in March 2005 and its steadfast resistance to paying this outstanding 40-year employee for the value of her work as indicative of sex discrimination.

Ample evidence in the record indicates that Ms. Mansfield's Division Chief position should have been Senior Level.  Ms. Mansfield's duties were substantially similar to the duties of Herman, Dimunation, and Byrum.  As Stephen H. Perloff, an expert classification specialist, wrote in his expert report:

> I have reviewed the position descriptions provided to me for Ms. Mansfield, John Byrum, Steven Herman, and Mark Dimunation.  Although each position has its own unique characteristics, they all have common program development and program management responsibilities.  Based on that review, I believe that the work of Ms. Mansfield is of equivalent levels of skill, effort, and responsibility to Mr. Byrum,

Herman, and Dimunation.

(Ex. 10 at p.4 ; *see* ex. 6 at 33, 81-82.) Indeed, the Library admits that from 2002 through his retirement in 2006, John Byrum was paid at the Senior Level for Division Chief duties that required "substantially equal skill, effort, and responsibility" as Ms. Mansfield's Division Chief duties.  (Ex. 12 ¶3.) Furthermore, in 2003, the Library's classification review determined that Ms. Mansfield was performing Senior Level duties in her division chief position, a position she had held since May 1998. (Ex. 19.)

The Library's reliance on *United States v. Testan*, 424 U.S. 392, 406 (1976) is completely misplaced as that case addresses the jurisdiction of the United States Court of Federal Claims in claims brought under the Classification Act.  (Def. Mem. at 21.)  Were a jury to conclude that Ms. Mansfield's Division Chief position remained classified at the GS-15 level *due to gender discrimination*, nothing in *Testan* would preclude Ms. Mansfield from relief under Title VII.

While the Library claims that it had budgetary constraints, a jury could find this excuse pretextual where the Library's budget could sustain increasing Ms. Mansfield's position to the Senior level.  *See infra* Part IV.  Moreover, the Library's alleged budgetary constraints fail to explain why it repeatedly targeted Ms. Mansfield to save money.  *See, e.g., Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 639-40 (3d Cir. 1993) ("[D]ifficult economic times" do not "create[] a veil of immunity behind which employers were free to discriminate.") In the absence of a legitimate, non-discriminatory reason for its alleged decision to seek a bargain on Ms. Mansfield's services, a jury could infer that the real reason was sex discrimination.  *See Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1293 (D.C. Cir. 1998).

Indeed, the Library repeatedly expected to benefit from Ms. Mansfield's ability to perform

Senior Level work while paying her at the GS-15 level.  In contrast, male employees repeatedly earned senior level pay when performing lesser or identical duties to Ms. Mansfield.  That some women were given senior level pay does not bar Ms. Mansfield from proving that the Library denied her senior level pay based on her gender.  *See Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he favorably treats other members of the employee's group.") Nor does the fact that a male employee, Jeffrey Heynen, did not obtain an upgrade to the Senior Level in his division chief position.[7]  "What matters in the end is not how the employer treated *other* employees, if any, of a different sex, but how the employer *would have* treated *the plaintiff* had she been of a different sex."  *Brown v. Henderson*, 257 F.3d 246, 254-55 (2d Cir. 2001).   Where the Library engaged in a pattern of refusing to pay Ms. Mansfield the value of her work while no male employees experienced such a pattern of treatment, a jury could infer that the Library simply would not have treated her this way if she had been a man.  *See, e.g., Alungbe v. Board of Trustees of Connecticut State University (CSU) System*, 283 F.Supp.2d 674, 684 (D.Conn. 2003) (repeated denials of plaintiff's promotion requests could show discrimination).

Furthermore, a jury could find the drastic decision to abolish Ms. Mansfield's Assistant Director position suspect.  The Library admits that it decided to abolish the positions of Herman and Dimunation because otherwise the response to Ms. Mansfield's complaint "would be more difficult to explain." (Ex. 5 at 182.)  This decision left Herman "upset, annoyed, angry, not happy" and Mr. Dimunation "extremely disappointed."  (Ex. 3 at 55-59; ex. 1 at 70.)  That the Library had to engage

---

[7]Moreover, the Library's reference to Jeffrey Heynen is a red herring where he did not have the senior level experience Ms. Mansfield admittedly acquired as Acting Director for Cataloging and Assistant Director for Bibliographic Access. (Ex. 5 at 83.)

in such practices to find a way to "explain" its continued underpayment of Ms. Mansfield could suggest that the Library was dissembling to cover up the real explanation – i.e. sex discrimination. *See Aka*, 156 F.3d at 1293.

## III.   MS. MANSFIELD IS ENTITLED TO SUMMARY JUDGMENT ON HER RETALIATION CLAIM

Summary judgment should be entered in favor of Ms. Mansfield on Count II of her Complaint because Defendant fails to show a genuine, triable issue of material fact on its defense of Plaintiff's retaliation claim.

