# Exhibit 2

# Deposition of Dennis Hanratty

*Mansfield v. Billington*, Civil Action No. 05-1790 (RMU/JMF)

1

```
1        UNITED STATES COURT OF FEDERAL CLAIMS
2
3
4    -------------------------------X
5    JUDITH A. MANSFIELD,         :
6           Plaintiff : Civil Action
7        v.              : No. 05-472C
8    THE UNITED STATES OF AMERICA,  : Judge Williams
9           Defendant :
10   -------------------------------X
11
12
13        Deposition of DENNIS M. HANRATTY
14            Washington, D.C.
15          Wednesday, January 31, 2007
16              2:50 p.m.
17
18
19
20   Job No.: 1-95857
21   Pages 1 - 132
22   Reported by: Nancy Bond Rowland
```

2

```
1        Deposition of DENNIS M. HANRATTY, held at the
2    offices of:
3
4        Webster, Fredrickson & Brackshaw
5        1775 K Street, N.W.
6        Suite 600
7        Washington, D.C.
8
9        Pursuant to agreement, before Nancy Bond
10   Rowland, Registered Professional Reporter and Notary
11   Public in and for the District of Columbia.
12
13
14
15
16
17
18
19
20
21
22
```

3

```
1            A P P E A R A N C E S
2    ON BEHALF OF PLAINTIFF:
3        BRUCE A. FREDRICKSON, ESQUIRE
4        WEBSTER, FREDRICKSON & BRACKSHAW
5        1775 K Street, N.W., Suite 600
6        Washington, D.C.  20006
7        (202) 659-8510
8
9    ON BEHALF OF DEFENDANT:
10       DOUGLAS K. MICKLE, ESQUIRE
11       UNITED STATES DEPARTMENT OF JUSTICE
12       Commercial Litigation/National Courts
13       1100 L Street, N.W., Room 4062
14       Washington, D.C.  20005
15       (202) 307-0383
16
17       JESSIE JAMES, JR., ESQUIRE
18       JULIA DOUDS, ESQUIRE
19       LIBRARY OF CONGRESS
20       101 Independence Avenue, S.E.
21       Washington, D.C.  20540
22       (202) 707-7464
```

4

```
1             C O N T E N T S
2    EXAMINATION OF DENNIS M. HANRATTY    PAGE
3    By Mr. Fredrickson              5
4
5
6             E X H I B I T S
7           (Retained by counsel)
8    DEPOSITION EXHIBIT              PAGE
9    17 - Declaration of Dennis Hanratty.    23
10       Bates no. 15 - 19
11   18 - Library of Congress Regulation 2017-2.1.   45
12       Bates no. 28 - 43A
13   19 - Notification of Personnel Action (Mansfield)  85
14   20 - Notification of Personnal Action (Wiggins)   97
15
16
17
18
19
20
21
22
```

5

1    P R O C E E D I N G S
2    DENNIS M. HANRATTY
3    having been duly sworn, testified as follows:
4    EXAMINATION BY COUNSEL FOR PLAINTIFF
5    BY MR. FREDRICKSON:
6    Q  Could you state your name please?
7    **A  Yes.  My name is Dennis Hanratty.**
8    Q  And are you employed?
9    **A  I am employed, yes.**
10   Q  Where do you work?
11   **A  I work at the Library of Congress.**
12   Q  What's your job at the Library of Congress?
13   **A  I'm the director for Human Resources.**
14   Q  When did you become the director for Human
15   Resources?
16   **A  In August of 2005.**
17   Q  Could you give me an overview of your career
18   at the Library of Congress?
19   **A  Yes.  I've been at the Library since 1983.**
20   **For the first seven years I worked in a research**
21   **capacity first as a research analyst and then as a**
22   **supervisor in the Federal Research Division of the**

6

1    **Library.  In 1990 I became a special assistant to the**
2    **associate librarian for Management.  In 1993 I**
3    **transferred over to Human Resources and became the**
4    **special assistant to the director for Human Resources.**
5    **And in 2002 I became the director for Strategic**
6    **Planning and Automation at Human Resources Services**
7    **leading up to my current position.**
8    Q  And in August of 2005 you became the director
9    of Human Resources?
10   **A  That's correct.**
11   Q  Is the director for Human Resources the top
12   personnelist within the Library of Congress?
13   **A  Yes, that's correct.**
14   Q  So you're in charge of personnel basically?
15   **A  Yes.**
16   Q  Okay.  Could you give me an overview of what
17   job duties you have as director of Human Resources?
18   **A  Well, we have basically four components of**
19   **Human Resources.  The first is our Office of Work Force**
20   **Acquisitions, and that's responsible for identifying**
21   **and selecting, assisting service units in the selection**
22   **of candidates for library positions.**

7

1    **The second office which is our Office of Work**
2    **Life Services basically provides assistance to**
3    **individuals once they have been selected as library**
4    **employees.  So that's the office where we provide**
5    **personnel action processing, payroll processing,**
6    **benefits counseling, retirement counseling, the full**
7    **gamut of human resource services that would be offered**
8    **to an employee.**
9    **The Office of Work Force Management which is**
10   **our third component is responsible for performance**
11   **management.  It's responsible for employee relations**
12   **and also for labor relations.**
13   **And then our final component which is the**
14   **Office of Strategic Planning and Automation handles the**
15   **strategic direction of Human Resources as well as all**
16   **automation services that are provided both within Human**
17   **Resources and throughout the agency to our customers.**
18   Q  Okay.  As the director for Human Resources
19   are you required to familiarize yourself with the
20   Library's regulations regarding personnel?
21   **A  Yes.**
22   Q  And have you done that?

8

1    **A  Yes.**
2    Q  And you're thoroughly familiar with the
3    Library's regulations on personnel?
4    **A  I would certainly say that I'm thoroughly**
5    **familiar.  Whether I would say I'm an expert in every**
6    **component of the regulation, I probably would not say**
7    **that.**
8    Q  Okay.  Taking you back to the job you held in
9    2000, director for Strategic Planning and Automation,
10   could you give me a summary of your job duties in that
11   position please?
12   **A  Well, in that particular position, as I**
13   **mentioned, I was responsible for the strategic planning**
14   **of human resources activities.  Specifically relevant**
15   **in terms of this particular case, I managed the senior**
16   **level work force on behalf of the director for Human**
17   **Resources.**
18   Q  Okay.  What do you mean when you say you
19   managed the senior level work force?
20   **A  For example, if there were requests coming in**
21   **from service units for temporary promotions of**
22   **individuals to the senior level work force, I would**

**9**

1 make a recommendation to the director for Human
2 Resources, and she in turn would make a recommendation
3 to the deputy librarian regarding the setting of pay
4 for that particular individual.
5      I would be responsible each spring for
6 assisting the director for Human Resources in the
7 performance appraisal process and would be responsible
8 based on the decisions that would have been made by the
9 service unit heads who collectively form a body known
10 as the Performance Review Board, they submit
11 recommendations to the deputy librarian, but once all
12 of those recommendations are approved, then I would be
13 responsible for ensuring that the pay adjustments,
14 awards, any type of monetary compensation that would
15 impact a senior level employee would be taken care of.
16      So I would be responsible for actually doing
17 the calculations, ensuring that the appropriate staff
18 within Human Resources entered that information into
19 our payroll system, and ensured that we met the time
20 frame for the adjustments to pay and performance
21 bonuses in accordance with our regulation.
22      Q  Did you have any other responsibilities in

**10**

1 the management of the SL work force?
2      A  Those were the primary responsibilities, but
3 if there were other responsibilities the director chose
4 to assign to me on a particular case, I would do those
5 as well.
6      Q  Okay.  So what I jotted down here was you had
7 responsibility in the area of temporary promotions and
8 the performance appraisal process?
9      A  Yes.
10      Q  So those two areas were the main ones?
11      A  I would say those are the main ones, yes,
12 that's correct.
13      Q  How about did you have any role in setting or
14 recommending pay levels for entry level SL employees?
15 Did you have any responsibility in that area as well?
16      A  Yes, I did have responsibility for that as
17 well.  Once a decision would have been made that an
18 individual was being promoted to the senior level then
19 I, consistent with our regulation, I would look at the
20 full gamut of background of that individual, the
21 responsibility of the particular position, the scarcity
22 of executives that could occupy that position, the

**11**

1 individual's current pay, and make a recommendation to
2 the director for Human Resources as to which of four
3 levels pay would be set.
4      Q  Okay.  Would you also make recommendations as
5 to the pay level for an individual that was coming into
6 the Library of Congress from outside the Library of
7 Congress?
8      A  Yes.  Yes, I would.
9      Q  So if somebody is hired and they're not
10 currently a Library employee and they were hired into
11 the senior level, you would make a recommendation to
12 the HR director as to the level of pay appropriate for
13 that individual?
14      A  That's correct.  Whether we're talking about
15 an external hire or someone who was a current library
16 employee, I would be responsible for making that
17 recommendation.
18      Q  Okay.  Did you have any responsibilities in
19 the area of classification?
20      A  No, I did not.
21      Q  Okay.  Were you involved at all in
22 classification reviews?

**12**

1      A  No.
2      Q  Since you became the HR director, have you
3 made yourself familiar with the classification
4 procedures at the Library of Congress?
5      A  Yes, I have.
6      Q  But you didn't know those procedures before
7 August of 2005, is that right?
8      A  I was familiar with those procedures, but it
9 wasn't my area of responsibility, and we had a separate
10 classification unit that was responsible for that.  So
11 I had indirect knowledge of the classification process.
12      Q  How did you acquire that indirect knowledge
13 of the classification process?
14      A  Well, simply by being special assistant to
15 the director for a number of years, and if there were
16 specific assignments that a director would have given
17 me, I would have garnered knowledge of the
18 classification process through that.
19      Q  And did the HR director assign you any
20 responsibilities in the area of classification or
21 classification review, anything of that sort?
22      A  No.  Those were pretty much handled directly

13

1 by the HR director in conjunction with the
2 classification unit.
3    Q   Was the classification unit located within
4 HR?
5    A   Yes.
6    Q   Is that what it's called, classification
7 unit?
8    A   Well, it probably has gone by a variety of
9 names.  Currently it's a subset of our Office of Work
10 Force Acquisitions, but at various times it might have
11 been the classification unit, might have been the
12 Classification Office.
13    Q   And who heads up that office?
14    A   Well, currently we have a director in our
15 Office of Work Force Acquisitions, her name is Sheila
16 Williamson.  She has responsibility for both the
17 position classification side of the house as well as
18 for the staffing side.
19    Q   What do you mean when you say staffing side?
20    A   I mean that's the side that is responsible
21 for working with the service units as they identify a
22 specific position that they're going to advertise,

14

1 ensuring that we follow all of the necessary steps
2 associated with our merit selection plan in selection
3 of those individuals.  So she has responsibility for
4 both of those areas.
5    Q   And how long has Ms. Williamson been in that
6 position, and by that I mean the Classification Office?
7    A   Well, she's a relatively new hire at the
8 Library.  She came on board in September of 2006.
9    Q   Okay.  And who headed up the Classification
10 Office before Miss Williamson?
11    A   Well, William Ayers was our acting director
12 of the Office of Work Force Acquisitions immediately
13 prior to Miss Williamson.
14    Q   And who was the last director before Mr.
15 Ayers?
16    A   Her name was Tawanda McLeod.
17    Q   Is Miss McLeod still with the Library of
18 Congress?
19    A   No, she's not.
20    Q   When did she leave?
21    A   Approximately 2003.  I don't know exactly
22 what time frame.

15

1    Q   Do you know Judy Mansfield?
2    A   I do know Judy.
3    Q   And were you involved in any way in any of
4 the classification issues related in her case?
5    A   The only involvement that I had with respect
6 to Judy's case was the setting of pay for her two
7 temporary appointments.  So I had lead responsibility
8 for that.
9    Q   Were you aware that a classification
10 specialist was retained by the Library of Congress to
11 review Miss Mansfield's position as chief of the Arts
12 and Sciences Cataloging Division as well as others?
13    A   I was aware of that, yes.
14    Q   Were you involved in any way in that process?
15    A   No, I was not.
16    Q   Were you consulted in any way in that
17 process?
18    A   No.
19    Q   Did anybody tell you anything about how that
20 process unfolded?
21    A   Yes.  I was aware of the recommendation that
22 came back from the classifier.

16

1    Q   And how did that information come to your
2 attention?
3    A   I really don't recall whether it was directly
4 from the director for Human Resources or whether I
5 heard that from someone else, but I was aware.
6    Q   Okay.  And what were you told?
7    A   That there had been a recommendation from the
8 contract classifier that three of the positions that
9 had been submitted to the contract classifier for
10 review, that he was recommending that they be at the
11 senior level position.
12    Q   And you believe you learned that from the HR
13 director?
14    A   I don't know.  I'm not sure who I learned it
15 from, but I was aware of that.
16    Q   Whoever you learned it from was somebody that
17 was employed by the Library of Congress?
18    A   Oh, yes.
19    Q   Can you give me a job title or anything like
20 that, a person?
21    A   No, because I really don't recall exactly how
22 I came upon that information, but it was credible

DEPOSITION OF DENNIS M. HANRATTY
Case 1:05-cv-01790-RMU CONDUCTED ON WEDNESDAY, JANUARY 04, 2007
Document 27-3   Filed 12/04/2007   Page 6 of 34

5 (Pages 17 to 20)

17

1    information.
2       Q   Okay.  It's not a question of you can't think
3    of the person's name?
4       A   No.  I just don't remember exactly when I
5    learned of that, but it would have been in the Human
6    Resources Services context.
7       Q   Okay.  So somebody in HR, somebody in Human
8    Resources, would have told you about the classification
9    recommendation by the outside classifier?
10      A   That's correct.  Yes.
11      Q   Okay.  And you can't remember who it was?
12      A   No, I can't.
13      Q   All right.  Did anybody consult you as to
14   what action the Library should take with respect to the
15   outside classifier's recommendation?
16      A   No.  No.
17      Q   You didn't discuss it with the HR director as
18   far as you can recall?
19      A   No, I didn't.
20      Q   Okay.  And why are you so certain about that?
21      A   Because I know that I was not involved at all
22   either directly or providing advice or counsel to the

18

1    HR director on that particular issue.  In sharp
2    contrast to that would be my extended involvement in
3    terms of her temporary promotions.
4       Q   Okay.  Before you became the HR director, am
5    I correct that you were never involved in any
6    reclassification of positions from the GS schedule to
7    SL?
8       A   That's correct.
9       Q   Okay.  Have you been involved in any
10   reclassifications of positions from the GS schedule to
11   the senior level schedule since you became the HR
12   director?
13      A   Yes, I have.
14      Q   And how many classification matters have you
15   been involved in in that regard?
16      A   My guess is we're probably talking about two
17   or three actions.  There aren't that many.  In any
18   given year there aren't that many reclassifications.
19      Q   Can you think of those examples now?
20      A   Yes.
21      Q   What are the positions you're talking about?
22      A   There's a director for Strategic Planning of

19

1    the Library that was a GS-15 position that was
2    reclassified to the senior level.  And there is a
3    relatively new request that came from our Inspector
4    General's Office for an assistant inspector general for
5    Audits.  Those are the two positions that come to mind.
6       Q   And who is holding the position of director
7    for Strategic Planning?
8       A   The individual?
9       Q   Right.
10      A   Her name is Karen Lloyd.
11      Q   Okay.  And was Miss Lloyd employed as
12   director for Strategic Planning when the classification
13   review took place?
14      A   Yes, that's correct.
15      Q   And was her position upgraded to an SL
16   position?
17      A   Her position was upgraded.  Yes, it was.
18      Q   How about the assistant IG for Audits?
19      A   That position has been upgraded, but it is
20   currently vacant.  It's a relatively new position.
21      Q   And how is it that the position was upgraded,
22   although it was vacant, how did that come about?