### A.    The Library's actions constitute illegal retaliation.

Contrary to Defendant's claims, the Library's decision to remove Ms. Mansfield from her position as Assistant Director for Bibliographic Access is exactly the type of adverse reaction to a complaint of discrimination that is prohibited by Title VII.  The freedom to make a complaint of sex discrimination without harm to one's employment status is fundamental to advancing Title VII's basic protection against employment discrimination.  As explained by the Supreme Court:

> The anti-discrimination provision [of Title VII] seeks a workplace where individuals are not discriminated against because of their . . . gender-based status. [citation omitted].  The anti-retaliation provision seeks to secure that primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.

*White*, 126 S.Ct. at 2412.

On March 16, 2005, Ms. Mansfield attempted to secure Title VII's "primary objective" of gender-based equality by alerting the Librarian of Congress that she had been underpaid for "two years" in comparison to her male colleagues.  (Ex. 25).  The Library concedes–as it must–that this letter was protected conduct under Title VII.  (Def. Mem. at 33.)  In response, the Library abolished

28

Ms. Mansfield's position as Assistant Director for Bibliographic Access, whereupon Ms. Mansfield returned to performing exclusively her Division Chief position.  The Library "does not dispute that as Division Chief, Ms. Mansfield occupied a lower position within the Library's hierarchy as compared to her position as Assistant Director for Bibliographic Access."  (Def. Mat. Facts at 12 ¶24.)  Nor does the Library dispute that Ms. Mansfield suffered a reduction in managerial and supervisory responsibilities.  (Def. Mat. Facts at 11-12 ¶¶19-24.)  In response to her sex discrimination complaint, therefore, in direct violation of the anti-retaliation law, the Library damaged Ms. Mansfield's career progression.

The Library does not contest that Ms. Mansfield's complaint prompted it to abolish Ms. Mansfield's assistant director appointment (along with the other assistant directorships) (Def. Mem. at 35 (presenting the abolishment of the assistant directorships as one course of action contemplated in light of Ms. Mansfield's complaint); Def. Mat. Facts at 10 ¶¶8-11.)  Instead, the Library seeks to justify its adverse treatment of Ms. Mansfield by purporting that upon receipt of Ms. Mansfield's complaint, it was limited to three options: "(1) return Plaintiff to her permanent position; (2) create a permanent position for Plaintiff at the SL pay grade; or (3) end the Assistant Director collateral duties for Plaintiff, Mr. Herman, and Mr. Dimunation." (Def. Mem. at 35.)  Indeed, Defendant devotes its entire opposition to Ms. Mansfield's retaliation claim to defending its choice among these options.

Yet, Defendant misses the mark.  Defendant also had the option to leave Ms. Mansfield in her position as Assistant Director for Bibliographic Access.  Defendant's refusal to allow Ms. Mansfield

to stay in her position once she had complained caused significant harm to Ms. Mansfield's career.[8]

Thus, the adverse action at issue in Ms. Mansfield's Motion for Partial Summary Judgment is the

removal of Ms. Mansfield from her position.  Because Defendant concedes that Ms. Mansfield lost

her position *as a result* of her complaint, Ms. Mansfield establishes her retaliation claim as a matter

of law. (*See, e.g.,* Def. Mat. Facts at 10 ¶9.)

        In sum, an employee who seeks equal pay for equal work should not have to fear that taking

steps to rectify discrimination will result in the loss of her job–or her position as in the case of Ms.

Mansfield. *See E.E.O.C. v. White and Son Enterprises,* 881 F.2d 1006, 1011-12 (11th Cir. 1989)

(forcing female employees to choose between accepting unfair pay and termination constitutes illegal

retaliation); *Pedreya v. Cornell Prescription Pharmacies, Inc.,* 465 F. Supp. 936, 948 (D. Co. 1979)

(illegal retaliation found where employer terminated female employee in response to notification  of

Equal Pay Act violation).  The Library's response to Ms. Mansfield's complaint penalized Ms.

Mansfield for exercising her legal right to invoke the protections of Title VII.    As a result, the

Library denied Ms. Mansfield "unfettered access to Title VII's remedial mechanisms" and subjected

her to illegal retaliation under *White,* 126 S.Ct. at 2415.

###    B.    The causal connection is established as a matter of law.

        Defendant boldly argues that "there is no causal connection" between Ms. Mansfield's written

complaint of discrimination and the Library's abolishment of her position as Assistant Director for

_____

        [8]The Library's failure even to consider the option of maintaining the *status quo* could
reasonably be construed as an admission that Ms. Mansfield was indeed receiving unequal pay
for her work as Assistant Director for Bibliographic Access.  (*See infra* Part II.B.)  The Library
may not legitimately defend its removal of Ms. Mansfield from her position by stating that
otherwise it would have been required to give her fair pay.  *See generally Roberts v. Houston
County Board of Education*, 819 F.Supp. 1019, 1029 (M.D. Ala 1993) (employer's proffered
justification for adverse action must be  "legitimate").

Bibliographic Access (Def. Mem. at 33.)  Yet, Defendant offers no alternative explanation for removing Ms. Mansfield's position.  As Defendant concedes, Ms. Mansfield may establish a "causal connection" by showing that the Library removed her position as Assistant Director for Bibliographic Access "on account of her engaging in protected activity."  (Def. Mem. at 34.)  The record is replete with undisputed evidence showing just that:

(1)    Ms. Marcum stated that "the [Assistant Director] positions would be eliminated *as a result* of Ms. Mansfield's complaint of discrimination." (emphasis added.)  Def. Mat. Facts at 10 ¶9.