20

1       A   Well, we had a specific request that came
2    from our inspector general, and he laid out a plan to
3    combine two of his functions into a new position and
4    had additional responsibilities associated with that
5    position.  I assigned it to my specialist, to Sheila
6    Williamson and to her team of classifiers.  They
7    conducted a classification evaluation, made a
8    recommendation that the position in fact was at the
9    senior level.
10      Q   And have you approved that?
11      A   Yes.  It's really not mine to approve.  The
12   process is that it's a recommendation that comes from
13   the director for Human Resources to the deputy
14   librarian, and the deputy librarian approved that.
15      Q   So your role as HR director would be to
16   either approve or disapprove but it still needs further
17   approval, is that accurate?
18      A   Yes, that's correct.  Even the term approval
19   is probably too strong because at best what I am doing
20   is making a recommendation to the Librarian's Office.
21      Q   All right.  So if I understand the
22   classification process correctly, the HR director's

21

1 role would be to consider the classification
2 recommendation made by your Classification Office and
3 make a recommendation to the deputy director one way or
4 the other, whether it ought to be reclassified or not,
5 is that accurate?
6    A  That's fair to say.
7    Q  And the deputy director or the deputy
8 librarian?
9    A  Deputy librarian.
10    Q  The deputy librarian makes a decision as to
11 whether or not the position is reclassified?
12    A  That's correct.
13    Q  All right.  So you were actually involved in
14 the Mansfield temporary promotions, is that what you're
15 saying?
16    A  That's correct.
17    Q  And just to go back in time, when did you
18 start that function of managing the SL work force?
19    A  It was probably something that I was doing, I
20 couldn't tell you exactly what time frame, but I was
21 doing it in the capacity of my position as special
22 assistant, and it became among the duties that carried

22

1 over in my new position.  So I would say probably we're
2 talking about around 2000.
3    Q  Okay.  Well, my notes reflect that you became
4 the director for Strategic Planning and Automation
5 around 2000.
6    A  2002.
7    Q  2002?
8    A  Yes.  Sorry.
9    Q  All right.  So you were the special assistant
10 for about two years doing the work of managing the SL
11 work force as part of your responsibilities?
12    A  And I would say yes, at least two years.
13 It's possible it could have been a little bit longer
14 than that, but I'm not sure exactly.
15    Q  All right.  I hate to see the record on that.
16 I'm going to be disappointed I think.  I want to make
17 sure I understand what you're saying.
18    A  Sure.
19    Q  Sometime in the year 2000 or thereabouts you
20 started doing the work that you described as managing
21 the SL work force, is that accurate?
22    A  Yes, that's correct.

23

1    Q  And at the time you started doing that work,
2 you were then the special assistant to the Human
3 Resources director?
4    A  That's correct.
5    Q  And then you carried over that function when
6 you became the director for Strategic Planning?
7    A  That's correct.
8    Q  And continued to do that on up to the time
9 that you became director of Human Resources, is that
10 all right?
11    A  Yes, that's correct.
12    Q  Okay.  Bear with me.  I'm going to get into
13 one of my folders here.
14    A  Sure.
15       MR. FREDRICKSON:  May I have this marked as
16 Plaintiff's Exhibit Number 17 please.
17       (Deposition Exhibit 17 was marked for
18 identification and was retained by counsel.)
19 BY MR. FREDRICKSON:
20    Q  I've had handed to you Plaintiff's Exhibit
21 Number 17.  Have you had a chance to look at it?
22    A  No, but I am familiar with this.

24

1    Q  Okay.  Am I right that Plaintiff's Exhibit
2 Number 17 is a declaration that you provided in
3 conjunction with this lawsuit?
4    A  Yes, that's correct.
5    Q  And you signed under penalty of perjury I
6 gather that the matters asserted in the declaration are
7 true?
8    A  That's correct.
9    Q  Okay.  Turn to the last page of Plaintiff's
10 Exhibit Number 17.  Is that your signature there above
11 the line that says Dennis M. Hanratty?
12    A  Yes.  Unfortunately, it is.
13    Q  Well, you could have been a doctor or lawyer
14 from looking at that, but that aside.
15       I gather at the time you executed this
16 affidavit because you were the director of Strategic
17 Planning and Automation?
18    A  Yes, that's correct.
19    Q  Is there a date on here that I'm missing?
20 Did you date this declaration?
21    A  It does not look like I did.
22    Q  This is a five-page declaration though,

25

1  right?
2      A  Yes.
3      Q  You actually did two declarations in this
4  lawsuit?
5      A  That's correct, yes.
6      Q  We're going to get to the other one.  This is
7  the five-page declaration that you did first, is that
8  right?
9      A  That's correct.
10     Q  Okay.  It says here in paragraph 3 "I was
11  also involved in the HRS process of implementing Miss
12  Mansfield's two temporary promotions to SL since this
13  is part of my regular duties in HRS."
14     A  Yes.
15     Q  Okay.  You told me you were involved in Miss
16  Mansfield's two temporary promotions, right?
17     A  Yes, that's correct.
18     Q  Were you involved in the temporary promotions
19  of Mr. Wiggins?
20     A  No, I was not.  Those occurred back in the
21  1995-1996 time frame, and that was prior to my doing
22  this work.

26

1      Q  Do you know who would have been responsible
2  for managing the SL work force in that time frame?
3      A  I believe it was Brent Kendrick.
4      Q  Brent?
5      A  Yes.
6      Q  Kendrick.  Is he still with the Library of
7  Congress?
8      A  No, he's not.
9      Q  Just put that aside.  I've got quite a few
10  questions on it, but just put it aside for a minute.
11     A  Sure.
12     Q  Tell me, how does the senior level
13  compensation system work at the Library of Congress?
14     A  Okay.  There are four bands that are used for
15  the purposes of initial pay setting, and those four
16  bands range from 120 percent of the monetary value of a
17  GS-15 step 1 to although our regulation states 162
18  percent, in fact every year that is trumped by a
19  statutory cap that exists on pay.  Senior level pay at
20  the Library cannot exceed the pay in any given year for
21  executive schedule level III which this year is
22  $154,600.

27

1      Q  Did you say executive schedule level III?
2      A  Yes, that's correct.
3      Q  Is that Roman numeral III?
4      A  Roman numeral III, yes.  So that $154,000
5  figure is actually much less than the SL-4 level which
6  is 162 percent of a GS-15 step 1 would come out to much
7  more than $154,000.  However, we're prohibited by
8  statute from paying that.
9      Q  When you say you're prohibited from paying
10  that, do you mean in salary?
11     A  In salary, that's correct.
12     Q  Because there are other forms of
13  compensation?
14     A  Yes.  We're talking strictly salary at this
15  point.
16     Q  Okay.
17     A  So whether we're talking about a temporary
18  appointment to the senior level or a permanent
19  appointment to the senior level, we would set pay on
20  the basis of one of those four SL levels.  Once an
21  individual, however, and here now I'm moving from
22  talking about a temporary employee to a permanent

28

1  senior level employee, once that individual is in the
2  system, everything thereafter is pay for performance.
3         So theoretically one could go from the bottom
4  of the senior level system to a higher level depending
5  on your performance.  And each spring there is a body
6  at the library called the Performance Review Board or
7  PRB are the initials, and the PRB has responsibility
8  for making a recommendation to the librarian and the
9  deputy librarian in terms of the value that will be
10  associated, the monetary value that will be associated
11  with a specific rating.  So an outstanding might be
12  worth X, a commendable rating might be worth Y, and so
13  forth.
14        The PRB then meets in the springtime
15  collectively, and each member of the Performance Review
16  Board presents its recommendations to the larger body.
17  That body then approves those, and they're submitted to
18  the deputy librarian for his concurrence and approval.
19  Assuming he approves that, then that comes back to
20  Human Resources Services to implement that decision,
21  and the process then will be repeated each year.
22     Q  Let me see if I understand what you've said.

DEPOSITION OF DENNIS M. HANRATTY
CONDUCTED ON WEDNESDAY, JANUARY 31, 2007
Case 1:05-cv-01790-RMU    Document 27-3    Filed 12/04/2007    Page 9 of 34

8 (Pages 29 to 32)

29

1  What the PRB is doing is recommending monetary values
2  for the ratings themselves.  In other words, what's the
3  monetary value of an outstanding rating?
4      A  Yes.
5      Q  It's not linked to Sally Smith or Bill Jones.
6  It's really what's the monetary value of any individual
7  in the SL system getting a rating of outstanding?
8      A  That's correct.
9      Q  All right.
10     A  And then once that is determined, and that's
11  determined roughly about this time of the year, it's a
12  January/February process, then the Performance Review
13  Board will meet collectively typically in April, and
14  that's when each member of the Performance Review Board
15  is coming armed with his information regarding Sally
16  Smith or Mary Jones and presenting that recommendation
17  to the larger body.  And if that body approves that,
18  then that's the recommendation that goes forth to the
19  deputy librarian.
20     Q  Okay.  So the first step is to place a
21  monetary value on the various ratings?
22     A  That's correct.

30

1      Q  And the ratings you're referring to are
2  ratings made through the performance appraisal system?
3      A  Yes.
4      Q  And are there four categories or elements
5  that are rated?
6      A  Yes.  Well, the system is flexible enough
7  that depending on the specific requirements of one's
8  job, one could have less than four ratings; but in the
9  vast majority of cases we're talking about being rated
10  on four different elements, and those are program
11  management, mission effectiveness --
12     Q  Let me just jot these down because I want to
13  follow up.
14     A  Sure.  Program management, mission
15  effectiveness, equal employment opportunity, and
16  special assignments.
17     Q  Okay.
18     A  The individual service unit head member of
19  the PRB has a right to say for a particular executive,
20  for this particular year you're going to be working on
21  a greater share of special assignments than you would
22  have in the past and so, therefore, the percentages

31

1  that will be associated with each of these conceivably
2  could change.  Typically I would say for the average
3  senior executive each element is worth 25 percent of
4  the overall rating.
5      Q  Okay.  And then the grades that are given, if
6  I could use that term, how many levels are there?
7      A  There typically are four:  outstanding,
8  commendable, successful, and minimally successful.
9      Q  How about unsuccessful?
10     A  Well, minimally successful is perhaps a nice
11  way of saying unsuccessful because what in essence
12  happens is a minimally successful element will be worth
13  minus money.  So it has the effect of being
14  unsuccessful.
15     Q  Got you.  You want to put a polite term on
16  it.
17     A  Yes, exactly.
18     Q  All right.  You've got an unsatisfactory
19  category?
20     A  Unsatisfactory.
21     Q  I think that's the fifth actually, isn't it?
22     A  I don't know.  I'd have to go back and check.

32

1      Q  This is all spelled out in the Library of
2  Congress regulations?
3      A  Yes.
4      Q  So in the spring does the PRB determine that
5  an outstanding is worth $2,000 or something like that?
6      A  Well, we typically do that right now.
7      Q  I'm sorry?
8      A  We typically do that right now.  That would
9  be a decision --
10     Q  In January?
11     A  -- in the January/February time frame.  So I
12  would expect actually a recommendation to be going to
13  the librarian probably by the end of this week
14  regarding the monetary value for the forthcoming
15  evaluations.
16     Q  But have I got that right, that's the way
17  it's done?
18     A  Yes.
19     Q  So it might be something like the PRB
20  recommends that outstanding is worth $2,000,
21  commendable is worth $1,500, just something like that?
22     A  Exactly.  Yes.

33

1    Q   Is the order of magnitude in that range or is
2    it something higher or lower?
3        A   The last few years it's been a range of
4    $2,500 for outstanding, $1,500 for commendable, $500
5    for successful, and then minus $500 for that fourth
6    category.
7        Q   Boy, what do you get for unsuccessful?
8        A   Well, you're going to get booted out of the
9    senior level work force.
10       Q   Are those given?
11       A   It's been a long time, but --
12       Q   Have you seen it since you've been the HR
13   director?
14       A   Not since I've been the HR director, but
15   there have been instances in the past where an
16   individual would have received an unsuccessful
17   evaluation, and this might have been -- In the
18   particular case that I can think of it was a career
19   Library of Congress employee who had been promoted to
20   senior level from GS-15, and so he was removed from the
21   senior level work force and returned to the general
22   schedule employment.