(2)    Ms. Marcum explained that she was "concerned enough" about Ms. Mansfield's complaint of discrimination, that she decided to "simply eliminate the assistant director positions."  (Ex. 5 at 171.)

(3)    Ms. Marcum told Mr. Dimunation that the assistant director positions were being terminated in order to respond to an objection by another staff member (Ms. Mansfield).  (Ex. 1 at 67-68.)

(4)    Ms. Marcum explained that in light of Ms. Mansfield's complaint, "the way to proceed was to eliminate the assistant director positions."  (Def. Mat. Facts at 10 ¶10.)

Not only do these facts demonstrate the causal connection, but Defendant admits that the decision to terminate Ms. Mansfield's position grew out of consultations with counsel *prompted* by "notice of Plaintiff's letter to the Librarian*."* (Def. Mem. at 34-35.)  Thus, Ms. Mansfield has established the "causal connection" as a matter of law.[9]

In light of the undisputed evidence, Defendant's claim that Plaintiff does not have even a "scintilla of evidence" showing inappropriate motivation runs afoul of Rule 56 (Def. Mem. at 36.). *See* Fed. R. Civ. P. 56(e) (on summary judgment the nonmoving party "may not rest upon the mere

---

[9] Particularly in light of this plethora of testimony indicating causation, Defendant's claim that Ms. Mansfield "relied entirely upon the proximity in time for the causal link" is surprisingly misguided. (Def. Mem. at 36.)

allegations or denials of the adverse party's pleading ).  As the non-moving party, Defendant must

"designate 'specific facts showing that there is a genuine issue for trial.'"  *Celotex Corp. v. Catrett*,

477 U.S. 317, 324 (1986).  Here, Defendant does not offer any factual evidence of another reason (nor

does the Defendant even articulate another reason) for abolishing Ms. Mansfield's position other than

her sex discrimination complaint.[10]  Therefore, under *Celotex*, Defendant's mere insistence that the

abolishment of the job was not retaliatory fails to create a genuine issue for trial.  *See Rubinstein v.*

*Administrators of Tulane Educational Fund*, 218 F.3d 392, 403-04 (5th Cir. 2000) (admission of "but-

for" causation sufficient to sustain retaliation finding).

    To the extent the Library claims that it acted within the options laid out by the General

Counsel, the "advice of counsel" is not a defense to retaliation.  *See Weissman v. Dawn Joy Fashions,*

*Inc.*, 214 F.3d 224, 234 n.4 (2d. Cir.  2000); *Pedreyra v. Cornell Prescription Pharmacies, Inc.*, 465

F.Supp. 936, 948 (D.C. Colo. 1979); *see also Zervas v. District of Columbia*, 1992 WL 232089 *2

n.7 (D.D.C. 1992) (consultation with counsel irrelevant to retaliation claims).  Therefore, whatever

role played by the Library's counsel is irrelevant and would not raise a genuine issue of fact on the

causal element of Ms. Mansfield's retaliation claim.

    Similarly, the Library's claim that Marcum had good intentions does not rebut the causal

connection.  First, the Library cites no facts in support of its claim that Marcum was trying to be

"equitable" and "fair." (Def. Mem. at 35-36.)  As such, this claim is "factually unsupported" and fails

---

[10] Defendant's reference to a supposed "demand" by Ms. Mansfield "that she be compensated at the SL pay grade" is unclear. (Def. Mem. at 34.)  Ms. Mansfield's complaint letter does not make any demands other than requesting to "negotiate a satisfactory resolution" to sex-based discrimination. (Ex. 25.) In any event, if Defendant removed Ms. Mansfield from her position based on her request to rectify sex discrimination, this is an admission of illegal retaliation.  (Def. Mem. at 34.)

to raise a genuine issue for trial. *Celotex*, 477 U.S. at 323-24.[11]  Second, even if Marcum thought of

herself as "equitable," her personal opinion does not rebut the damaging consequences of her action.

Good intentions are not a defense to adverse treatment under Title VII.  *See, e.g., E.E.O.C. v. Joe's*

*Stone Crab, Inc.*, 220 F.3d 1263, 1284 & n.20 (11 Cir. 2000) ("animus" or "malice" need not be

proven to show that employer subjects plaintiff to an adverse action based on impermissible factor).[12]

In sum, "the retaliatory finding rests on cause and effect, regardless of whether [Defendant]

acted out of animus and revenge or on the advice of counsel." *Farias,* 259 F.3d at 100-01.  In *Passer*,

the American Chemical Society (ACS) "freely admitt[ed]" that it postponed indefinitely a symposium

to honor a chemist "because [the chemist] had filed discrimination charges." *Passer* 935 F.2d at 330.

Much as the Library does here, ASC claimed it was "motivated simply by legal prudence and not by

any desire to harm or publicly humiliate [the plaintiff]." *Id.* at 325.  Yet, the Court still found that

plaintiff satisfied the causal element of his retaliation claim because there was "no doubt" that

Plaintiff was penalized because of "protected conduct." *Id.* at 330.[13]  Accordingly, Defendant's

---

[11]The testimony reveals not a concern about being fair, but rather that abolishing Ms. Mansfield's position without abolishing the other assistant directorships "would be difficult to explain . . . ." (Ex. 5 at 182.)