34

1    Q   Okay.  Stayed with the Library of Congress as
2    an employee?
3        A   Yes.
4        Q   But as a GS level employee?
5        A   Yes.
6        Q   All right.  So if I've got this right then,
7    somebody that scored outstanding in four elements under
8    the theoretical framework you've set up would get
9    $10,000?
10       A   That's correct.
11       Q   And that would be a bonus of $10,000?
12       A   It depends.  It depends on where the
13   individual's pay is at the time.  It's a pay adjustment
14   unless the individual's pay is such that I can't adjust
15   the pay because we're hitting against the statutory
16   cap.  So, for example, if it was an executive who was
17   making $125,000, what would happen in the springtime
18   would be that the pay would be adjusted to $135,000,
19   and so over the course of 26 pay periods you'd get an
20   incremental value of that.
21       Q   I see.
22       A   If, however, the individual was at the

35

1    statutory cap which this year is $154,600, we could not
2    raise that person's pay.  So the $10,000 would be paid
3    as an award.
4        Q   I see.  So if I understand this, if someone
5    is hitting up against the cap, then you pay it as a
6    bonus?
7        A   Yes.
8        Q   And if someone is below the cap and you can
9    pay them over the span of the coming year, you pay them
10   over the span of the coming year?
11       A   That's correct.
12       Q   All right.
13       A   And sometimes there could be a mix.  Someone
14   might be entitled to $10,000, and they're $5,000 below
15   the cap.  So we'll have a percentage that will be
16   bringing them up to the cap, and the balance would be
17   an award.
18       Q   So you get to float on the money, that 5,000
19   bucks, over the course of the year?
20       A   Yes.
21       Q   I see.  All right.  After someone enters into
22   the senior level service and they've been given an

36

1    initial level like an SL-1 or an SL-2, do those levels
2    have any meaning for that individual thereafter?
3        A   No.  No.  They are only for the purposes of
4    setting pay upon initial appointment.  Once you're in
5    the system, you're really SL irrespective of your
6    particular level, and then everything after that is
7    determined by your performance.
8        Q   Okay.  So if someone's been in the senior
9    level system for three years, they don't have any
10   particular level.  They've just got a salary that's
11   been set by the Performance Review Board?
12       A   That's correct.
13       Q   With approval by the deputy librarian?
14       A   That's correct.
15       Q   All right.  Are there any other additional
16   types of compensation that SL employees are eligible
17   for in addition to salary, bonus, and this pay
18   adjustment system, that GS schedule employees are not
19   eligible for?
20       A   Well, there's one other form of compensation,
21   and that is the librarian could choose to recognize at
22   the time of the performance appraisal process, could

---

37

1 choose to recognize some senior level employees for
2 outstanding performance or distinguished performance
3 that occurred over the past year. And in our
4 regulation it says that the librarian may provide a
5 bonus of up to 20 percent of basic pay.
6        In fact, that's somewhat of a misnomer
7 because of the issue of the award structure in the
8 federal government. No award can be given by the
9 Library of Congress in excess of $10,000 without
10 getting the concurrence of the Office of Personnel
11 Management. So, therefore, there is in effect a cap of
12 $10,000 on those librarian awards.
13    Q  I gather an award could be made of more than
14 $10,000 but you need OPM approval?
15    A  You would need OPM approval, and to my
16 knowledge we have never chosen to go that route.
17    Q  How often have distinguished performance
18 awards been made?
19    A  In a given year there might be 10 or 15 out
20 of the 100 plus senior level employees.
21    Q  How many senior level employees do you have
22 now at the library approximately?

38

1    A  I don't know exactly the number, but I would
2 guess somewhere in the neighborhood of 100 to 105.
3    Q  Does being a member of the senior level carry
4 some level of prestige or status within the library?
5    A  Perhaps. I think really it's more for pay
6 purposes than anything else.
7    Q  Okay. Are you senior level now?
8    A  I am, yes.
9    Q  When did you become senior level?
10    A  With my selection as the HR director in
11 August of 2005.
12    Q  How did you feel about becoming senior level?
13    A  I was pleased because it meant an increase in
14 my pay.
15    Q  Were you pleased for any other reason?
16    A  No.
17    Q  Didn't attach any particular significance to
18 it?
19    A  No.
20    Q  No more elevation in status?
21    A  I tend not to worry about status.
22    Q  Do some of the people at the Library concern

39

1 themselves with such things?
2    A  Oh, I'm sure.
3    Q  Would it be accurate to say that the 100 to
4 105 senior level employees are really the upper echelon
5 of the Library of Congress?
6    A  Yes, that's fair in terms of their positions.
7 Yes.
8    Q  Would they be the officials at the Library
9 that really determine the course of the Library, the
10 programs that are initiated, how they're developed,
11 that kind of thing?
12    A  That's fair to say.
13    Q  And the senior level managers would be the
14 people that would determine the strategic planning for
15 the Library?
16    A  Yes.
17    Q  Is there some cap on total compensation for
18 senior level managers?
19    A  Yes, there is.
20    Q  And what is that?
21    A  That is the equivalent of executive schedule
22 level I which currently is I believe $186,000.

40

1    Q  Okay. I gather for the executive -- is it
2 called executive schedule, did you say?
3    A  Yes.
4    Q  For the executive schedule, the lower the
5 number the better?
6    A  That's correct.
7    Q  So executive schedule level I is the highest
8 paid?
9    A  That's correct.
10    Q  And III is what, the lowest paid?
11    A  No. Actually there is an executive schedule
12 IV. That's the lowest.
13    Q  Okay. How many total employees do you have
14 at the Library of Congress?
15    A  Approximately 4,000.
16    Q  Has the budget for compensation gone up every
17 year since you've been the HR director?
18    A  Yes. Yes, it has.
19    Q  Were you familiar with the budget for
20 personnel before you became the HR director for the
21 Library?
22    A  Yes, I was.

41

1    Q   Has the budget for personnel been going up
2  every year since 2001?
3    A   Well, yes, but, and the but is the costs have
4  gone up as well.  So what happens each year, and this
5  is why the budget would go up, Congress will mandate
6  and the President will sign a cost-of-living adjustment
7  in January of each year.  Those are costs that the
8  agency is required to pay.  So although the budget has
9  gone up, the budget has gone up primarily because it
10 needs to accommodate the increases in pay.  Now, what's
11 likely to happen this particular year -- And in fact,
12 the budgets really have gotten tighter and tighter and
13 tighter.
14   Q   What do you mean when you say that?
15   A   I mean that it becomes much more difficult to
16 have any increases that are what we would define as
17 growing workload.  So there are new initiatives that
18 the Library needs to accomplish, and in order to do so
19 will need more money, will need more staff.  It's very,
20 very difficult these days to see any increase in that
21 respect, and in fact we fully expect that with the
22 fiscal year 2007 budget which has not yet been

42

1  finalized, we fully expect that at best we will receive
2  only a share of the cost-of-living adjustment that
3  we're required to pay to all employees in January.
4    Q   Well, who do I speak to about that?  That
5  doesn't seem right.
6    A   Well, not much you can do about that one.
7  It's a consequence of the war.
8    Q   So what does that mean for the Library?
9    A   Well, that means the Library needs to
10 basically dig deeper into its pockets to have the same
11 level of operational support.  In my particular case,
12 for example, I have a $300,000 increase in a critical
13 system that we use for personnel action processing, and
14 this is a system that is owned by the National Finance
15 Center which is part of the Department of Agriculture.
16 They need to charge me more because it's costing them
17 more to meet their needs.
18     I had requested additional funds in my 2007
19 budget request to pay for that.  That's not going to be
20 available which means, therefore, that the only way --
21 And I cannot turn the system off because to do so would
22 mean that I would basically grind the Library to a

43

1  halt.  No one could do any type of personnel action
2  whether we're talking about a promotion, demotion,
3  transfer, reassignment, you name it, the full gamut of
4  all activities.  So I can't turn the system off.
5      The only way I can basically keep that system
6  going is by not filling vacancies as they occur, and so
7  I've made a conscious decision to do that.  My
8  predecessor had three special assistants.  I have none.
9  I can't afford to hire a special assistant because I
10 need to make sure that the system is operational.  That
11 same type of situation is being played out in every
12 department of the Library.
13   Q   I see.  How has the size of the work force at
14 the Library of Congress changed over the last several
15 years, if at all?
16   A   It's declined substantially.
17   Q   Can you give me an estimate of the numbers?
18   A   Well, back roughly 1990 time frame we were at
19 about 5,000 employees.  So in the last 15 years we've
20 shrunk by 20 percent.
21   Q   Okay.  How about over the last three or four
22 years, what's been the trend?

44

1    A   It has gotten smaller.  I would guess around
2  2002-2003 time frame, we were probably at about 4,300
3  employees.
4    Q   In 2002-2003?
5    A   Yes.  Roughly 4,300.  So we're down to 4,000
6  now.  And the reason, as I mentioned, is that service
7  units need to keep those positions vacant to pay for
8  their other mandatory expenses.  To pay, for example,
9  the fact that Congress has mandated a cost-of-living
10 adjustment but they haven't given you the funds to pay
11 for it.
12   Q   Has digitization and automation helped make
13 the Library more efficient?
14   A   I believe it has.
15   Q   And can fewer people do more work for the
16 Library as a result of that?
17   A   I think that's probably true, that we've
18 become more efficient.  Nonetheless, there are
19 significant demands for our services, and in some cases
20 automation will create new demands.
21   Q   All right.  I'm going to have you hang onto
22 that.  I want to ask you a few questions.  Maybe it's

---

**45**

1  best to just have this marked.
2      MR. FREDRICKSON: This would be Plaintiff's
3  Exhibit Number 18 please.
4      (Deposition Exhibit 18 was marked for
5  identification and was retained by counsel.)
6  BY MR. FREDRICKSON:
7      Q   I've had handed to you Plaintiff's Exhibit
8  18, and I'm going to ask you to take a look at it. Do
9  you know what Plaintiff's Exhibit Number 18 is?
10     A   I do.
11     Q   And what is Plaintiff's Exhibit Number 18?
12     A   It's Library of Congress Regulation 2017-2.1
13  which is the senior level executive system regulation.
14     Q   And what do they call this, LCR, is that the
15  abbreviation for it?
16     A   That's correct.
17     Q   LCR 2017-2.1, does that govern the
18  compensation system for the senior level?
19     A   Yes, it does.
20     Q   How people become senior level?
21     A   That's correct.
22     Q   The criteria for a senior level position?

**46**

1      A   Yes.
2      Q   The appraisal system for senior level
3  personnel at the Library?
4      A   Yes.
5      Q   And was this in place, I guess it's got a
6  review date -- Well, let me ask you the question. When
7  did the Library of Congress regulation that's been
8  marked as Plaintiff's Exhibit Number 18 go into effect?
9      A   I don't know when this regulation was first
10  issued. I would think probably in the early 1990s
11  because if you look under section 2 where it says
12  Authority, the authority for establishing our senior
13  level system was the Federal Employees Pay
14  Comparability Act of 1990. So we were responsible for
15  developing a system thereafter. So I would say
16  sometime 1992, 1993 probably is when this regulation
17  was first enacted, and it's been modified over the
18  years.
19     Q   If you'd look at page 1 of Plaintiff's
20  Exhibit Number 18 in the upper left-hand corner, it
21  says issue date April 28, 1998. Do you see that?
22     A   Yes.

**47**

1      Q   What's the significance of that? What does
2  that mean?
3      A   That means that's the last time that this
4  particular regulation was issued. So presumably unless
5  there has been a more recent review date, and I don't
6  think there has, this is the current version.
7      Q   What's the significance of the review date
8  April 28, 2000, what does that mean?
9      A   That means that we're expected to take a look
10  at the regulation at that time and see if there are
11  some changes that might need to be made as a result of
12  the passage of time.
13     Q   Okay. Now, if you'd just put that aside for
14  a moment. You said that you had as a responsibility
15  when you were the special assistant to the HR director
16  for temporary promotions in the SL --
17     A   That's correct.
18     Q   -- in determining pay rates of those who
19  receive temporary promotions, is that correct?
20     A   Yes.
21     Q   Is this the regulation that would guide you
22  when you were determining pay rates, for example, or

**48**

1  how temporary promotions were handled for SL?
2      A   Yes, except that with respect to temporary
3  promotions what also came into play here was the past
4  practice of the Library in establishing pay. Would you
5  like me to elaborate on that?
6      Q   Sure. Why don't you do that.
7      A   Okay. The regulation itself speaks to a
8  range of factors that one would look at in the
9  establishment of pay. The Library historically and
10  since this regulation has been in effect, the Library
11  historically has interpreted that to deal specifically
12  with permanent appointments to the senior level. When
13  we are talking about temporary appointments to the
14  senior level, the Library's past practice, something
15  which I continued and which continues to today, is that
16  the sole factor that we look at in terms of assessing
17  pay --
18     Q   Oh, I think you're getting ahead of me
19  actually.
20     A   I'm sorry.
21     Q   Because you're going to the specifics of how
22  a temporary promotion is made, right?

---

49

1    A  Yes.

2    Q  Okay. All right. Let me back off.

3    A  Okay.

4    Q  I misunderstood your question to me. What I

5  was trying to figure out is is Plaintiff's Exhibit

6  Number 18, the LCR 2017-2.1 that you have in front of

7  you, is that the controlling regulation for temporary

8  promotions where temporary promotions are of someone

9  going from GS to SL?

10    A  Yes. You're correct.

11    Q  Okay. And there's no other document you can

12  go to and say Oh, this also applies to temporary

13  promotions at the Library of Congress?

14    A  That's correct.

15    Q  All right. So if we're going to try to

16  figure out what the regulation was, we have it right

17  here in Plaintiff's Exhibit Number 18?

18    A  You do.

19    Q  Okay. And how were temporary promotions

20  handled at the Library of Congress when someone was

21  going from GS to SL on a temporary basis?

22    A  Basically what would happen would be that the

50

1  request would come into Human Resources, and the person

2  who was responsible for making that recommendation back

3  to the director for Human Resources would look at the

4  current salary of the employee in question and then

5  apply a reasonable percentage increase. And typically

6  when I say reasonable, I'm talking in the neighborhood

7  of 5, 6, 7, 8, 9 percent, nothing more than that.