[12]Moreover, Library management *was* irked by Ms. Mansfield's invocation of her legal rights.  Marcum found it "surprising and disappointing" that Ms. Mansfield would treat the issue as a "legal matter." (Ex. 5. at 184-85).  Marcum was "bothered a lot" and "very disturbed" that "in effect" she was being "accused of discrimination" and that "this had gone to this stage." (*Id.* at 158.) Discovery of the "approach taken" by Ms. Mansfield in writing her letter was a "sad day for all of us." (*Id.* a163.)  *See, e.g., Rubenstein,* 218 F.3d at 406 (supervisor exhibited retaliatory disdain toward plaintiff's "rights to seek redress in the courts").

[13]Similarly, Defendant claims that Marcum's decision was not motivated "by anything more than a desire to do the appropriate thing by removing those duties which Plaintiff in her letter claimed she should be compensated for at the SL pay grade." (Def. Mem. at 36.)  Of course, there is nothing "appropriate" about removing Ms. Mansfield's highest level duties in response to her complaint of sex discrimination.  Contrary to Defendant's suggestion, neither the

admission that it abolished Ms. Mansfield's job in response to her protected conduct establishes the causal element as a matter of law.

### C.     Termination of Ms. Mansfield's position constitutes an adverse action.

In removing Ms. Mansfield's Assistant Director for Bibliographic duties, Defendant subjected Ms. Mansfield to an adverse action as a matter of law.  (*See* Pl. Mem. at 7-9.) Defendant attempts to defeat the "adverse action" element of Ms. Mansfield's retaliation claim by describing Ms. Mansfield's Assistant Director duties as "temporary" or "collateral."   Yet, the Supreme Court specifically declined to cordon off specific categories of adverse actions from actionable retaliatory treatment, recognizing instead that "effective retaliation" can take many forms.  *White*, 126 S.Ct. at 2412.  Defendant's opposition fails to raise a genuine issue for trial because it entirely overlooks *White* and relies on inapt analysis in *Forkkio v. Tanoue*, 131 F.Supp.2d 36 (D.D.C. 2001).

Under the Supreme Court's holding in *White*, Title VII makes unlawful any action that "produces an injury or harm" that would be "likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers."  *White,* 126 S. Ct. at 2414-15.  The undisputed evidence indicates that Ms. Mansfield suffered such a harm.  Upon losing her position, Ms. Mansfield:

- Returned to a lower position in Defendant's hierarchy

- Supervised 75 employees instead of a staff of over 500

- Supervised one division instead of nine divisions

- Managed a budget of $4.4 million instead of $40 million

---

legal opinion of the Library's Counsel nor the testimony of Mr. Perloff, a classification specialist, have any bearing on the legal ramifications of Defendant's removal of Ms. Mansfield's duties. (Def. Mem. at 35 nn. 18 &19).

● No longer participated in the directors' meetings.

(Def. Mat. Facts at 11-12 ¶¶20-24.)   Moreover, the reactions of Ms. Mansfield's male colleagues indicate that the assistant director positions provided "objectively" desirable opportunities. (Def. Mat. Facts at 11 ¶¶15-17 (calling the assistant directorships "important," "thrill[ing]," and "where all the action took place.")  Thus, Ms. Mansfield suffered the sort of harmful treatment explicitly recognized by the Supreme Court to constitute an adverse action.   Her "professional advancement" was diminished (*White,* 126 S.Ct. at 2415-16), she lost the "prestige" of a higher level position (*id.* at 2417), and she lost objectively desirable opportunities (*id.* at 2417), a loss described by her male colleagues as "extremely" disappointing and upsetting. (Def. Mat. Facts at 11 ¶¶17-18).   Any reasonable person would likely forgo a complaint of sex discrimination to avoid such an adverse development in her career.   Therefore, Defendant subjected Ms. Mansfield to an adverse action as a matter of law.  *White,* 126 S.Ct. at 2416-17.

Ignoring the Supreme Court's analysis in *White*, Defendant makes much of the term "collateral" and claims that the description of the Assistant Director for Bibliographic Access duties as "collateral" shows that removal of those duties was not an adverse action. (Def. Mem. at 33-34.) This argument elevates form over substance.  The sworn testimony of Defendant's own witnesses reflects that, as Assistant Director for Bibliographic Access, Ms. Mansfield carried out the same duties as she had as Acting Director for Cataloging.  (Ex. 7 at 85-88; ex. 5 at 145.)  These duties were extensive and rated at the senior level.  (Ex. 7 at 56.)  Thus, to the extent that Defendant tries to minimize the significance of plaintiff's position with the "collateral" label, this is nothing more than a point of semantics and fails to raise a genuine fact issue in the face of the actual work that Ms. Mansfield performed as Assistant Director for Bibliographic Access.