8      We would consider that to be a reasonable

9  increase in pay to reflect the increased temporary

10  responsibilities that one would be taking on as a

11  senior level temporary employee.

12      So what that means, therefore, is that if

13  you're on the low end of the GS-15 scale, the odds are

14  that the recommendation was coming back at the SL-1

15  level. If you were in the upper range, it might be

16  SL-2 or conceivably could be SL-3 because we would

17  certainly want to be able to compensate you fairly.

18    Q  Okay. Well, that goes to a very specific

19  point, but let me ask you this. How were temporary

20  promotions effectuated at the library?

21    A  Well, I can speak particularly in terms of

22  the way that I did it. You know, it's conceivable that

51

1  someone else might prior to my taking on the

2  responsibility might have done it a slightly different

3  way.

4    Q  That's fine, but my question is a little bit

5  broader than that.

6    A  Okay.

7    Q  Maybe I didn't articulate it very well.

8  That's happened once or twice. Here's what I want to

9  know. The supervisor says I want to fill this position

10  on a temporary basis. How do they go about doing it?

11  Are they required to post it? Can they pick their own

12  person? Can they suggest a length of time they can be

13  in the position? Can they recommend a pay rate? That

14  kind of thing.

15    A  They would recommend the name of the

16  employee. Basically what would happen would be that

17  there would be a personnel action that would be

18  generated by the service unit head, and the service

19  unit head would tell us that I would like to promote

20  Mary Jones or John Smith for a 120-day period of time.

21    Q  What's magic about the 120-day period?

22    A  That's the limit in which one can be

52

1  temporarily promoted absent a competitive announcement.

2    Q  When you say competitive announcement, you

3  mean the job is posted?

4    A  The job is posted.

5    Q  A vacancy announcement is publicly posted,

6  and people can apply for it competitively?

7    A  That's correct, yes.

8    Q  Okay. What's supposed to happen after the

9  120-day period?

10    A  Well, basically what would happen is the

11  individual returns back to the original grade that he

12  or she occupied before. And if there was in fact a

13  posting that went up during that 120-day period of time

14  and was still not finalized, the regulations allow that

15  that individual could remain in the higher graded

16  position for a maximum of 270 days including the 120

17  days as part of that 270 days.

18    Q  So if the position is posted, the employee

19  that's temporarily promoted stays in the position and

20  continues to be paid at the higher level, and that can

21  last a total of 270 days?

22    A  Well, it would really be at the discretion of

DEPOSITION OF DENNIS M. HANRATTY
CONDUCTED ON WEDNESDAY, JANUARY 24, 2007
Case 1:05-cv-01790-RMU Document 27-3 Filed 12/04/2007 Page 15 of 34

14 (Pages 53 to 56)

53

1 the service unit head. That is, the service unit head
2 could put up a posting within that 120-day period and
3 at the 120th day decide to return that employee back to
4 the original grade and then put someone else in that
5 vacancy for a period of time or leave it vacant. That
6 would be at the discretion of the service unit head.
7 However, if the service unit head desires to continue
8 to have that individual compensated post day 120, he or
9 she is permitted to do so because there's a competitive
10 posting that's up.
11    Q   Let's assume a situation where there's no
12 competitive posting.
13    A   Okay.
14    Q   The GS employee is temporarily promoted into
15 the higher level SL position.
16    A   Yes.
17    Q   After 120 days what happens to the person
18 that's temporarily promoted?
19    A   That person returns back to the original
20 position, the original grade, the original step that
21 that person held on the day that he or she was promoted
22 to the higher position.

54

1    Q   Okay. And the higher level position then
2 remains vacant or the service unit fills that position
3 with someone else?
4    A   That's correct.
5    Q   And that would be your understanding of the
6 requirements of the Library of Congress?
7    A   Yes.
8    Q   So if a GS level employee was temporarily
9 promoted and the job is not posted, it would be
10 contrary to the Library's regulations for that person
11 to stay in the position uncompensated, is that right?
12    A   Into that formal position, yes, that's
13 correct. You would have to -- By our official records
14 we would back you out of that position, and you would
15 return to your previous title.
16    Q   I'm not talking about records. I'm talking
17 about holding the position, doing the job.
18    A   No, I wouldn't say it's necessarily contrary
19 to what our regulations require. Our regulations
20 require that you return according to your official
21 position, you return back to that official position.
22 Now, if you're informally holding a position, well, I

55

1 can't specifically address that.
2    Q   Okay. Turn if you would to Plaintiff's
3 Exhibit Number 18, and would you point out for me the
4 section on temporary promotions?
5    A   It's section 13.
6    Q   Okay. So this is the reg of the Library of
7 Congress that governs temporary promotions?
8    A   That's correct.
9    Q   And this is the regulation that governed
10 temporary promotions during the whole time that you
11 managed the SL work force, is that right?
12    A   Yes, that's correct.
13    Q   Could you point out to me in section 13 of
14 Plaintiff's Exhibit Number 18 any language that you
15 think allows the service unit manager to temporarily
16 promote somebody for 120 days and then keep them in
17 that position without the additional compensation
18 beyond the 120-day period? And I'm talking again about
19 a nonposted situation.
20    A   Well, you wouldn't be kept in that position.
21 You would in fact by my official records, you would be
22 returned to your particular position. So you would not

56

1 be in that position on the 121st day.
2    Q   Okay. Let me see if I understand what you
3 said. The way you understand the regulations to work
4 on temporary promotions, if a GS employee was
5 temporarily promoted, unless it was posted, unless
6 there was a posting for that position, they stay in the
7 position for 120 days?
8    A   That's correct.
9    Q   And then they return to their old position?
10    A   That's correct.
11    Q   Okay. Now, you handled the temporary
12 promotion for Judith Mansfield into the Arts and
13 Sciences Cataloging Division from the Arts and Sciences
14 Cataloging Division position to the position of acting
15 director for Cataloging, is that right?
16    A   I did.
17    Q   Okay. And the first temporary promotion that
18 Miss Mansfield received was for 120 days, is that
19 right?
20    A   That's correct.
21    Q   And when she was promoted to the position
22 temporarily for the first 120-day period, she was paid

57

1  at the SL rate, is that correct?
2  **A   That's correct.**
3  Q   Okay.  Did you know that she stayed in that
4  position after the 120-day period?
5  **A   No.  As far as I was concerned, she returned**
6  **to a different position because that's what our**
7  **official records indicate.**
8  Q   She'd go back to the chief of the Arts and
9  Sciences Cataloging Division?
10  **A   Yes.**
11  Q   So did you know that she continued to be the
12  acting director for Cataloging beyond the 120-day
13  period?
14  **A   No, I was not aware of that.**
15  Q   Nobody told you that?
16  **A   No.**
17  Q   And you also handled Judith Mansfield's
18  temporary promotion on a second occasion for a 120-day
19  period, is that right?
20  **A   That's right.**
21  Q   So the second time that Miss Mansfield was
22  promoted, she was promoted to the position of acting

58

1  director for Cataloging on the books of the Library of
2  Congress, right?
3  **A   Yes.**
4  Q   And she served as acting director for
5  Cataloging for an additional 120-day period?
6  **A   Right.**
7  Q   And at that time was she paid at the senior
8  level?
9  **A   Yes, she was.**
10  Q   And then what happened at the end of the
11  second 120-day period?
12  **A   At the end of the second 120-day period, she**
13  **left the senior level work force and returned to her**
14  **GS-15 position.**
15  Q   And that was required by the regulations of
16  the Library of Congress?
17  **A   Yes.**
18  Q   And in the first instance it was required at
19  the end of the 120-day period that she return to her
20  old position, chief of Arts and Sciences Cataloging
21  Division chief?
22  **A   Yes.**

59

1  Q   All right.  When Miss Mansfield was first
2  temporarily promoted to the position of acting director
3  for Cataloging, how was her pay determined?
4  **A   As I mentioned previously, when we're talking**
5  **about setting pay for a temporary appointment,**
6  **temporary promotion to the senior level work force, by**
7  **past practice, and I would state that this has been the**
8  **consistent practice throughout the administration of**
9  **this regulation, the sole criteria that would be used**
10  **would be the employee's pay, the employee's current**
11  **pay, and we would then try to determine what a**
12  **reasonable level of increase would be looking at the**
13  **monetary value of the four SL levels vis-a-vis the**
14  **employee's current pay.**
15  Q   Okay.  Bear with me just a minute if you
16  would please.
17  **A   Sure.**
18  Q   Would you point out for me in Plaintiff's
19  Exhibit Number 18 where the Library of Congress
20  regulations dictate how the employee on a temporary
21  promotion, how their pay is set?
22  **A   This particular regulation really doesn't**

60

1  **speak to that particular issue because, as I mentioned,**
2  **we have always interpreted the following section which**
3  **deals with the factors that would be used for pay, we**
4  **have always interpreted this to mean we're talking**
5  **about a permanent appointment into the work force as**
6  **opposed to a temporary appointment.**
7  Q   So you're saying the Library of Congress has
8  no regulation that dictates how someone promoted on a
9  temporary basis from GS to SL is to be compensated?
10  **A   We would use --**
11  Q   I'm just asking if there's a regulation on
12  that?
13  **A   No, there is no specific regulation.**
14  Q   There's no document at the Library of
15  Congress that you can point to that says this is the
16  manner in which we compensate SL level employees who
17  are temporarily promoted to the SL level, is that
18  right?
19  **A   What we're talking about basically is that in**
20  **general guidance we follow what we do for general**
21  **schedule employees, and that is there is a specific**
22  **formula that is used when you're looking at temporarily**

61

1    **promoting someone in the general schedule, and we would**
2    **basically adopt that same process, and that same**
3    **process is that you're really giving someone a**
4    **reasonable increase in terms of pay. There's a more**
5    **formula driven process at the general schedule where**
6    **you're looking at two steps above and going down to the**
7    **next grade and so forth, but the upshot is you're**
8    **trying to achieve some reasonable increase in pay, and**
9    **that's what we're doing.**
10    Q Okay. I'm trying to get a grip on what you
11  do at the Library of Congress.
12    A Sure.
13    Q I also want to know what the regulations say,
14  and it's not crystal clear to me, so what I want to do
15  is ask you this question.
16    A Sure.
17    Q Is it true that the Library of Congress does
18  not have a regulation that dictates the rate of pay
19  that applies to a GS level employee who is temporarily
20  appointed to the senior level?
21    A Well, what I would say is this.
22    Q Before you answer, I'm separating out what

62

1  the Library's practice is from what the regulations
2  are.
3    A I understand.
4    Q I'm going to ask you about the practice in a
5  minute.
6    **A Sure. If you look at the factors that are**
7  **listed here.**
8    Q And you're pointing to Plaintiff's Exhibit
9  Number 18?
10    A Yes, exactly. Yes.
11    Q Where?
12    **A I'm on page 33 where it says Factors for**
13  **setting initial rate of pay. There are eight or nine**
14  **different factors that are used. What I'm saying is**
15  **that our process is that for temporary appointments we**
16  **look at factor number C, candidate's current pay, and**
17  **that becomes the driver for how we set pay. We do not**
18  **look at the other factors, and historically we have**
19  **not.**
20    Q Okay. So there's no other regulation other
21  than Plaintiff's Exhibit Number 18 --
22    A That's correct.

63

1    Q -- that you look at and say this really
2  requires us to do this when a GS employee is being
3  temporarily promoted to the senior level?
4    **A That's correct.**
5    Q And where in the language in section 14,
6  subpart B, do you look at when you say that we only
7  look at the candidate's current pay when you're trying
8  to determine the rate of pay for a GS employee who's
9  temporarily promoted to the senior level?
10    **A Basically what I'm suggesting to you is that**
11  **this is our practice. This is the way that we have**
12  **done this.**
13    Q Okay. My question is looking at the
14  regulation, are you constrained in any way to only
15  focus on the candidate's current pay?
16    **A Depending on how you interpret the phrase**
17  **initial appointment. If you interpret initial**
18  **appointment to mean that we're looking at temporary**
19  **promotions as well as permanent promotions, then we**
20  **could certainly use all factors. But as I mentioned to**
21  **you, the way that we've interpreted this in the past is**
22  **that those factors apply specifically, other than**

64

1    **current pay, those factors apply specifically to**
2  **permanent appointments.**
3    Q I understand that, and I'm going to ask you
4  about permanent appointments in a minute.
5    A Sure.
6    Q Put that aside for a moment.
7    A Okay.
8    Q I'm asking you about somebody who's
9  temporarily promoted from GS to senior level. Is there
10  anything in the regulation 2017-2.1, section 14, that
11  restricts you to just looking at the candidate's
12  current pay?
13    A No, there is not.
14    Q Okay. And is there anything in LCR 2017-2.1
15  that says when it talks about base pay for initial
16  appointments, that that is restricted to permanent
17  initial appointments?
18    A No.
19    Q Okay. Let me ask you a different set of
20  questions.
21    A Okay.
22    Q How do you go about determining the initial

65

1 rate of pay for someone who is permanently appointed to
2 the senior level?
3    A  We would look at all of these different
4 factors that are contained in this particular
5 regulation.
6    Q  And by that you mean section 14(B)?
7    A  That's correct.
8    Q  And then I guess subpart 2 talks about
9 factors setting initial rate of pay, that's the section
10 you look to?
11    A  Yes. And historically the way that I have
12 done this is that if we're talking about a permanent
13 appointment, I would draft a memorandum, when I was
14 working for the director for Human Resources, I would
15 draft a memorandum for her signature which would look
16 at the full gamut of the particular position, look at
17 the background of the individual, look at issues such
18 as scarcity of other candidates, criticality of the
19 position and so forth, as well as salary, current
20 salary of the individual, and then make a
21 recommendation to the director for Human Resources.
22 She in turn would make a recommendation to the deputy

66

1 librarian.
2    Q  Okay. When you're hiring somebody from the
3 outside into the senior level, how do you take into
4 account the candidate's current pay?
5    A  In many cases these are federal employees, so
6 you know what their level of pay is. And if not, then
7 we look at the employment record, recent employment
8 record of the employee.
9    Q  Okay. And how do you take that into account
10 when you're recommending what the pay level should be
11 for that candidate?
12    A  Well, it becomes one factor among many. It
13 certainly is a critical factor because you're certainly
14 not going to be able to hire a senior level executive
15 and give that person less money than he or she is
16 earning in another agency or on the outside. So it
17 clearly becomes a paramount factor, but it's not the
18 only factor.
19    Q  Okay. In your experience when you were doing
20 this, did you have any parameters in your own mind as
21 to how you would take into account current pay?
22    A  As I mentioned, I would give that paramount

67

1 importance but by no means would it be the only factor
2 that I'd look at.
3    Q  Okay. What I was trying to get to was did
4 you have a range in mind like you were trying to give
5 somebody maybe give them 5 percent more than they're
6 earning, 10 percent more than they're earning,
7 something like that or have any thought about going
8 about taking into account the current pay?
9    A  I think a 5 to 10 percent increase would be
10 reasonable, but it's conceivable that it could be more
11 or less depending on the other factors.
12    Q  Have you ever approved like a 50 percent
13 increase in the current pay?
14    A  I don't know about a 50 percent, but I know
15 in one particular case we did have a more sizeable
16 increase than I probably would have recommended
17 otherwise, but there were other factors that came into
18 play here.
19    Q  Okay. Are you thinking of a particular
20 example?
21    A  Yes.
22    Q  And what example is that?