Defendant's reliance on *Forkkio v. Tanoue* is similarly misplaced because the facts of *Forkkio* are distinguishable.    Defendant argues that Ms. Mansfield's duties as Assistant Director for Bibliographic Access were only "temporary entitlements" under *Forkkio*.  (Def. Mem. at 34.) Yet, unlike Ms. Mansfield, Plaintiff Samuel Forkkio held an "acting" position with a set expiration date and *only* returned to his permanent position upon the pre-determined expiration of his temporary position.  Indeed, this Court explicitly rejected Forkkio's adverse action claim because the cause of his reversion to the lower-graded position was the pre-set expiration date and not his EEOC complaint.  *See Forkkio*, 131 F.Supp.2d at 42-44.[14]

In contrast, Ms. Mansfield's position as Assistant Director for Bibliographic Access was never an "acting" position and had no pre-determined expiration date.  *See supra* Part II.A.3; *infra* Part IV.B.   The *only* reason the position ended when it did was Ms. Mansfield's complaint of discrimination.  Indeed, Defendant has offered no evidence to indicate that the arrangement would not have continued in the absence of Ms. Mansfield's complaint.  As Ms. Mansfield testified:

> The Library treated my appointment to Assistant Director for Bibliographic Access as it would any official, non-temporary appointment. I was never told the duties I acquired through my appointment were temporary. We (the three Assistant Directors) were not named "acting" Assistant Directors.  We were not named "interim" Assistant Directors.

(Ex. 11 at p. 53).  Indeed, the Library announced Ms. Mansfield's appointment as a "staff change," called the appointment "official, " and differentiated her appointment from the "acting" position of

---

[14] Furthermore, in *Forkkio*, the Court based its decision upon other distinguishable facts. Unlike the loss of supervisory and management duties suffered by Ms. Mansfield, Forkkio's work did not change when he returned to his permanent position.  *Forkkio*, 131 F.Supp.2d at 43. Just before the expiration date of his temporary position, Forkkio passed up the opportunity to apply for an extension of the position, and then four months later, Forkkio obtained the higher-level position on a permanent basis anyway.  *Id.* at 43-44.

Mr. Wiggins. (Exs. 22-24.) Therefore, the Library fails to provide factual support for its claim that Ms. Mansfield's Assistant Director duties were temporary entitlements. With no fixed term or pre-set expiration date, and having served officially in her capacity as Assistant Director for Bibliographic Access since August 2004, Ms. Mansfield would have continued to serve in that capacity indefinitely, but for her complaint of sex discrimination in March 2005. Therefore, *Forkkio* does not apply here.

Whether or not the Library actually promised Ms. Mansfield that the duties would become permanent, the withdrawal of those duties once they had been given to Ms. Mansfield constitutes an adverse action.[15] Instructively, the United States Court of Appeals for the District of Columbia Circuit has declined to adopt the narrow interpretation of the adverse action element urged by Defendant. In *Passer*, the Court found that the cancellation of a seminar offered in honor of a retired chemist constituted an actionable adverse employment action in a retaliation claim. 935 F.2d at 331. The Court rejected the employer's claim that the seminar was a "'mere gratuity,'" and instead recognized the adverse impact on the Plaintiff to withdraw a rare and prestigious honor. *Passer*, 935 F.2d at 331. Similarly, in *Paquin v. Federal National Mortgage Assn.*, 119 F.3d 23, 32 (D.C. Cir. 1997), the Court reiterated that the "*withdrawal* of a voluntary benefit . . . may constitute an adverse action." *Paquin*, 119 F.3d at 32 (emphasis added.)

In fact, Ms. Mansfield's duties as Assistant Director for Bibliographic Access were the same as those she had assumed in September 2002, when she first became Acting Director for Cataloging.

---

[15] Even at-will employees are not guaranteed permanence in their position–yet termination of an at-will employee is still considered an adverse action. The record also reflects evidence that the Library did consider the positions permanent and was intending to re-write the position descriptions. (Ex. 23.) The fact that Ms. Mansfield's position description had not yet been re-written to reflect her appointed duties as Assistant Director for Bibliographic Access does not insulate Defendant from a retaliation claim.

(Ex. 7 at 87.)  Thus, as of March 2005, Ms. Mansfield had performed these higher level duties for over two years.  The Library strains credulity when it suggests that removing the highest level duties carried out by Ms. Mansfield for the previous two years of her career would not constitute an adverse employment action under *White*.  Because Ms. Mansfield suffered the sort of adverse action that would scare any reasonable employee from complaining about sex discrimination, Ms. Mansfield establishes this element of her retaliation claim as a matter of law.

***

Because undisputed facts in the record establish Ms. Mansfield's retaliation claim as matter of law, Ms. Mansfield respectfully requests that the Court grant her Motion for Partial Summary Judgment and enter judgment in her favor on Count II of her Complaint.  Moreover, for the same reasons, the Defendant's motion for summary judgment on Ms. Mansfield's retaliation claim must be denied.

## IV.    A JURY COULD FIND THE LIBRARY'S EXPLANATIONS TO BE PRETEXT.

### A.    The Library's budget could sustain increasing Ms. Mansfield's pay to the Senior Level.

The defendant asserts that "budget constraints" explain why the Library did not pay Ms. Mansfield at the Senior Level for her work as the Assistant Director for Bibliographic Access.  Def. Mem. at 31.  However, the defendant provides scant evidence to support its claim, and a jury could easily see the evidence as little more than an excuse to pay this high-performing female employee less than her male colleagues simply because the Library thought it could get away with paying her less than her services were worth.