68

1    A  This was a selection for an employee in the
2 Congressional Research Service.
3    Q  And what was the percentage increase over the
4 current pay that was recommended by you in that
5 instance?
6    A  I think in that particular case we probably
7 gave the individual somewhere in the neighborhood of
8 maybe 20 percent increase, and that would be a sizeable
9 increase, very sizeable increase.
10    Q  During the time that you managed the SL work
11 force in this area, did you ever give a pay increase
12 that was more than 20 percent over their current pay?
13    A  Well, I'm not sure exactly what the
14 particular percentage was in this particular case, but
15 that's the one that comes to mind. I'd have to
16 actually go back and look at my records and see what
17 the specific increase was. But we took into account
18 other factors. For example, the particular individual
19 in question was the director of a public policy
20 institute. He had authored several books that were
21 very significant and timely for the type of research
22 that he would be conducting for the Congressional

---

69

1  Research Service. So we took into account factors like
2  that.
3     Q  I see. What I was trying to get at is that
4  20 percent kind of the outer range of the increase over
5  current pay that you would have seen in the time that
6  you managed the SL work force?
7     A  Yes, I would say so. I would say that's
8  correct.
9     Q  And the 20 percent I gather is a rather
10 extraordinary increase over current pay in your
11 experience?
12    A  Yes.
13    Q  What's the more normal range?
14    A  I'd say the more normal range is probably in
15 that 5 to 10 percent range.
16    Q  Okay. Did anybody at the Library ever
17 suggest to you that it was the Library's practice to
18 allow temporary promotions of 120 days, and then let a
19 calendar year go by, and then make a second temporary
20 promotion into the same position?
21    A  Yes, that could be done. That's permissible.
22    Q  Is there something in the regs that you could

---

70

1  point to that show that?
2     A  Not specifically in these particular regs,
3  but you would find that in the Code of Federal
4  Regulations which is what we would follow for the
5  purposes of setting pay, and that would be true not
6  merely for general schedule employees but senior level
7  employees as well. So in the CFR it indicates that
8  absent competition, promotion should only occur within
9  a 120-day window for a calendar year.
10    Q  Is there a particular reg you can cite me on
11 that or do I have to find out by myself?
12    A  I know it's in Title 5, and I think it's 335,
13 but I'm not sure of the specific number.
14    Q  Bear with me a minute if you would please.
15    A  Sure.
16    Q  You've got Plaintiff's Exhibit Number 17,
17 your first declaration out as well, don't you?
18    A  I do.
19    Q  Do you have that in front of you now?
20    A  I do.
21    Q  Turn if you would to paragraph 8, and just
22 for clarity of the record what I want to do is read

---

71

1  this aloud. It says "Consistent with Library
2  regulations limiting temporary promotions to SL to 120
3  days where a permanent candidate is not being sought to
4  the vacant position through a competitive announcement,
5  Ms. Mansfield's temporary promotion to SL ended on
6  January 20th, 2003." Do you see that paragraph?
7     A  I do.
8     Q  Okay. What did you mean by that paragraph?
9     A  What I meant was that absent a competitive
10 announcement, the temporary promotion to the senior
11 level has to end on the 120th day.
12    Q  And that in fact happened in Miss Mansfield's
13 case at least as far as the Library's records were
14 concerned?
15    A  That's correct.
16    Q  And also that's what happened to Miss
17 Mansfield in terms of the pay that she received?
18    A  You're correct.
19    Q  Okay. And nobody told you in HR that Miss
20 Mansfield in fact continued to work as the acting
21 director for Cataloging after January 20th, 2003, is
22 that right?

---

72

1     A  That's right.
2     Q  All right. The director for Cataloging
3  position was an SL level job, is that right?
4     A  Yes, that's correct.
5     Q  Did you look at the position description for
6  that position in making your determination as to what
7  rate of pay Miss Mansfield should receive?
8     A  No, I did not.
9     Q  Was that consistent with your practice not to
10 look at the position descriptions?
11    A  For temporary promotions.
12    Q  Okay.
13    A  I would certainly look at the position
14 description for permanent promotions.
15    Q  All right. Did you know when you were
16 involved in the temporary promotions for Judith
17 Mansfield that the director for Cataloging oversaw
18 eight divisions in the Cataloging Division?
19    A  Yes, I was aware it was a significant
20 position.
21    Q  And what do you mean when you say a
22 significant position?

---

**73**

1    A   In terms of scope of responsibility, and it's
2    one of the larger sections within Library Services
3    which is our largest service unit.
4        Q   Okay.  Did it ever come to your attention
5    that Miss Mansfield became the assistant director for
6    Bibliographic Access?
7        A   I heard about that after the fact but not
8    while it was happening.
9        Q   When you say you learned of it after the
10   fact, what do you mean?
11       A   I mean as a result of the specific complaint
12   that Judy has filed.
13       Q   After the lawsuit was filed you learned about
14   it?
15       A   Yes, exactly.
16       Q   I see.  Did it come to your attention that
17   the assistant director for Bibliographic Access oversaw
18   all eight divisions within the -- all eight Cataloging
19   Divisions plus another division, did you know that?
20       A   No.
21       Q   Did that come to your attention?
22       A   No.  No.  All I was aware of was that she had

---

**74**

1    performed with two other employees in Library Services
2    collateral duty responsibilities, and this was one of
3    those.
4        Q   How did you learn that?
5        A   I heard about that.  I don't know.
6        Q   You don't know how you heard about it?
7        A   No.
8        Q   And it was after the lawsuit had been filed?
9        A   Yes, that's correct.
10       Q   Okay.  Let me direct your attention to
11   paragraph 10, and I'm going to read that aloud.  This
12   is of your declaration that's been marked as
13   Plaintiff's Exhibit Number 17.  It says "Consistent
14   with Library regulations limiting the length of
15   temporary promotions to 120 days where a permanent
16   candidate is not being sought via the vacant position
17   through a competitive announcement, Miss Mansfield's
18   temporary promotion to SL ended on June 9, 2004."  Do
19   you see that paragraph?
20       A   I do.
21       Q   What did you mean by that?
22       A   As I mentioned before, absent a competitive

---

**75**

1    announcement being posted on our boards, the temporary
2    promotion would need to end on the 120th day.
3        Q   Okay.  From your perspective as somebody
4    managing the SL work force, would you understand that
5    to mean that Miss Mansfield would no longer have
6    supervisory authority over the eight divisions in the
7    Cataloging Directorate?
8        A   Yes.  I would assume that she was no longer
9    functioning as the director for Cataloging.
10       Q   Okay.  Bear with me a minute.  I'll see if I
11   have any other questions on this one.
12       A   Okay.
13       Q   Has the number of SL level employees at the
14   Library of Congress changed since the year 2000?
15       A   No.  I think it's more or less in that 100 to
16   105 range.
17       Q   In the time that you managed the SL work
18   force, approximately how many temporary promotions have
19   you handled?
20       A   I don't know exactly.  I would guess a couple
21   dozen.
22       Q   Okay.  So approximately 24, 25, in that

---

**76**

1    range, mid 20s?
2        A   I would think.  I'm really not sure exactly
3    what the number would be, but I would think that's
4    reasonable.
5        Q   Okay.  Would it be easy for you to identify
6    which individuals were involved in those temporary
7    promotions?
8        A   Yes, I could do that.
9        Q   How would you do that?
10       A   I would look at my own files.  I maintain a
11   separate file for temporary promotions.
12       Q   Okay.  And where is that file maintained?
13       A   In my office.
14       Q   Does the file include temporary promotions
15   that have occurred since you became the HR director?
16       A   Yes, it would.
17       Q   How far back does it go?
18       A   It would just go back to the time that I
19   first started doing this.  So I don't know what the
20   oldest one would be, but it might be in that 2000
21   range.  I don't know.
22       Q   Okay.  Let me direct your attention to

---

77

1 Plaintiff's Exhibit Number 18 in a section that's
2 labeled as section 14, subsection D, Other
3 Compensation.
4    A  Yes.
5    Q  You have that out in front of you?
6    A  I do.
7    Q  Okay.  Number 3 under D is paid time off as
8 an incentive award.  Do you see that section?
9    A  I do.
10    Q  Is that something that is provided to SL
11 employees from time to time at the library?
12    **A  From time to time, but it's probably the**
13 **exception rather than the rule.**
14    Q  How often is paid time off provided as an
15 incentive award?
16    **A  I would say at most we're probably talking**
17 **about one or two employees per year.**
18    Q  Okay.  And is there any range of time off
19 that's provided with pay?
20    **A  The maximum that I can recall was two weeks.**
21    Q  Okay.  And if you'd go down to subsection 8,
22 Retention Pay, could you describe what that form of

78

1 compensation is?
2    **A  That's where the library makes a**
3 **determination that the critical nature of this**
4 **particular employee is truly essential to the**
5 **operations of the Library, and that absent a retention**
6 **allowance there is a reasonable chance that that**
7 **employee will leave the Library's service.  So in that**
8 **particular case then we're permitted to provide**
9 **retention payments that would be up to 25 percent of**
10 **basic pay, basic pay being part of the overall pay**
11 **formula.  Basic pay does not equate to total pay.**
12 **Basic pay is that part of the pay prior to the locality**
13 **pay being added on top of it.**
14    Q  Let me hand you what's been marked as
15 Plaintiff's Exhibit Number 14 from a previous
16 deposition and ask you to examine it.  This is a
17 Notification of Personnel Action for Steven Herman
18 dated January 9, 2005.  At least that's the effective
19 date.
20    A  Yes.
21    Q  So when you were talking about basic pay,
22 you're talking about what appears in box 12A, basic

79

1 pay?
2    A  That's correct.
3    Q  So the retention bonus here could be up to 25
4 percent of $136,900?
5    **A  Yes, but it's important to take into**
6 **consideration what I said before about there being a**
7 **total -- total compensation may never exceed executive**
8 **level schedule I.**
9    Q  Right.
10    **A  So what that means, therefore, is that**
11 **retention allowances, awards, any other form of**
12 **compensation could never go over that amount.  So,**
13 **therefore, if Steve Herman had received an award during**
14 **the course of a year which would increase his**
15 **compensation further beyond that $149,000 and, of**
16 **course, the level would have been lower in calendar**
17 **year 2005.  It wouldn't have been $186,000.  It might**
18 **have been $175,000.  So let's just assume that he**
19 **received an outstanding performance evaluation in all**
20 **four critical elements and is entitled to $10,000.**
21 **Well, that's money that is counting against that**
22 **statutory cap of total compensation.  So, therefore, he**

80

1 **could not receive 25 percent of basic pay because that**
2 **would push him over the cap.**
3    Q  So if I understand it correctly, the
4 retention payment could be up to 25 percent of base pay
5 so long as the total compensation did not exceed the
6 cap on total compensation?
7    **A  That's correct.**
8    Q  Okay.  Thank you.  And how many instances are
9 there of the Library making retention payments to
10 Library of Congress senior employees?
11    **A  Typically there are three in a year.**
12    Q  Okay.  And is that a situation where the
13 retention payment is made every year for those same
14 three people or does it vary person to person?
15    **A  It requires a new memo from the librarian,**
16 **but there is nothing that would prohibit a retention**
17 **allowance from being given to the same employee in**
18 **consecutive years.**
19    Q  And what's been the practice at the Library
20 since you've started managing SL?
21    **A  There are three individuals that have**
22 **received retention allowances for the last few years,**

81

1  yes.
2    Q  Okay.  Who are they?
3    A  Joanne Jenkins, Deanna Marcum, and Laura
4  Campbell.
5    Q  And has Miss Marcum received a retention
6  payment every year since she's returned to the Library
7  at the senior level?
8    A  I do not know.  I don't know exactly when her
9  first retention allowance was issued.
10   Q  So Deanna Marcum and was it Miss Campbell did
11 you say?
12   A  Laura Campbell and Joanne Jenkins.
13   Q  What position does Miss Campbell hold?
14   A  She's the associate librarian for Strategic
15 Initiatives.
16   Q  And what position does Miss Jenkins hold?
17   A  She's a chief operating officer.
18   Q  What's that position, chief operating
19 officer?
20   A  That's a relatively new position.  Our deputy
21 librarian retired in December, and the librarian
22 restructured the responsibilities of the deputy

82

1  librarian position, and the chief operating officer has
2  responsibility for all of the infrastructure units in
3  the Library and also provides support and guidance to
4  the librarian.
5    Q  Okay.  Turn if you would again to Plaintiff's
6  Exhibit 18.  I want to direct your particular attention
7  to Section 8 of LCR 2017-2.1.
8    A  Yes.
9    Q  More particularly what I want to do is ask
10 about the criteria for senior level positions.  Do you
11 see that section 8(B) there?
12   A  I do, yes.
13   Q  You see the first criterion listed is
14 directing an organizational unit.  Do you know what's
15 meant by that?
16   A  Specifically I don't know.  I would have to
17 get one of our classification experts to define those
18 terms for me.
19   Q  Okay.  And do you know what's meant by
20 criterion number 2, accounting for the success of one
21 or more specific programs or projects critical to the
22 mission of the agency?