To place the budgetary argument in context, the Library must concede (and has conceded)

38

that:

- Ms. Mansfield was required to perform work at the Senior Level as the Assistant Director for Bibliographic Access (Ex 7 at 172-173);

- Ms. Mansfield had been performing Senior Level work for at least two and a half years (Ex. 7 at 68, 94; ex. 4 at 212.);[16]

- Ms. Mansfield performed "very well" (Ex. 7 at 61, 68, 88) and she did "very good work" at the Senior Level (Ex. 5 at 137);[17]

- Ms. Mansfield effectively succeeded Mr. Wiggins as the Director for Cataloging (Ex. 7 at 56-57, 87; ex. 5 at 116, 145);

- Mr. Wiggins was promoted to and compensated at the Senior Level when he became the Director for Cataloging (Ex. 7 at 48);

- The Library did not promote or compensate Ms. Mansfield at the Senior Level when she succeeded Mr. Wiggins. (Ex. 7 at 105-07 ; ex. 5 at 147-148.)

Moreover, all of the directors and assistant directors within Library Services after the reorganization in August 2004 were compensated at the Senior Level except Ms. Mansfield. (Ex. 7 at 95-96.) Thus, to compensate all of the upper management in Library Services at the Senior Level after the reorganization implemented by Ms. Marcum would have required the Library to increase the compensation of a single employee – Ms. Mansfield – out of a staff of more than 2,500 employees. (Ex. 5 at 6.)

Regardless of whatever budgetary constraints the Library had at the time, the truth of the matter is that the annual budget for the Library is **half a billion dollars** (Ex. 7 at 99), and the cost of paying Senior Level compensation to a single female employee who was performing a job that required Senior Level work is dwarfed by comparison, to say the least. The annual budget for Library

---

[16] Mr. Wiggins conceded that Ms. Mansfield had been performing at the Senior Level as the ASCD Chief from 2000-2001 onward. (Ex. 7 at 119.)

[17] Mr. Wiggins, when asked how Ms. Mansfield performed as the Assistant Director for Bibliographic Access, testified: "She was excellent." (Ex. 7 at 183.)

Services alone was $200 million, and the Acquisitions and Bibliographic Access Directorate budget in particular was $95 million. (Ex. 5 at 6, 29-30, 34. )

In comparison, the cost of compensating Ms. Mansfield at the Senior Level would have been minuscule.  Mr. Wiggins estimated the total budgetary impact on an annual basis to be in the range of "between $3,000 and $5,000."  (Ex. 7 at 98.)  Ms. Marcum believed that, with potential bonuses, the cost of paying Ms. Mansfield at the Senior Level would have been in the range of $8,000 to $13,000 per year.  (Ex. 5 at 68-69.)

In addition, a jury could find that, if the Library wanted to compensate Ms. Mansfield fairly for the Senior Level work she was doing (and as her male counterparts were paid), the Library's multi-million dollar budget could have easily and comfortably absorbed such a cost.  For instance, the defendant paid Ms. Marcum herself a signing bonus of $20,000 just to come to work for the Library.  (Ex. 5 at 199.)  In addition, the Library found room in its budget to pay Ms. Marcum two "retention bonuses," one of $30,000 and another of $32,000, since she was first hired in 2003.  (Ex. 5 at 199-200.)  Finally, nothing about the Library's fiscal situation prevented Ms. Marcum from rebuilding and redecorating her suite of offices once she came on board.  (Ex. 5 at 215.)[18]

In sum, in light of these expenditures, a jury may well find implausible the defendant's assertion that the $200 million "Library Services' budget could not support the addition of any new SL positions," (Def. Mem. at 6), when the cost of paying Ms. Mansfield at the Senior Level for the Senior level work she was doing would have been a tiny fraction of the budget.  Summary judgment must be denied where the plaintiff presents evidence that the employer's justification is implausible

---

[18]  Moreover, in this same time frame, more than one Senior Level employee within Library Services retired and was not replaced (Ex. 5 at 211-212), affording the Library the ample opportunity to compensate Ms. Mansfield at the Senior Level without increasing its budget.

and the jury is not required to believe the defendant's alleged justification is true.  *Reeves*, 530 U.S. at 151; *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1564 (11th Cir. 1987).

B.    **"Ongoing Reorganization" fails to explain the Library's refusal to pay Ms. Mansfield the value of her Senior Level work.**

The defendant also argues that the supposed "ongoing reorganization of Library Services" explains why the Library did not compensate Ms. Mansfield at the Senior Level and on a par with her male counterparts.  (Def. Mem. at 31-32.)  However, a jury would not be required to believe this explanation, and the law could not possibly countenance the illegal and discriminatory compensation of the plaintiff simply because the Library's plans for the future were not cast in concrete.