83

1    A  Well, that's fairly open-ended in terms of a
2  specific definition.  So I don't have a definition for
3  you.
4    Q  Okay.  And do you know what's meant by
5  monitoring and evaluating progress being made in
6  achieving organizational goals, adjusting strategies as
7  necessary?
8    A  Again, I would rely on one of our classifiers
9  to assist me in making these determinations.
10   Q  And with respect to criterion number 4,
11 exercising important policy making or other executive
12 functions, what's meant by that?
13   A  Same thing, I would rely on my classifier to
14 help me on this.
15   Q  Bear with me again if you would please.  I
16 think I'm through with this document at the moment.
17   A  Okay.
18   Q  Thank you.  What's the folder you have out in
19 front of you?  Is that connected with this case?
20   A  Yes, it is.
21   Q  What is it?
22   A  It is the Notifications of Personnel Action

84

1  for both Beacher Wiggins and also for Judy Mansfield.
2    Q  Do you mind if I look at it?
3    A  Sure.  Be happy to walk you through it.
4    Q  Let me take a look at it and see if we can
5  save some trees, that I don't need to copy it.
6    A  I've also got copies.
7    Q  Already cut the trees down and turned them
8  into paper and now a document for me.  Thank you.
9    A  Certainly.
10   Q  I'm going to study this at a break and maybe
11 come back to it if that's okay with you.
12   A  Sure.
13   Q  You know what, I think I'm going to take
14 about a 10 or 15-minute break and review my notes and
15 study these and see if we need to go that route or not.
16   A  Okay.
17      (Recess)
18 BY MR. FREDRICKSON:
19   Q  I'm sorry if I asked this question before.  I
20 just want to make sure I know what the situation was.
21   A  Sure.
22   Q  Am I correct that you were not involved in

85
1 any way in any discussion about the elimination of the
2 assistant director positions?
3    A  That's correct.
4    Q  You brought with you some documents, and I've
5 had them copied, and I'd like you to take a look at
6 them.  I gather from what you said you brought these
7 along so you could explain to me how Mr. Wiggins was
8 treated and how Miss Mansfield was treated, is that
9 right?
10    A  That's correct.
11    Q  What you brought with you appeared to me to
12 be the SF-50s that you've collected for Mr. Wiggins
13 1995 to 1997, is that right?
14    A  That's correct.
15    Q  And then for Miss Mansfield what you've done
16 is you've collected the SF-50s for Miss Mansfield for
17 the period September 2002 through June of 2004, is that
18 right?
19    A  That's correct.
20       MR. FREDRICKSON:  May I have this marked as
21 Plaintiff's Exhibit Number 19.
22       (Deposition Exhibit 19 was marked for

86
1 identification and was retained by counsel.)
2 BY MR. FREDRICKSON:
3    Q  Would you take a look at Plaintiff's Exhibit
4 Number 19, and tell me what that document is?
5    A  These are the series of Notifications of
6 Personnel Action for Judy Mansfield covering the period
7 of her two temporary promotions and then her return
8 back to the GS-15 position.
9    Q  And I think before we broke you said you
10 could talk me through it I think might have been your
11 phrase.
12    A  Yes.
13    Q  Would you do that for me please?
14    A  I'll be happy to.  The first action and the
15 effective date you see is box 4 in the top right-hand
16 corner, effective date of 9/22/02, and this is her
17 temporary promotion not to exceed January 19th, 2003.
18 At the time she was a GS-15 step 5 employee.  So using
19 the past practice that I had mentioned before, I
20 determined that a reasonable pay increase for her would
21 be in the neighborhood of about 6 percent, and that
22 would bring her to SL-1.  So that is what I recommended

87
1 to the director for Human Resources, that's what she
2 recommended to the deputy librarian, and that's what he
3 approved.
4    Q  And that was Miss Teresa Smith, the HR
5 director?
6    A  That's correct.
7    Q  And the deputy librarian was?
8    A  Donald Scott.
9    Q  Am I correct that when you made your
10 recommendation as to the salary level that Miss
11 Mansfield be provided, you did so only by looking at
12 what Miss Mansfield's current salary was?
13    A  That's correct.
14    Q  Okay.
15    A  So that basically is what is reflected in
16 document number 1 here.
17    Q  That's page 1 of Plaintiff's Exhibit Number
18 19?
19    A  Yes, that's correct.  Document number 2 is
20 dated effective date of 1/20/2003, and this is
21 returning her to her position as a GS-15 step 5 rate.
22    Q  Okay.  So Plaintiff's Exhibit Number 19, page

88
1 2, reflects that according to the personnel records,
2 Miss Mansfield was no longer serving as the director
3 for Cataloging at the Library of Congress?
4    A  That's correct, yes.
5    Q  Okay.
6    A  The third document which is dated May 18th,
7 2003 --
8    Q  And by the third document you mean page 3 of
9 Plaintiff's Exhibit Number 19?
10    A  Yes.  It's dated May 18th, 2003, and this
11 shows that she received a within grade increase that
12 brought her from 15 step 5 to 15 step 6.
13    Q  Is that a merit increase?
14    A  It's merit in the sense that the -- It
15 happens on specified periods of time unless the manager
16 tells us the performance is not of an acceptable level
17 of confidence.  So there is a merit element to it, but
18 it is not the same as a quality step increase.
19    Q  Okay.  What's a quality step increase?
20    A  A quality step increase is where a manager is
21 recognizing an employee for outstanding performance
22 during a set period of time, and one of the techniques

89

1    that a manager can use at that time is to increase that
2    employee's step from the current step to one step above
3    that. Rather than having to wait for the normal cycle
4    of within grade increases, which depending on where you
5    are in the ten steps in a particular grade, could be
6    one year, two years or three years. So the quality
7    step increase is a tool that's in a manager's toolbox
8    to reward those individuals who are performing at a
9    high level.
10       Q  I see. And the within grade increases that
11   are not quality step increases, those are dictated by
12   performance at an acceptable level but on a schedule --
13       A  On a schedule, exactly.
14       Q  -- number of years?
15       A  Exactly.
16       Q  Okay. I've got it. Thank you.
17       A  So then document number 4.
18       Q  You're referring to page 4 of Plaintiff's
19   Exhibit Number 19?
20       A  I'm sorry. I don't have the nomenclature
21   down. Page 4.
22       Q  That's why we're keeping you until midnight.

90

1        A  Exactly. Page 4, Exhibit Number 19. I'll
2    get this lingo down yet. This is a quality step
3    increase for Judy to bring her from the level of 15
4    step 6 to 15 step 7.
5        Q  Okay. Now, page 4 of Plaintiff's Exhibit
6    Number 19 shows a quality increase?
7        A  Yes.
8        Q  So does that mean to personnel that the
9    service unit manager determined that Miss Mansfield's
10   performance and her duties were, how did you put it,
11   exceptional?
12       A  I would say at an exceptional or an
13   outstanding level, yes, that's correct.
14       Q  All right.
15       A  The next document in this packet is dated
16   February 8th, 2004, and this is Judy's second temporary
17   promotion. As I mentioned in the previous two
18   documents, she had gone from 15/5 to a 15/6 and a 15/6
19   to a 15/7. So her new rate of pay now is 15/7.
20       Q  15/7 meaning GS grade 15 step 7?
21       A  Exactly.
22       Q  All right.

91

1        A  So when I looked at her salary, I felt it
2    unreasonable for this temporary promotion to place her
3    at SL-1 because her pay had increased as a result of
4    the within grade increase and the quality step
5    increase. So what appeared reasonable to me,
6    therefore, was that this promotion, this temporary
7    promotion, should be set at SL-2, and that's what I
8    did.
9        Q  Okay.
10       A  And then the next document, I simply included
11   this in here because it had the same effective date as
12   the document immediately prior to that. 2004 was a
13   very strange year for cost-of-living adjustments, and
14   what ended up happening was the President approved
15   cost-of-living adjustments in increments.
16           Ordinarily you'd get the entire
17   cost-of-living adjustment in January. This particular
18   year, however, there was an executive order that took
19   place in February. It so happened that it was hitting
20   at the same time that we were promoting her to the
21   temporary promotion.
22           And so you'll notice that the first step that

92

1    we did on 2/28/2004 was to move her from 15/7 to the
2    senior level rate at $125,000, and then the second step
3    that we did was to move her to the $128,000 rate to
4    reflect what the President had approved in that second
5    increment.
6        Q  So if I understand you correctly, looking at
7    page 6 of Plaintiff's Exhibit Number 19, that shows an
8    increase in pay for Miss Mansfield, but that was
9    dictated by Presidential action?
10       A  That's correct.
11       Q  And that was an across-the-board increase for
12   federal employees?
13       A  Across-the-board increase. And since the
14   senior level pay system is a percentage above and
15   beyond the general schedule, therefore, an SL-2 would
16   have a pay -- If you were promoting someone temporarily
17   into the SL-2 rate, that's going to be impacted by a
18   cost-of-living adjustment. And so you'll notice that
19   as compared to the previous document, her pay went up
20   by about $3,000. Same date.
21           And then the final document that's in this
22   package is dated June 9th, 2004, and that's returning

93

1 **her to her GS-15 step 7 position and her pay.**
2 Q All right. Bear with me a minute if you
3 would please. Let me ask you this question. I want to
4 ask you a question about the seventh page, the last
5 page of Plaintiff's Exhibit Number 19.
6 A Yes.
7 Q Now, this page is the SF-50 Notification of
8 Personal Action for Judith Mansfield with an effective
9 date of June 9th, 2004. Am I correct about that?
10 A That's correct.
11 Q And if you look at box 7, it says From, and
12 that's the position that she was holding on June 9th,
13 2004, correct?
14 A Yes.
15 Q So as of June 9th, 2004 Miss Mansfield was
16 serving as the director for Cataloging?
17 A Yes.
18 Q Okay. And was being paid at that point in
19 time on a temporary basis at the SL level, is that
20 correct?
21 A That's correct.
22 Q Okay. And then if you go over to box 15,

94

1 that shows the position that Miss Mansfield was moving
2 back to?
3 A Yes, that's correct.
4 Q And that's the chief of the Arts and Sciences
5 Cataloging Division, is that right?
6 A Yes, that's correct.
7 Q So this document shows that Miss Mansfield
8 held the acting director for Cataloging position up
9 until June 9th, 2004, right?
10 A Yes, that's correct.
11 Q And then was moved back to her position as
12 chief of the Arts and Sciences Cataloging Division at
13 that time?
14 A That's correct.
15 Q Okay. Let me ask you this question. Am I
16 right that for you as the HR director looking at
17 Plaintiff's Exhibit Number 19, that shows that the
18 first time Miss Mansfield served as the acting director
19 for Cataloging would have been September 22nd, 2002?
20 A Yes, that's correct.
21 Q And Plaintiff's Exhibit Number 19 also shows
22 that the last time that Miss Mansfield served as the

95

1 acting director for Cataloging would have been June
2 9th, 2004, is that right?
3 A That's correct.
4 Q Now, if Miss Mansfield had been working at
5 the SL level as the director for Cataloging between
6 September 2002 and June of 2004, would she have been
7 eligible for pay adjustments during that time period as
8 an SL employee?
9 A **If she was doing that in an official**
10 **capacity, I would say yes. And by an official**
11 **capacity, I mean that there is a duly processed**
12 **Notification of Personal Action. I mean, as far as I'm**
13 **concerned as the HR director, this is the official**
14 **record.**
15 Q When you say "this," you mean the collection
16 of SF-50s that make up Plaintiff's Exhibit Number 19?
17 A That's correct.
18 Q But if Miss Mansfield were actually doing the
19 job of acting director for Cataloging at the senior
20 level, she would have been eligible for the senior
21 level performance appraisal raises?
22 A **No, she would not.**

96

1 Q Why is that?
2 A **The performance appraisal process is limited**
3 **to those who are permanent employees at the senior**
4 **level work force.**
5 Q Bear with me a minute if you would please.
6 A Sure.
7 Q From looking at Plaintiff's Exhibit Number
8 19, it looks like to me that Miss Mansfield was
9 promoted on a temporary basis for a 120-day period
10 initially, right?
11 A Yes, that's correct.
12 Q And then about a year passed, and then she
13 was promoted again on a temporary basis for another
14 120-day period?
15 A That's correct.
16 Q Is that your understanding looking at
17 Plaintiff's Exhibit Number 19?
18 A Yes.
19 Q You said that was consistent with the
20 Library's practice in handling temporary promotions, is
21 that right?
22 A Yes, that's correct.