Much of the testimony and documentary evidence undermines the defendant's theory that the Library's appointment of Ms. Mansfield to a Senior Level position was so tentative as to excuse the Library's refusal to pay her as it did her male colleagues.  For example, in its Annual Report to Congress, the Library announced that Ms. Mansfield had been appointed to the position of Assistant Director for Bibliographic Access, not "acting" director or "interim" director. (Ex. 11 at 53.) Similarly, in her newsletter to all of Library Services, Ms. Marcum stated:

> I am pleased to announce these appointments:
> Beacher Wiggins will serve as *acting* Assistant Director for Acquisitions.
> Judy Mansfield is the Assistant Director for Bibliographic Access.
> Steve Herman is the Assistant Director for Collections Management.
> Mark Dimunation is the Assistant Director for Special Collections and Services.

(Ex. 22 (emphasis added).)[19]   The announcement makes no mention of the notion that these appointments are just a tentative phase in an "ongoing reorganization."  The attached organizational chart for Library Services similarly contrasts the "acting" designation for Mr. Wiggins' appointment

---

[19]  A jury could conclude that the only thing tentative about these appointments was Mr. Wiggins' appointment as "acting" assistant director.

with the absence of any such qualifier attached to the other assistant director positions.  (*Id.* at p. 2.)[20]

All of the appointed assistant directors agree that when Ms. Marcum appointed them she did not inform them that the positions were for any limited duration.  (Ex. 3 at 73; ex. 1 at 64; ex. 11 at p. 53.)  Indeed, in her welcoming memo to the new assistant directors, Ms. Marcum explained that "your appointments are now official" and the position descriptions would be rewritten, but she made no mention of the positions being subject to change or elimination due to an "ongoing reorganization."  (Ex. 23.)  To the contrary, all signs pointed to official, permanent positions, and nothing hints at the tentative nature of the assignments which the defendant now asserts to excuse its failure to pay Ms. Mansfield fairly.

The abrupt abolishment of the positions after Ms. Mansfield's complaint of sex discrimination came as a complete surprise to each as well.  Mr. Herman testified that, when Ms. Marcum informed him and Mr. Dimunation that she was abolishing the assistant director positions, he and Mr. Dimunation "both kind of sat there kind of looking at her with this like what did we do kind of thing, you know," and as Mr. Herman recounted:

> She did tell us that Judy Mansfield had, and I don't remember the exact words because we were just kind of taken aback, but either filed discrimination or said there was an equal pay issue, discrimination issue, and that she had no choice to abolish the positions.

(Ex. 3 at 55-56.)  Mr. Dimunation similarly testified that "[b]oth of us were quite surprised . . .", and he explained why:  "Didn't see it coming.  Had no idea."  (Ex. 1 at 71.)  A jury could reasonably find

---

[20]  Also noteworthy is Ms. Marcum's choice of language in describing the positions: "the assistant directors (all of whom have *collateral division chief duties*."  (*Id.* at p. 1 (emphasis added).)  That description accurately described Ms. Mansfield's duties, as the management of nine divisions and 550 employees required the assignment of another employee to carry out the division chief duties.  (Ex. 5 at 145-146; ex. 4 at 155-156.)

that these two assistant directors would not have been shocked had they believed at the time that their appointments were in any way tentative due to an "ongoing reorganization" in Library Services, as the defendant now proclaims.

### C.    The Library is not entitled to any inferences on summary judgment.

Defendant improperly asks for an inference that it did not subject Ms. Mansfield to sex discrimination based on Wiggins' advocacy on behalf of Ms. Mansfield to obtain Senior Level pay. (Def. Mem. at 20.)  Yet, under Rule 56, all inferences must be drawn in favor of the non-moving party. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 573-74 (6th Cir. 2003) (rejecting application of the same actor inference as contrary to Fed.R.Civ.P. 56).  Granting such an inference to the Defendant, on its face, would violate the clear meaning of this rule.[21]  *See id*.  While *factfinders* may, depending on the circumstances, draw an inference based on the same actor theory, the inference is not mandatory and the factfinder may reject it as part of its duty to weigh the evidence.  Indeed, a jury could view the Library's refusal to upgrade Ms. Mansfield to the Senior Level despite her supervisor's firm support an indication of sex discrimination, and thus summary judgment must be denied.  *See Hunt v. Cromartie,* 526 U.S. 541, 553 (1999) (summary judgment "inappropriate when the evidence is susceptible to different interpretations").

---

[21] Moreover, the Library's claim misses the mark because Wiggins is not the "actor" who denied Ms. Mansfield senior level pay, and therefore, the Library would have no basis to even seek the same actor inference.

## CONCLUSION

The Library essentially argues that it could not pay Ms. Mansfield at the Senior Level because she was not already a senior level employee. Yet, Ms. Mansfield's compensation level was within the Library's control. The Library cannot claim that Ms. Mansfield did not do senior level work, only that it did not place her in the Senior Level. With undisputed excellent work, 2.5 years of undisputed senior level duties, several males earning senior level pay for comparable work, a supervisor who repeatedly advocated for her upgrade to the Senior Level, and the findings of a classifier's report supporting an upgrade to the Senior Level, a jury could reasonably infer that the Library's staunch resistance to making Ms. Mansfield a Senior Level employee is simply illogical and, thus, indicative of sex discrimination. *See generally Aka*, 156 F.2d 1284.