97

1    Q   Okay. Thank you.
2        MR. FREDRICKSON: May I have this marked as
3    Plaintiff's Exhibit Number 20 please.
4        (Deposition Exhibit 20 was marked for
5    identification and was retained by counsel.)
6    BY MR. FREDRICKSON:
7    Q   I'm going to have handed to you Plaintiff's
8    Exhibit Number 20 for the purposes of your reviewing it
9    to determine whether or not you can identify that
10   document for me?
11   A   I can.
12   Q   And what is Plaintiff's Exhibit Number 20?
13   A   It's the series of Notifications of Personnel
14   Action that are pertinent to Beacher Wiggins, temporary
15   promotions, and then ultimately his permanent
16   promotion.
17   Q   Now, I think based on what you said earlier,
18   you didn't have any involvement in the temporary
19   promotions of Mr. Wiggins, is that right?
20   A   That's correct.
21   Q   What you're doing now is looking back at the
22   historical records for Mr. Wiggins and trying to

98

1    reconstruct what happened?
2    A   That's correct.
3    Q   It's not based on your personal knowledge
4    that was contemporaneous with the events?
5    A   That's correct.
6    Q   Again, I think you offered to talk me through
7    this document.
8    A   Sure. I'd be happy to.
9    Q   Would you do that for me please?
10   A   Sure. What it's showing is that the first
11   action here is the temporary promotion for Beacher
12   Wiggins with an effective date of January 16th, 1995.
13   Beacher was a GS-15 step 6 employee at the time, and
14   you'll notice that his salary including locality pay
15   was at the time $83,600. The determination was made,
16   again not by me but probably by Mr. Kendrick but I'm
17   not certain but in any event by Human Resources
18   Services, that the appropriate temporary promotion for
19   Beacher should be at the SL-1 level. And so,
20   therefore, it was a rather modest increase of $2,300 to
21   go from a chief of Arts and Sciences Cataloging
22   Division to the director for Cataloging. So he was

99

1    temporarily promoted at the SL-1 level.
2    Q   Why do you say it's significantly modest or
3    something like that? Is that because the director for
4    Cataloging job is so much bigger than chief of the Arts
5    and Sciences Division?
6    A   No. Actually what I'm suggesting here is 15
7    step 6 you sort of get into a little bit of gray area
8    as far as I'm concerned, and so it's conceivable that
9    if this had come to me to evaluate today, I might have
10   recommended an SL-2.
11   Q   Okay. But somebody else did this?
12   A   Someone else recommended an SL-1, and that's
13   what was approved.
14   Q   I see. All right. So you're going now to
15   page 2 of Plaintiff's Exhibit Number 20?
16   A   I'm going to page 2, right. So at page 20
17   effective February 19th of 1995 Beacher received a
18   quality increase. So very similar to what we had
19   before with Judy. He's going from a 15 step 6 to a 15
20   step 7. So the quality increase is being applied on
21   the basis of his permanent position which is his GS-15
22   position. So that's why it's affecting this particular

100

1    record. But this is actually tied to the third
2    document because the third document has the same
3    effective date of February 19th, 1995.
4        He's already at this point one month into his
5    120 days for temporary promotion. Because he earned
6    the quality increase on February 19th, that pushed him
7    from a 15 step 6 to a 15 step 7. At that point Human
8    Resources determined that having reached step 7, it was
9    unreasonable to expect him to be the director for
10   Cataloging at the SL-1 level and, therefore, effective
11   February 19th, 1995 they temporarily promoted him from
12   SL-1 to SL-2 to reflect the fact he's now a 15 step 7.
13       So that's exactly what happened in Judy's
14   case where we had an employee who was a 15 step 7 and
15   we placed her in an SL-2 temporary promotion.
16   Q   Okay. Hold on for just one minute, will you
17   please?
18   A   Sure. That would be the 2004 promotion.
19   Q   Okay. Let me hand you back Plaintiff's
20   Exhibit Number 19, and I'm going to direct your
21   particular attention to page 4.
22   A   Okay.

101

1 Q Now, you said that Mr. Wiggins was treated
2 the exact same way as Miss Mansfield, is that right?
3 A That's correct.
4 Q Okay. Just look at Plaintiff's Exhibit
5 Number 19, page 4. That's the document you're talking
6 about. That's Judy Mansfield's Notice of Personnel
7 Action where she got the quality increase?
8 A No. Actually I'm really talking about the
9 next document in this which is the promotion not to
10 exceed -- it's the one with the effective date of
11 2/8/04.
12 Q Okay.
13 A And the reason why I'm saying that's exactly
14 the same is that in Judy's case we're taking a 15 step
15 7 employee, temporarily promoting that employee to the
16 SL-2 level. In Beacher Wiggins' case we're taking a 15
17 step 7 employee and temporarily promoting that employee
18 to the SL-2 level. So it's exactly the same.
19 Q I see what you're saying. Now, in Miss
20 Mansfield's case she got the quality increase. That's
21 the document that is page 4 of Plaintiff's Exhibit
22 Number 19?

102

1 A That's correct.
2 Q That's the SF-50 that has the effective date
3 of August 24th, 2003, is that right?
4 A Yes, exactly. That's actually roughly
5 comparable to the previous document in Beacher's file
6 which shows a quality increase to take him from a 15/6
7 to a 15/7. The exact same thing happened for both
8 employees.
9 Q Let me ask about that because in Miss
10 Mansfield's case Miss Mansfield was initially promoted
11 to the acting director for Cataloging in September
12 2002, right?
13 A That's correct.
14 Q Okay. And she got the quality increase 11
15 months after her initial temporary appointment to the
16 position of acting director for Cataloging, is that
17 right?
18 A Let's see the dates here. Yes.
19 Q If you'd look at Mr. Wiggins' situation, he
20 was initially appointed on a temporary basis to the
21 acting director for Cataloging position in January of
22 1995, is that right?

103

1 A That's correct.
2 Q And then if you flip over to the very next
3 page that is page 2 of Plaintiff's Exhibit Number 20,
4 that's the SF-50 with the effective date of February
5 19th, 1995, right?
6 A That's correct.
7 Q So less than one month or one month after Mr.
8 Wiggins had become the acting director for Cataloging
9 he was given a quality increase, correct?
10 A That's correct. Typically quality increases
11 happen at the time that an employee is going to receive
12 his or her performance appraisal. So without knowing
13 the situation for both Judy and Beacher, my guess is
14 that Judy's performance evaluation was coming up
15 roughly at this August 2003 time frame. She received
16 an outstanding performance evaluation, and her manager
17 gave her a quality increase in addition to that.
18 I suspect that Beacher's performance
19 evaluation in his GS-15 position was due in February of
20 1995. Same thing. Outstanding performance evaluation.
21 Quality step increase. That's speculation on my part
22 because I don't have their performance evaluations, but

104

1 I think that's what happened.
2 Q But you don't know what happened in Mr.
3 Wiggins' situation?
4 A No, I don't.
5 Q I gather with respect to the quality increase
6 in Miss Mansfield's situation, you don't know about
7 that either?
8 A No, I don't.
9 Q Okay. Let's go back to Plaintiff's Exhibit
10 Number 20.
11 A Do you want 19 back?
12 Q Why don't you just put it to the side. I
13 don't know if we need to come back to it or not.
14 You'll have it right there, but let's focus on
15 Plaintiff's Exhibit Number 20. That's the collection
16 of SF-50s for Mr. Wiggins. You took me through the
17 first two pages I think so far.
18 A I did, yes.
19 Q So we're on page 3, is that right?
20 A That's correct. So we're on page 3 now.
21 Because of the quality step increase, Human Resources
22 decided that as a 15 step 7 employee he should be paid

105

1  for his temporary appointment, temporary promotion, at
2  the SL-2 level rather than the SL-1 level which is what
3  he was receiving as of January 16th. So that's what
4  that next document is showing.
5      Q  All right.
6      A  The next document which is dated 5/16/1995 is
7  showing that Beacher Wiggins is returning from director
8  for Cataloging and back to his official position as the
9  chief of Arts and Sciences Cataloging Division at a 15
10  step 7.
11     Q  Okay. So that's the 120-day period that
12  you're referring to?
13     A  The 120-day period has kicked in, that's
14  correct.
15     Q  So Mr. Wiggins has served as an acting
16  director for Cataloging for 120 days, and then the
17  temporary promotion supposedly ended?
18     A  That's correct. Yes.
19     Q  Okay.
20     A  Now, the next document is dated 11/12/1995,
21  and at this point then there has been a posting put up
22  looking for a director for Cataloging.

106

1      Q  How do you know that?
2      A  You can't tell that from this, but we can
3  tell it from other records we have in Human Resources.
4      Q  When was the posting made?
5      A  I believe it was sometime in -- I don't have
6  the exact date. Sometime in late 1995.
7      Q  Would that be reflected in documents that the
8  Library would have?
9      A  It should be.
10     Q  What kind of document would you be looking
11  for?
12     A  We'd probably be looking at a vacancy
13  announcement request -- excuse me -- vacancy
14  announcement.
15     Q  Do you see -- You're looking at page 5 of
16  Plaintiff's Exhibit Number 20, right?
17     A  I am looking at page five, yes.
18     Q  And it says effective date of November 12th,
19  1995?
20     A  That's correct, yes.
21     Q  So you're saying this shows a second
22  temporary promotion for Mr. Wiggins from the chief of

107

1  Arts and Sciences Cataloging Division to the acting
2  director for Cataloging?
3      A  That's correct.
4      Q  And Mr. Wiggins goes from a GS-15 step 7 to
5  an SL-2 position?
6      A  Yes.
7      Q  And your understanding is that the Library
8  could do this because the vacancy announcement was
9  posted for the position?
10     A  That's correct because we have the rule of
11  thumb that I mentioned before which is 120 days, and
12  you would not be eligible for a new temporary promotion
13  until 12 months would have passed unless we're talking
14  about a situation where a vacancy has been posted in
15  which case you can conceivably be eligible for
16  additional time within that year.
17     Q  Bear with me a minute. Okay.
18     A  So the next document in this listing here
19  which is page 6 is dated March 12, 1996, and this is
20  returning Mr. Wiggins back to the position of chief of
21  Arts and Sciences Cataloging Division at the 15 step 7
22  level.

108

1      Q  So that's another 120 days in the temporary
2  promotion?
3      A  Yes, exactly.
4      Q  Okay. If the vacancy announcement had not
5  been posted, would it have been contrary to make a
6  second temporary appointment? Strike that.
7      A  Yes.
8      Q  Let me start again. I just want to get it
9  cleanly so I know what we're saying and we're on the
10  same page.
11     A  I understand.
12     Q  Am I right that it would have been contrary
13  to the Library of Congress' practices to appoint Mr.
14  Wiggins to a second 120-day temporary promotion within
15  a year of his finishing his first 120-day promotion --
16     A  You're correct.
17     Q  -- if the vacancy announcement had not been
18  posted?
19     A  That's correct.
20     Q  Okay.
21     A  So basically what this is showing then is a
22  return back to the GS-15 step 7 level and back to his

109

1 official position of chief of Arts and Sciences
2 Cataloging Division.
3 Q Okay.
4 A The next document is reflecting August 18th,
5 1996, a within grade increase, bringing him to the 15
6 step 8 level.
7 Q Okay.
8 A The next document which is dated November
9 10th, 1996 is another temporary promotion, and it's my
10 understanding that there were two separate vacancy
11 announcements issued for the director for Cataloging.
12 There was the one that was issued back sometime in late
13 1995 which did not result in a selection. Then this
14 particular position was re-posted, and Mr. Wiggins was
15 again temporarily promoted from in this he was 15 step
16 8, so he was one step above where Judy was, but again
17 he was only promoted to the senior level 2 level.
18 The next document shows that there is an
19 extension of that promotion, and that is because the
20 competitive announcement has been issued but the
21 selecting official has not yet made a selection. And
22 by our authority, we can continue to have that

110

1 temporary promotion continue, and so he's being
2 extended in this particular position not to exceed July
3 7th, 1997.
4 Q Okay. Hold on a second. So am I right from
5 looking at Plaintiff's Exhibit Number 20, this
6 collection of SF-50s for Mr. Wiggins, that after
7 November 1996 Mr. Wiggins never returned to the GS pay
8 rate?
9 A That's correct, yes, because effective
10 11/10/1996 he was temporarily promoted to the senior
11 level, and then that was extended because there was a
12 competitive announcement.
13 Q All right.
14 A The next document is the personnel action
15 recommendation that was submitted by Winston Tabb who
16 was the associate librarian for Library Services at the
17 time to permanently select Beacher Wiggins as the
18 director for Cataloging. A couple of things I'd like
19 to point out here.
20 First of all, you can see on the left-hand
21 side the From side and then the right-hand side the To
22 side confirming that he is in an SL-2 position, and he

111

1 is moving now to an SL-3 position -- excuse me -- an
2 SL-3 level because what's in essence happening here,
3 and it's fully described on the succeeding page which
4 provides the justification, is that the selecting
5 official is identifying all of the criteria that is
6 responsible for his determining that the appropriate
7 level of pay for Beacher Wiggins should be at the SL-3
8 level.
9 He's looking at the responsibility of the
10 position, talking about the significant responsibility
11 that the director for Cataloging handles. He's talking
12 about the specific skills that Mr. Wiggins brings to
13 the job. And so all of those were factors that
14 contributed to the recommendation to Human Resources,
15 and I see an initial there of BLK 6/6/97 next to the
16 SL-3 level, and that would in fact be Brent Kendrick's
17 initials. So he would have confirmed that yes, I agree
18 that looking at the full spectrum of factors that are
19 in the senior level regulation, Beacher Wiggins is
20 deserving of being permanently promoted or permanently
21 appointed at the SL-3 level.
22 The other thing I'd like to mention which

112

1 struck me in looking at this document is in the
2 justification of the recommendation which is on the
3 next page, the second sentence begins Mr. Wiggins has
4 served as acting director of Cataloging since January
5 1995. So in fact, his situation was identical to what
6 Judy was experiencing. That is, as far as Human
7 Resources Services was concerned, we had returned him
8 to his official post as chief of the Arts and Sciences
9 Cataloging Division, but what this justification is
10 telling me is that despite the fact that at the end of
11 the 120 days we're returning him back to the general
12 schedule, he continued to perform the responsibility of
13 acting director for Cataloging for a two-year period.
14 So it's identical I believe to the situation that we
15 have with respect to Judy.
16 Q Okay. That's your interpretation.
17 A That's my interpretation.
18 Q You didn't write this justification.
19 A I didn't write this, that's right.
20 Q You're not really sure who did write the
21 recommendation?
22 A I assume, I cannot conclusively demonstrate,

113

1  but I assume this was written by Winston Tabb who is
2  the recommending official.
3     Q   But that was my question.  You don't know who
4  wrote it?
5     A   I do not know who wrote this.
6     Q   Okay.  And you don't know what was on the
7  mind of the person that wrote this?
8     A   No.  That's correct.
9     Q   All right.
10    A   And then the final document that's in the
11 package is the Notification of Personnel Action which
12 ties back into that recommendation on the previous page
13 which is basically now formally promoting Beacher from
14 his temporary SL-2 level to his new permanent SL-3
15 level.
16    Q   All right.  Is there anything else
17 significant that you glean from Plaintiff's Exhibit
18 Number 20?
19    A   No.  That's it.
20    Q   Okay.  Turn if you would to the page in
21 Plaintiff's Exhibit Number 20 that says at the top
22 Personnel Action Recommendation.  It's the third from

114

1  the last page.
2     A   It's the one dated 3/10/97 in the right-hand
3  corner, box 4, effective date?
4     Q   Date of request is June 4, 1997.
5     A   Okay.  This document here, the
6  recommendation.
7     Q   Right.
8     A   Got it.
9     Q   Just so we're clear on the record, it's page
10 10 of Plaintiff's Exhibit Number 20, it says Personnel
11 Action Recommendation, and it is for Mr. Wiggins, and
12 it says under Nature of Action Recommended, it says
13 temporary promotion made permanent.
14    A   Right.
15    Q   Do you see that?
16    A   I do see that.
17    Q   And the date of request is June 4, 1997?
18    A   Yes.
19    Q   So you have the same document out that I do?
20    A   I do, yes.
21    Q   Okay.  If you go down to line 8, it says
22 Vacancy Announcement and has got the number.  Do you

115

1  see that?
2     A   I do see that, yes.
3     Q   It's 960171.  You see that?
4     A   Yes.
5     Q   Does that indicate it was a vacancy
6  announcement that was posted in 1996?
7     A   Yes.  That was the structure we used at that
8  time.
9     Q   You go over to the next line or further on
10 that row, further to the right it says date 9/17/1996?
11    A   Yes.
12    Q   So that was the date of the vacancy
13 announcement?
14    A   That would have been the date the vacancy
15 announcement would have been issued, right.
16    Q   And if you go to the last page of Plaintiff's
17 Exhibit Number 20, that is the SF-50, the Notification
18 of Personnel Action for Mr. Wiggins which made official
19 his permanent promotion to director for Cataloging
20 position, right?
21    A   That's correct.
22    Q   And that was effective June 8th, 1997?