Respectfully submitted,

WEBSTER, FREDRICKSON, HENRICHSEN, CORREIA & PUTH, P.L.L.C.

_____
   */s/   **Bruce A. Fredrickson**
Bruce A. Fredrickson  #933044
Cedar P. Carlton # 480255
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510
(202) 659-4082 (fax)

Attorneys for Plaintiff Mansfield

44

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 4th day of December, 2007, a true and accurate copy of Plaintiff Judith A. Mansfield's Opposition to Defendant's Motion for Summary Judgment, Reply in Support of Motion for Partial Summary Judgment, and Proposed Order, was filed and served electronically to:

Jane M. Lyons, Esq.
Assistant United States Attorney
555 4th Street, N.W.
Room E4822
Washington, D.C. 20530


     ___/s/   **Cedar P. Carlton**___
Cedar P. Carlton, #480255
Webster, Fredrickson, Henrichsen, Correia & Puth, P.L.L.C.
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510 (tel)
(202) 659-4082 (fax)
ccarlton@wfhcplaw.com

Attorney for Plaintiff

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

_____

JUDITH A. MANSFIELD                    )
                                       )
            Plaintiff,                 )
                                       )
      v.                               )        Civil Action No. 05-1790 (RMU/JMF)
                                       )
JAMES H. BILLINGTON,                   )
LIBRARIAN OF CONGRESS,                 )
                                       )
            Defendant.                 )
_____)

### [PROPOSED] ORDER

Upon consideration of Plaintiff Judith A. Mansfield's Opposition to Defendant's Motion for

Summary Judgment and Plaintiff's Motion for Partial Summary Judgment, any opposition and reply

thereto, and upon the entire record herein; it is

ORDERED that Defendant's Motion for Summary Judgment shall be, and hereby is,

DENIED; and it is further

ORDERED that Plaintiff's Motion for Partial Summary Judgment shall be, and hereby, is,

GRANTED, and it is further

ORDERED that Judgment in favor of Plaintiff shall be entered on Count II of the Complaint

and the matter shall proceed to trial for the determination of the make-whole relief to be provided to

Plaintiff.


Dated: _____          _____
                                            Judge Ricardo M. Urbina

                                            United States District Court
                                            for the District of Columbia

cc:

      Bruce A. Fredrickson
      Cedar P. Carlton
      Webster, Fredrickson, Henrichsen, Correia & Puth, P.L.L.C.
      1775 K Street, N.W., Suite 600
      Washington, D.C.  20006

      Jane M. Lyons, Esq.
      Assistant United States Attorney
      555 4th Street, N.W.
      Room E4822
      Washington, D.C. 20530

## TABLE OF EXHIBITS

Exhibit 1        Deposition of Mark Dimunation

Exhibit 2        Deposition of Dennis Hanratty

Exhibit 3        Deposition of Steve Herman

Exhibit 4        Deposition of Judy Mansfield

Exhibit 5        Deposition of Deanna Marcum

Exhibit 6        Deposition of Stephen Perloff

Exhibit 7        Deposition of Beacher Wiggins

Exhibit 8        Verified Complaint

Exhibit 9        Affidavit of Judith A. Mansfield, January 25, 2006

Exhibit 10       Expert Report, Stephen H. Perloff

Exhibit 11       Plaintiff's Answers to Defendant's First Set of Interrogatories, Excerpts

Exhibit 12       Defendant's Response to Plaintiff's Requests for Admissions

Exhibit 13       Settlement Agreement and Stipulation Regarding Back Pay, United States Court of Federal Claims

Exhibit 14       Mansfield Performance Plan, Progress, and Appraisal Record, 1998

Exhibit 15       Mansfield Performance Plan, Progress, and Appraisal Record, 2004

Exhibit 16       Mansfield Notification of Personnel Action, 5/24/98

Exhibit 17       Mansfield Notification of Personnel Action, 1/09/05

Exhibit 18       Position Description, Director for Cataloging

Exhibit 19       Classification Report, April 23, 2003

Exhibit 20       Reclassification Request, April 25, 2003

Exhibit 21       Memo Denying Reclassification Request, April 8, 2004

Exhibit 22    Announcement of Assistant Director Appointments, August 6, 2004

Exhibit 23    Email Welcoming Assistant Directors, August 6, 2004

Exhibit 24    Annual Report September 2004 Appendix K:Staff Changes

Exhibit 25    Mansfield Letter Complaining of Sex Discrimination, March 15, 2005

Exhibit 26    Announcement Eliminating Assistant Director positions, April 13, 2005

Exhibit 27    Mansfield EEOCO Allegation of Discrimination, April 18, 2005

Exhibit 28    Byrum Notification of Personnel Action

Exhibit 29    Byrum Position Description

Exhibit 30    Dimunation Application for Federal Employment

Exhibit 31    Dimunation Notification of Personnel Action

Exhibit 32    Herman Notification of Personnel Action

Exhibit 33    Wiggins Notifications of Personnel Action

Exhibit 34    Declaration of Deanna Marcum

Exhibit 35    Declaration of Beacher Wiggins