116

1     A   Yes.
2     Q   And it says down at the bottom in the Remarks
3  section, it says selected from vacancy 960171?
4     A   Yes.
5     Q   And this is dated September 17th, 1996,
6  right?
7     A   That's correct.
8     Q   So the vacancy announcement from which Mr.
9  Wiggins was selected was posted September 17th, 1996?
10    A   Yes.
11    Q   Yet if you go to the fifth page of
12 Plaintiff's Exhibit Number 20, you see the Notification
13 of Personnel Action that's effective November 12, 1995,
14 right?
15    A   I do see that, yes.
16    Q   Okay.  So if you look at these documents, you
17 can see that Mr. Wiggins was first temporarily promoted
18 in January of 1995?
19    A   That's correct.
20    Q   And he served 120 days in a temporary
21 capacity?
22    A   Yes.

117

1    Q    And was paid at the SL level during that 120
2    days?
3    A    Yes, that's correct.
4    Q    And the temporary promotion ended in May of
5    1995, is that right?
6    A    No. As I read this, it ended March 11, 1996.
7    Q    Well, if you start with page 1 of Plaintiff's
8    Exhibit Number 20, that shows that Mr. Wiggins was
9    initially given a temporary promotion to the SL level
10   in January of 1995?
11   A    That's correct.
12   Q    So go through the pages with me.
13   A    Okay.
14   Q    The next page shows a quality increase in
15   February of 1995, right?
16   A    Right.
17   Q    The next page shows the effect of the quality
18   increase taking into account the other increase that
19   was made, right?
20   A    Yes.
21   Q    Okay. And then the next page shows the end
22   of Mr. Wiggins' temporary 120-day promotion, right?

118

1    A    That's correct.
2    Q    So Mr. Wiggins was initially promoted on a
3    temporary basis in January of 1995, right?
4    A    Yes.
5    Q    And then his temporary promotion ended 120
6    days later in mid March 1995, right?
7    A    No. May 16th, 1995.
8    Q    Okay. What did I say?
9    A    Mid March.
10   Q    Okay. Mid May. Sorry. So he had the 120
11   days?
12   A    He had the 120 days.
13   Q    If you go to the next page, that's the SF-50
14   with the effective date of November 12, 1995, right?
15   A    That's correct, yes.
16   Q    So that shows that he got another promotion
17   on a temporary basis in November of 1995, is that
18   right?
19   A    That's correct.
20   Q    Now, the vacancy announcement wasn't posted
21   until September of 1996, right?
22   A    As I mentioned, my understanding is there

119

1    were two separate postings.
2    Q    Somebody told you that?
3    A    Yes. That's my understanding.
4    Q    You haven't seen documentation to show that?
5    A    I haven't seen it.
6    Q    I assume you searched for documentation to
7    show that?
8    A    I can search for it. I did not.
9    Q    You didn't?
10   A    No.
11   Q    Somebody told you?
12   A    Yes.
13   Q    Who told you that?
14   A    This is my understanding.
15   Q    No. Who told you that?
16   A    It was my understanding from one of our staff
17   members.
18   Q    Who told you that?
19   A    I'm not certain of the actual person that --
20   My understanding is that one of my staff members, Susan
21   Freswick, had determined this.
22   Q    Okay. And who is she?

120

1    A    She is a supervisor in my office of Work Life
2    Services.
3    Q    What is her job title?
4    A    She's a -- I don't know her exact job title.
5    Sorry.
6    Q    Do you know when she started at the Library
7    of Congress?
8    A    Yes. She started in the Library of Congress
9    in 2004.
10   Q    Okay. Well, is it safe to assume that she
11   wouldn't have any personal knowledge of these events?
12   A    No, not on the basis of personal knowledge.
13   I'm talking about records.
14   Q    So someone told you, someone who didn't work
15   at the Library of Congress in 1995 told you that the
16   vacancy announcement had been posted sometime prior to
17   November of 1995?
18   A    Yes. It's my understanding that there were
19   in fact two vacancy announcements that were posted.
20   There was one that was posted at the end of 1995, did
21   not result in a selection. There was another vacancy
22   announcement that was posted at the end of 1996, and

121

1 that's the one that resulted in Beacher Wiggins'
2 selection.
3     Q  Did Mr. Wiggins apply to the vacancy
4 announcement to your knowledge?
5     A  I assume he did.  I don't know.
6     Q  You don't have any personal knowledge of
7 whether he applied, is that right?
8     A  I don't have personal knowledge, but I don't
9 believe that he could have been a candidate for a
10 vacancy announcement that's being announced
11 competitively if he didn't apply.
12     Q  You don't know anything about the
13 circumstances of the filling of the vacancy for the
14 director for Cataloging that occurred in the 1990s, is
15 that true?
16     A  I don't, but at the same time we could not
17 have a vacancy announcement up and make a selection of
18 someone who was not a candidate for that position.
19     Q  Say that again.
20     A  If there was a competitive announcement that
21 was made for a position, we could not make a selection
22 of someone who did not apply for that position.

122

1     Q  Well, unless you violated your rules.
2     A  True.
3     Q  Okay.  And you don't know anything about the
4 circumstances of filling the position of director for
5 Cataloging that resulted in Mr. Wiggins being promoted
6 to that position, right?
7     A  No.  My knowledge is basically looking at the
8 records, the official records.
9     Q  Okay.  Bear with me a minute if you would
10 please.
11     A  Sure.
12     Q  I guess I asked you before, I just want to
13 make sure we've exhausted these two documents which I'm
14 exhausted and I don't know about you, but is there
15 anything else, any other information you thought was
16 pertinent to the issues that we're here about today
17 that you can see by looking at either Plaintiff's
18 Exhibit Number 19 or Plaintiff's Exhibit Number 20?
19     A  No.  Simply to reiterate that the way in
20 which I set temporary promotion pay for Judy Mansfield
21 was identical to what had happened in Beacher Wiggins'
22 case.

123

1     Q  Okay.  Again, not based on personal knowledge
2 but just your review of the records?
3     A  That's right.
4     Q  Okay.  Do you have any other information that
5 you think has a bearing on this case that I haven't
6 asked you about, any other subject areas, anything like
7 that?
8     A  No, I don't think so.
9         MR. FREDRICKSON:  Why don't we take a short
10 break, and let me review my notes.  I think I'm pretty
11 well close to being finished, but I'd like to stop and
12 check.
13         THE WITNESS:  Sure.  That's fine.
14         (Recess)
15 BY MR. FREDRICKSON:
16     Q  I just want to ask you a few more questions
17 about the SL employees at the Library of Congress.  You
18 said there are usually about 100 to 105 SL level
19 employees, right?
20     A  Yes.
21     Q  How many of those SL employees at the Library
22 of Congress are at the cap, at the highest level of

124

1 compensation that they could have under the
2 congressional cap?
3     A  My guess without checking the records is
4 probably 75 to 80 percent.
5     Q  Okay.  And do you have a sense of how long it
6 takes typically for somebody to get from the SL-1 if
7 they start there on up to the highest level of
8 compensation at the library?
9     A  It really can vary substantially by
10 performance because, as I mentioned, one could move
11 rapidly up the line based on outstanding performance
12 whereas one could come in at an SL-2 or SL-3 and be
13 successful but nothing else and it's going to take that
14 employee quite a period of time to get up to the cap.
15     Q  Okay.  So if the Library employee is a pretty
16 successful employee, they can make it to the cap once
17 they get to the senior level system pretty quickly
18 meaning within a matter of three years or something
19 like that, that's a possibility, isn't it?
20     A  Again, it depends on a number of factors.  It
21 depends on, first of all, where that person is coming
22 in.  Let's assume somebody is coming in at the SL-1

125

1  level.
2      Q  Take Mr. Wiggins for example.
3      A  All right.
4      Q  He started at the SL-1 level.
5      A  Well, no, because when he permanently became
6  a member of the senior level work force, that personnel
7  action recommendation that we walked through before
8  showed that he was an SL-3. So he's coming into the
9  system as an SL-3.
10     Q  I understand on a permanent basis, but Mr.
11 Wiggins' initial appointment was at an SL-1.
12     A  Yes, but that doesn't have any bearing on
13 one's movement into the system on a permanent basis.
14 What becomes the critical differentiator is where
15 you're starting when you're a permanent employee. So
16 in this particular case he's coming in as an SL-3. I
17 would imagine based on outstanding performance he could
18 probably get to the statutory cap within a matter of
19 three or four years. That would be my guess.
20     Q  And in Mr. Wiggins case regardless of whether
21 it's a temporary promotion or not, the fact of the
22 matter is that Mr. Wiggins was initially appointed on a

126

1  temporary basis at an SL-1, right?
2      A  Yes.
3      Q  And by the time he actually got his permanent
4  appointment, he was already an SL-3 when he was
5  permanently appointed, correct?
6      A  But as a result of his permanent appointment,
7  not as a result of anything he did during his temporary
8  appointments.
9      Q  Well, obviously wouldn't that have
10 contributed to his making the initial appointment at
11 the SL-3, his performance over the last couple of
12 years, you would have taken that into account, right?
13     A  I think that probably was taken into account
14 as stated in the justification, but it wouldn't have
15 just been that particular performance. It was a whole
16 gamut of factors. It was the nature of the position.
17     Q  Meaning the director for Cataloging?
18     A  Director for Cataloging. Again, not merely
19 what he would have done since 1995, but as stated in
20 the justification, they're talking about performance
21 during his Library tenure.
22     Q  Okay. And with respect to the criteria of

127

1  the nature of the position, the director for Cataloging
2  is a big important job at the Library of Congress?
3      A  Yes, it is.
4      Q  Because it's got eight divisions?
5      A  Yes.
6      Q  And it's got 550 employees roughly?
7      A  Yes.
8      Q  And it's got a budget of 40 plus million
9  dollars per year?
10     A  Sure.
11     Q  And that's a big unit at the Library of
12 Congress?
13     A  It's a big unit.
14     Q  And it's an important unit, the Cataloging is
15 an important unit to the Library of Congress, isn't it?
16     A  Yes, it is.
17     Q  And so that's the kind of thing that one
18 takes into account when you're trying to determine what
19 SL level an employee would come into the SL service,
20 right?
21     A  That's right.
22     Q  All right.

128

1      A  Educational background might also be an
2  important factor we would look at.
3      Q  We went through the criteria. It's laid out
4  in your regulations?
5      A  Exactly.
6          MR. FREDRICKSON: That's all I have.
7          THE WITNESS: All right. Great.
8          MR. JAMES: We'll read.
9          (Signature having not been waived, the
10 deposition of Dennis M. Hanratty was concluded at 6:15
11 p.m.)
12
13
14
15
16
17
18
19
20
21
22

129

ACKNOWLEDGMENT OF DEPONENT

1
2    I, Dennis M. Hanratty, do hereby acknowledge
3    that I have read and examined the foregoing testimony,
4    and the same is a true, correct and complete
5    transcription of the testimony given by me and any
6    corrections appear on the attached Errata Sheet signed
7    by me.
8
9    _____
10    (DATE)          (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

130

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

1
2    I, Nancy Bond Rowland, Registered
3    Professional Reporter, the officer before whom the
4    foregoing proceedings were taken, do hereby certify
5    that the foregoing transcript is a true and correct
6    record of the proceedings; that said proceedings were
7    taken by me stenographically and thereafter reduced to
8    typewriting under my supervision; and that I am nether
9    counsel for, related to, nor employed by any of the
10    parties to this case and have no interest, financial or
11    otherwise, in its outcome.
12    IN WITNESS WHEREOF, I have hereunto set my
13    hand and affixed my notarial seal this 6th day of
14    February 2007.
15
16    My commission expires:
17    October 31, 2009
18
19
20    _____
21    NOTARY PUBLIC IN AND FOR THE
22    DISTRICT OF COLUMBIA

131

ERRATA SHEET

1
2    IN RE:  Mansfield v. USA
3    RETURN BY: _____
4    PAGE  LINE  CORRECTION AND REASON
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    (DATE)          (SIGNATURE)

132

ERRATA SHEET CONTINUED

1
2    IN RE:  Mansfield v. USA
3    RETURN BY: _____
4    PAGE  LINE  CORRECTION AND REASON
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10    ____  ____  _____
11    ____  ____  _____
12    ____  ____  _____
13    ____  ____  _____
14    ____  ____  _____
15    ____  ____  _____
16    ____  ____  _____
17    ____  ____  _____
18    ____  ____  _____
19    ____  ____  _____
20    ____  ____  _____
21    ____  ____  _____
22    (DATE)          (SIGNATURE)