# Exhibit 5

# Deposition of Deanna Marcum

*Mansfield v. Billington*, Civil Action No. 05-1790 (RMU/JMF)

DEPOSITION OF DEANNA B. MARCUM
CONDUCTED ON TUESDAY, FEBRUARY 13, 2007
Case 1:05-cv-01790-RMU    Document 27-3    Filed 12/04/2007    Page 2 of 58

1 (Pages 1 to 4)

**Page 1**

1  UNITED STATES COURT OF FEDERAL CLAIMS

2

3

4  -----------------------------X

5  JUDITH A. MANSFIELD,          :

6         Plaintiff : Civil Action

7  v.              : No. 05-472C

8  THE UNITED STATES OF AMERICA,  : Judge Williams

9         Defendant :

10 -----------------------------X

11

12

13         Deposition of DEANNA B. MARCUM

14              Washington, D.C.

15         Tuesday, February 13, 2007

16              10:00 p.m.

17

18

19

20 Job No.: 1-95858

21 Pages 1 - 226

22 Reported by: Nancy Bond Rowland

**Page 2**

1        Deposition of DEANNA B. MARCUM, held at the

2  offices of:

3

4        Webster, Fredrickson & Brackshaw

5        1775 K Street, N.W.

6        Suite 600

7        Washington, D.C.

8

9        Pursuant to agreement, before Nancy Bond

10 Rowland, Registered Professional Reporter and Notary

11 Public in and for the District of Columbia.

12

**Page 3**

1              A P P E A R A N C E S

2  ON BEHALF OF PLAINTIFF:

3        BRUCE A. FREDRICKSON, ESQUIRE

4        WEBSTER, FREDRICKSON & BRACKSHAW

5        1775 K Street, N.W., Suite 600

6        Washington, D.C. 20006

7        (202) 659-8510

8

9  ON BEHALF OF DEFENDANT:

10       DOUGLAS K. MICKLE, ESQUIRE

11       UNITED STATES DEPARTMENT OF JUSTICE

12       Commercial Litigation/National Courts

13       1100 L Street, N.W., Room 4062

14       Washington, D.C. 20005

15       (202) 307-0383

16

17       JESSIE JAMES, JR., ESQUIRE

18       JULIA DOUDS, ESQUIRE

19       LIBRARY OF CONGRESS

20       101 Independence Avenue, S.E.

21       Washington, D.C. 20540

22       (202) 707-7464

**Page 4**

1  ALSO PRESENT: Ethan Stone

2

3

4              C O N T E N T S

5  EXAMINATION OF DEANNA B. MARCUM              PAGE

6    By Mr. Fredrickson              5

7    By Mr. James                216

8

9

10             E X H I B I T S

11        (Retained by counsel)

12 DEPOSITION EXHIBIT                    PAGE

13 25 - E-mail dated 5/4/04.            48

14      Bates no. 155

15 26 - Letter dated 3/15/05.          149

16      Bates no. 156

17 27 - Declaration of Deanna B. Marcum.       201

18      Bates no. 1 - 6

19

20

21

22

5

```
1        P R O C E E D I N G S
2            DEANNA B. MARCUM
3    having been duly sworn, testified as follows:
4        EXAMINATION BY COUNSEL FOR PLAINTIFF
5    BY MR. FREDRICKSON:
6        Q  Could you state your name please?
7        A  Deanna Marcum.
8        Q  And do you work?
9        A  Do I work?
10       Q  Yes.
11       A  Yes.
12       Q  Where do you work?
13       A  The Library of Congress.
14       Q  What's your position at the Library of
15   Congress?
16       A  I'm the associate librarian for Library
17   Services.
18       Q  Associate librarian --
19       A  For Library Services.
20       Q  -- for Library Services.  And for how long
21   have you had that position?
22       A  Since August 11th, 2003.  Three and a half
```

6

```
1    years.
2        Q  What do you do in that position?
3        A  I head the Library part of the Library of
4    Congress.  The component parts are the Congressional
5    Research Service, the Copyright Office, and the
6    Library, and I'm the head of the Library.
7        Q  Okay.  And how big a unit is the Library
8    Services at the Library of Congress now?
9        A  There are about 2,500 staff.
10       Q  And do you have an annual budget?
11       A  Yes.
12       Q  What's the approximate budget for Library
13   Services?
14       A  For Library Services about $200 million.
15       Q  Can you tell me a little bit more
16   specifically what your duties are as the associate
17   librarian for Library Services?  Give me the broad
18   overview, and I might pick up some detail from there.
19       A  Okay.  It is my job to think about the future
20   and position the 53 divisions within Library Services
21   to move into that future.  I set the policies.  I plan
22   the new activities.  I've led the strategic planning
```

7

```
1    work.  I have five directors who report to me and a
2    deputy, and they then manage the 53 divisions.
3        Q  Okay.  And who do you report to?
4        A  To Dr. Billington, the librarian.
5        Q  At one point there was a deputy librarian?
6        A  Right.
7        Q  Is there a deputy librarian there now?
8        A  The deputy librarian retired.  There's a
9    chief operating officer, and I work very closely with
10   her, but my direct reporting relationship is to the
11   librarian.
12       Q  And when there was a deputy librarian, who
13   did you report to in that time frame?
14       A  That was a kind of joint reporting.  I met
15   with Dr. Billington every Thursday, and we went through
16   all of my agenda items.  I met with the deputy at his
17   request.
18       Q  Okay.
19       A  So the reporting box is the librarian of
20   Congress, deputy librarian, so I worked with both of
21   them.
22       Q  Okay.  And who was the deputy librarian?
```

8

```
1        A  Donald Scott.
2        Q  Who is the COO?
3        A  Joanne Jenkins.
4        Q  And that's chief operating officer?
5        A  Chief operating officer.
6        Q  And who were the five directors that report
7    to you?
8        A  They are Dianne van der Reyden who is the
9    director of Preservation.  You want me to spell these
10   names?  Would that help you?
11       Q  Sure.
12       A  v-a-n d-e-r R-e-y-d-e-n.  She's the director
13   of Preservation.  Kathryn Mendenhall with a K,
14   K-a-t-h-r-y-n, Mendenhall is serving in an acting
15   position filling two directorates.  She is the acting
16   director for Partnerships and Outreach and the acting
17   director for Technology Policy.
18       Q  So Miss Mendenhall is the director for
19   Partnerships and Outreach, and she's also serving as
20   acting director for --
21       A  She's serving in an acting capacity in the
22   two.
```

---

**9**

1  Q  Oh, in both?
2  A  Yes. They're small directorates.
3  Q  Okay. So Miss Mendenhall is the acting
4  director for Partnerships and Outreach and Technology
5  Policy, did you say?
6  A  Right. And those are two separate
7  directorates.
8  Q  Okay.
9  A  Beacher Wiggins is the director for
10  Acquisitions and Bibliographic Access. And Jeremy
11  Adamson is the director for Collections and Services.
12  Q  Collections and Services?
13  A  Collections and Services.
14  Q  Okay. Now, are these five directors all in
15  the senior level executive service for the Library of
16  Congress?
17  A  Yes.
18  Q  Okay. So if I use the term SL --
19  A  I'll know what you mean.
20  Q  Okay. I thought you might. And are you an
21  SL employee?
22  A  Yes, I am.

---

**10**

1  Q  Could you tell me a little bit about your
2  background before you came to the Library of Congress
3  as the associate librarian for Library Services?
4  A  I'll just give you a quick sketch.
5  Q  That will be great.
6  A  I became a librarian in 1971, completed my
7  degree from the University of Kentucky. I was in
8  professional positions there from -- I started there in
9  1969. I left in 1974. I was in cataloging positions
10  while I was there. I went to Vanderbilt University in
11  1974 as the director for Research and Development and
12  later became the associate librarian for Public
13  Services.
14  Q  For Public Services?
15  A  For Public Services. Moved to Washington in
16  1977. I was at the Association of Research Libraries
17  as a management training specialist. I was there until
18  1981 when I became a program officer at the Council on
19  Library Resources, and then later became vice-president
20  of that organization.
21  Q  Just let me catch up here. You started at
22  the Council on Library Resources, did you say?

---

**11**

1  A  Right.
2  Q  And your first position was what?
3  A  Program officer.
4  Q  Program officer.
5  A  It was a foundation. And then
6  vice-president. And in 1989 I became the dean of the
7  Library School at Catholic University. 1993 I came to
8  the Library of Congress as director of Collections and
9  Public Services it was called then.
10  Q  Director of Collections and Public Services?
11  A  Yes. And I was there for two years in that
12  position.
13  Q  Till 1995?
14  A  Uh-huh.
15  Q  Could you say yes or no instead of uh-huh. I
16  understand you, but the record is just going to be
17  cleaner.
18  A  Yes. I will say yes.
19  Q  Thank you.
20  A  In 1995 I became the president of two
21  foundations, the Council on Library Resources and the
22  Commission on Preservation and Access.

---

**12**

1  Q  Commission on Preservation and Access?
2  A  Yes, and I was hired specifically to merge
3  those two organizations.
4  Q  Okay. So I guess this is your second tour of
5  duty at the Council for Library Resources?
6  A  That's correct.
7  Q  All right.
8  A  And I stayed there until August 2003. The
9  name of the merged organization, by the way, is the
10  Council on Library and Information Resources. After a
11  year I was president of that new merged organization.
12  Q  Okay.
13  A  And then I started my second tour of duty at
14  the Library of Congress.
15  Q  In your first tour of duty at the Library of
16  Congress you were the director of Collections and
17  Public Services, is that right?
18  A  Yes. Let me think about the way that was
19  phrased. It was PSCM. Public Services and Collections
20  Management.
21  Q  Public Services and Collections Management.
22  Now, when you served as the director of Public Services

---

13

1   and Collections Management at the Library for two
2   years, was that an SL position?
3      A  I'm not sure.
4      Q  I got you on the first stumper of the day.
5   You don't remember?
6      A  I think it must have been.  I think it was at
7   the level I senior level.  It must have been.
8      Q  Okay.  The organizational structure that you
9   described that now exists at the Library within Library
10  Services where you have the five directorates, was that
11  the organizational structure that existed when you
12  started as the associate librarian for Library
13  Services?
14     A  No.
15     Q  Could you describe the organizational
16  structure that existed within Library Services in
17  August of 2003 when you started as the associate
18  librarian?
19     A  A lot has happened since then, so I'll have
20  to go back and think about it.  There were seven
21  directors when I arrived.  There was a director of
22  Acquisitions, a director of Cataloging, a director of

14

1   General Collections, a director of Area Studies
2   Collections, a director of Special Collections.  There
3   was, you know, I'm not quite sure what it was called.
4   It was the APLO, I guess it was looking for a new name,
5   but it was the automation group.  That's six, right?  I
6   don't know what the seventh one was.  Who else was
7   there.
8      Q  Public Services maybe?
9      A  It was Public Services, yes.
10     Q  And did each one of these were they called
11  directorates?
12     A  Uh-huh.  They were.  I'll do better at saying
13  yes, I promise.  I'll do better at saying yes.
14     Q  Great.  There were seven directorates within
15  Library Services when you started?
16     A  Right.
17     Q  And did each one have a director at the time
18  that you started?
19     A  Either a permanent director or an acting
20  director.
21     Q  And can you identify who the directors were
22  when you started in August of 2003?

15

1      A  Preservation was the seventh.  I'm sorry.
2   Public Services went with Collections, and Preservation
3   was the seventh.  I knew if I thought about this long
4   enough.  Okay.  The director of Acquisitions was Nancy
5   Davenport.  The director of Cataloging was acting, Judy
6   Mansfield.  The director of General Collections and
7   Area Studies, there were two.  Let's see.  Stephen
8   James was the director of General Collections.  The
9   head of Special Collections was -- Who was there.  I
10  think that was not filled at the time I was there when
11  I arrived.  Carolyn Brown was the head of Area Studies.
12     Q  Carolyn Brown?
13     A  Carolyn Brown.
14     Q  That's Area Studies?
15     A  Area Studies, yes.  Diane Kresh was head of
16  Collections and Public Services.
17     Q  Diane Kresh was head of what directorate?
18     A  Collections and Public Services, and that's
19  part of the general collection, so I guess that's --
20  I'm trying to go back and put that together.
21  Collections and Public Services was Diane Kresh, and
22  that included General Collections and Special

16

1   Collections.  She was taking those two roles.  Carolyn
2   Brown was head of Area Studies.  And Mark Roosa was
3   head of Preservation.
4      Q  How do you spell Mark's name?
5      A  R-o-o-s-a.
6      Q  R-o-o-s-a?
7      A  Yes.
8      Q  Preservation director?
9      A  Right.  Correct.
10     Q  How about the Automation Group?
11     A  Susan Hayduchok.  I'm trying to think how to
12  spell Hayduchok.  H-a-y-d-u-c-h-o-k.
13     Q  Just so I understand it, I jotted down
14  Stephen James as the director for General Collections.
15     A  He was the head of the Humanities and Social
16  Sciences reading room.  He was not a director at the
17  time.  He retired very soon after I arrived, but he was
18  the head of the reading room.  So let me go through the
19  list again.  I think I have it straight now.
20     Q  Okay.
21     A  Nancy Davenport, Acquisitions.  Judy
22  Mansfield was acting.

17

1    Q   Acting director for Cataloging?
2    A   Acting director for Cataloging. Diane Kresh
3  was acting director for Collections and Public
4  Services, and that included the General Collections and
5  Special Collections. Susan Hayduchok was the
6  Automation head. Mark Roosa, the director of
7  Preservation.
8    Q   All right. I think I've got it.
9    A   I think that's correct.
10   Q   What was Mr. Wiggins' job when you came on
11 board in August of 2003?
12   A   He had been the acting associate librarian
13 for Library Services.
14   Q   He had been the acting associate librarian,
15 the job that you came into in August of '03?
16   A   That's correct. Right.
17   Q   So when you started as associate librarian
18 for Library Services, what job did Mr. Wiggins then
19 assume?
20   A   I made him the deputy associate librarian.
21   Q   And how long did Mr. Wiggins serve in that
22 job?

18

1    A   Until we realigned the directorates, and that
2  was the following year.
3    Q   Can you be more specific as to when the
4  realignment took place?
5    A   It went into effect in September of 2004. I
6  think that's the date.
7    Q   Okay. So Mr. Wiggins was the deputy
8  associate librarian until September of 2004?
9    A   Correct.
10   Q   Okay. Just to sort of finish the picture
11 here, Nancy Davenport, did she remain the director of
12 Acquisitions until the reorganization in September of
13 2004?
14   A   Until I think it was June or July. She left
15 to become the president of the Council on Library and
16 Information Resources, the job I had vacated. We just
17 switched.
18   Q   I have a feeling it's a small world we're
19 talking about.
20   A   It is a small world.
21   Q   Okay. And Miss Mansfield, did she remain the
22 acting director for Cataloging until September of 2004?

19

1    A   Yes.
2    Q   And Miss Brown, did she remain the director
3  for Area Studies Collections until September of 2004?
4    A   Yes. I hope that's the right date. I'm not
5  absolutely certain of that date, but it's close.
6    Q   Okay. I've got some documents we're going to
7  get to later on, and if you think it's otherwise, let
8  me know during the course of the deposition, and we can
9  try to pinpoint it a little more finely.
10   A   All right.
11   Q   I'm just trying to get the -- Well, enough
12 said.
13   A   Yes.
14   Q   And Miss Hayduchok, did she remain the
15 Automation Group director until September of 2004?
16   A   Yes, and then she retired soon thereafter. I
17 think she retired in December 2004. It was right after
18 the realignment.
19   Q   And Diane Kresh, did she remain the director
20 for Collections and Public Services until September of
21 2004?
22   A   Shortly before that, shortly before the

20

1  realignment she was transferred to the Veterans History
2  Project.
3    Q   Do you remember when that was when she
4  transferred?
5    A   I know it was a few months before the
6  realignment, but I don't know the date.
7    Q   And Mark Roosa, did he remain the director of
8  Preservation until the realignment in September of
9  2004?
10   A   Just before that he resigned to take a
11 director's position in California.
12   Q   Okay. So he left the Library of Congress?
13   A   He did. And interestingly I know he went to
14 the university where Ken Starr is in the law school,
15 but I don't remember the name of the university.
16   Q   Pepperdine?
17   A   Pepperdine College, right. Right.
18   Q   I think I left out Mr. James, Stephen James.
19   A   Oh, he was the head of the reading room in
20 Humanities and Social Sciences.
21   Q   And how long did he remain in that position?
22   A   Until I think it was 2005 when he retired.

21

1    Q  Okay.  Do you remember when it was in 2005
2  that Mr. James retired?
3    A  He took the early out, the financial
4  incentive for retirement, and that was in the summer of
5  2005.  That was a phased process, but I think he left
6  in the summer 2005.
7    Q  All right.  When you came on board as the
8  associate librarian with these seven directors, did
9  they report directly to you then?
10    A  Yes.
11    Q  And did you have a pretty good sense of how
12  each of the directors were performing?
13    A  Not when I arrived, no.  It took a little
14  while to figure that out.
15    Q  How long did it take for you to sort of come
16  up to speed on how the directors were performing?
17    A  In the case of Judy, she reported through
18  Beacher.
19    Q  That's Miss Mansfield reported through Mr.
20  Wiggins, is that right?
21    A  Correct.  Is it better if I use last names?
22    Q  Probably a little clearer.  I bet there's

22

1  probably more than one Judy at the Library.
2    A  Probably so.  Because he had been so involved
3  in all the technical processing areas.  I knew Diane
4  Kresh, and I knew Mark Roosa from earlier involvement
5  before I had come to the Library of Congress, so I knew
6  their work pretty well.
7    I didn't know Nancy Davenport's work at all
8  really, and I didn't know Sue Hayduchok's work at all.
9  So it took several months to begin to have a sense of
10  what they were doing.
11    Q  Okay.  Did you have any kind of regular
12  meetings that you held of the directors when you
13  started back at the Library in August of 2003?
14    A  I did.  I met with the directors as a group
15  every Tuesday at 1:30.
16    Q  Okay.  What was the purpose of the directors
17  meeting?  Is that an accurate title for the group, a
18  directors meeting?
19    A  Yes, it is.
20    Q  What was the purpose of having the directors
21  meetings on a weekly basis?
22    A  Two purposes: One, I informed them of work I

23

1  was doing with the librarian's office, budget
2  information or personnel policy information they needed
3  to know; and then we went around the room and talked
4  about the issues they were working on in the near
5  future.  When I arrived it was more a share information
6  kind of session.
7    Q  Did it change over time?
8    A  As I became more interested in strategic
9  planning, it became a meeting to think about the
10  future, and it was not until the realignment when I had
11  the new directors in place that I began meeting with
12  each of them individually in addition to the
13  once-a-week group meeting.
14    Q  And when you use the term strategic planning,
15  what do you mean by that?
16    A  Thinking about the future of the Library and
17  how we're going to get there.
18    Q  During the course of the time that you
19  started in August of 2003 till let's say the summer of
20  2004, did you have a sense of how Judy Mansfield was
21  performing in her role as the acting director for
22  Cataloging?

24

1    A  She seemed to be doing very well.  She had
2  been working on a strategic plan for Cataloging,
3  thinking about the redefinition of that division.
4    Q  And what did that entail?
5    A  She was bringing in people from the outside
6  to talk to the catalogers about changes that were
7  likely to occur in the future.  She was working with
8  other national -- with her counterparts in other
9  national libraries looking at how they were approaching
10  cataloging.  She was thinking about the future.
11    Q  Okay.  When you say she was bringing in
12  people from outside regarding the changes that might be
13  coming in cataloging, who did you mean?  What types of
14  people were you referring to?
15    A  She'd bring in people who were from
16  universities.  I think she had someone from Amazon.com
17  come in one day.  From the technology areas or other
18  universities where they were engaged in significant
19  change in how cataloging was done.
20    Q  Okay.  And you also said that Miss Mansfield
21  worked with her counterparts in other libraries.  What
22  did you mean by that?  Who would her counterparts in

25

1 other libraries be?
2     A  Directors of Cataloging at the British
3 Library or the National Library of Australia, for
4 example.
5     Q  So international libraries?
6     A  International libraries.
7     Q  National Libraries of other countries?
8     A  Right.
9     Q  Okay.  What did you generally understand Miss
10 Mansfield's responsibilities to be as the director for
11 Cataloging?
12     A  I had asked Beacher when I arrived to take a
13 hard look at streamlining the processes in cataloging.
14 I learned that cataloging a book was costing $150 per
15 title when I arrived.  I thought that was much too
16 high.  And he worked with Miss Mansfield in
17 streamlining processes, trying to find ways to increase
18 the productivity in cataloging.  So my specific charge
19 to cataloging was find ways to get the numbers up and
20 the costs down.
21     Q  Numbers of works catalogued?
22     A  Works catalogued.

26

1     Q  And the dollars down, the cost per cataloging
2 a particular work?
3     A  Right.
4     Q  Okay.  And was Miss Mansfield successful in
5 doing that?
6     A  I don't know if the cost -- I don't know what
7 the cost is right now.  We're calculating that at the
8 moment.  But yes, she seemed to have been successful in
9 doing that.  The productivity is up.
10     Q  Okay.  How do you determine the cost of
11 cataloging a work?
12     A  I look at the number of -- These are really
13 crude measures.  I look at the number of items that are
14 catalogued, the number of people who were involved in
15 that division, and the cost of those people.  So it's
16 really a rough division.  The number of items that come
17 out the system and the amount of money that went into
18 the system.
19     Q  Okay.  When Miss Mansfield served as the
20 acting director for Cataloging, did you believe that
21 she was doing senior level work?
22     A  That's a really hard question to answer

27

1 because I'm not sure I -- I don't know the answer to
2 that.  Was she setting policy?  No.  Was she looking
3 toward the future?  Yes, very much so.  The cataloging
4 area is a peculiar one in that there's no interaction
5 with the public.  There are no big contracts to manage.
6 It's very much a production activity.  She managed
7 people very well I think.  She managed the process very
8 well.  But the kinds of things I think about for senior
9 level people are policy determinations.
10     Q  Policy terminations?
11     A  Determinations.
12     Q  Determinations.
13     A  And all of those technical processing
14 positions don't have that component.
15     Q  What do you mean when you say policy
16 determinations?  Could you give me an example?
17     A  In the reading rooms, for example, where the
18 directors of those reading rooms determine the scope of
19 the collections, they determine how extensive the
20 collections will be in a particular area, and they get
21 to know all the works that are being created in that
22 subject field.  They know the scholars in that field.

28

1 They're good at languages that are relevant to that
2 field.  And they determine what proportion of the
3 resources that we have collected in print form will be
4 turned into digital resources that are available on the
5 web, for example.  Those are the kinds of things I
6 think about as policy.  Those aren't options for the
7 technical services staff.  The rules have been
8 established, and they see to it that people follow
9 those rules and get the work out.
10     Q  How about the interaction with the
11 international libraries, is that senior level type
12 work?
13     A  That's the kind of thing that a senior level
14 person would do, yes.
15     Q  And Miss Mansfield did that, had interaction
16 with international libraries in her work as director
17 for Cataloging?
18     A  Yes.
19     Q  How about interaction with other libraries
20 around the country?
21     A  I think on a personal level, yes, she did.
22 She's active in the American Library Association.  She

**29**

1  goes to meetings. She knows people. But in terms of
2  developing policy with them or developing some sort of
3  plan with them, no. I think it's on a personal level
4  only.
5      Q  I don't think I did ask this question, so let
6  me ask you of the seven directors who were within your
7  organizational structure of Library Services when you
8  started in August of '03, could you tell me which ones
9  were SL employees of the Library? Miss Davenport?
10     A  All of them were I believe. Miss Mansfield
11  was acting, a temporary senior level appointment. All
12  of them were.
13     Q  Okay. Within those seven directorates were
14  the budgets roughly comparable or did they vary quite a
15  bit?
16     A  Are we talking about the seven or the five we
17  now have?
18     Q  Let's start with the seven. I'm going to get
19  to the five eventually, but I'm starting with the seven
20  if that's okay. These are the seven directorates when
21  you started as associate librarian, what were the
22  budgets of each if you could just approximately?

**30**

1      A  I don't know if I can recall the -- I can
2  give you kind of percentages, and I'm guessing about
3  this. Cataloging accounted for of the $200 million
4  about $50 million. Acquisitions, probably $45 million,
5  something like that. And then the others were probably
6  pretty evenly divided. Preservation is a small
7  directorate. And APLO --
8      Q  What's that one?
9      A  I'm trying to visualize the budgets. I would
10  guess that the others were roughly divided, the
11  remaining $100 million divided among the others.
12     Q  So the remaining five divisions, if you put
13  to the side Cataloging and Acquisitions, had a total
14  budget of about $100 million?
15     A  Yes. Collections had a bigger budget, but
16  it's hard to divide this because the Collections budget
17  is separate from the personnel budget. I'm just
18  thinking about the number of people. The $50 million
19  for Cataloging, $45 million for Acquisitions, maybe
20  $35 million for Collections, and the remaining equally
21  divided.
22     Q  Okay. That sounds like to me what remains is

**31**

1  about $70 million divided four ways. Does that sound
2  right?
3      A  That's about right.
4      Q  So in the neighborhood of $15 million?
5      A  $15 million to $20 million.
6      Q  The remaining directorates had about budgets
7  of about $15 million to $20 million each?
8      A  Yes.
9      Q  Okay.
10     A  One of the reasons that this is so hard to
11  calculate is when I arrived, the directorates did not
12  have their own budgets. I'm just thinking about the
13  expenses of each of them. They weren't managing their
14  own budgets.
15     Q  Okay. Did that change over time?
16     A  Yes.
17     Q  And when did it change?
18     A  When I realigned the service unit, and the
19  directors were all given a budget to work with.
20     Q  So as of the fall of 2004 each of the
21  directorates had their own budget?
22     A  Right.

**32**

1      Q  Okay. Can you give me -- I believe you said
2  there were about 2,500 employees within Library
3  Services when you started in August of 2003, is that
4  right?
5      A  Yes.
6      Q  And can you give me approximate numbers of
7  staff by directorate as they existed in August of 2003
8  when you started?
9      A  Well, let me back up. There are 2,500 now.
10  There were closer to 3,000 when I came. I can only do
11  this proportionally.
12     Q  That's fine.
13     A  There were probably 800 in Cataloging. I'm
14  guessing. Acquisitions, probably 400, 500, something
15  like that. Collections -- I don't know how to divide
16  them because Collections were divided between the
17  General Collections and Special Collections which were
18  probably 400 or so, 500.
19     Q  400 to 500 in Collections?
20     A  Maybe even 600.
21     Q  400 to 600 in Collections?
22     A  Yes. I'm not sure. And Area Studies

33

1 included the four area studies reading rooms, and they
2 have about 20 people each, so say 100 people there.
3 Preservation has about 100. I'm trying to calculate
4 how many I've accounted for. APLO, I don't know how
5 many were there. It was both the Integrated Library
6 System and APLO together.
7    Q  What's the acronym you're using, APLO?
8    A  Automated Processing Library Organization.
9 It's the Automation Division.
10    Q  Okay. How many in that directorate, that is
11 APLO?
12    A  Probably no more than 200.
13    Q  I think we have Preservation left.
14    A  In 2003 there were probably 150 people in
15 Preservation. There aren't that many now.
16    Q  Did you have a separate breakout for Special
17 Collections or did you lump that in with Collections
18 when you said the 400 to 600?
19    A  I was combining General Collections and
20 Special Collections. It may be more. Actually there
21 were probably -- There are 23 reading rooms. Maybe
22 700.

34

1    Q  Okay. Did we cover all the seven then?
2    A  I think so.
3    Q  Okay. I guess the Cataloging Division was
4 the largest in terms of staff?
5    A  Yes.
6    Q  And the largest in terms of budget?
7    A  Yes.
8    Q  How did it come about that you reorganized
9 Library Services?
10    A  I spoke with the staff when I first arrived,
11 and I talked about my goal of looking at the Library of
12 the 21st century from the user's perspective, and
13 instead of thinking about what we wanted to do
14 ourselves, try to put ourselves in the shoes of our
15 users and begin designing services that would meet
16 their needs, and I thought to do that we had to be
17 organized differently.
18    Q  Okay. What was it about the organization
19 that existed when you arrived as the associate
20 librarian for Library Services that made you think you
21 had to make a change to put yourself in the user's
22 shoes?

35

1    A  It was taking far too long for materials to
2 be processed. So any new materials were two years
3 getting through cataloging. By the time a user wanted
4 to find something new, it was too late. Our hours
5 weren't responsive to the times people want to go to
6 libraries. It looked to me as if our services were
7 designed more for our benefit than our users. So I
8 wanted to change that.
9    Q  I'm trying to get at why the organizational
10 structure stood in the way of providing the 21st
11 century user better service though. Can you inform me
12 on that?
13    A  I can use Cataloging as a good example.
14    Q  All right.
15    A  We were viewing ourselves as the creators of
16 perfect records or as close to perfect records as
17 humans can manage. That meant adding lots of
18 information in the cataloging record that I determined
19 through user surveys people were not using at all.
20    Q  Could you give me an example of that please?
21    A  Is it okay if it's fairly arcane?
22    Q  Sure.

36

1    A  Series authority record. We had been
2 managing 980,000 series authority records. I'll use a
3 very simple example. When you buy a paperback, there's
4 a little note and it says Penguin Classic Number 426.
5 We were keeping track of all of the series numbers that
6 were included in the book. Sometimes those series
7 actually meant something, but most often they didn't.
8    Q  Would that series number be provided by the
9 publisher of the book?
10    A  It would be on the book somewhere. It would
11 be incorporated. And the cataloger was recording that
12 in the bibliographic entry, and then checking to make
13 sure that we had every number before that, and that we
14 had a perfect record.
15    Q  Okay.
16    A  In user studies I determined that no one to
17 speak of was using that record and determined that
18 that's something we could drop in order to catalogue
19 more material. That's the kind of thing we were trying
20 to do.
21        I also asked the catalogers since publishers
22 are now using digital technology as much as we are, I

37

1  was asking them to extract any of the bibliographic
2  information that came electronically from the publisher
3  automatically into our bibliographic record so that we
4  were not doing that work ourselves and we were simply
5  taking it as it came from the publisher, and this was a
6  big change in the way we do our work.
7      Q  Okay.  And how did that come about that you
8  changed the way that the Library does its work in
9  cataloging?  In other words, was that a product of you
10  were just making that decision?  Did you discuss it
11  with folks at the Library?  Did you discuss it with
12  people outside the Library?  Can you inform me as to
13  the process by which you determined a change in the
14  course in cataloging?
15      A  I've been in this profession since 1969.
16  I've devoted my life to it.  I've thought about these
17  things every day of my life.  I work very closely with
18  people all over the country and all over the world.  I
19  saw what other libraries were doing.  I spent a lot of
20  time analyzing user surveys and began discussing all of
21  these issues with the directors as soon as I arrived.
22      Q  So is that the type of topic that would have

38

1  been discussed at the directors meetings when you
2  started out at Library Services like how should
3  cataloging evolve at the Library of Congress?
4      A  And I tried to leave the specifics to the
5  directors, but I talked in general terms about
6  simplifying processes, looking at all these issues from
7  the user's perspective, giving better value to the
8  American public.  I thought we were spending too much
9  money on processing and not enough money on getting
10  content to the user.  So we talked more about those
11  kinds of policy issues and directions rather than I
12  didn't specify any particular process they needed to
13  work on.
14      Q  So to use the example that you gave, the
15  series authority records, you didn't dictate let's drop
16  this?
17      A  No.  They came up with that as a solution to
18  meet my directive.
19      Q  Okay.  Who is "they"?  Who came up with that?
20      A  That was done while Beacher has been the
21  director of Acquisitions and Bibliographic Access.
22      Q  Okay.  Could you give me an example in

39

1  another area other than Cataloging of what you mean
2  when you say that you wanted to change the Library's
3  practices to better serve the 20th -- 21st century
4  user?
5      A  21st century.  We were doing all right with
6  the 20th.
7      Q  I'm stuck in the 20th century.
8      A  In the Area Studies reading rooms, for
9  example, where we have a lot of immigrant populations
10  using the materials, the Asian division is a good
11  example, we began experimenting with having Saturday
12  hours.  We had never had Saturday hours before and have
13  determined that many users from the Asian community
14  come to the Library and use the collections on Saturday
15  when they're not able to during the week.  So we're
16  beginning to do those kinds of things to open up the
17  Library.
18      We've changed the policy in all the reading
19  rooms.  When I arrived you had to be 18 or older to use
20  the collections.  We've now determined that a high
21  school student can have a reason to use the Library,
22  and it's fine.  So those kinds of things we're doing to

40

1  make it a little more user friendly.
2      Q  Okay.  Could you give me an example in the
3  area of Preservation how the practices have evolved at
4  the Library to better serve the 21st century user?
5      A  Doing two things:  One, we've invested
6  $2 million in the last year in state-of-the-art
7  research and testing equipment, and we're doing this
8  because other libraries around the country are cutting
9  back on their preservation.  As they move into
10  digitization, they're cutting back on traditional
11  preservation.  So we are serving all libraries in the
12  country by doing this research and testing in our lab,
13  and we see that as a service to the nation.
14      On a more individual user basis, we've
15  started a workshop every year preserving your family's
16  treasurers, and we have an open house.  We invite
17  people to bring their scrapbooks, photograph albums,
18  other documents of various kinds, and we give them
19  on-the-spot advice about how to care for those
20  materials.
21      Every division is doing something to be a
22  little more interested in the user.

41

1   Q   Who's involved in the decision making process
2   to reorganize Library Services?
3       A   Who was involved in that process?
4       Q   Yes.
5       A   Well, the directors were involved.  The way I
6   approached that decision, I had spoken every day in the
7   Coolidge Auditorium that holds 500 people until I
8   covered every single person in Library Services.  So
9   that was two weeks every day I gave the same talk.
10      Q   To whom?
11      A   To every staff member in Library Services.
12  And I talked about my vision for the 21st century
13  library, the kinds of things we should be doing.  In
14  the directors meeting I asked them to take that vision
15  and come up with their recommendation for the
16  organizational structure that would allow us to
17  accomplish that.  I gave, I don't know, I think two
18  weeks for people to come up with a chart showing how
19  they would reorganize if they were doing it.
20          We then had presentations from each of the
21  directors on how they would put units together or new
22  units they would create.  So we spent, I don't know,

42

1   two or three months probably looking at all of the
2   options.  I also had an administrative services unit
3   within my office.  These were people who had some
4   experience with organizational development, and they
5   met with us and critiqued the different proposals.
6           And after all of that discussion I proposed
7   what I thought was the best of all we had heard, and
8   they agreed that that was the way to proceed.
9       Q   So I gather you engaged the directors who
10  were the directors for the seven directorates as a part
11  of that reorganization process?
12      A   Right.
13      Q   And was this in the spring of 2004 that this
14  was going on?
15      A   Yes.
16      Q   Just going back to my notes earlier, I gather
17  as a part of the reorganization you wound up with five
18  directorates, is that right?
19      A   Right.
20      Q   And those were Preservation?
21      A   Yes.
22      Q   Acquisitions and Bibliographic Access, is

43

1   that right?
2       A   Right.
3       Q   Collections and Services?
4       A   Yes.
5       Q   I'm a little bit unclear about the other two.
6   I think one was Partnerships and Outreach?
7       A   Correct.
8       Q   And the fifth one was the Technology Policy
9   directorate?
10      A   Right.  Do you have Preservation on the list?
11      Q   Didn't I mention that, director of
12  Preservation?
13      A   Yes.
14      Q   Okay.  Now, could you provide for me the
15  breakout by budget for each of the five directorates
16  after the reorganization?
17      A   I don't know the exact numbers.  I can again
18  do it proportionally.  The Acquisitions and
19  Bibliographic Access directorate now has about 900
20  people, and I really don't know what the budget is.
21  Collections and Services has between 800 and 900 people
22  after all of those have been pulled together.

44

1   Partnerships and Outreach has probably 200 people.
2   Preservation has 100.
3       Q   100?
4       A   Yes.  And Technology Policy has 300 or so.
5       Q   Okay.  And this is all as of fall of 2004?
6       A   Yes.  The numbers have been pretty much the
7   same since that time.
8       Q   What's the total budget for Library Services
9   in the fall of 2004 if you can remember?
10      A   $200 million.  The budget has been flat since
11  I arrived.
12      Q   And can you break out the budget by
13  directorate in the new organization that existed in the
14  fall of 2004?
15      A   I'm only guessing.  I don't know the numbers.
16      Q   Can you put them in rank order in terms of
17  size?
18      A   The budget for Acquisitions and Bibliographic
19  Access is the largest.  Collections is second, and
20  those are only the people cost in Collections and
21  Services.  There is a separate $13 million
22  appropriation for acquisitions for the books we buy.

45

1 Third is Partnerships and Outreach. Technology Policy
2 is fourth. And Preservation is fifth.
3 Q What sort of document would there be in
4 existence today which reflect the various budgets
5 broken out by directorate as of fall 2004?
6 A I have all of those records in my office. I
7 could certainly provide them. That would be better
8 than relying on my terrible memory for those things.
9 Q So these would be contemporaneous records of
10 what the budgets were in the fall of 2004, for example?
11 A Right. We have those budgets.
12 Q All right. Bear with me a minute.
13 Now, as a part of the reorganization that
14 occurred in 2004, did you contemplate using assistant
15 directors as well as directors in the new organization?
16 A I was concerned that I had created two very
17 large directorates in this realignment. By combining
18 Acquisitions and Cataloging pretty much doubled the
19 number of people in one directorate. And in
20 Collections and Services I combined Area Studies,
21 General Collections, and Special Collections. So I
22 talked with the directors about looking at their chiefs

46

1 in the directorates and asking some number of them to
2 take on collateral duties as assistant directors.
3 Q Okay. Who was involved in the process of the
4 discussion concerning the creation of these assistant
5 directors?
6 A At the time that decision came, Robert Dizard
7 was the deputy of associate librarian, and he and the
8 directors and I discussed that possibility.
9 Q When you say the directors, you're referring
10 to the seven directors?
11 A I'm referring to the five.
12 Q The five. Okay.
13 A Yes.
14 Q When did you determine that there would be
15 five directors, five directorates?
16 A That was all part of the realignment
17 discussion that had taken place earlier in the year,
18 and then we agreed on the five, and then after they
19 were in place we began the discussion of assistant
20 directors.
21 Q Okay. When did Mr. Dizard start with the
22 Library of Congress?

47

1 A July of 2004.
2 Q So right in the midst of this reorganization
3 process?
4 A Yes. Just as we were finalizing the
5 directorates.
6 Q Okay. Let me see if I find a document to
7 pinpoint the time.
8 MR. JAMES: Would this be a good time to
9 break? We've been going for about an hour.
10 MR. FREDRICKSON: Sure.
11 (Recess)
12 (Questions and answers read)
13 BY MR. FREDRICKSON:
14 Q We've had a passage of the last couple of
15 questions and answers read to you while we were off the
16 record, and you indicated that you wanted to make a
17 revision.
18 A Right. Robert Dizard came to Library
19 Services in 2004, but he had been at the Library for
20 several years, probably a dozen years or so. I don't
21 know exactly when he started at the Library of
22 Congress. He had been in the Copyright Office and

48

1 transferred to Library Services.
2 Q He had been in Copyright?
3 A He had been in Copyright, yes.
4 Q And Mr. Dizard transferred to Library
5 Services you believe sometime in July of 2004?
6 A Yes.
7 MR. FREDRICKSON: May I have this document
8 marked as Plaintiff's Exhibit Number 25 please.
9 (Deposition Exhibit 25 was marked for
10 identification and was retained by counsel.)
11 BY MR. FREDRICKSON:
12 Q Have you had a look at Plaintiff's Exhibit
13 Number 25?
14 A Yes.
15 Q Do you recognize Plaintiff's Exhibit Number
16 25 as an exchange of e-mail between you and Miss
17 Mansfield?
18 A Yes.
19 Q And that exchange occurred in May of 2004?
20 A Yes.
21 Q If I could read aloud, if you start at the
22 bottom, would that have been the earlier e-mail than

49

1   the one at the top?  Am I reading that correctly?
2       A  Yes.
3       Q  Okay.  So it says here "Dear Deanna:  Thank
4   you for giving me time to think about the assistant
5   director for Cataloging position.  This gave me time to
6   think through the concept of director/assistant
7   director and to discuss it with Beacher.  I am very
8   flattered that you want me to do this job, and I think
9   I now see how it can work.  So I'm on board.  Judy."
10  And then at the top you respond "This makes me
11  extremely happy.  Thanks."  Do you see that?
12      A  Yes.
13      Q  And it says that the date of your response is
14  May 4th, 2004, is that right?
15      A  Yes.
16      Q  Does reading Plaintiff's Exhibit Number 25
17  give you a better sense of when it was that you in
18  Library Services decided to use assistant director
19  positions in the new organization?
20      A  Yes.  I really did have those -- I was
21  thinking it was later in the year.
22      Q  So sometime in the spring of 2004 Library

50

1   Services had determined that you would reorganize and
2   use assistant directors in addition to the five
3   directors of the new directorates, is that right?
4       A  Yes.  All of these discussions were going on
5   earlier, and they became assistant directors though
6   after the realignment.
7       Q  I read Plaintiff's Exhibit Number 25 to
8   suggest that you offered Miss Mansfield the position of
9   assistant director for Cataloging, is that right?
10      A  We had discussions about what assistant
11  directors would do, and the ultimate decision was the
12  directors', not mine.
13      Q  Okay.  Well, let me revise the question.  I
14  read Plaintiff's Exhibit Number 25 to mean that the
15  position of assistant director for Cataloging was
16  offered to Miss Mansfield in May of 2004.  Is that an
17  accurate reading of the exchange of e-mails reflected
18  in Plaintiff's Exhibit Number 25?
19      A  I think it was a discussion, not a job offer.
20      Q  Okay.  She says "Thank you for giving me time
21  to think about the assistant director for Cataloging
22  position," right?

51

1       A  Yes.
2       Q  And also "I am very flattered that you want
3   me to do this job, and I think now I see how it can
4   work, so I'm on board," right?
5       A  Yes.
6       Q  And you say "This makes me extremely happy"?
7       A  Yes.
8       Q  Why did it make you extremely happy?
9       A  Because I had hoped she would be willing to
10  take on more responsibility.  We had talked about what
11  role she would have in the new organization.  This
12  became an issue when I decided on Robert Dizard as the
13  deputy, and that took Beacher back to his position as
14  director for Cataloging.
15          So Judy, Miss Mansfield, excuse me, wanted to
16  talk about what her options might be, and we talked
17  about the possibility of assistant directors, and this
18  conversation had to do with is that something you would
19  be interested in doing, willing to take it on.
20      Q  Okay.  This is a conversation you and Miss
21  Mansfield had?
22      A  Yes.

52

1       Q  Okay.  Was this a series of conversations or
2   one conversation that you're talking about?
3       A  It was an informal conversation when she
4   dropped by my office to talk about what happens to me.
5       Q  So you are thinking of a single conversation
6   then?
7       A  To my knowledge, yes.
8       Q  All right.  So how long did this conversation
9   last approximately?
10      A  30 minutes.
11      Q  And what did you say to Miss Mansfield and
12  what did she say to you in that meeting?
13      A  I don't remember specifics.  I know the gist
14  of the conversation, but I don't know what precisely
15  was said.
16      Q  Okay.  Give me the best recollection you have
17  of what you said to Miss Mansfield in the meeting.
18      A  Her reason for coming to see me is that she
19  was unhappy with the appointment or the proposed
20  appointment, he hadn't been appointed yet, of Bob
21  Dizard.  She wanted to be sure that whatever role she
22  had, she did not have to report to him.  She wanted to

53

1　talk about what I thought her options were in Library
2　Services, and I believe it was in this conversation
3　that I told her that I was thinking about the assistant
4　directors in a collateral duty arrangement to help with
5　some of the coordination that would be necessary when
6　we started combining these divisions into a single
7　directorate.
8　　Q　Did you bring Mr. Dizard in as the deputy
9　associate librarian for Library Services?
10　　A　Yes.
11　　Q　Why did you do that?
12　　A　Because he had been responsible for the
13　business reengineering in the Copyright Office, and I
14　thought he had done a spectacular job. Before working
15　in the Copyright Office he had been in Congressional
16　Relations at the Library. And before that he had been
17　a congressional staffer. And I thought he had the kind
18　of experience I really needed to make the changes I
19　wanted to make in Library Services. He had the
20　organizational background that no one else in Library
21　Services had.
22　　Q　Do you remember anything else you said to

54

1　Miss Mansfield or she said to you in the meeting you
2　had where you discussed the assistant --
3　　A　Not specifically, no.
4　　Q　And in the meeting that you just described,
5　was that a conversation that you had with Miss
6　Mansfield that occurred before the exchange of e-mail
7　that's been reflected in Plaintiff's Exhibit Number 25;
8　in other words, before May 4, 2004?
9　　A　It obviously was, but I don't remember when
10　the conversation took place.
11　　Q　Okay. But it would have been before May 4th,
12　2004?
13　　A　Yes.
14　　Q　Okay. Did you have any other conversations
15　with Miss Mansfield about assuming an assistant
16　director position?
17　　A　The nature of my conversations with her were
18　always unplanned and unstructured. I didn't meet with
19　her on a regular basis individually, so most of my
20　conversations occurred when she dropped by to show me
21　something that had happened or something she had done,
22　and we talked about a lot of things when I met with

55

1　her, but I don't recall any other meetings about this
2　topic.
3　　Q　About the assistant director topic?
4　　A　Right.
5　　Q　By the way, is Cataloging and Bibliographic
6　Access the same thing?
7　　A　Yes. I changed the name.
8　　Q　Why was that?
9　　A　Because I wanted all of the catalogers to
10　begin to understand that what they were doing by
11　creating records is providing access to users and that
12　they weren't cataloging per se. They were finding ways
13　to provide access. So it was an intentional new term.
14　　Q　Okay. You meant the same thing but just
15　wanted a different message to be conveyed to the
16　catalogers, is that right?
17　　A　I wanted a different philosophy in
18　cataloging.
19　　Q　And that philosophy was to make the books and
20　works that the Library had more accessible to the 21st
21　century user?
22　　A　Right. And to begin thinking not just about

56

1　creating bibliographic records but finding ways to put
2　content onto the web so it would be easier for people
3　to get to the actual content, not just the surrogate
4　catalogue record.
5　　Q　By surrogate you mean what?
6　　A　Catalogue records have been created as
7　surrogates for the book, that you should be able to
8　read the bibliographic record and know a little bit
9　about the book. I wanted the full content of the book
10　on the web. So it was a change in philosophy.
11　　Q　The full content of the book on the web?
12　　A　Where possible, where copyright allows it.
13　　Q　Okay. Did Miss Mansfield at any point
14　explain to you why she didn't want to report to Mr.
15　Dizard?
16　　A　I think -- Well, the reasons she gave me were
17　he's too structured. He doesn't take people into
18　account enough. And she had had in an earlier
19　position, and I honestly don't know what position she
20　held when she was working with him, in one of the
21　cataloging positions she had held she had worked with
22　him in looking at the seamless process from books

57

1 coming into copyright, then coming into cataloging, and
2 she thought he was too structured and too management
3 oriented.
4    Q  Did she explain what she meant by management
5 oriented?
6    A  As opposed to people oriented.
7    Q  Okay. And did you react to Miss Mansfield's
8 comments?
9    A  Only by saying I thought that's exactly what
10 we needed, that there had been too many decisions by
11 exception, and I thought he would help us be more
12 businesslike.
13    Q  And did Miss Mansfield respond to that
14 comment?
15    A  She wanted assurance that she would not have
16 to report to him.
17    Q  What did you say?
18    A  That she was at that point going back to be
19 the division chief in Cataloging, and I said you will
20 be reporting to the director for Cataloging. So that
21 should not be a problem.
22    Q  Well, did there come a point in time when

58

1 Miss Mansfield became the assistant director for
2 Bibliographic Access?
3    A  Yes.
4    Q  And when was that, do you remember?
5    A  Well, I don't think my dates are very good.
6 After the realignment, so after September.
7    Q  Okay. Let me see if I can address that, if
8 you'd bear with me a minute. Okay. I'm going to hand
9 you what's been marked as Plaintiff's Exhibit Number 13
10 in a prior deposition and ask you to look at that if I
11 could.
12     Have you had a chance to look at Plaintiff's
13 Exhibit Number 13?
14    A  Yes.
15    Q  And you can see it's a two-page document
16 actually. Did you look at page 2?
17    A  Oh, I didn't look at page 2. I better look
18 at that. Okay. Yes.
19    Q  Am I right that Plaintiff's Exhibit Number 13
20 is your announcement of the assistant director
21 positions and the appointments for those positions, an
22 announcement made on August 6, 2004?

59

1    A  This wasn't the formal announcement. This
2 was in my electronic newsletter to the entire staff.
3 There was a formal announcement a little bit later but,
4 yes, this is when I told the staff what was happening
5 next.
6    Q  And what do you mean when you say there was a
7 formal announcement a little bit later?
8    A  There was -- Let's see. I can't remember if
9 this chart was attached to this newsletter or not, but
10 there would have been a press release in the way of a
11 formal announcement at some point. This is my informal
12 conversation with all of Library Services staff every
13 Friday.
14    Q  Do you see in the fifth paragraph down on
15 page 1 of Plaintiff's Exhibit Number 13, it says
16 "Attached is an organization chart showing the names of
17 the directors and assistant directors"?
18    A  I guess it probably was attached then, yes.
19    Q  So you believe the chart that's page 2 of
20 Plaintiff's Exhibit Number 13 is the chart referenced
21 on page 1 where it says an organizational chart showing
22 the names of the directors and assistant directors is

60

1 attached?
2    A  Yes.
3    Q  And basically what Plaintiff's Exhibit Number
4 13 is, this is the announcement to the entire staff of
5 Library Services that there are going to be these
6 assistant director positions and who they are?
7    A  Yes.
8    Q  Okay. If I could direct your attention to
9 the fourth paragraph of page 1 of Plaintiff's Exhibit
10 Number 13, it says here "The directors have made
11 decisions about assistant directors." Who did you mean
12 when you say the directors have made decisions about
13 assistant directors, who were you referring to?
14    A  To Beacher Wiggins, Carolyn Brown, I took one
15 of the directorates on an acting basis, Dianne
16 van der Reyden, and by that time Henry Rossman who had
17 replaced Sue Hayduchok.
18    Q  But the specific reference here where it says
19 "The directors have made decisions," do you mean Mr.
20 Wiggins, Miss Brown?
21    A  Beacher Wiggins and Carolyn Brown.
22    Q  Those two?

61

1    A  Those two.
2    Q  Just those two?
3    A  Yes.
4    Q  The others, Dianne van der Reyden and Henry
5    Rossman, weren't involved in the decision as to who the
6    assistant directors were going to be?
7    A  That's correct.
8    Q  Did Mr. Wiggins have any conversations with
9    you regarding the assistant director positions before
10   this announcement was made in August of 2004?
11   A  Yes.
12   Q  Okay.  Was this a series of discussions you
13   had with Mr. Wiggins or was it a single conversation?
14   A  A series of discussions.
15   Q  Can you separate out in your mind any of
16   those conversations and give me the content of a
17   particular conversation or does it pretty much run
18   together?
19   A  They were all pretty much the same.  He did
20   not agree with my decision that the assistant directors
21   would be serving in the collateral duty arrangement.
22   Q  Let me see if I understand what you're

62

1    saying.  You had a series of conversations with Mr.
2    Wiggins about the assistant director position before
3    the decision was made to have assistant directors, is
4    that true?
5    A  Yes.
6    Q  Okay.  And am I also correct that you can't
7    separate out in your mind today and say I had a
8    particular conversation and here's what happened, is
9    that true?
10   A  That's true.
11   Q  But you can recall the content of the
12   discussion you had with Mr. Wiggins regarding these
13   topics, is that right?
14   A  Yes.
15   Q  Can you tell me what you said to Mr. Wiggins
16   in these conversations and what he said to you?
17   A  Here are the threads of the conversation.
18   One, he wanted the assistant director to be a permanent
19   position.  He wanted to appoint Miss Mansfield to that
20   position.  He had decided he would be the acting
21   assistant director for Acquisitions because he thought
22   it would allow him to learn more about the part of the

63

1    job he didn't know so much about.  He had been in
2    Cataloging his entire career.  He really wanted Miss
3    Mansfield to continue I think as the director of
4    Cataloging.  I think that's pretty much it.
5    Q  That's what Mr. Wiggins said to you, those
6    things?
7    A  Yes.
8    Q  What did you say in response to Mr. Wiggins
9    saying that he wanted to appoint Judy Mansfield to the
10   position?
11   A  I thought that was fine.  I thought she would
12   do a good job.  I could understand his interest in
13   doing that.  I always cautioned him to look more
14   holistically at this new directorate.  I really wanted
15   to see a combination of Acquisitions and Cataloging.
16   When I arrived, one set of records was kept by
17   Acquisitions, and that very same information was
18   generated again by the catalogers, and the reason I
19   combined the two is to make greater use of all of the
20   data elements we had from the very beginning so that we
21   wouldn't spend so much time on cataloging.
22       I told Mr. Wiggins that my only concern about

64

1    the arrangement he was proposing is that it looked as
2    if he was trying to keep Cataloging and Acquisitions
3    separate.  So I wanted assurance that however he put
4    this together, that my goal of streamlining,
5    simplifying, making better use of the information we
6    had would be realized, and he assured me that that was
7    the case.
8    Q  Okay.  And did you agree with Mr. Wiggins
9    that it would be fine for him to serve as the assistant
10   director for Acquisitions?
11   A  I agreed to it.
12   Q  Okay.  Did you respond to Mr. Wiggins telling
13   you that he wanted the assistant director to be a
14   permanent position?
15   A  I told him I could not do that.
16   Q  Okay.  Did you explain why?
17   A  Two reasons:  I was not at all certain that
18   this was the right organizational structure.  I had
19   told the staff in other communications with them that
20   in the realignment we would try this new arrangement,
21   and we would see how it worked.  That my main goal was
22   to define new ways of doing the Library's work, and I

DEPOSITION OF DEANNA B. MARCUM
Case 1:05-cv-01790-RMC Document 25-16 CONDUCTED ON MONDAY, FEBRUARY 4, 2007 Filed 12/04/2007 Page 18 of 58

17 (Pages 65 to 68)

65

1  thought this was the organizational structure that
2  would allow us to achieve our goals; but if it wasn't,
3  we would make changes. I didn't want to set an
4  organizational structure in stone before I saw how it
5  was actually going to work because we had made
6  significant changes in the directorates.
7      My second reason was financial. The first
8  thing I learned within a month after I arrived in 2003,
9  I learned that I had no money other than personnel
10  money. It took an incredible amount of work to figure
11  out what money was actually available, and when I did
12  the analysis of the budget, I learned that Mr. Wiggins
13  had hired 64 catalogers during his acting tenure as
14  associate librarian for Library Services. He had hired
15  64 new catalogers without any increase in the budget.
16  So all of those positions had to be covered by the
17  existing budget.
18      He had also created new ladders for all of
19  the catalogers meaning that all of them instead of
20  being in the GS-9 to 12 series had an additional
21  potential of going to a GS-13. And virtually all of
22  the people, they had all been there for a long time,

66

1  they all qualified for this increase, and all of those
2  had to be covered with a flat budget.
3      When I had spoken with Dr. Billington and
4  General Scott about my plans to realign the
5  directorates, I had told them that I would do it
6  without adding new positions, that I would work within
7  the structure I had. So I was not willing to create
8  permanent positions for the assistant directors for two
9  reasons.
10      Q  Is this the part of the conversation you had
11  with Mr. Wiggins still?
12      A  Yes.
13      Q  Okay. Go ahead.
14      A  That's it.
15      Q  Oh, that was it?
16      A  Yes. I was just summarizing. Those were the
17  two reasons.
18      Q  I thought you had slipped into what you told
19  the librarian and deputy librarian, that's why I sort
20  of interjected there.
21      A  No. I told them that I would not add
22  positions, that I would not create new positions, that

67

1  I would work with the number of staff we had.
2      Q  Okay. To see if I've got a grip on what
3  you've told me, when you spoke to Mr. Wiggins about his
4  desire to have assistant director as a permanent
5  position, you told him that you weren't certain about
6  the organizational structure, and you were concerned
7  about the finances?
8      A  Correct.
9      Q  Okay. What did Mr. Wiggins say in response
10  to those reasons?
11      A  He was looking at the cost from it's not that
12  much from the GS-15 position Miss Mansfield now holds
13  to a senior level position. He saw it as a small
14  increment. I saw it as simply one of many things that
15  had happened in Library Services to increase the
16  overall personnel budget over time, and I did not want
17  to continue that pattern until I had a much better
18  grasp of the budget.
19      Q  Did you talk numbers with Mr. Wiggins about
20  the cost of making Miss Mansfield a senior level
21  employee?
22      A  No.

68

1      Q  What did you --
2      A  He simply said it wouldn't cost that much.
3  It's not that much. We talked in those terms.
4      Q  Just focusing on making Judy Mansfield an SL,
5  this time frame where you're having discussions about
6  the assistant director, in your view how much would it
7  cost just that position?
8      A  It would have been probably $3,000 or so a
9  year in our annual salary, but being in a senior level
10  position also puts the employee in an -- Let's save
11  we call it. There is a Performance Review Board that
12  evaluates the bonuses for the senior level people. So
13  it could have been based on her performance a good bit
14  more per year.
15      Q  Meaning in the order of magnitude of $5,000
16  to $10,000?
17      A  Probably.
18      Q  So the total cost of making Miss Mansfield an
19  SL employee in this time frame would have been $3,000
20  or thereabouts in salary plus you believe something in
21  the order of magnitude of $5,000 to $10,000 in
22  additional bonus money?

69

1    A  Yes, that's correct.
2    Q  So the order of magnitude for making her an
3  SL would have been about $8,000 to $13,000 per year?
4    A  Something like that.
5    Q  Okay.
6    A  But the other issue that we had to face is
7  that I am not allowed to make somebody a senior level.
8  If we were going to have a senior level position, that
9  would have to be created and posted and people would
10  have to apply for it.  You can't just move somebody
11  from a 15 to a senior level.
12    Q  I understand that.  I was just trying to
13  pinpoint the cost.  You think in this time frame the
14  cost of making Judy Mansfield an SL would have been
15  around $8,000 maybe to as much as $13,000 per year, is
16  that right?
17    A  Yes.
18    Q  All right.  Did you have any discussion with
19  Miss Mansfield at any point concerning her possibility
20  of becoming an SL employee?
21    A  No.
22    Q  Did you discuss with Mr. Dizard the

70

1  possibility of making Judy Mansfield an SL employee at
2  any point?
3    A  No.
4    Q  Did you discuss with Mr. Scott the
5  possibility of making Judy Mansfield an SL employee at
6  any point?
7    A  No.
8    Q  Did you discuss with the librarian, is it
9  Dr. Billingham?
10    A  Dr. Billington.
11    Q  Billington.  I should know that.  Did you
12  ever discuss with Dr. Billington the possibility of
13  making Judy Mansfield an SL employee?
14    A  No.
15    Q  Did you ever discuss with is it Teresa Smith,
16  the HR director?  Was she the HR director in this time
17  period?
18    A  Yes.
19    Q  Did you ever discuss with Teresa Smith the
20  prospect of making Judy Mansfield an SL employee?
21    A  Yes.
22    Q  And when did you have that discussion?

71

1    A  I don't know the date.  It was probably in
2  the fall of 2003.
3    Q  Was it a single discussion you're thinking of
4  or was it a series of discussions?
5    A  I had one discussion with her about it, Miss
6  Smith.
7    Q  Okay.  And how long did that discussion last?
8    A  30 minutes.
9    Q  And can you be more specific as to when in
10  time it was you had this discussion with Miss Smith?
11    A  I'm guessing it was late October, early
12  November of 2003, but that is only a guess.  Mr.
13  Wiggins had --
14    Q  Well, I was just trying to pinpoint a time
15  frame.
16    A  Okay.  All right.
17    Q  Is there some way you can think of that you
18  can pinpoint it more specifically?
19    A  I could go back to my records in my office.
20    Q  What records would you have that would help
21  pinpoint when it was that you spoke to Miss Smith about
22  Miss Mansfield becoming an SL?

72

1    A  I spoke about three of the Cataloging
2  Division chiefs.  It was not just Miss Mansfield.
3    Q  Okay.  What records would you have that would
4  help you pinpoint that, the timing?
5    A  Mr. Wiggins had submitted a proposal to Human
6  Resources for upgrading three positions to senior
7  level.  Those had been submitted before I arrived.  I
8  did not know that they had been submitted.  I learned
9  this subsequently.  Miss Smith called me to ask if we
10  could discuss the proposal for an upgrade to senior
11  level for the cataloging chiefs, and I went to meet
12  with her at her request, and then she sent a memo to
13  Mr. Wiggins saying we had discussed this.  I had
14  decided not to proceed with the proposal to upgrade
15  these positions, and she was sending the paperwork that
16  had been submitted back to Cataloging.  I could find
17  that memo that she sent, and so I could pinpoint the
18  date that way.
19    Q  I think I have it.  Let me see if I can put
20  my hands on it if you don't mind.
21    A  Okay.
22    Q  I'm going to hand you what's been marked as

73

1 Plaintiff's Exhibit Number 6, and I'll ask you to
2 examine it. Have you had a chance to look at
3 Plaintiff's Exhibit Number 6?
4    A Yes.
5    Q Plaintiff's Exhibit Number 6 is a memo from
6 Teresa Smith, the director of Human Resources, to
7 Beacher Wiggins who was then acting deputy associate
8 librarian for Library Services dated April 8th, 2004,
9 is that right?
10    A Yes.
11    Q Have you seen Plaintiff's Exhibit Number 6
12 before?
13    A I don't know if I've seen this. She sent me
14 a copy of something like this, but I'm not sure I've
15 seen this one.
16    Q Okay. Well, having had a chance to look at
17 Plaintiff's Exhibit Number 6, it says "Based on a
18 recent conversation with Deanna Marcum, the decision
19 was made that GS-14 and GS-15 division chief and
20 assistant chief positions will not be upgraded, and no
21 further action will be taken at this time. We are
22 returning the position descriptions to you for your

74

1 records."
2    A Yes.
3    Q That sounds like the memo that you described
4 earlier that would help you pinpoint when in time this
5 conversation with Miss Smith occurred?
6    A Yes.
7    Q Does it?
8    A Yes.
9    Q When did you have your conversation with Miss
10 Smith concerning the possibility of upgrading the
11 division chief positions in the Cataloging Division?
12    A Well, it must have been in late winter or
13 early spring 2004.
14    Q The memo is dated April 8th. I wouldn't
15 think that would be winter.
16    A It could have been February, March.
17    Q It says here "Based on a recent conversation
18 with Deanna Marcum."
19    A I don't know when I had the conversation. I
20 don't know the date. I know this came within a few
21 weeks after that conversation.
22    Q And you believe you have a memo that Miss

75

1 Smith sent to you that reflects the same information?
2    A Yes.
3    MR. FREDRICKSON: I don't believe I've seen
4 that. I don't know if you know if you've produced
5 that, but I would like to have a copy of that document.
6 Is there any chance we could see it before we finish
7 today? It might help us pinpoint the date.
8    MS. DOUDS: I can try.
9    THE WITNESS: I can call my office and tell
10 them where to look for it.
11    MR. FREDRICKSON: That would be great. I'd
12 appreciate that.
13 BY MR. FREDRICKSON:
14    Q I think we've got a rough sense of when the
15 meeting took place with you and Miss Smith. You're
16 saying late winter, early spring 2004, is that right?
17    A Yes.
18    Q And what do you remember Miss Smith saying to
19 you in that meeting?
20    A She wanted to make sure I knew about these
21 requests because they had come directly to her and
22 hadn't come through my office. They had gone to her

76

1 before I was there, and she just wanted to make sure I
2 knew about them.
3    We talked about her concern that a lot of new
4 senior level positions were being created, and she
5 wondered if we ought to have some kind of review
6 process so that people from other parts of the Library
7 were involved in making decisions about senior level
8 people. So that was a good part of the discussion, how
9 we should proceed with this sort of request.
10    I told her that I didn't want to make any
11 decisions about senior level positions in any part of
12 Library Services until I better understood the kind of
13 organizational structure we were going to need and then
14 take a look at what was required and what sort of
15 person needed to be in that position. So I asked her
16 to make no decision on these particular requests.
17    Q Did you know in the spring of 2004 that the
18 Library had engaged a classification specialist to
19 examine the Cataloging Division chief positions the
20 prior year, that is 2003?
21    A I learned that in the process of this
22 discussion.

77

1    Q   Miss Smith told you that?
2    A   Yes.
3    Q   So am I right that Miss Smith told you that
4 the Library had engaged a classifier to examine the
5 division chief positions back in the spring of 2003 --
6    A   Correct.
7    Q   -- to determine whether or not they were
8 properly classified?
9    A   Yes.
10   Q   And did Miss Smith tell you that three of the
11 division chief positions within the Cataloging
12 Directorate should be classified at the SL level?
13   **A   She told me that this had happened.  She**
14 **showed me the work that had been done.  And she also**
15 **told me that there had been enormous pressure on this**
16 **person from the cataloging directorate and from Mr.**
17 **Wiggins to bring everyone up to the senior level, and**
18 **that she was not quite certain how to deal with this**
19 **any longer, that it was a kind of constant refrain and**
20 **wondered how I felt about it.**
21   Q   I'm not sure that you quite answered my
22 question because I wanted to know whether or not Miss

78

1 Smith told you in this conversation that the classifier
2 the Library had hired determined that three of the
3 division chief positions should be rated at the SL.
4 Did you learn that in that meeting?
5    A   Yes, I did.
6    Q   Okay.  And one of the positions that the
7 classifier thought ought to be rated an SL level was
8 the position formerly held by Judy Mansfield, is that
9 right?
10   **A   That's correct.**
11   Q   The chief of the Arts and Sciences Cataloging
12 Division, is that right?
13   **A   Correct.**
14   Q   Do you recall the other division chief
15 positions that the classifier determined should be
16 classified at the SL level?
17   **A   One was a vacant division chief position.**
18   Q   What was that chief position?
19   **A   It was the Social Sciences Division.  And the**
20 **other was Jeffrey Heynen's position, and I'm not sure**
21 **what that division was called at the time.  I just**
22 **don't remember.**

79

1    Q   Do you know the content of the division's
2 work, the division that Mr. Heynen headed up?
3    **A   Yes.  I think it was History, and they had**
4 **divided the cataloging responsibilities by subject**
5 **area, and it was one of the subject areas in**
6 **Cataloging.**
7    Q   Did you review the report prepared by the
8 classifier that the Library hired to do the
9 classification review?
10   **A   I scanned it in Miss Smith's office.**
11   Q   So the classifier's report prepared at the
12 Library's request had never been shown to you before
13 the meeting you had with Miss Smith in late winter,
14 early spring 2004, is that right?
15   **A   It's conceivable that -- I think Beacher**
16 **had -- Mr. Wiggins, excuse me -- had talked about this**
17 **with me, but I had not seen the report until that time.**
18   Q   Until the meeting with Miss Smith?
19   **A   That's correct.  I believe that's the case.**
20   Q   Okay.  You say you scanned.  What do you mean
21 by that?  You read it or you read it quickly?
22   **A   I read it quickly.**

80

1    Q   So you did read the classifier's report at
2 the meeting with Miss Smith?
3    **A   Yes.**
4    Q   Did you say anything to Miss Smith about the
5 classifier's report?
6    **A   No.**
7    Q   Did Miss Smith say anything to you about the
8 classifier's report in the meeting?
9    **A   Only what I told you before, that she was**
10 **feeling very uncomfortable about these constant**
11 **requests coming from Cataloging, and she wasn't quite**
12 **sure how to address them.**
13   Q   And who were the requests coming from, did
14 she explain?
15   **A   She told me that Mr. Wiggins was bringing**
16 **these requests to her directly but that some of the**
17 **chiefs were also calling and urging that this be done.**
18   Q   Did she mention any names?
19   **A   No.**
20   Q   So you didn't know who was exerting pressure
21 on Miss Smith other than Mr. Wiggins, is that accurate?
22   **A   That's correct.**

81

1    Q   Okay.  Am I right that you told Miss Smith
2  that regardless of what the classifier found, that the
3  positions would not be upgraded to SL at this point in
4  time?
5    A   I told her that -- I didn't really put it in
6  **the context of what the classifier found.  I said I'm**
7  **just not ready to make decisions about the level of**
8  **these positions until we have a much better**
9  **understanding of what the divisions are going to be**
10 **doing.**
11   Q   Okay.  And by the positions, you mean the
12 division chief positions?
13   A   Correct.
14   Q   Okay.  At the point in time where you had
15 this meeting with Miss Smith and you read the
16 classifier's report, did you remove any of the duties
17 of the division chiefs?
18   A   When I met with Mr. Wiggins the next time, I
19 **told him what I had said to Miss Smith, and I said As a**
20 **manager it's your responsibility to make sure that**
21 **you're not asking people to do things above their grade**
22 **level.  And since I'm not going to make a decision on**

82

1  **this right away, you need to analyze what people are**
2  **actually doing, but that's as far as it went.**
3    Q   So when you met with Mr. Wiggins, you didn't
4  direct him to remove duties from any of the division
5  chiefs, am I right about that?
6    A   That's correct.  I asked him to look at them
7  **and make proper decisions.**
8    Q   In other words, you left it to Mr. Wiggins to
9  do what he felt was appropriate in light of what you
10 had learned in your meeting with Miss Smith, is that
11 right?
12   A   Correct.
13   Q   Okay.  Do you know whether or not any duties
14 were removed from any of the division chiefs that the
15 classifier found should be classified at the SL level?
16   A   I don't know.
17   Q   Okay.  At the point in time that you had this
18 meeting with Miss Smith in late winter or early spring
19 of 2004 concerning the classifier's report, was Miss
20 Mansfield serving as the acting director for Cataloging
21 at that point in time?
22   A   Yes.

83

1    Q   Did Mr. Heynen have any duties other than his
2  division chief duties at that point in time?
3    A   **Do you mean in terms of the formal**
4  **organization?**
5    Q   Well, I mean like Miss Mansfield was the
6  acting director for Cataloging and the division chief
7  for the Arts and Sciences Cataloging Division.  So my
8  question is did Mr. Heynen have any comparable duties
9  like Miss Mansfield was actually performing in the
10 spring of 2004 over and above his division chief
11 duties?
12   A   No.
13   Q   He did not?
14   A   No.
15   Q   Do you know if Mr. Heynen ever served as the
16 acting director for Cataloging?
17   A   I don't know.
18   Q   You don't know one way or the other?
19   A   I don't know at all.
20   Q   Okay.  Am I right that Mr. Heynen had never
21 served as the acting director for Cataloging during any
22 time that you've been the associate librarian for

84

1  Library Services?
2    A   That's true.
3    Q   I'm going to hand you what's been marked as
4  Plaintiff's Exhibit Number 2, and ask you to examine
5  it.  Have you had a chance to read Plaintiff's Exhibit
6  Number 2?
7    A   Yes.
8    Q   Is Plaintiff's Exhibit Number 2 a copy of the
9  classifier's report that we've been discussing that you
10 read quickly at your meeting with Miss Smith?
11   A   **I only saw a summary of this report.  I did**
12 **not see this document.**
13   Q   Okay.  Let me ask you about some of the
14 information here.  Did you learn in your meeting with
15 Miss Smith that the classifier was recommending the
16 upgrading of the division chief positions for, I'm
17 looking at the last page of Plaintiff's Exhibit Number
18 2, the division chief positions for Social Sciences,
19 History and Literature, Arts and Sciences, and Special
20 Materials Cataloging Divisions?
21   A   Yes.
22   Q   Do you remember who held the Social Sciences

85

1  Cataloging Division chief position at the time in the
2  spring of 2004?
3      A  That was vacant I believe at that time.
4      Q  Okay.  And who held the division chief
5  position for the History and Literature Cataloging
6  Division?
7      A  That was Jeff Heynen.
8      Q  And the Arts and Sciences Cataloging Division
9  chief was held by Miss Mansfield, is that right?
10     A  Yes.
11     Q  And then who held the Special Materials
12 Cataloging Division chief position?
13     A  Susan Vita.
14     Q  Now, there were two other divisions that the
15 classifier did not recommend elevation to the senior
16 level, is that right?
17     A  Yes.
18     Q  The Cataloging in Publication and the Decimal
19 Classification Division chief positions, right?
20     A  Correct.
21     Q  Who held the Cataloging in Publication chief
22 position at that time?

86

1      A  John Celli.
2      Q  And who held the division chief position for
3  the Decimal Classification Division?
4      A  His first name is Dennis but I don't remember
5  this last name.
6      Q  Smith?  Dennis Smith maybe or David Smith?
7      A  I don't remember his last name.  I'm sorry.
8      Q  By the spring of 2004 were you familiar with
9  what the division chiefs did within the Cataloging
10 Division?
11     A  At a broad level, not at a specific level.
12     Q  Would Mr. Wiggins be more familiar with what
13 the Cataloging Division chiefs did on a day-to-day
14 basis than you would?
15     A  Yes.
16     Q  By virtue of his experience as being the
17 director for Cataloging?
18     A  Yes.
19     Q  Did you know how long that Mr. Wiggins had
20 served as the director for Cataloging before Miss
21 Mansfield became the acting director for Cataloging?
22     A  It was quite a while.  I don't know how long.

87

1      Q  Okay.  Do you believe you saw a different
2  document than what you see here as Plaintiff's Exhibit
3  Number 2 that summarized the classifier's findings?
4      A  I believe I saw only the findings and
5  conclusions.
6      Q  In a separate document?
7      A  I don't know in what form it was given to me.
8  I don't know.
9      Q  Okay.  I'll take that out of your way if I
10 could please.  Thank you.  Bear with me a minute if you
11 would please.
12         When was it that you met with Mr. Wiggins
13 after your meeting with Miss Smith concerning the
14 classifier's audit?
15     A  I don't know specifically.  I meet with Mr.
16 Wiggins every Tuesday morning at 8:45.  So it was a
17 Tuesday morning at 8:45 soon thereafter, but I don't
18 know what the date was.
19     Q  Okay.  So in the spring of 2004 you were
20 meeting with Mr. Wiggins weekly?
21     A  Yes.
22     Q  And at one of those meetings you had this

88

1  discussion regarding your meeting with Miss Smith
2  concerning the classification specialist's review, is
3  that right?
4      A  Correct.
5      Q  I think you told me a little bit about that
6  conversation, but do you recall any more about your
7  conversation with Mr. Wiggins concerning the
8  classification review?
9      A  I don't think there was anything more that I
10 discussed with him about that.
11     Q  What I jotted down, and if I've captured this
12 correctly, I think what you told Mr. Wiggins was as a
13 manager make sure they are not doing things above their
14 grade level, something to that effect.  Is that about
15 right?  Is that an accurate reflection of what you told
16 Mr. Wiggins?
17     A  Yes.
18     Q  Why did you tell him that?
19     A  He was making the case that we had people
20 doing senior level work and they needed to be
21 recognized for that, and I had gone through my reasons
22 for not wanting to make those decisions about senior

89

1　level right at that time. And I said If you're
2　concerned about people doing more than they should be
3　doing, then you as a manager need to make sure you're
4　not asking them to do that.
5　　Q But why? Why would you tell him? Did you
6　think it was unfair? Did you think it was unlawful?
7　Did you think it violated some library reg? What made
8　you tell him that?
9　　A I thought he was focusing on the wrong thing.
10　I thought he was working hard to have individuals
11　upgraded, and I wanted to look at the organization much
12　more holistically, and I wanted to take a step back and
13　look at all of the needs, and I didn't want to deal
14　with one person at a time. So the only advice I knew
15　for him is if you think you're asking people to do
16　things that are not reasonable given their position
17　description, then make sure you have that straightened
18　out. That's your job as a manager.
19　　Q Okay. Did you think it was unfair to have
20　the division chiefs do duties that were essentially
21　senior level if they were paid as GS employees?
22　　A What I thought was unfair is that the library

90

1　in my opinion had distorted the system by dealing with
2　one individual at a time, and I didn't want to do that
3　any longer.
4　　Q I understand that, but that doesn't answer my
5　question I don't think really. What I wanted to know
6　is did you in the spring of 2004 when you were having
7　these conversations with Mr. Wiggins, did you think it
8　was unfair to have GS level division chiefs performing
9　senior level work? Did you think it was unfair?
10　　A I didn't think that was happening.
11　　Q Okay. And why not?
12　　A The decisions that were being made in the
13　Cataloging Divisions were much more structured. There
14　were many fewer opportunities for broad policy making.
15　There were almost no opportunities for redoing of their
16　work. They really were following very set procedures,
17　and I didn't see that as a senior level activity.
18　　Q Do you have any training in classification
19　reviews or anything like that?
20　　A No. Well, I've been -- Not in classification
21　reviews. I've been involved in job analysis in
22　determining levels for positions as they were being

91

1　created, and I've had training for that.
2　　Q Would you describe that training for me
3　please.
4　　A When I first came to the Library I had job
5　analysis training.
6　　Q That's in 1993 I believe?
7　　A I had another kind of training then for job
8　analysis, but when I returned to the Library in 2003
9　　Q Okay. So when you got back and you came as
10　associate librarian you took training?
11　　A Yes, because the personnel system had
12　changed.
13　　Q And that was a training course in job
14　analysis?
15　　A I had one of the job analysis consultants
16　come to meet with me and go through all of the
17　procedures.
18　　Q And who was that?
19　　A It was a consultant. I can find the name
20　back at the office. It was a consultant to Human
21　Resources in job analysis.
22　　Q Someone that worked for the Library of

92

1　Congress?
2　　A On contract.
3　　Q Okay. You don't remember the individual's
4　name?
5　　A No, but I can find it.
6　　Q Okay. And did you have a single meeting with
7　this individual?
8　　A It was probably an hour and a half, two
9　hours.
10　　Q Okay. Am I right that you didn't take a
11　formal course in job analysis then?
12　　A No, I didn't.
13　　Q Okay. What you did do was meet with a
14　consultant hired by the Library to inform you about job
15　analysis, job content, that kind of thing, am I right?
16　　A Yes.
17　　Q Did you get any materials from the consultant
18　that helped inform you as to how you analyze the
19　content of a job to determine grade level or anything
20　like that?
21　　A No. She told me how they did that when they
22　were looking at positions.

93

1    Q   Okay.  Beyond this one-and-a-half hour to
2  two-hour meeting that you had with the job analysis
3  consultant, did you get any other training in the area
4  of job classification or job classification audits or
5  anything like that?
6    A   No.
7    Q   Did you have any training in classification
8  work when you worked in your first tenure with the
9  Library?
10    A   Yes.  There was a class I attended when I
11  first came to the Library in '93 on job analysis, and
12  that was a Human Resources course for new managers.
13    Q   Would that course work be reflected in your
14  personnel file?
15    A   I don't know.
16    Q   Did you get any sort of certificate or
17  anything of that sort?
18    A   Not that I remember, but I don't know.
19    Q   Do you remember how long that course was?
20    A   It was a morning.
21    Q   Did you have any other training that would
22  inform you as to how to go about doing a job

94

1  classification analysis or anything like that other
2  than what you've already described?
3    A   When I worked in universities we were trained
4  to do that sort of work.  I was the affirmative action
5  officer at the University of Kentucky early in my
6  career, and we had several courses for the affirmative
7  action officers within the university looking at job
8  equity and job classification.
9    Q   Okay.
10    A   Most of the training I had at the Association
11  of Research Libraries was from the National Training
12  Labs in California on organizational development and
13  job restructuring.  It wasn't classification per se but
14  looking at the content of jobs in order to achieve
15  certain work.
16    Q   Okay.  Any other training?
17    A   I'm trying to think.  I don't think there was
18  any at Vanderbilt.  I don't remember any.  At Catholic
19  University when I was the dean, we had courses for the
20  deans in all of the pieces of affirmative action, and
21  it included some job analysis kinds of activities, but
22  that was pretty broad.  That was at the dean's level,

95

1  and just to make sure that we were doing everything we
2  could to bring a diverse pool of candidates to the
3  university.
4    Q   Okay.  Any other training that relates to job
5  classification?
6    A   I don't think so.
7    Q   All right.  I want to go back to your meeting
8  with Mr. Wiggins in that time frame when you told him
9  that these division chiefs should not be doing work
10  above their grade level, okay, in that time frame.
11      Did you think that it would violate any
12  Library of Congress regulation to have division chiefs
13  do work above the grade level as determined by the
14  classification specialist?
15    A   Well, that's an interesting question.  I
16  didn't think of it in those terms.  I didn't put it in
17  those terms ever in my own mind.
18    Q   So that thought never crossed your mind?
19    A   No.  Really I was dealing with Mr. Wiggins'
20  constant request to upgrade a position.  And my advice
21  to him was if you think this is not the right thing,
22  then do something else.

96

1    Q   Okay.  And when you said that to him, do
2  something else if you don't think it's the right thing,
3  here's my question very specifically, did you have in
4  mind there's a Library of Congress regulation that
5  prohibits that?  Was there anything like that going on
6  in your mind at that point in time?
7    A   I don't think that was in my mind.
8    Q   In the meeting you had with Miss Smith, did
9  she point out that it might not be consistent with
10  regulations of the Library of Congress to have division
11  chiefs do work that was above their grade level?  Did
12  she say anything like that?
13    A   No.
14    Q   Did Miss Smith tell you that it might be
15  illegal to have division chiefs do work above grade
16  level?
17    A   No.
18    Q   Did the thought occur to you when you had
19  your meeting with Mr. Wiggins where you were saying
20  don't have them do work above grade level if you think
21  it's not right, did you think that there was any law
22  that would be violated by having those division chiefs

97

1 do work above grade level?
2    A  The average age of managers in Library
3 Services is 58. Almost everyone who's been at the
4 Library in Library Services has been there for a very
5 long time. The people who really like their jobs, and
6 there are many, many, many of those people, all do far
7 more than they are required to do. So I didn't think
8 about it in any particular way other than that quite
9 frankly.
10    Q  Okay. So when you told Mr. Wiggins don't
11 have them do work above grade level, you weren't
12 thinking of any possible violation of law. That was
13 just not a thought that occurred to you. Am I right
14 about that?
15    A  That's correct.
16    Q  Okay. What did Mr. Wiggins say when you
17 basically told him that if he didn't think it was
18 right, don't have them do work above grade level?
19    A  I don't think he -- I don't remember any
20 comment he made about that. He made it very clear he
21 didn't agree with the decision I had made.
22    Q  Not to upgrade the positions?

98

1    A  Yes.
2    Q  Okay. Bear with me a minute if you would
3 please. I'm going to come back to a document that we
4 saw earlier, and that's Plaintiff's Exhibit Number 2.
5 I want to direct your particular attention to the final
6 page where it has the classification consultant's
7 signature and name. Do you have that page in front of
8 you?
9    A  Yes.
10    Q  Do you see where it says there 4/23/03?
11    A  Yes.
12    Q  Did Miss Smith make you aware that that
13 classification review had been completed in April of
14 2003 when you met with her in the late winter or early
15 spring of 2004?
16    A  All I remember is that she said it had been
17 done before I came.
18    Q  So sometime at least before August of 2003?
19    A  Yes.
20    Q  And that's a fact that you knew when you met
21 with Miss Smith in the late winter or early spring of
22 2004?

99

1    A  Yes.
2    Q  Did you ask Miss Smith why she hadn't
3 provided you with the classification review report
4 before the late winter of 2004 or early spring of 2004?
5    A  I knew the reason. There had been a lot of
6 discussion in the Executive Committee meetings about
7 how we would review requests for senior level
8 positions. So I knew it had been an issue within the
9 Library.
10    Q  I guess my question was though did you ask
11 Miss Smith why she had not brought the classification
12 review report to your attention before the late winter
13 or early spring of 2004? Did you ask her in that
14 meeting that?
15    A  No, I didn't ask.
16    Q  Why not?
17    A  Because I knew this was a subject of much
18 broader discussion in the Library. In our Executive
19 Committee meetings I had heard these discussions. So I
20 knew decisions were in abeyance.
21    Q  When you say the Executive Committee, who do
22 you mean?

100

1    A  Dr. Billington, General Scott, Dan Mulholland
2 who is the director of the Congressional Research
3 Service, Mary Beth Peters who is the register of
4 Copyright, Joanne Jenkins who was then chief of staff,
5 and Laura Campbell, the Office of Strategic
6 Initiatives, and me.
7    Q  Office of Strategic Initiatives?
8    A  Yes.
9    Q  Did you have a regular meeting of the
10 Executive Committee?
11    A  We met twice a month.
12    Q  Was there a discussion at any of these
13 Executive Committee meetings that you had twice a month
14 of the classification report prepared and submitted by
15 Mr. Krigbaum?
16    A  No. Purely a policy level body, and we
17 didn't discuss specifics like this in any of those
18 meetings.
19    Q  I must have missed it, but what did you say
20 you discussed at the Executive Committee level that
21 pertained to the classification issues that we've been
22 discussing here this morning?

101

1    A  Miss Smith had come to one of the Executive
2  Committee meetings to say that she was getting a lot of
3  requests for upgrades to senior level. She wasn't sure
4  how comparable these things were because they were
5  coming from all of the service units, and she was going
6  to work with us in finding some mechanism for a broader
7  review of the creation of senior level positions.
8    Q  And what was the reaction of the Executive
9  Committee, those on the Executive Committee, regarding
10  her suggestion that we look for a broader means of
11  reviewing the grade levels?
12    A  Like everything in the Executive Committee,
13  there is a lot of difference of -- Well, almost
14  everyone thought that was a good idea, that there
15  wasn't comparability in the Library, but all of the
16  service units were a little bit skeptical of their
17  colleagues analyzing their own positions.
18    Q  What does that mean? Tell me more
19  specifically what you mean by that, the last comment,
20  that the service units chiefs, did you say, were
21  skeptical of --
22    A  The service units, my counterparts, the head

102

1  of CRS, the head of Copyright, the head of Library
2  Services, and so on. The head of CRS wants to make
3  decisions for himself about CRS is probably the best
4  example. I think we all recognize there's a problem.
5  How that should be solved, there was a lot of
6  difference of opinion about how that might be done.
7  Ultimately Miss Smith recommended that there be a
8  senior level review board that would draw from all
9  parts of the Library in looking at senior level
10  positions.
11    Q  Was there a board created like that, a senior
12  level review board?
13    A  No. Congressional Research Service objected
14  strongly to that recommendation.
15    Q  Since you've been the associate librarian for
16  Library Services, has the library undertaken any
17  comprehensive classification review?
18    A  No, not to my knowledge.
19    Q  And certainly no broad classification review
20  within Library Services, is that right?
21    A  That's correct. They had gone through a lot
22  of that work before I came when the Avue system was

103

1  installed.
2    Q  What does that mean, Avue system?
3    A  It is a commercial database for personnel
4  management.
5    Q  Is that an acronym, Avue?
6    A  No. I think it's just the name of the
7  product.
8    Q  How do you spell that?
9    A  A-v-u-e.
10    Q  A-v-u-e. That's like a commercial product, a
11  personal management product of some sort?
12    A  All the positions have to be analyzed before
13  they are posted. There is a panel of people with
14  experts who look at the position. They make certain
15  that the requirements are as they should be. And then
16  they identify the knowledge, skills, and abilities that
17  are required to do the various parts of the job.
18    Q  Who's "they"?
19    A  The panel reviewing the job. There is a
20  panel for each position that comes open. The system
21  has all of this information in digital form, and
22  applicants for the position are allowed to apply online

104

1  and give all their information in this online system.
2  And then there is some sort of matching algorithm that
3  looks at the candidate's knowledge, skills, and
4  abilities as recorded in the position application with
5  the requirements, and the computer actually produces a
6  list of people who are eligible for a job.
7    Q  How many senior level employees did you have
8  within Library Services when you started in August of
9  2003?
10    A  I don't know the number. I could calculate
11  it, but I don't know the number.
12    Q  Do you know approximately how many senior
13  level employees you had in August of 2003 within
14  Library Services?
15    A  Let's see. The directors were senior level.
16  I'm senior level. The deputy is senior level. There
17  were three senior level positions in Cataloging. I
18  believe there was only one senior level position in
19  Acquisitions. I believe that's correct. It's in
20  Special Collections that there are the most. These are
21  the curators who have advanced academic degrees and
22  subject specialties in addition to their Library

---

**105**

1 training. There are probably 20 or so, that's a guess,
2 but I think there are probably that.
3 Q In Special Collections?
4 A In Area Studies, Special Collections, and the
5 General Collections. There's a Center for the Book,
6 senior level person.
7 Q Center for the Book?
8 A Center for the Book. There is a senior level
9 publishing officer. I think that's the number. There
10 were no other senior level positions in Preservation.
11 There were no other senior level positions in the
12 Automation area. So most of the senior level positions
13 are concentrated in the curatorial divisions.
14 Q Meaning they take care or of the books and
15 the records?
16 A They take care of building the collections
17 which is an important distinction.
18 Q Okay. That was a bad question on my part. I
19 assumed I knew something, and obviously I don't. So
20 let me try that one again.
21 What did you mean when you said the
22 curatorial positions?

**106**

1 A These are the people who have deep knowledge
2 in a subject area, and they are responsible for
3 building the collections for future generations in
4 those subject areas or language areas. These are the
5 people who work with scholars in those fields, who
6 develop symposia and publications and exhibits. So
7 they both build the collections and they find the best
8 ways for making the content of those collections more
9 readily available to a broad public.
10 Q Okay. Let me just try to get a better sense
11 of how many SL positions there were in Library Services
12 in August of 2003 by reference to the testimony you
13 just gave. My count would be the directors, there were
14 seven?
15 A Seven of those.
16 Q But Miss Mansfield was not a senior level
17 employee?
18 A She was acting senior level at various times,
19 you know, what the law allowed, those 120-day periods.
20 Q But what I was trying to do is get the count
21 of the number of senior level employees. So I wouldn't
22 count Miss Mansfield because she wasn't a senior level

**107**

1 employee, was she?
2 A No.
3 Q Okay. So there were six directors?
4 A Yes.
5 Q One deputy?
6 A Yes.
7 Q Your position?
8 A Yes.
9 Q That's eight. Okay. You said there were
10 three SL positions in the Cataloging Division?
11 A The Special Materials Cataloging Division
12 chief was senior level. The regional cataloging, the
13 person who took care of international cataloging, John
14 Byrum. Barbara Tillett in the Policy and Support
15 Office.
16 Q So that's three senior level in Cataloging?
17 A That's correct.
18 Q Okay. You said there was one senior level in
19 Acquisitions. Who was that?
20 A Actually that's a double count because she
21 was the director, Nancy Davenport. So I don't believe
22 there are any other senior level positions in

**108**

1 Acquisitions. There weren't at the time.
2 Q Okay. Then you said there was a single SL
3 Center for the Book, right?
4 A Uh-huh.
5 Q You have to say yes or no if you would
6 please.
7 A Yes.
8 Q A single senior level publications officer
9 was it?
10 A Director of the Publishing Office.
11 Q Okay. And about 20 senior levels within the
12 Special Collections, General Collections, and Area
13 Studies. Is that about right?
14 A That's approximately right.
15 Q So you had about 34 senior level employees
16 within Library Services when you started in August of
17 2003. Does that seem right to you?
18 A That's about right, yes.
19 Q And has that number changed over time from
20 2003 to the present?
21 A I have added no senior level positions.
22 There have been a few retirements we have not filled.

DEPOSITION OF DEANNA B. MARCUM
Case 1:05-cv-01790-RMU   Document 25-16   MONDAY, FEBRUARY 12, 2007   Filed 12/04/2007   Page 29 of 58

28 (Pages 109 to 112)

109

1  So there are fewer now than there were.
2      Q  Okay.  And how many senior level employees
3  have retired within Library Services since you came on
4  board?
5      A  This is where I need my records.  I don't
6  know.  Let me try to think about that.  John Byrum has
7  retired.  Susan Vita has been transferred to the Music
8  Division chief.
9      Q  Is that outside Library Services?
10     A  It's in Library Services, but it's outside
11  the cataloging area.
12     Q  So Miss Vita is still with the Library of
13  Congress in Library Services, and she's still SL?
14     A  Yes.
15     Q  Okay.
16     A  John Newsom who was the head of the Music
17  Division and senior level person has retired.  I'm
18  trying to go through the list and think about other
19  people who have retired.  The head of the European
20  Division has moved out of Library Services into another
21  area of the Library.
22     Q  Who's that?

110

1      A  John Vanoudenaren.  I'll have to spell that
2  for you.  V-a-n-o-u-d-e-n-a-r-e-n.
3      Q  So he's still with the Library, no longer
4  with the Library Services?
5      A  That's correct.
6      Q  And still an SL?
7      A  Yes.
8      Q  And is there a new European Division chief?
9      A  No.  That's a rotating position, and we
10  haven't named a chief in European.
11     Q  What was Mr. Newsom's, was that in the Music
12  Division, did you say?
13     A  Yes.
14     Q  Okay.  Can you think of any others that have
15  left the Library Services Division who are SL?
16     A  I can't think of others.  I can go back and
17  put that list together.
18     Q  I'd love that.  It will probably save us a
19  few minutes too.  That will be great.
20     A  All right.  I'll be happy to.  I'll go back
21  and do that.  All who have retired since I came to the
22  Library, correct?

111

1      Q  Right.  You sort of expanded that to include
2  people that transferred out of Library Services.
3      A  Okay.
4      Q  What I'm trying to do is find out how many
5  SLs were at the beginning of your tenure as associate
6  librarian for Library Services and how many SL
7  employees you currently have.
8      A  Okay.  I can produce that list for you.
9      Q  That would be great.
10     A  Happy to do it.
11     Q  I'm getting the sense you probably have about
12  30 or fewer SLs now than you did when you started as
13  associate librarian?
14     A  Yes.  There are a few fewer than there were
15  when I came.
16     Q  Am I right that none of the positions that
17  are SL rated have gone away though?  In other words,
18  John Byrum retired but the division chief position in
19  that division Cataloging is still SL rated?
20     A  That will be reviewed.  We haven't filled
21  that position yet, and that will go through the job
22  analysis, and we will determine if that is a senior

112

1  level position or if that was a benefit for Mr. Byrum
2  for doing good work.  I suspect it will not be a senior
3  level position.
4      Q  Because you think that Mr. Byrum was paid at
5  the senior level for doing good work?
6      A  Well, I think at the time he was made a
7  senior level person, he had an enormous portfolio of
8  creating partnerships and programs with international
9  institutions.  It was a very big program.  So at the
10  time, and that was in the '80s I think sometime, I can
11  see that that would have made sense.  The scope of that
12  position today isn't the same.
13     Q  Okay.  And am I right that the scope of that
14  position that Mr. Byrum held was not the same at the
15  end of his tenure as it was in the beginning?
16     A  I think that's probably true.
17     Q  In other words, it wasn't Mr. Byrum's
18  retirement that changed the nature of the position.  It
19  changed during the time that Mr. Byrum held the
20  position?
21     A  There have been lots of changes in the work
22  they are all doing, yes.

113

1     Q   I'm asking about Mr. Byrum's position.
2     A   Generally, yes.
3     Q   Okay. I sensed that you didn't think that
4   Mr. Byrum was doing senior level work when he was at
5   the end of his tenure as the division chief. Is that
6   true?
7     A   That was my guess, but I did not analyze that
8   in any way. So I don't really know.
9     Q   Okay. Would Mr. Wiggins be closer to that
10   situation and know better than you factually whether or
11   not Mr. Byrum was doing senior level work at the time?
12     A   Yes.
13     Q   Would that be true for all the division chief
14   positions within Mr. Wiggins' directorate?
15     A   He was closer to them.
16     Q   So Mr. Wiggins would have a better sense of
17   what division chief jobs required senior level work and
18   what did not within the directorate of Cataloging, is
19   that true?
20     A   That's true, but it also is true that Mr.
21   Wiggins thinks all of them should be senior level. He
22   wants desperately for them to be senior level.

114

1     Q   Am I right that he didn't push for the two
2   that the classifier did not find senior level?
3     A   What he told me is that he thought they
4   should all be senior level.
5     Q   Okay. But he didn't push to get them
6   reclassified, the two that Mr. Krigbaum found were not
7   senior level?
8     A   That is true.
9     Q   The positions chief of the Cataloging in
10   Publication and the Decimal Classification Division, is
11   that true?
12     A   He will return to that another day I'm sure.
13     Q   But in the 2004 time frame --
14     A   That's correct.
15     Q   -- Mr. Wiggins wasn't pushing that those
16   other two division chiefs, the Cataloging in
17   Publication and the Decimal Classification chief
18   positions be rated at SL, is that true?
19     A   That's true. And the one other position I
20   should mention, after Susan Vita went to head the Music
21   Division, we've had an acting person in the Special
22   Materials cataloging, and that was at a 15 level, not a

115

1   senior level. We didn't put a senior level in that.
2     Q   Who's that?
3     A   Linda Stubbs was the person who took that
4   job. She's now on a temporary assignment in Rio de
5   Janeiro, but she'll be back.
6     MR. FREDRICKSON:  This will be a good
7   breaking point for lunch.
8     (Recess)
9   BY MR. FREDRICKSON:
10     Q   I gather at some point Miss Mansfield became
11   the assistant director for Bibliographic Access, is
12   that right?
13     A   That's correct.
14     Q   And what did she do, that is what did Miss
15   Mansfield do as the assistant director for
16   Bibliographic Access?
17     A   What she did was worked out with her
18   director, Mr. Wiggins, my understanding from talking
19   with him, he really divided the responsibilities so
20   that she continued with cataloging duties primarily,
21   managing the Cataloging Divisions. He took care of the
22   Acquisitions Divisions. And he was the final authority

116

1   on decisions that had to be made within the Cataloging
2   Directorate.
3     We had directors meetings once a week, and
4   she and the other assistant directors came to three
5   meetings a month. The fourth meeting was devoted to
6   the directors only. So she took part in all of the
7   discussions that we had about future directions.
8     Q   And when you say she continued with her
9   cataloging duties, continued to manage the Cataloging
10   Division, you mean she continued to do the work she had
11   done as acting director of the Cataloging Directorate?
12     A   As I understand it, yes.
13     Q   And Mr. Wiggins did the work for the
14   Acquisitions unit, is that right?
15     A   The Acquisitions Division. It had been a
16   separate directorate before.
17     Q   Okay. Let me go back to one of the exhibits
18   we looked at earlier. I'm going to hand you back
19   what's been marked as Plaintiff's Exhibit 13, and ask
20   you a few questions about that if I could.
21     A   Okay.
22     Q   More particularly I want to direct your

117

1  attention to page 2 of Plaintiff's Exhibit Number 13.
2  So page 2 of Plaintiff's Exhibit Number 13 I think you
3  said was the organizational chart that came out in July
4  2004 and was part of the announcement of the
5  appointment of assistant directors, right?
6      A  Yes.
7      Q  Now, where you have the first column on the
8  left there, it's a little bit cut off, but I believe it
9  says Acquisitions and Bibliographic Access.  Do you see
10  that column there?
11     A  Yes.
12     Q  And then under that column it's broken into
13  two units, the Acquisitions and then Bibliographic
14  Access?
15     A  Correct.
16     Q  So just focusing on the Bibliographic Access
17  unit where it says Judy Mansfield, assistant director,
18  am I reading this right where it lists a number of
19  divisions underneath that, do you see that?
20     A  Yes.
21     Q  Would Miss Mansfield be then responsible for
22  managing those divisions, the Arts and Sciences

118

1  Cataloging Division, Cataloging Distribution Service,
2  and the ones that follow below?
3      A  **In an informal sense only.  Mr. Wiggins was**
4  **responsible for all of these.  It was his**
5  **responsibility to look after all of these.  But the**
6  **assistant directors were meant to help with some of the**
7  **coordinating functions to make sure the directors**
8  **weren't overwhelmed with the day-to-day.**
9      Q  Okay.  So to avoid having the director be
10  overwhelmed with the day-to-day, that was the role of
11  the assistant directors, is that right?
12     A  Correct.
13     Q  And I gather from what you've said that you
14  sort of delegated to Mr. Wiggins to divide up the
15  responsibilities as he saw fit within that Acquisitions
16  and Bibliographic Access?
17     A  Yes.
18     Q  Okay.  Turn if you would to the next column
19  to the right there where it says Collections and
20  Services at the top.  Do you see that?
21     A  Yes.
22     Q  And then it has Carolyn Brown, director,

119

1  listed right underneath that.  Do you see that?
2      A  Yes.
3      Q  So Carolyn Brown was the director for
4  Collections and Services, correct?
5      A  Correct.
6      Q  Was that called a directorate, Collections
7  and Services, is it Collections and Services a
8  directorate?
9      A  **These were simply divisions within the**
10  **directorate.  So we had clustered the General**
11  **Collections and Services, the Collections Management in**
12  **another cluster, and Special Collections and Services**
13  **in another.**
14     Q  Okay.  My question is probably a little
15  narrower than maybe you interpreted it.  I was just
16  trying to figure out what that was called, the unit
17  called Collections and Services.  Did it have a title?
18  Was it called a directorate?
19     A  **It wasn't called anything.**
20     Q  Nothing?  Just Collections and Services?
21     A  **Right.**
22     Q  Okay.  All right.  And I gather that there

120

1  were two assistant directors in the Collections and
2  Services, is that right?
3      A  **That's correct.**
4      Q  One was Steve Herman, assistant director for
5  Collections Management?
6      A  **Yes.**
7      Q  And the other was Mark Dimunation, assistant
8  director for Special Collections and Services, is that
9  right?
10     A  **Correct.**
11     Q  Now, did you appoint Mr. Herman and Mr.
12  Dimunation or did someone else?
13     A  **Carolyn Brown made the ultimate decision.  I**
14  **talked to many of the chiefs about their interests in**
15  **taking on collateral duties.  So I had spoken with both**
16  **Mr. Herman and Mr. Dimunation about their willingness**
17  **to take on additional roles.**
18     Q  Do you remember your meeting with Mr. Herman?
19     A  **When we talked about this topic?**
20     Q  Yes.
21     A  **I can't remember the specific meeting.  I can**
22  **remember some of the things we talked about.**

121

1    Q   Okay.  And would this have been in the spring
2    of 2004 that you had these discussions with Mr.
3    Herman --
4    A   Yes.
5    Q   -- about the possibility of becoming the
6    assistant director for Collections Management?
7    A   Correct.
8    Q   Okay.  Do you think that there was more than
9    one discussion or you just can't see that in your mind?
10   A   I can't tell you specifically how many
11   meetings we had.  There were probably a couple of
12   discussions, but I honestly don't know.
13   Q   I gather you can remember some of the content
14   of what you said to Mr. Herman and what he said to
15   you --
16   A   I do.
17   Q   -- when you were contemplating the idea of
18   Mr. Herman being assistant director for Collections
19   Management, is that right?
20   A   Yes.
21   Q   Tell me what you said to Mr. Herman about the
22   assistant director position.

122

1    A   I explained the overall aspiration to create
2    these five directorates, recognizing that two of the
3    directorates would be very large, and talked about at
4    least thinking about the possibility of creating these
5    coordinating positions as assistant director.  He was
6    interested in knowing more about reporting
7    relationships, the specifics of reporting
8    relationships.  I tried to explain the coordinating
9    role of these, not the reporting role.  Talked about
10   how difficult it was to bring -- Because general
11   Collections and Services had been one directorate,
12   Special Collections had been another, Area --
13   Q   Hold on for a second.  Could you say that
14   again please so I can process it?
15   A   The General Collections and Services had
16   reported to Diane Kresh earlier in a separate
17   directorate, Special Collections had also reported to
18   Diane Kresh, but Area Studies had been in the
19   directorate of Carolyn Brown.  So we talked about how
20   hard it was for any one person to be able to cover all
21   of these things successfully and really talked to him
22   about his willingness to help Carolyn Brown manage this

123

1    very big directorate.
2    Q   And what was Mr. Herman's reaction to the
3    idea of being assistant director?
4    A   He liked the idea.  He's a fairly linear
5    person.  He wanted more details than I could give him
6    at the time.
7    Q   Okay.  I told you earlier I like to learn, so
8    what do you mean when you say a linear person?
9    A   A linear person?  He likes to see the full
10   picture, and he likes to know how all the lines are
11   drawn.  And I'm not so linear.  So we had an
12   interesting discussion about being a little more
13   flexible in Library Services than we had been in the
14   past.  I was looking to see how flexible he was willing
15   to be.
16   Q   When you say flexible, what do you mean by
17   that?
18   A   Was he willing to experiment with new ways of
19   doing things.  Was he willing to really think hard
20   about how things might be done differently rather than
21   maintaining the status quo.  And because I was still
22   fairly new, I needed to know him better.

124

1    Q   Did you suggest the idea of Steve Herman
2    being the assistant director?
3    A   To Carolyn Brown?
4    Q   Right.
5    A   Yes.
6    Q   Okay.  Why did you suggest Steve Herman?
7    A   He has such a long history of where the
8    collections are.  He knows all about the storage
9    arrangements.  He knows about the security
10   arrangements.  He has been deeply involved in
11   collection security.  That was an area Miss Brown did
12   not have, and I thought he would really complement what
13   she knew.
14   Q   Okay.  And what else did you discuss with Mr.
15   Herman?
16   A   I don't know if we discussed in those early
17   meetings or afterwards, his involvement in the
18   directors meeting was an important issue for him.  He
19   wanted to make sure the assistant directors had a seat
20   at the table.
21   Q   Did Mr. Herman explain why that was
22   important?

125

1    A  Not to my recollection.

2    Q  I've never worked at the Library. Is that

3  important?

4    A  Well, you know, I'm still an outsider at the

5  Library in so many ways. My perception is that having

6  a seat at the table is a very big deal for everybody

7  there. It's just such a big organization. It's a

8  complex organization. And many people worry that they

9  are not heard because it's just so hard to have that

10  human contact. So my perception is it's always an

11  issue there.

12    Q  Okay. And did you assure Mr. Herman that

13  he'd have a seat at the table?

14    A  I assured him that he would have a seat at

15  the table most of the time, but I also made sure he

16  understood that the assistant directors were not

17  directors, and that there's a policy role for directors

18  that I was not going to delegate to anyone else, and

19  that there would be times when we would meet separately

20  as directors.

21    Q  Okay. Do you remember anything else about

22  your discussion with Mr. Herman?

126

1    A  I don't think so. I don't remember other

2  specifics.

3    Q  Did you tell Mr. Herman that the position of

4  assistant director would have a limited duration or

5  anything like that?

6    A  I had told everyone I talked to that this was

7  an experiment on my part, and that I was making these

8  positions collateral duty in large part because I

9  wasn't certain that this was the right structure. I

10  didn't know how well the staff would react to this

11  coordinating arrangement. I didn't know.

12    Q  Well, am I right in thinking that you did not

13  convey to Mr. Herman that this is an assistant director

14  position and you're only going to be in it for three

15  months or six months?

16    A  No, not at all.

17    Q  You didn't do anything like that?

18    A  No, I didn't.

19    Q  It was open-ended?

20    A  It was open-ended.

21    Q  Now, when you use the term experiment with,

22  what did you mean?

127

1    A  This was my first step in making some

2  organizational change in the service unit, and I was

3  concerned that these two directorates were very large,

4  and I knew that a lot depended upon the directors

5  having good collaboration and coordination with either

6  all of their division chiefs or assistant directors. I

7  knew they would need help of some kind. I didn't know

8  if that help was going to come best from the division

9  chiefs or from this coordinating level of assistant

10  director. I just didn't know the answer to that.

11    Q  Okay. And you've used the term several times

12  now collateral duties. What did you mean by that?

13    A  That their positions were in their division

14  chief positions, but I was asking them to take on

15  collateral, additional duties, to help the director

16  with coordinating the activities of the directorate.

17    Q  Okay. Turn if you would to page 1 of

18  Plaintiff's Exhibit Number 13. I wanted to direct your

19  attention to the fourth paragraph down.

20    A  Yes.

21    Q  It says there "Directors have made decisions

22  about the assistant directors," and it says in

128

1  parentheses "all of whom have collateral division chief

2  duties."

3    A  Yes.

4    Q  What did you mean by that phrase all of the

5  assistant directors would have collateral division

6  chief duties, what did you mean by that?

7    A  That they were division chiefs in addition to

8  being assistant directors.

9    Q  So they had both roles?

10    A  They had both roles.

11    Q  Okay. And am I right that Beacher Wiggins

12  became the acting assistant director for Acquisitions?

13    A  Correct.

14    Q  And that was his own choice?

15    A  That was his choice.

16    Q  Okay. And did you have any meetings with Mr.

17  Dimunation regarding the assistant director position?

18    A  Yes. I had the same kind of conversation

19  with him that I had with Mr. Herman.

20    Q  Can you describe what you said to Mr.

21  Dimunation and what he said to you in the meetings that

22  you had with him concerning the assistant director

129

1 positions?
2    A  I had spoken with Mr. Dimunation very early
3 in my thinking about the possibility of being the
4 director of Collections and Services, and we had
5 concluded I think mutually that he is such a wonderful
6 specialist -- he's a rare book specialist and deeply
7 involved in that field -- that it would be a waste for
8 him to spend all of his time on management.
9    Q  So you had him in mind for the position that
10 Miss Brown actually got?
11    A  Originally, yes.
12    Q  I see.  He wanted to do less management, more
13 what?
14    A  The dilettante work that he does.  He's
15 interested in everything.  He really wanted to be more
16 involved with scholars, with poets, with rare book
17 dealers.  He had built up all of those connections over
18 the years and wanted to continue them.
19    Q  So when you spoke to Mr. Dimunation about the
20 possibility of maybe him being the director for
21 Collections and Services, I gather he declined, is that
22 true?

130

1    A  Well, I didn't offer him the position.  We
2 simply talked about it.  You know, do you think this
3 would be a good fit.  I think we concluded after
4 discussing this for a while that that probably wasn't
5 the best use of his talent.
6       So in subsequent conversations I talked with
7 him about this assistant director role, and we talked
8 about in a way this allowed him to have both things.
9 It allowed him to have more influence in the
10 directorate, but it also kept him well grounded in his
11 field.
12    Q  And when you say more influence in the
13 directorate, what do you mean?  How would being the
14 assistant director provide Mr. Dimunation an
15 opportunity to have more influence in the directorate?
16    A  Well, I expected that Miss Brown would meet
17 with the assistant directors and talk about things in
18 the various areas, and that he would have a seat at her
19 table, to use my earlier metaphor, more than he would
20 as a division chief.
21    Q  I see.  So in other words, you expected that
22 Mr. Dimunation would have the opportunity to have more

131

1 influence in determining the future direction of the
2 Library in the collections area?
3    A  Well, he would at least be privy to the
4 conversations about those matters.
5    Q  I'm assuming you didn't want somebody there
6 sitting at the meetings with their mouth shut the whole
7 time, so they'd contribute to the conversation?
8    A  They'd contribute.
9    Q  In that regard would you agree he'd have the
10 opportunity, Mr. Dimunation would have the opportunity
11 to contribute to developing the course of the future
12 direction of the Library?
13    A  Yes.
14    Q  And with Mr. Dimunation did you also not say
15 to him anything like this assistant director position
16 will be a job of limited duration, it will only be
17 three months or six months or a year or anything like
18 that.  Am I right about that?
19    A  Right.  I told him the same thing I told Mr.
20 Herman, that I wanted to try this to see how it worked,
21 but we did not talk about a limit of time.
22    Q  Okay.  Did you have a conversation with Miss

132

1 Mansfield about the possibility of her being the
2 assistant director?
3    A  I think according to the e-mail the date was
4 in May, we had had that discussion.  That was the only
5 discussion we had about it.  All subsequent discussions
6 about that were with Miss Mansfield and Mr. Wiggins.
7    Q  Okay.  So have you remembered anything else
8 about your conversation with Miss Mansfield about the
9 assistant director position other than what you've
10 already told me about today?
11    A  It was not a conversation, but in one of the
12 division chiefs meetings which I had once a month, I
13 meet with all the 53 division chiefs, and in one of
14 those meetings she asked the question would there be
15 position descriptions for the assistant directors, but
16 that's the only other question I recall from her about
17 the role.
18    Q  Do you remember when that meeting took place,
19 the division chiefs meeting?
20    A  I don't.  It was not long after this chart
21 was released, and I think there were a fair number of
22 questions among staff about the reporting

133

1  relationships, were they reporting to assistant
2  directors or were they reporting to directors, and in
3  the context of that discussion is when I recall her
4  asking the question about will there be a position
5  description.
6      Q  Do you have somebody on your staff by the
7  name of Jim Carroll?
8      A  Yes.
9      Q  What does Jim Carroll do?
10     A  Jim has now retired.  He was the head of
11 Administrative Services for Library Services.
12     Q  And did you ask Jim Carroll to put together
13 position descriptions for the assistant director
14 positions?
15     A  I believe Beacher asked Mr. Carroll to put
16 together those position descriptions.
17     Q  And you don't recall doing that?
18     A  I don't.
19     Q  And were position descriptions prepared by
20 Mr. Carroll for the assistant director positions?
21     A  It's interesting.  The only thing I know
22 about the assistant director positions is that Beacher

134

1  Wiggins gave me a position description that he thought
2  would be useful in Miss Mansfield's case.
3      Q  Okay.  Do you remember when that was?
4      A  I think all we really determined is that I'm
5  not good at dates.
6      Q  Well, I hope we've accomplished more than
7  that, but let me see if I can put my hands on it
8  because I think I have that, if you'll bear with me a
9  moment.
10         Let me hand you what's been marked as
11 Plaintiff's Exhibit Number 9 in a previous deposition.
12 Have you had a chance to look at Plaintiff's Exhibit
13 Number 9?
14     A  Yes.
15     Q  Plaintiff's Exhibit Number 9 appears to be an
16 e-mail from Mr. Wiggins to you with the handwritten
17 date of January 12th, 2005 concerning a position
18 description for the assistant director for Acquisitions
19 and Bibliographic Access, is that right?
20     A  I don't think it was an e-mail; but other
21 than that, yes.
22     Q  You don't think that's an e-mail?

135

1      A  I think he brought this to me in one of our
2  regular meetings.
3      Q  Okay.  So it's a memo that he prepared, a
4  short memo he prepared, by which he transmitted a
5  proposed position description, is that right?
6      A  Yes.
7      Q  And it's for the position of assistant
8  director for Bibliographic Access, is that right?
9      A  Correct.
10     Q  And does that help pinpoint in time when it
11 was that you had the discussion with Mr. Wiggins
12 regarding a position description?
13     A  Well, it says on here 1/12/05, and I don't
14 know who put that date there, but I'm assuming that's
15 the date.
16     Q  Take a look at page 2 there, if you'll look
17 at the box about two-thirds of the way down there where
18 it says Beacher Wiggins, director, Acquisitions and
19 Bibliographic Access, appears to be a signature, and
20 beside that has a date?
21     A  Yes.
22     Q  That's 1/12/05?

136

1      A  Right.
2      Q  In other words, January 12th, 2005?
3      A  Yes.
4      Q  So having that information does it help you
5  remember when it was you discussed the position
6  description for the assistant director for
7  Bibliographic Access position?
8      A  It was a few weeks after he gave me this that
9  we discussed it.
10     Q  Okay.  Do you see in the body of the memo
11 page 1, it says attached is the PD.  I assume that
12 means position description.  Is that the way you
13 understand it?
14     A  Yes.
15     Q  "Attached is the PD for the position that
16 we've discussed."  Did you have discussions about doing
17 a position description before you received this memo
18 that's been marked as Plaintiff's Exhibit Number 9?
19     A  Mr. Wiggins brought up often his desire to
20 create a senior level position for Miss Mansfield, and
21 he had told me before I saw this that he was working on
22 a position description that he believed was the right

137

1 way to go, and it was a kind of ongoing discussion.
2    Q   Okay.  All right.  When did this discussion
3 begin?
4    A   It began when we appointed assistant
5 directors.  So that was in July.
6    Q   Of 2004?
7    A   Of 2004.
8    Q   And I guess there were a number of times that
9 Mr. Wiggins talked to you about --
10    A   Indeed.
11    Q   -- having a position description and having a
12 senior level assistant director for Bibliographic
13 Access, is that right?
14    A   Correct.
15    Q   Okay.  And did Mr. Wiggins offer
16 justification for his position?
17    A   He quite rightly pointed out that Miss
18 Mansfield does very good work.  He almost always spoke
19 of it in terms of not just fairness to her, but he
20 really wanted to see the division chiefs in the
21 cataloging area have appointments at the senior level
22 because he thought that was more equitable in the

138

1 Library generally, and he had been working on these one
2 by one.
3    Q   Well, did Mr. Wiggins' justification include
4 the fact that Miss Mansfield was not just a division
5 chief but she was also the assistant director for
6 Bibliographic Access at that point?
7    A   Yes.
8    Q   And what did Mr. Wiggins tell you about that?
9 What was his justification in that area?
10    A   He thought that was the right thing to do.  I
11 think he really believed that was the proper thing to
12 do.
13    Q   Let me go back to the organizational chart
14 that's page 2 of Plaintiff's Exhibit Number 13.  I'm
15 going to hand that back to you.  I just want to ask you
16 a few questions about that.
17       When you say you had the directors meetings
18 three times a month, that included the assistant
19 directors?
20    A   Yes.
21    Q   I want to find out who attended those
22 meetings.  Am I right that those meetings would have

139

1 been attended by you as the associate librarian for
2 Library Services?
3    A   Yes.
4    Q   And the deputy associate librarian, Mr.
5 Dizard, would attend those meetings?
6    A   Yes.  Dizard.
7    Q   Dizard.  The transcript will look just the
8 same.
9    A   Right.  In case you're going to say it again.
10    Q   I'll probably get it down probably by 2008 or
11 so.  And then Mr. Wiggins as the director for
12 Acquisitions and Bibliographic Access attended the
13 meetings?
14    A   He attended as the director of Acquisitions
15 and Bibliographic Access, right.
16    Q   And then Miss Mansfield as assistant director
17 for Bibliographic Access attended?
18    A   Correct.
19    Q   And Miss Brown attended as director of
20 Collections and Services, is that right?
21    A   Correct.
22    Q   And Mr. Herman attended as the assistant

140

1 director for Collections Management, is that right?
2    A   Yes.
3    Q   And then Mr. Dimunation attended as assistant
4 director for Special Collections and Services, is that
5 right?
6    A   Correct.
7    Q   And then Ms. van der Reyden attended as the
8 acting director for Preservation, is that right?
9    A   Yes.
10    Q   And then Mr. Rossman attended as the acting
11 director for Technology Policy, is that right?
12    A   That's correct.
13    Q   On this organizational chart among those
14 individuals, who were the SL level employees that
15 attended the directors meetings?
16    A   Dianne van der Reyden was an acting senior
17 level person.  She had been promoted for a period of
18 time.  Henry Rossman was from the Congressional
19 Research Service.  He was a GS-15.  Part of the time
20 when he was attending he had a promotion to senior
21 level acting but most of the time was not.
22    Q   Did someone take Mr. Rossman's place?

141

1    A  Kathryn Mendenhall is acting in this position
2  now along with acting Partnerships and Outreach.
3    Q  And what is she, a GS or SL?
4    A  She's a senior level.
5    Q  Okay.  And everyone else on the chart is an
6  SL level employee?
7    A  Yes.  Miss Mansfield was senior level part of
8  the time and part of the time not.
9    Q  When she was the assistant director for
10  Bibliographic Access?
11    A  I don't remember.  She could serve only 120
12  days.  So there were times when she couldn't be a
13  senior level person and times when she was.
14    Q  Okay.  Did you make an effort after she
15  became assistant director for Bibliographic Access to
16  have Miss Mansfield temporarily promoted to the SL
17  level?
18    A  Mr. Wiggins was responsible for all of those
19  decisions.  I was not involved in those decisions.
20    Q  So would it be accurate to say you did not?
21    A  I did not.
22    Q  Okay.  Would it be accurate to say that the

142

1  personnel records of the Library of Congress would
2  indicate when Miss Mansfield was serving on a temporary
3  basis at the SL level?
4    A  Yes.
5    Q  Okay.  So Mr. Dizard, Miss Brown, yourself,
6  Mr. Herman, Mr. Dimunation were all SL level employees,
7  right?
8    A  That's correct.  And Mr. Wiggins.
9    Q  Mr. Wiggins as well, also SL?
10    A  Yes.
11    Q  I think we talked a little bit about the
12  discussions that maybe preceded Mr. Wiggins handing you
13  what's been marked as Plaintiff's Exhibit Number 9
14  including a position description for the assistant
15  director for Bibliographic Access.
16        Do you remember anything else about your
17  discussions with Mr. Wiggins before he gave you this
18  document that's been marked as Plaintiff's Exhibit
19  Number 9 concerning the assistant director for
20  Bibliographic Access position?
21    A  I don't think so.  I think I've reported that
22  conversation pretty fully.

143

1    Q  Okay.  And then I think you said you had a
2  discussion with Mr. Wiggins after you received the
3  document that's been marked as Plaintiff's Exhibit
4  Number 9, is that right?
5    A  Yes.
6    Q  And is that a single conversation that you're
7  thinking of or is it a series of conversations?
8    A  It could have come up more than once, but I
9  remember having one conversation about it, but I'm sure
10  there were others.
11    Q  Can you place in time when it was in relation
12  to your receipt of the document that's been marked as
13  Plaintiff's Exhibit Number 9?
14    A  It was a few weeks after receiving this.  I
15  just put it in a folder for a while.
16    Q  Was there any particular reason you did that?
17    A  I thought I had been clear enough already
18  with Mr. Wiggins that I was not going to make this
19  decision right away.  So I just put it in a folder.
20    Q  Okay.  So when did you have the meeting?  Was
21  it a few weeks later, is that what you're saying?
22    A  Yes.

144

1    Q  Where did the meeting take place?
2    A  In my office.
3    Q  And what did you say to Mr. Wiggins and what
4  did he say to you?
5    A  He asked where I stood with the position
6  description, and I reiterated that I was not ready to
7  make decisions about the assistant directors.  I didn't
8  want to create a position description.  I left it as
9  collateral duty quite intentionally.  That after we had
10  some experience with this organizational structure if
11  this seemed to be working, then all of the directors
12  would sit down and figure out how assistant directors
13  would be used.
14        What he was proposing for Miss Mansfield was
15  very different from the way assistant directors were
16  being utilized in Collections and Services, and I
17  didn't want to create this position for one person, and
18  I didn't think it was time to create these as formal
19  organizational structures.
20    Q  I just want to see if I heard you right.  Am
21  I correct that you said Mr. Wiggins was using the
22  assistant director position within Acquisitions and

145

1 Bibliographic Access in a manner that was different
2 than I gather Miss Brown used assistant directors
3 within Collections and Services, is that right?
4    A  Yes.
5    Q  And what did you mean by that?
6    A  What I meant by that is that he in having
7 **Miss Mansfield serve as the assistant director for**
8 **Bibliographic Access, he was really continuing her role**
9 **as acting director for Cataloging, and he was not using**
10 **her in this more coordinating role that I had imagined**
11 **the directors would use.**
12    Q  Okay. So Miss Mansfield was still managing
13 the old Cataloging Directorate just as when she was the
14 acting director for Cataloging?
15    A  Yes.
16    Q  All right. Did you discuss with Mr. Wiggins
17 how the division chief duties for the Arts and Sciences
18 Cataloging Division position were getting done?
19    A  I don't think we had -- I think Miss
20 **Mansfield had put someone into that position**
21 **temporarily, and I have a vague recollection of a form,**
22 **one of the 500 forms coming across my desk every day,**

146

1 **that there was an assignment of someone temporarily to**
2 **cover that, but that's really all I know about it.**
3    Q  I see. And this is while she was the
4 assistant director for Bibliographic Access?
5    A  Correct.
6    Q  And how about Mr. Herman, did he do anything
7 like that?
8    A  No.
9    Q  Did Mr. Herman appoint somebody on a
10 temporary basis or detail somebody on a temporary basis
11 to do the division chief duties when he was assistant
12 director for Collections Management?
13    A  No, he did not.
14    Q  And did Mr. Dimunation use someone to carry
15 out his duties in the position of chief of the Rare
16 Book Division --
17    A  No.
18    Q  -- when he was assistant director for Special
19 Collections and Services?
20    A  No, he did not.
21    Q  So when you got the position description you
22 remained unpersuaded by Mr. Wiggins, is that accurate?

147

1    A  I remained unpersuaded.
2    Q  Did you take any action as a result of
3 receiving Plaintiff's Exhibit Number 9 and then
4 discussing it with Mr. Wiggins? In other words, he
5 gave you the position description, and you discussed
6 it. Did you do anything else other than discuss it
7 with Mr. Wiggins?
8    A  No.
9    Q  Did you discuss the idea of having position
10 descriptions for the assistant director positions in
11 the meetings with just the directors, did that come up
12 as a topic in that type of meeting?
13    A  **Not that I recall, no. I don't think so.**
14 **That would have been a more procedural matter. I don't**
15 **think we would have discussed that.**
16    Q  Do you remember whether Mr. Wiggins ever told
17 you that he thought there might be a sex discrimination
18 issue in the manner in which Miss Mansfield was paid?
19    A  **He described it as pay equity.**
20    Q  Was this in this series of conversations that
21 you had with Mr. Wiggins about the assistant director
22 position?

148

1    A  **No. It was at the end of one of our 8:45**
2 **Tuesday meetings, he always brought a list of things**
3 **with him, gave me the list. It was not on the list,**
4 **but as he stood to leave he said Oh, I think you should**
5 **know there may be a pay equity problem with Judy**
6 **Mansfield, and you should think about that.**
7    Q  And what did you say?
8    A  **I said Tell me what I need to know. I'm not**
9 **sure what you mean.**
10    Q  And what did he say?
11    A  **Mark Dimunation and Steve Herman are at the**
12 **senior level, and Miss Mansfield is not.**
13    Q  Okay. And did you respond?
14    A  **I said that they were senior level when I**
15 **named them to the assistant director roles, and**
16 **everyone agreed to take these positions as collateral**
17 **duty.**
18    Q  Did Mr. Wiggins say anything?
19    A  **No. Maybe under his breath, but nothing that**
20 **I heard.**
21    Q  Are you able to place this meeting in time
22 somehow by reference to any of these documents we've

149

1  seen or otherwise?

2  **A  Well, it was a week or two -- It was in close**

3  **proximity to the time when Miss Mansfield wrote a**

4  **letter to Dr. Billington and placed it under Jessie**

5  **James' door.**

6  Q  So a week or two before that?

7  **A  Yes.**

8  Q  All right.  Bear with me a moment.

9  MR. FREDRICKSON:  May I have this marked as

10  the next exhibit please.

11  (Deposition Exhibit 26 was marked for

12  identification and was retained by counsel.)

13  BY MR. FREDRICKSON:

14  Q  What I've had handed to you is Plaintiff's

15  Exhibit Number 26.  I'd ask you if you would read

16  through that if you would please.

17  **A  Okay.**

18  Q  Have you had a chance to read Plaintiff's

19  Exhibit Number 26?

20  **A  Yes.**

21  Q  Is Plaintiff's Exhibit Number 26 a letter

22  from Miss Mansfield to Dr. Billington that you

151

1  letter that's been marked Plaintiff's Exhibit Number 26

2  to you?

3  **A  It was the day it was received.  I think that**

4  **was the day.**

5  Q  The letter is dated March 15th, 2005, right?

6  **A  Yes.**

7  Q  Okay.  So you believe that you heard about

8  the letter from Mr. Dizard on March 15th, 2005?

9  **A  I heard about it the day it was delivered to**

10  **Mr. James, and I don't know if March 15th is the day it**

11  **was delivered to him or if it was the day it was**

12  **written.  I just don't know.**

13  Q  All right.  Does the time frame, middle of

14  March, seem consistent with your recollection as to

15  when you first heard of the letter that's been marked

16  as Plaintiff's Exhibit Number 26?

17  **A  Yes.**

18  Q  Okay.  What did you say to Mr. Dizard in that

19  conversation?

20  **A  We'll need to meet about this as soon as I'm**

21  **back with OGC, the Office of General Counsel.**

22  Q  And did Mr. Dizard say anything else?

150

1  referenced earlier in your testimony?

2  **A  Yes.**

3  Q  So this is the letter that was given to

4  Dr. Billington and, as you described it I think, placed

5  under Jessie James' door?

6  **A  That's correct.**

7  Q  All right.  And when did you first see

8  Plaintiff's Exhibit Number 26?

9  **A  I first heard about it in a telephone call.**

10  **I was traveling at the time and my deputy, Mr. Dizard,**

11  **called to tell me that Mr. James had brought this**

12  **letter to his attention.**

13  Q  What did Mr. Dizard say about it, say about

14  the letter?

15  **A  He wanted me to know about it just to make**

16  **sure I was informed, and then when I returned from**

17  **wherever I was, I met with the Office of General**

18  **Counsel about this.**

19  Q  Okay.  Did you get a description from Mr.

20  Dizard of the letter in that conversation?

21  **A  He read it to me.**

22  Q  Okay.  And when did Mr. Dizard read the

152

1  **A  No.  We talked about other matters that had**

2  **come up during the day.  That's all.**

3  Q  Did you discuss any of the points raised by

4  the letter that's been marked as Plaintiff's Exhibit

5  Number 26?

6  **A  I made some comment about this is the first**

7  **time I've heard of this.**

8  Q  Well, am I right that you said it was a

9  little bit before this letter that you had had a

10  discussion with Beacher Wiggins about pay equity?

11  **A  Yes.  I was referring to I didn't know what**

12  **the informal efforts to resolve the matter, I didn't**

13  **know what the informal efforts were.  They had not**

14  **included me, whatever they were.**

15  Q  I see.  Okay.  That's what you're referring

16  to?

17  **A  That's what I'm referring to.**

18  Q  But prior to March 15th, 2005 or mid March

19  2005 I gather Mr. Wiggins had raised the issue of pay

20  equity with you on behalf of Miss Mansfield?

21  **A  I didn't know if it was on his behalf or on**

22  **hers.  He didn't say I'm raising this for Miss**

---

153

1    Mansfield.  He just said I think you need to look at
2    the possibility of a pay equity problem.
3        Q   I was trying to just get a sense of the
4    timing though.  This conversation you had with Mr.
5    Wiggins where he said I think there might be a pay
6    equity issue with respect to Miss Mansfield, that's a
7    conversation you had with Mr. Wiggins prior to
8    receiving the letter that's dated March 15th, 2005 that
9    is marked as Plaintiff's Exhibit Number 26?
10       A   That's correct.
11       Q   And you think it was about a week or two, is
12   that what you said?
13       A   A week or two before that.
14       Q   Did you do anything as a result of your
15   conversation with Mr. Wiggins a week or two before the
16   letter of March 15th, 2005?
17       A   I asked Mr. Carroll to find the regulations
18   pertaining to pay equity so I would know exactly what
19   was being referred to.
20       Q   Okay.  And did he provide you with anything,
21   Mr. Carroll that is?
22       A   He provided the definition of pay equity that

---

154

1    had come through legislation, but it wasn't terribly
2    helpful.  I couldn't see how that connected to what was
3    being said to me by Mr. Wiggins.
4        Q   So did Mr. Carroll show you the Equal Pay
5    Act?
6        A   Yes.
7        Q   Did Mr. Carroll explain any of that to you?
8        A   Well, I didn't think I needed an explanation
9    of that.  That was very much a part of my formative
10   years when I was working on affirmative action a long
11   time ago.  So I thought I knew that legislation pretty
12   well.  I didn't know if there were other regulations
13   that I didn't know about.
14       Q   So way back when you were in jobs prior to
15   even coming to the Library of Congress, you knew about
16   the Equal Pay Act?
17       A   Yes.
18       Q   And had studied it when you were affirmative
19   action officer at --
20       A   University of Kentucky.
21       Q   -- University of Kentucky, is that true?
22       A   That's correct.

---

155

1        Q   So you had actually known about the Equal Pay
2    Act and familiarized yourself with it I gather back in
3    the early '70s?
4        A   Yes.
5        Q   What did you understand the Equal Pay Act to
6    require?
7        A   Very simply, equal pay for equal work.
8        Q   Do you remember anything else about your
9    conversation with Mr. Carroll when he brought you the
10   Equal Pay Act?
11       A   No, I don't.
12       Q   Did he bring you -- Did Mr. Carroll bring you
13   anything else other than the Equal Pay Act itself?
14       A   No.
15       Q   No Library of Congress regulation or anything
16   like that?
17       A   No.
18       Q   Did you do anything other than ask Mr.
19   Carroll about -- I can't remember what you asked Mr.
20   Carroll?
21       A   Pay equity or the regulations regarding pay
22   equity that I need to know.

---

156

1        Q   Did you ask him to do anything else other
2    than look to see if there were any pay equity
3    regulations at the Library?
4        A   No.
5        Q   When Mr. Carroll came back and provided you
6    with a copy of the Equal Pay Act, did you take any
7    action as a result of that?
8        A   No.
9        Q   Now, before this letter that's been marked as
10   Plaintiff's Exhibit Number 26, the March 15th, 2005
11   letter from Miss Mansfield to Dr. Billington, did you
12   do anything else between the time that Mr. Wiggins
13   spoke to you about pay equity and the time that the
14   letter came?
15       A   The only thing I did is write pay equity at
16   the bottom of my list of things to talk to him about
17   when we next met to find out more about what he meant.
18       Q   What do you mean by your list?  You keep a To
19   Do list or something?
20       A   I keep a list of things I want to talk to
21   each of the directors about.  I just have a folder with
22   their names in it.

157

1    Q   So did you meet with the Office of General
2   Counsel about the letter?
3    A   Yes.
4    Q   When was that?
5    A   I think this was at the end of a week if I
6   remember correctly, and it was early the next week, the
7   beginning of the next week.
8    Q   Who was present at the meeting?
9    A   Mr. James and Mr. Ovelio and Miss Douds.  It
10  might have been just the two.  I don't know if Miss
11  Douds was there the first meeting.  Can I ask you if
12  you were there?
13   Q   Not at the moment.
14   A   Not at the moment.  I think it was actually
15  Mr. James and Mr. Ovelio when he first met.
16   Q   Would it be Ovelio Riviello?
17   A   Yes.  Yes.  Ovelio is his first name.  I
18  apologize.
19   Q   I don't know what your position is on that,
20  but I think I do need to ask what was said in the
21  meeting.
22   A   I asked them what are my options when I am

158

1   given this kind of letter, and we talked about the
2   options that were available to me.  And I was very
3   disturbed that I was in effect being accused of
4   discrimination.  That bothered me a lot.  And I was
5   concerned that this had gone to this stage and I had
6   not heard anything about it from Miss Mansfield.  So I
7   was still trying to figure out what to do.
8        The legal counsel described the solutions
9   available to me.  One is to simply end the assistant
10  director positions since they hadn't been formal
11  positions in the first place and just call them all
12  done.
13       Another option was to send Miss Mansfield
14  back to her division chief position leaving Mr.
15  Dimunation and Mr. Herman in place.
16       And a third option was to go back and look at
17  position descriptions to see if I wanted to create
18  formal positions that we can move senior level people
19  without any formal process.  But since Miss Mansfield
20  was a GS-15, in order for her to have a senior level
21  position, we would have to post it, and she would be in
22  a competitive process.

159

1    Q   Okay.  And what else did you say at the
2   meeting?
3    A   I just asked procedural questions.  You know,
4   when this kind of letter was received, where does it
5   go, what happens.  I hadn't had anything like this
6   happen before.  I didn't know the process.  So I asked
7   those kinds of questions.
8    Q   And what did you learn?
9    A   Well, Mr. James pointed out this last
10  paragraph, that she was giving us ten days for an
11  informal resolution, and after that she would
12  apparently be taking this to a lawyer is what it
13  appeared to be.
14   Q   Okay.  What else did you learn in asking
15  about the procedural questions?
16   A   I'm not sure.  I don't know that I noted
17  anything else.
18   Q   Did you make any notes of the meeting?
19   A   No.
20   Q   Did you make up any notes after the meeting?
21   A   No.
22   Q   Have you typed up any memorandum that

160

1   concerns the meeting that would reflect the content of
2   the meeting?
3    A   No.
4    Q   Have you seen any notes of the meeting?
5    A   No.
6    Q   Have you seen any summary of what happened at
7   the meeting, anything like that?
8    A   No.
9    Q   When you met was it just you and Mr. James
10  and Mr. Riviello as best you recall today?
11   A   I think that's correct.
12   Q   And I gather there may or may not have been
13  another attorney in the room?
14   A   Later on there was.  Whether or not there was
15  that day, I don't know.
16   Q   All right.  But on your side of the equation
17  you didn't bring in somebody else from your staff to
18  sit in on the meeting or anything like that?
19   A   I had the deputy, Robert Dizard, there.
20   Q   He was there as well?
21   A   He was there as well.
22   Q   Okay.  Did you take any action after the

161

1  meeting was over?
2    A  After thinking about it, really going through
3  the options, I decided I would end all of the acting
4  director positions and just eliminate all of them.
5    Q  You said you would eliminate all of the
6  acting directors.  Do you mean assistant director
7  positions?
8    A  Acting assistant director positions, yes.
9    Q  In other words, you decided to eliminate the
10  positions of assistant director for Bibliographic
11  Access, the assistant director for Collections
12  Management, and the position of assistant director for
13  Special Collections and Services, those three
14  positions?
15    A  Correct.
16    Q  Okay.  And did you meet with Mr. Herman about
17  the elimination of the assistant director position?
18    A  I met with -- First I met with the directors
19  and told them what I was doing and why.
20    Q  Now when you say directors, who do you mean?
21    A  I mean Mr. Wiggins, Miss van der Reyden, Mr.
22  Rossman, Miss Brown.

162

1    Q  Was this a special meeting or was it one of
2  your regular directors meetings?
3    A  It was a special meeting.
4    Q  And how long after you had met with the
5  Office of General Counsel was this meeting with the
6  directors?
7    A  It was within a day or two.
8    Q  Okay.  And what did you say at the meeting of
9  these directors?
10    A  I told them that I was very sorry to say that
11  at least one of the assistant directors was unhappy
12  with the arrangement and considered it discriminatory.
13  I had considered the options, and I had concluded that
14  it was best to simply eliminate those positions, but I
15  wanted to hear from them, if they had other thoughts
16  about that.
17    And we talked about how well -- It turned
18  into a much broader conversation of how well this was
19  working in the first place.  Mr. Wiggins thought it was
20  working well, and he was sorry to see this end.
21  Carolyn Brown thought it was not working very well, and
22  she thought she would prefer another arrangement

163

1  anyway.  So it was okay with her.  The other directors
2  who didn't have assistant directors said very little.
3  It was a sad day for all of us.
4    Q  Why was that?
5    A  That this had been the approach taken.
6    Q  What do you mean by that?
7    A  That Miss Mansfield hadn't spoken to me or to
8  Mr. Dizard about this but had simply written a letter.
9  We were sorry we hadn't had more communication about
10  this.
11    Q  With Miss Mansfield?
12    A  Yes.
13    Q  Or do you mean from Miss Mansfield?
14    A  From her.
15    Q  Okay.
16    A  It was a very big surprise, so we were all
17  kind of adjusting to what we would do next.
18    Q  Okay.  Did Miss Brown say anything as to why
19  she thought the arrangement was not working well?
20    A  What she told me confidentially is that the
21  two who had been named as assistant directors in her
22  area were so knowledgeable that she often felt excluded

164

1  from the conversation.  That they had been there a long
2  time.  They knew a great deal.  She felt a little bit
3  as if she had inside information, and she thought it
4  might work better to have more distributed
5  responsibilities among the chiefs for her.
6    Q  And how long had Miss Brown been at the
7  Library of Congress?
8    A  Well, she had been there at least since 1993
9  because I think she was -- She had been there just a
10  short while when I arrived in 1993.  I don't know how
11  long.  It was before that but not a long time before
12  that.
13    Q  Sounds like what you're describing to me is a
14  separate conversation you had with Miss Brown apart
15  from the other directors.
16    A  That's correct.
17    Q  Have I got a grip on that?
18    A  That's correct.
19    Q  Let's finish that, tell me what else she
20  said, and then we'll come back to the directors meeting
21  because I want to pick up what she said at the
22  directors meeting.  So tell me what else Miss Brown

**165**

1  said at this separate meeting you had with her.

2    A  I think that was the essence of it.

3    Q  I'm not sure I understand what you mean when

4  you say that Miss Brown felt that she felt excluded

5  from the conversation when she was meeting with the

6  assistant directors or at the directors meetings?

7    A  No. I think when she was meeting with them.

8  My analysis of the situation is she's a very quiet,

9  deliberative person. Both Mr. Dimunation and Mr.

10  Herman are anything but. They're quite outgoing. They

11  have long histories. They are both trained librarians.

12  Dr. Brown is a Chinese scholar. And I think they use

13  their expert knowledge in some ways to establish their

14  supremacy.

15    Q  You have experience as an affirmative action

16  officer and trained in EEO and all that, so I want to

17  ask you this question. Did you perceive that there was

18  a gender issue there?

19    A  No. I think it was strictly a personality

20  issue of very different styles.

21    Q  And did Miss Brown suggest that maybe there

22  was a gender issue there in terms of her relationship

**166**

1  with these two personalities, Mr. Herman and Mr.

2  Dimunation?

3    A  No, she did not suggest that. I think she

4  too -- What she relayed to me is that she just felt

5  they always describe issues in terms of their

6  experience, their very long and solid experience, and

7  she felt a little uneasy about that.

8    Q  Okay. When did this conversation you had

9  with Miss Brown on a confidential basis take place in

10  relationship to the directors meeting where you

11  announced that the assistant director positions would

12  be eliminated?

13    A  It was after the directors meeting.

14    Q  Okay. Immediately after?

15    A  I think it was that same day later in the

16  day. She came to me to just talk about it more.

17    Q  All right. What did you say in the

18  confidential meeting you had with Miss Brown?

19    A  I said Well, if you're having that kind of

20  difficulty and we have another assistant director who

21  feels she is being discriminated against, then it's

22  probably best that we just eliminate all three.

**167**

1    Q  Okay. And what did she say?

2    A  She agreed with that, but she didn't know how

3  she would get all this work done. She was very

4  concerned about the workload, and we agreed we would

5  have to find other ways of helping her manage what was

6  a very big workload.

7    Q  Did you discuss with her at that time how

8  she'd get her work done?

9    A  No. One of the things you probably need to

10  understand, my day is divided into 15-minute segments,

11  and they are constant. So I spend this much time with

12  everybody.

13    Q  So we're giving you a break today basically.

14    A  This is vacation.

15    Q  There we go. Regard it as a snow day.

16    Let's go back to the directors meeting where

17  you announced the elimination of the assistant

18  directors positions.

19    A  Okay.

20    Q  I think we got a little bit off when you said

21  Carolyn Brown and you had a confidential discussion.

22  Let me focus on what did Miss Brown say in the meeting,

**168**

1  the directors meeting itself?

2    A  It was a very short meeting, and we didn't

3  have a lot of discussion. I mostly called them

4  together on an emergency basis to let them know what

5  had happened. In the meeting I simply said I'll have

6  to have longer conversations with the two directors who

7  are most affected by this, but I want all of you to

8  have an opportunity to think about possibilities. And

9  so we spent I don't think more than 30 minutes. It was

10  a short meeting.

11    Q  Do you remember anything else that Miss Brown

12  said in the meeting?

13    A  No. I think she said very little in the

14  meeting.

15    Q  Do you remember anything else that Mr.

16  Wiggins said at the meeting?

17    A  No.

18    Q  Do you remember anything else that you said

19  at the meeting?

20    A  I think that was about it. It was a

21  descriptive summation on my part of where we were.

22    Q  Okay. You were describing how you were going

**169**

1  to proceed basically?
2     A  Right.
3     Q  Okay. Did you have another meeting with Mr.
4  Wiggins where you had a discussion with him at greater
5  length concerning this issue?
6     A  We met every Tuesday, so our subsequent
7  conversations took place in that context. I asked him
8  as we looked at options, I asked him since there were
9  three senior level people in the former Cataloging
10 Directorate, if he felt so strongly that it be a senior
11 level person, why he didn't want to just bring one of
12 them into the organizational structure since that would
13 have been -- then there wouldn't have been these
14 levels, the difficulties created by different levels.
15 He did not want to do that. He wanted Miss Mansfield
16 to be in the position. And nothing changed really. We
17 just had the same conversation we had had.
18    Q  Did he explain why he wanted Miss Mansfield
19 in the position?
20    A  Only to say that he thought she was the best
21 person.
22    Q  Okay. Did you make any adjustments to help

**170**

1  the workload of Mr. Wiggins in the position of the
2  director for Acquisitions and Bibliographic Access?
3     A  I asked the two affected directors to come
4  back to me with a plan for how the workload would be
5  distributed and what they wanted to do. I left it to
6  them to decide. He came back with the plan that they
7  would simply divide the coordinating duties equally
8  among the division chiefs, and they would handle it
9  that way.
10    Q  Okay. Is that what happened?
11    A  As far as I know. I mean, I don't go to that
12 level of detail now, so I don't know. But he seems to
13 be handling the workload fine, so I assume that is
14 working.
15    Q  What were the duties that you discussed with
16 Mr. Wiggins would be divided among the division chiefs?
17 What kinds of things are you talking about?
18    A  I was most concerned -- I don't know what
19 duties he was talking about. What I was concerned
20 about is that because Acquisitions and Cataloging had
21 been separate, I was very anxious to have good
22 cross-communication, and I wanted to be sure there were

**171**

1  people looking at how to combine these divisions more
2  effectively, and that was my concern and what I talked
3  with him about.
4     Q  Okay. Did you have a meeting with either Mr.
5  Herman or Mr. Dimunation concerning the elimination of
6  the assistant director positions?
7     A  Yes. I met with each of them.
8     Q  In separate meetings?
9     A  In separate meetings.
10    Q  Tell me about your meeting with Mr. Herman
11 regarding the elimination of the assistant director
12 position.
13    A  I tried to keep that meeting as neutral as I
14 could. I told him that there had been a complaint by
15 Miss Mansfield of discrimination, and that I was
16 concerned enough about that that I thought for now at
17 least we would simply eliminate the assistant director
18 positions. And that I was sorry to tell him this, but
19 it would be effective immediately.
20    Q  And what did Mr. Herman say?
21    A  He was angry. He really couldn't understand
22 that. He thought it was going to be an impossible job

**172**

1  for Carolyn Brown to manage without assistant
2  directors. He asked a number of questions about how
3  would we proceed. I told him we were still working on
4  that, but that I wanted to let him know what was
5  happening.
6     Q  Okay. Do you remember anything else about
7  your meeting with Mr. Herman?
8     A  No.
9     Q  And then am I right that you had a separate
10 meeting as you recall with Mr. Dimunation?
11    A  Yes.
12    Q  Okay. And what did you say to Mr. Dimunation
13 in that meeting?
14    A  I said basically the same thing. His
15 question was how will we notify the staff. He was very
16 concerned about that. And I agreed to have both Mr.
17 Dimunation and Mr. Herman review the memo that I would
18 eventually prepare to send to the staff.
19    Q  Did Mr. Herman explain -- I'm sorry. Did Mr.
20 Dimunation explain the nature of his concern about the
21 notice to the staff?
22    A  I think he was concerned that this was all so

173

1  abrupt, that the action connoted failure on the parts
2  of the assistant directors.
3      Q   And what did you say?
4      A   I told him I understood why he would think
5  that, and I would try very hard to word the memo in
6  such a way that it was not an indication of failure.
7  On the other hand, I could not go into detail in such a
8  memo about what led up to this.  So that it was going
9  to be kind of a vague memo unfortunately.
10      Q   Is that what you told him in the meeting?
11      A   Yes.
12      Q   That it would be a vague memo?
13      A   Yes.
14      Q   Okay.  How did he react to that?
15      A   He said How vague?
16      Q   Did you explain?
17      A   I said I'll show you what I have drafted when
18  I've drafted it.
19      Q   Did you have any discussion of the
20  announcement to the staff when you spoke to Mr. Herman
21  in that meeting?
22      A   I went back to him with the proposed memo to

174

1  him.
2      Q   To Mr. Herman?
3      A   Yes.  And gave him an opportunity to read it
4  too.
5      Q   I guess my question was a little more
6  specific with that.  When you met with Mr. Herman when
7  you said we're going to abolish the assistant director
8  positions, did the announcement to the staff issue come
9  up in that meeting with Mr. Herman?
10      A   I don't know if it came up in that first
11  meeting or not.  I don't recall it, but it could have.
12  I don't know.
13      Q   All right.  Do you remember anything else
14  about your conversation with Mr. Dimunation concerning
15  the elimination of the assistant director positions?
16      A   He welcomed me to the Library of Congress.
17      Q   Did you ask for an explanation for what that
18  meant?
19      A   It was his perception that this is how
20  personnel cases are handled at the Library of Congress
21      Q   What did you say?
22      A   I said I'm sorry to learn this.

175

1      Q   Anything else to the discussion?
2      A   No.
3          MR. FREDRICKSON:  Let's take about a
4  ten-minute break, and I'll review my notes.
5          (Recess)
6  BY MR. FREDRICKSON:
7      Q   I want to ask you a little bit, and I
8  apologize if I've covered a little bit of this before,
9  but I just want to make sure I know the answer to the
10  question.
11          What was your idea of what the assistant
12  directors were going to do?
13      A   I thought they would help coordinate
14  communication from the director to the division chiefs.
15  I thought they would take on special projects that the
16  director gave them because I was asking all the
17  directorates to do quite a few new things, and so it
18  took some planning.  I thought they would find ways to
19  be as helpful as they could be to the directors.  I
20  understood that would take different forms in different
21  directorates.
22      Q   The way you envisioned it, did you see the

176

1  assistant director positions requiring the same level
2  of skill whether it was the job that Miss Mansfield was
3  going to hold, Mr. Herman was going to hold, Mr.
4  Dimunation was going to hold?
5      A   No, I didn't.  I thought the role Mr.
6  Dimunation played was quite different from the role Mr.
7  Herman played.  And the way Mr. Wiggins defined Miss
8  Mansfield's role, it was very different indeed.  So
9  they were quite different.  They weren't comparable.
10      Q   Okay.  Explain that to me how they weren't
11  comparable?
12      A   The directors were using their assistants in
13  very different ways.  Dr. Brown used Mr. Dimunation I
14  think primarily in focusing on donors and collections
15  and working with the other division chiefs to make sure
16  we were going after collections that individuals had
17  that we wanted.
18          Mr. Herman was used almost exclusively for
19  planning a very difficult storage situation.  We bring
20  in 10,000 items a day, and all the buildings on Capitol
21  Hill are full, so it's a constant problem of trying to
22  figure out where things are going to be put.  And he

177

1  was also, we were under a lot of pressure then to
2  develop new security procedures for the collections,
3  and Mr. Herman had a lot of expertise there. So he was
4  working primarily in those areas.
5      And Mr. Wiggins was using Miss Mansfield's
6  expertise to direct cataloging, and she I think had no
7  involvement at all as far as I could see anyway in the
8  acquisition side of things or the broader issues of the
9  directorate.
10     Q  Let me go back to Mr. Dimunation. Wasn't
11  part of his job as a division chief for Rare Book to be
12  involved in donor and collections?
13     A  Right but only for Rare Book.
14     Q  And with respect to Mr. Herman, wasn't his
15  division chief job, a good part of it, focused on the
16  storage situation for collections?
17     A  It was for the General Collections only. So
18  he took on a much broader role in looking at the
19  requirements for Special Collections and Area Studies.
20  So it was a considerably broadened scope.
21     Q  It was broadened, but wasn't his collections
22  that he was responsible for as division chief by far

178

1  the largest of the collections within the broader scope
2  of his assistant director positions?
3      A  No. The Special Collections are much larger.
4      Q  Okay. Can you give me a sense of the volumes
5  there?
6      A  We have 132 million items in the Library.
7  About 30 million of those are in the General
8  Collections. And 102 million or now 105 million, it
9  grows enormously, are in Special Collections.
10     Q  Okay. When you were deciding whether to
11  eliminate the assistant director positions, did you
12  talk to Dr. Billington?
13     A  No.
14     Q  Did you inform Dr. Billington about the
15  decision to terminate the assistant director positions?
16     A  No.
17     Q  Was Mr. Scott at the Library at this point in
18  time --
19     A  Yes.
20     Q  -- in March/April of 2005?
21     A  He was.
22     Q  Okay. Did you talk to Mr. Scott about

179

1  eliminating the assistant director positions?
2      A  Yes.
3      Q  Was that a meeting with just the two of you?
4      A  Yes.
5      Q  And what did you say to Mr. Scott in that
6  meeting?
7      A  I told him how -- I first showed him the
8  organizational chart. He had seen the earlier
9  realignment chart and had approved that, and so I
10  brought that with me. I told him that he would
11  probably recall that I said this was an experiment, I
12  will see how it works, and it hadn't worked very well,
13  and I was sorry to report that and told him what had
14  happened.
15     Q  What do you mean when you say that, what had
16  happened?
17     A  I told him that we had received the letter
18  from Miss Mansfield, that I had consulted with OGC, I
19  had consulted with the directors, and had concluded
20  that the way to proceed was to eliminate the assistant
21  director positions. He wanted to know how I proposed
22  to handle the workload, and I described what the

180

1  directors had proposed to me, and he said that sounded
2  reasonable, and I should proceed.
3      Q  Okay. Now, this conversation you had with
4  Mr. Scott, was that before you eliminated the assistant
5  director positions?
6      A  Yes. It was before I sent out the
7  announcement.
8      Q  And was Miss Smith still the director for
9  Human Resources at that point in time?
10     A  Let's see. I believe she was still there. I
11  believe that's right.
12     Q  Okay. Did you speak to Miss Smith, that's
13  Teresa Smith, the director of Human Resources, before
14  you eliminated the assistant director positions?
15     A  No, I didn't. It's conceivable that Mr.
16  Dizard consulted with her.
17     Q  Was there any particular reason you did not
18  consult the director of Human Resources before
19  eliminating the assistant director positions?
20     A  I didn't because in my view these were
21  informal positions. They weren't an established part
22  of the organizational structure, and I thought I had

181

1 been quite clear with everyone that we were
2 experimenting, to use that word again, so I didn't see
3 the necessity of doing that. I think Mr. Dizard did
4 consult with her because he's probably more concerned
5 about documenting everything we do. So I suspect he
6 did.
7    Q  All right. Did you have a separate meeting
8 with Mr. Dizard concerning the elimination of the
9 assistant director positions before the decision was
10 made?
11    A  He was part of the directors meeting when we
12 discussed this. He and I meet every day either at the
13 beginning of the day or at the end of the day. So we
14 discussed this just in the course of discussing all the
15 things going on in the Service Unit.
16    Q  It sounds like you did discuss the
17 elimination of the positions before they were
18 eliminated then?
19    A  Yes. Yes.
20    Q  What did you say to Mr. Dizard and what did
21 he say to you about eliminating the assistant director
22 positions?

182

1    A  He always took me back to the alternatives
2 that had been outlined by OGC, and his view was it
3 would be much more difficult to explain keeping some of
4 the assistant directors and eliminating one of them,
5 and he argued quite strongly against that option.
6    And on the matter of creating formal
7 positions, he always held the budget sheets in front of
8 me and said How are you going to pay for this if you do
9 it? So I think by process of elimination he thought it
10 was best to eliminate the three.
11    Q  Okay. When you say he, Mr. Dizard, suggested
12 it would be more difficult to explain keeping some of
13 the assistant directors, meaning Mr. Herman and Mr.
14 Dimunation, right?
15    A  Right.
16    Q  And eliminating the position held by Judy
17 Mansfield?
18    A  Yes.
19    Q  Okay. After the letter had been sent to
20 Dr. Billington?
21    A  Yes.
22    Q  Okay. What did you say in the meeting or the

183

1 conversation you had with Mr. Dizard about eliminating
2 the assistant director positions?
3    A  I don't know what I said specifically. I
4 mostly used him as a sounding board to work my way
5 through the situation. Because he is so familiar with
6 all of the regulations and requirements, I trust him
7 completely to make sure I'm not ignoring something. So
8 I talked with him about it as a way of hearing my own
9 voice in many respects.
10    Q  Okay. Do you remember anything else about
11 your conversations with Mr. Dizard concerning
12 elimination of the assistant director positions that
13 you haven't already told me?
14    A  No.
15    Q  Okay. I've tried to pick up the logical
16 candidates that you might have discussed this with.
17 Did I miss anybody? Did you have any conversation with
18 anyone else at the Library concerning elimination of
19 the assistant director positions before that decision
20 was made?
21    A  Not that I can recall.
22    Q  Okay. Did you talk to Miss Mansfield about

184

1 eliminating the assistant director positions?
2    A  No.
3    Q  Did you make a conscious decision not to do
4 that?
5    A  I did.
6    Q  And what was your reasoning?
7    A  I decided that since she had filed an
8 official complaint, it was best that I not have
9 conversations with her, that I should just let this go
10 through the process. I very much wanted to talk with
11 her but decided that was not a reasonable thing to do
12 once the official complaint had been filed.
13    Q  Okay. When you say official complaint, do
14 you mean the letter to Dr. Billington?
15    A  Yes.
16    Q  What was so troubling about the letter to
17 Dr. Billington to you?
18    A  It was a bolt out of the blue.
19    Q  Anything else?
20    A  My real concern about that letter is that we
21 had had so many discussions about collateral duty in
22 the directors meetings when we had talked about roles

185
1  and responsibilities, and I had given that explanation
2  to Mr. Wiggins so many times I was really surprised
3  that this was being treated as a legal matter, that
4  there had been some form of discrimination. It was
5  surprising and disappointing.
6      Q  And why do you say disappointing?
7      A  Because I thought we had a different kind of
8  agreement. I thought everyone understood the
9  collateral duty part.
10     Q  Okay. Have you ever discussed with Judy
11 Mansfield the elimination of the assistant director
12 positions?
13     A  No.
14     Q  I assume you've spoken with her since?
15     A  Not very much interestingly. When she went
16 back to her division chief responsibility, I just
17 didn't see very much of her anymore. She comes to
18 chiefs meetings. I see her there. I see her more at
19 professional meetings, like the American Library
20 Association, than I see her at the Library of Congress.
21 The discussions I've had with her have been there.
22     Q  Have they been cordial?

186
1      A  Very cordial.
2      Q  Okay. I gather you wouldn't have any problem
3  working with her more directly in the future at this
4  point?
5      A  Not at all.
6      Q  Did you take a trip to I want to say Korea
7  that she was on recently, Miss Mansfield? I hope I
8  didn't get the country wrong.
9      A  Yes. We were both at the IFLA meeting,
10 International Federation of Library Associations, in
11 Korea in Seoul.
12     Q  Did you speak to Miss Mansfield there?
13     A  Yes. She was having lunch with Melissa
14 Travett in the hotel lobby, and I was trying to get to
15 a meeting in the next 30 minutes or so. There were no
16 places to sit, and they invited me to sit with them for
17 lunch.
18     Q  Did you discuss any of the issues that we've
19 talked about here today or --
20     A  No.
21     Q  -- was it totally different?
22     A  We had a very pleasant, very interesting,

187
1  pleasant conversation. They helped me figure out how
2  to get lunch in Korea when it didn't seem obvious.
3  There were no people around.
4      Q  And have you had any other conversations
5  one-on-one with Judy Mansfield since the assistant
6  director position was eliminated?
7      A  Again, at the IFLA meeting I think it was in
8  Scotland in Glasgow -- No. Let's see, was it there?
9  No. It was the IFLA meeting in Argentina, the U.S.
10 ambassador had a reception for the American delegates
11 at his home, and I was at the reception, Miss Mansfield
12 was at the reception, and we chatted there. Then she
13 came to tell me that she had met someone who wanted to
14 talk about some Library of Congress issue and put me in
15 touch with the other person. We had that conversation.
16     I run into her occasionally in the parking
17 garage when we're coming to work in the morning, but
18 that's it.
19     Q  Okay. During the time that the assistant
20 director positions were being used by the Library, did
21 you meet with any of the assistant directors concerning
22 their performance as assistant directors?

188
1      A  No.
2      Q  At any point during the time that the
3  assistant director positions were in existence, did you
4  criticize the performance of any of the assistant
5  directors? In other words, did you communicate any
6  criticism you had of any of the assistant directors'
7  performance?
8      A  No. I saw their performance evaluations that
9  had been written by the directors, and I signed those
10 ultimately, but that was the extent of my involvement
11 with their performance evaluations.
12     Q  That would have been for all three assistant
13 directors?
14     A  It was for the two senior level people
15 because of the way senior level assessments are
16 handled. I did not see the performance evaluation of
17 Miss Mansfield because that was done through the GS-15
18 process, and that didn't have to come to me.
19     Q  Okay. And how was Mr. Dimunation rated on
20 the performance evaluations that you just referred to?
21     A  That was a while ago. I think he was rated
22 quite well. I don't recall there being any problem. I

189

1  would have to go back and look at what the actual
2  ratings were.
3      Q  And how about Mr. Herman, was there any
4  negative criticism of Mr. Herman's performance in his
5  performance appraisal with respect to his assistant
6  director duties?
7      A  No.
8      Q  The directors meeting where you discussed
9  elimination of the assistant directors, was that the
10  first time that you had heard that there was any
11  problem with the assistant directors on the Collections
12  and Services side?
13      A  What I had heard from Dr. Brown earlier is
14  that she was concerned that her communication style
15  wasn't the best.  She worried that she wasn't
16  communicating as effectively as she might have with her
17  assistants.  She had raised with me -- I can remember
18  one instance in which she thought Mr. Herman had spoken
19  on her behalf when it wasn't quite his responsibility
20  to do so.
21      But mostly she was asking me how I would
22  handle that situation.  It wasn't a complaint as much

190

1  as a kind of vexation on her part.  She wanted to do a
2  better job, and she was trying to figure out better
3  ways to communicate.
4      Q  Was that early on in the time frame that the
5  assistant director positions existed or can you place
6  it in time at all?
7      A  I don't know when it was.
8      Q  And did you do anything as a result of your
9  conversation with Miss Brown?
10      A  I talked with her about how to communicate
11  with them just pointing out that she's quiet and waits
12  until she hears all of the evidence, and they have
13  opinions before they even know what the question is.
14  So maybe it was trying to just say to them I'm going to
15  talk about this, and then I'd like to hear from you,
16  just something that simple.
17      Q  So in other words, you offered Miss Brown
18  some advice on how to deal with it?
19      A  Some advice on how to deal with it.
20      Q  You don't remember doing anything else?
21      A  No.
22      Q  Okay.  How did the Library communicate to

191

1  Miss Mansfield that the assistant director position was
2  eliminated?
3      A  Mr. Wiggins told her.
4      Q  Did you direct Mr. Wiggins to do that?
5      A  Yes.
6      Q  What did you say to Mr. Wiggins?
7      A  I told him that he would need to let Miss
8  Mansfield know that we were abolishing the assistant
9  director positions, and that she would be the division
10  chief for Arts and Sciences cataloging.
11      Q  Did you tell Mr. Wiggins to explain why that
12  had happened or anything like that?
13      A  I don't think I asked him to explain why.  I
14  don't remember asking him to explain why.  I told him
15  that I did not think I should have a conversation with
16  her since she had filed a complaint, and I wanted to
17  make sure the process was handled properly.  I don't
18  remember having any other -- I don't think we discussed
19  anything more.
20      Q  At the point in time when you were telling
21  Mr. Wiggins to tell Miss Mansfield that the position is
22  being eliminated, did it occur to you that probably

192

1  she'd want to know why?
2      A  I was sure that she would know why.
3      Q  And what do you mean by that?
4      A  When Mr. Wiggins told her what the plan was
5  and I had indicated that I was concerned about being
6  accused of discrimination, I didn't think we could
7  continue, I thought she would understand exactly what
8  that meant.
9      Q  Okay.  Do you remember anything else about
10  your conversation with Mr. Wiggins concerning his
11  talking to Miss Mansfield?
12      A  No.  I'm trying to go back and replay all of
13  this.  I don't remember anything else.
14      Q  Okay.  Did Mr. Wiggins come to you and report
15  back Here's how my conversation went with Miss
16  Mansfield, anything like that?  Did you get a report
17  back from him?
18      A  Mr. Wiggins was less than happy with me at
19  the moment, so our conversations tended to be rather
20  brief.  So he reported back that he had done that, and
21  I asked if he had made the appropriate assignments
22  within the directorate.  He said yes, they were taking

193

1   care of it. Our conversations were really abbreviated
2   about this subject.
3      Q   Did Mr. Wiggins report Miss Mansfield's
4   reaction when Mr. Wiggins informed her that the
5   assistant director position was going to be eliminated?
6      A   No, he did not.
7      Q   I gather you didn't ask?
8      A   I didn't ask. I assume it was not a happy
9   day for her either.
10     Q   I'm going to hand you what's been marked as
11  Plaintiff's Exhibit Number 16 in another deposition,
12  and ask you to examine it.
13         You had spoken earlier about making an
14  announcement concerning the elimination of the
15  assistant director positions, and I've handed you a
16  document that's been marked as Plaintiff's Exhibit
17  Number 16 which is a memo to the directors and division
18  chiefs from you dated April 13th, 2005, is that right?
19     A   Yes.
20     Q   Now, is Plaintiff's Exhibit Number 16 the
21  announcement that you had made mention of?
22     A   There are two things about this that concern

194

1   me. One is my signature isn't on it, so I think this
2   is the draft, because I would have signed this. And I
3   know that both Mr. Dimunation and Mr. Herman had some
4   problem with the phrase "but these positions have not
5   worked out as intended." I may be wrong about this,
6   but I believe that that phrase was modified before this
7   was sent out.
8      MR. FREDRICKSON: Okay. Do you have any
9   wisdom on this issue because I don't believe there's
10  been anything turned over other than this document on
11  that issue.
12     MR. JAMES: We can check.
13     THE WITNESS: I could be wrong.
14     MR. FREDRICKSON: It's been a while.
15     THE WITNESS: It has been a while, but it's
16  very unlikely that this is the final draft since it
17  isn't signed.
18     MR. JAMES: We can check, and we'll see.
19     MR. FREDRICKSON: Thank you.
20  BY MR. FREDRICKSON:
21     Q   But you knew I guess that the phrase "these
22  positions have not worked out as intended" did not sit

195

1   well with Mr. Dimunation nor Mr. Herman, is that right?
2      A   I knew that very well.
3      Q   How did you know that very well?
4      A   They told me directly.
5      Q   What was the nature of the concern that they
6   expressed or how did they tell you? What did they say?
7      A   They were deeply concerned that this would
8   appear to be an indictment of the performance of all
9   three of the assistant directors, and their contention
10  was there had been one problem identified. They were
11  happy. They thought it was working very well. They
12  didn't like this.
13     Q   Okay. When you say that they thought that
14  there had been one problem identified, what did you
15  mean by that?
16     A   That one person believed she had been
17  discriminated against.
18     Q   Did you draft the document that's been marked
19  as Plaintiff's Exhibit Number 16?
20     A   Yes, I did.
21     Q   And did you draft it in April of 2005?
22     A   I'm assuming I did. Yes, I must have.

196

1      Q   You believe so?
2      A   I believe so, yes.
3      Q   Where it says To Directors and Division
4   Chiefs on Plaintiff's Exhibit Number 16, the memo
5   that's dated April 13th, 2005, who were the directors
6   and division chiefs who were referred to there?
7      A   The directors are the five that I mentioned
8   earlier in the realigned organization. Do you want me
9   to name them again?
10     Q   It might be clearer if you did.
11     A   Okay. Beacher Wiggins, Carolyn Brown, Henry
12  Rossman, Dianne van der Reyden, and I was an acting
13  director so I was included in that, and the deputy
14  Robert Dizard. And the division chiefs, I won't be
15  able to give you names because there are 53 of them,
16  but the chiefs of all of the divisions within Library
17  Services.
18     Q   Okay. Was there another announcement that
19  was circulated more broadly than to the directors and
20  division chiefs that announced the elimination of the
21  assistant director positions?
22     A   No.

197

1    Q   All right. I'll take that back. Thank you.
2        MR. FREDRICKSON:  Did you have any luck in
3    turning up anything?
4        MS. DOUDS:  No, not yet.
5        (Discussion off the record)
6    BY MR. FREDRICKSON:
7    Q   I gather it's accurate to say that when the
8    assistant director positions were eliminated, that was
9    the only restructuring that occurred at that time?
10   A   Yes.
11   Q   So the directors in the new organization that
12   you set up in the fall of 2004 remained the same?
13   A   They remained.
14   Q   And there were no other changes other than
15   the elimination of the assistant director positions?
16   A   That's correct.
17       MR. FREDRICKSON:  I think I am actually
18   closing in now, so I want to take another about
19   ten-minute break and review my notes, and I think I'm
20   close to being done, if that's okay.
21       THE WITNESS:  Okay.
22       (Recess)

198

1    BY MR. FREDRICKSON:
2    Q   I guess I learned the other day from talking
3    to Mr. Hanratty that there are types of compensation in
4    SL that are not available to GS employees.  So I just
5    want to ask you a little bit about that.
6        Am I right that in the SL system that SL
7    employees are entitled to consideration for bonuses
8    over and above the salary that they were to earn as SL
9    employees, is that right?
10   A   That's correct.
11   Q   Is that something that's not available to GS
12   employees?
13   A   They can receive awards, financial awards of
14   various kinds, but it's a different system.
15   Q   All right.  What about a retention bonus, is
16   that something that's available to SL employees?
17   A   Yes.
18   Q   Okay.  And how does that work, do you know?
19   A   The Library offers a financial incentive for
20   someone to stay in the position rather than leave the
21   Library or it can be used to fill a position that is
22   extremely hard to fill and you know it would be

199

1    difficult to find another appropriate candidate.
2    Q   Okay.  Has the Library Services used
3    retention bonuses at all since you've been there?
4    A   Let me think.  There was a bonus to the
5    curator of Architecture.
6    Q   Is that within Library Services?
7    A   It's within Library Services.  I believe
8    there have been a couple of instances of retention
9    bonuses for technical people who were involved with the
10   National Audiovisual Conservation Center.
11   Q   Okay.  How about yourself, have you ever
12   received a retention bonus?
13   A   Yes, I have.
14   Q   On more than one occasion?
15   A   Yes.  I received a signing bonus when I
16   joined the Library because my salary at my other job
17   was a good bit more than my salary at the Library of
18   Congress.
19   Q   And what was the amount of the signing bonus?
20   A   If I remember correctly, it was $20,000.
21   Q   And what about the retention bonus, was there
22   more than one retention bonus?

200

1    A   I had one retention bonus of $30,000, and I
2    just received another this year for $32,000.
3    Q   So you've received two retention bonuses
4    since you've been at the Library?
5    A   Yes.
6    Q   Since 2003?
7    A   Yes.
8    Q   Okay.  You said something I believe this
9    morning to this effect.  If I've got it wrong, just
10   correct me.  My note taking is good, but it's not
11   entirely legible either.
12       I think what you said was if Judy Mansfield
13   was to be considered for an SL level position as
14   assistant director as Beacher Wiggins proposed, it
15   would have to be a situation where it was a competitive
16   selection, is that right?
17   A   That's correct.
18   Q   Okay.  Am I right that the Library
19   regulations would permit the posting of a vacancy
20   announcement for an assistant director position like
21   Miss Mansfield held and the library could fill that
22   position on a temporary basis while that competitive

201

1  process was playing out?
2  **A  I think that's correct although I'm not**
3  **absolutely certain of the rules that apply.  I believe**
4  **that's correct.**
5  Q  Okay.  Isn't that done at the Library all the
6  time where there's a vacancy, the vacancy announcement
7  is posted, and the position is filled on an acting
8  basis for a temporary period of time?
9  **A  It may well be a common practice.  I don't**
10  **know.**
11  Q  Okay.  There's nothing in the Library
12  regulations that you're aware of that would prohibit
13  that, is that right?
14  **A  That's correct.**
15  MR. FREDRICKSON:  May I have this marked as
16  Plaintiff's Exhibit Number 27.
17  (Deposition Exhibit 27 was marked for
18  identification and was retained by counsel.)
19  BY MR. FREDRICKSON:
20  Q  I'm going to have handed you a copy of a
21  document that's been labeled Plaintiff's Exhibit Number
22  27, and I would ask you to examine it.

202

1  Have you had a chance to read Plaintiff's
2  Exhibit Number 27?
3  **A  Yes.**
4  Q  And am I correct that Plaintiff's Exhibit
5  Number 27 is a sworn declaration that you signed in
6  this case?
7  **A  Yes.**
8  Q  Okay.  I don't see a date on Plaintiff's
9  Exhibit Number 27.  I might have missed it, but do you
10  see one?
11  **A  I don't see a date.**
12  Q  And am I correct that if you turn to the last
13  page of Plaintiff's Exhibit Number 27, that's your
14  signature, Deanna B. Marcum?
15  **A  That is my signature.**
16  Q  Okay.  Did you draft the declaration that's
17  been marked as Plaintiff's Exhibit Number 27?
18  **A  No.**
19  Q  Did you read it before you signed it?
20  **A  Yes.**
21  Q  Let me direct your attention to paragraph 5
22  of Plaintiff's Exhibit Number 27, your declaration, and

203

1  I want to ask you some questions about that paragraph.
2  Do you have that in front of you?
3  **A  I do.**
4  Q  The first sentence reads "Shortly after my
5  appointment as associate librarian for Library Services
6  in August of 2003, I became aware that Miss Mansfield,
7  a GS-15 employee and the chief of the Arts and Sciences
8  Cataloging Directorate (ASCD), was performing the
9  duties of acting director for Cataloging."
10  That's in your declaration, and you've sworn
11  that that's true, correct?
12  **A  Yes.**
13  Q  Okay.  Where it says Cataloging Directorate,
14  did you really mean to say division there?  Would it be
15  more accurate to say division, chief of the Arts and
16  Sciences Cataloging Division?
17  **A  Yes, it would be division.**
18  Q  And how did you become aware that Miss
19  Mansfield was a GS-15 employee performing the duties of
20  acting director for Cataloging?
21  **A  In conversation with Mr. Wiggins.**
22  Q  Did you understand in August of 2003 that

204

1  Miss Mansfield was performing the duties of acting
2  director for Cataloging but she was paid at the GS-15
3  level at that time?
4  **A  Yes, I knew that.**
5  Q  And the director for Cataloging was actually
6  an SL rated position at the time that Miss Mansfield
7  was performing the acting director for Cataloging
8  position, right?
9  **A  Yes.**
10  Q  Okay.  Now, the next sentence says "I was
11  also aware that her supervisor, Beacher Wiggins, the
12  director of Cataloging, had temporarily promoted her
13  for 120 days to the SL pay grade based on her
14  performing the higher graded duties of acting
15  director."
16  Is that something you learned from Mr.
17  Wiggins as well?
18  **A  Yes.**
19  Q  And you don't have any personal knowledge
20  about the circumstances under which Miss Mansfield was
21  temporarily promoted to the acting director of
22  Cataloging position, is that right?

205

1    A  That's correct.
2    Q  When you became aware that Miss Mansfield was
3  performing the duties of the position of the acting
4  director for Cataloging but was paid at the GS-15
5  level, did you do anything to correct that situation?
6    A  Mr. Wiggins told me that there were rules
7  governing how long people could be promoted to a senior
8  level position, and that was he was following those
9  rules.  He was doing everything he could in terms of
10  increase in grade salary adjustments and awards as the
11  rules allowed to compensate her.
12    Q  Okay.  Well, my question was a little more
13  specific than that.  What I asked was did you do
14  anything to correct the situation where Miss Mansfield
15  was serving as the acting director for Cataloging but
16  being paid as a GS employee?
17    A  No.
18    Q  Okay.  Did Mr. Wiggins tell you that for a
19  temporary promotion where the job is not posted, that
20  the GS employee could be temporarily promoted for only
21  a 120-day period?
22    A  He told me that, but the information about

206

1  duration came from Mr. Carroll through Human Resources
2  I believe.
3    Q  So you talked to Mr. Carroll about Miss
4  Mansfield's pay situation when she was serving as
5  acting director for Cataloging, is that right?
6    A  I asked him a much more general question.  I
7  asked what are the rules about temporary promotions for
8  staff to senior level.
9    Q  And what prompted you to ask Mr. Carroll
10  that?
11    A  When Mr. Wiggins gave me a chart showing when
12  Miss Mansfield had gone to senior level status, when
13  that had to end, how long that existed, when it went
14  into effect again, and I realized I didn't know all the
15  rules that governed this, so I consulted with Mr.
16  Carroll who is my administrative services person.
17    Q  Is the chart you just described in your files
18  at the office?
19    A  No.  He just drew a time line on a piece of
20  paper.  When I say chart, that's not quite accurate.
21    Q  All right.  Do you have that piece of paper
22  any longer?

207

1    A  I can look for it.  I doubt that I do, but
2  I'll see if I do.
3    Q  Do you have a file that's on Judy Mansfield's
4  situation at all at the office?
5    A  No, I don't.  I have a folder for Mr.
6  Wiggins, my discussions with him, but it's just
7  handwritten notes to myself, so that gets tossed every
8  year.  But I'll see if I have it.  I'll look for it.
9    Q  All right.  So am I correct, do I understand
10  this correctly that you talked to Mr. Carroll about the
11  Library's regulations regarding temporary promotions
12  when Mr. Wiggins brought to your attention Miss
13  Mansfield's pay situation when she was serving as
14  acting director for Cataloging?
15    A  Yes.
16    Q  Okay.  And what did Mr. Carroll explain to
17  you about the Library's regulations regarding temporary
18  promotions?
19    A  He didn't explain -- I simply asked him if we
20  had followed all the regulations, if we had done what
21  we were supposed to do, and he assured me that we had.
22    Q  Did Mr. Carroll tell you that he knew that

208

1  Miss Mansfield continued to serve in the acting
2  director for Cataloging position after her 120-day
3  period had expired?
4    A  I don't think we discussed that.  I don't
5  believe that was part of the conversation.
6    Q  Did Mr. Carroll point out to you any Library
7  of Congress regulation that would permit the Library to
8  continue to have Miss Mansfield serve as the acting
9  director for Cataloging, the SL level position, after
10  her 120-day temporary promotion had expired?
11    A  No.
12    Q  Are you aware of any regulation that would
13  permit that?
14    A  I don't know of that.  I just don't know
15  about it.
16    Q  Okay.  Did you do anything to find out other
17  than talk to Mr. Carroll about it?
18    A  No.
19    Q  No, you did not?
20    A  No, I did not.
21    Q  Okay.  Am I right that where your declaration
22  talks about the Library of Congress regulation

209

1 concerning temporary promotions, that's not really
2 based on your personal knowledge?
3    **A  That is based on what I was told by the**
4 **staff.**
5    Q  By Mr. Carroll?
6    **A  Yes.**
7    Q  By anyone else?
8    **A  Mr. Wiggins gave a similar explanation and**
9 **talked about how he had been through a very similar**
10 **process when he was the acting director of Cataloging.**
11    Q  Okay. Am I right that you were not at the
12 Library of Congress when Mr. Wiggins served as the
13 acting director for Cataloging?
14    **A  That's correct.**
15    Q  So you don't have any personal knowledge
16 about Mr. Wiggins' treatment when he was the acting
17 director for Cataloging?
18    **A  No. And I wasn't there when Miss Mansfield**
19 **was put into this acting director for Cataloging**
20 **position either.**
21    Q  Okay. So where you address Miss Mansfield's
22 temporary promotion to acting director for Cataloging,

210

1 it's not based on your personal knowledge, am I right
2 about that?
3    **A  That's correct.**
4    Q  And when you discuss the temporary promotions
5 that Mr. Wiggins experienced as acting director for
6 Cataloging, you're not speaking from personal knowledge
7 in your declaration either?
8    **A  No. I'm relying on what he told me.**
9    Q  It's not based on your personal knowledge.
10 Am I right about that?
11    **A  That's correct.**
12    Q  Okay. Am I right that you have not gotten
13 involved in establishing pay for employees in Library
14 Services who have received temporary promotions?
15    **A  That's correct.**
16    Q  So when your declaration addresses how
17 Library employees who receive temporary promotions are
18 paid, that is not based on your personal knowledge
19 either, is it?
20    **A  That's based on information I had from my**
21 **staff.**
22    Q  But not your own personal knowledge?

211

1    **A  But not my personal knowledge.**
2    Q  Okay. Bear with me here. I just want to see
3 if there are any other questions I want to ask.
4       Let me direct your attention to paragraph 11
5 of your declaration that's been marked as Plaintiff's
6 Exhibit Number 27 if I could. I want to ask you about
7 the last sentence. It says "The Library Services
8 budget did not allow for the creation of any new
9 permanent SL positions at the time." And by "at the
10 time" you're referring to in the summer of 2004 to the
11 spring of 2005?
12    **A  Yes.**
13    Q  Okay. What was the Library Services budget
14 in that time frame?
15    **A  $200 million.**
16    Q  Am I right that in that time frame 2004 to
17 2005 you did have more than one SL employee within
18 Library Services retire?
19    **A  I'm sure that's true. I don't know**
20 **specifically who retired. I would have to go back and**
21 **look at dates. I'm sure they did.**
22    Q  Am I right that in each instance where an SL

212

1 employee retired, you did not fill that position with
2 an SL level employee within Library Services?
3    **A  In 2005 I offered financial incentives for**
4 **people who were already eligible to retire to retire,**
5 **and I did that with the understanding that we would not**
6 **fill behind unless it was absolutely critical to do so.**
7    Q  What do you mean when you say you would not
8 fill behind?
9    **A  That we would not replace that person after**
10 **he or she retired.**
11    Q  With an SL employee?
12    **A  With anything.**
13    Q  With anyone?
14    **A  With anyone.**
15    Q  So the position would be vacant?
16    **A  Would be vacant because the next step of the**
17 **reorganization was restructuring of the divisions**
18 **themselves, and I wanted to make sure we had a base**
19 **that would allow for this transformation of the work.**
20 **So I was very reluctant to fill positions unless they**
21 **absolutely had to be filled to meet a congressional**
22 **requirement or some other critical national**

213

1  **requirement.**
2  Q  And how was the work handled where someone
3  retired and you didn't fill the position?
4  **A  In some cases we simply didn't do the work**
5  **anymore.  In some cases we redistributed the work among**
6  **others.**
7  Q  Let me direct your attention if I could to
8  paragraph 10, and just ask you to read that to
9  yourself.
10  **A  Okay.**
11  Q  I want to ask you in paragraph 10 it says
12  "Based on the recommendation of Mr. Wiggins and Miss
13  Mansfield's expressed interest, I assigned Miss
14  Mansfield to perform collateral duties as assistant
15  director for Bibliographic Access."
16  What duties did you assign to Miss Mansfield
17  by the way of collateral duties as assistant director
18  for Bibliographic Access?
19  **A  Just the coordinating responsibilities I**
20  **described earlier.**
21  Q  And where it says that -- Did you also assign
22  collateral duties to Mr. Herman and Mr. Dimunation?

214

1  **A  Yes.**
2  Q  And were they also the collateral duties you
3  described earlier?
4  **A  Yes.**
5  Q  Okay.  When you assigned the collateral
6  duties to the assistant directors, how did you know the
7  pay status or pay grade of Mr. Herman and Mr.
8  Dimunation?
9  **A  I see the performance reviews of all senior**
10  **level people, so I knew they were in that category.**
11  Q  Okay.  And in Miss Mansfield's case, Mr.
12  Wiggins had informed you that she was a GS employee?
13  **A  Yes.**
14  Q  Because you wouldn't have seen her
15  performance appraisals?
16  **A  That's correct.**
17  MR. FREDRICKSON:  I don't really want to
18  prolong this.  I did want to see the budget information
19  that I think we had requested sometime ago actually in
20  our request for production.  It came out of the
21  briefing that we did before.  It could be I see it and
22  I don't see a need for any follow-up at all.  But

215

1  subject to that caveat, I don't have any further
2  questions at this time.
3  MR. JAMES:  When you say follow-up, tell me
4  what you mean by that.
5  MR. FREDRICKSON:  Well, if there's some
6  budgetary documents that we had requested and I haven't
7  seen yet and you produce them and I need some
8  clarification, I might like to have the deponent come
9  back so I could ask those questions.  It's not my
10  intention to do that, but I would like to see the
11  stuff.
12  MR. MICKLE:  Of any new documents produced.
13  MR. FREDRICKSON:  Right.
14  MR. MICKLE:  Okay.
15  MR. FREDRICKSON:  I think there's probably
16  quite a bit from what I heard today.
17  MR. MICKLE:  I'd be surprised.
18  MR. JAMES:  Well, we'll check.
19  MR. FREDRICKSON:  Okay.  That's fine.
20  MR. JAMES:  That's it?
21  MR. FREDRICKSON:  For me.
22  MR. JAMES:  I have only a couple of

216

1  questions.
2  EXAMINATION BY COUNSEL FOR DEFENDANT
3  BY MR. JAMES:
4  Q  You testified earlier in response to
5  questions from Bruce concerning the budgetary
6  constraints in 2005, and you offered early out and did
7  not fill those positions?
8  **A  Yes.**
9  Q  Did you see the savings that you anticipated
10  from those positions?
11  **A  It was just taken away from me in this**
12  **budget.**
13  Q  So you didn't get the savings?
14  **A  No.**
15  Q  Who took it away?
16  **A  I believe the chief financial officer offered**
17  **up those savings.  When we had a budget cap that was**
18  **imposed by the legislative branch, that was identified**
19  **as money that didn't have to be used, so it was offered**
20  **up.**
21  Q  So financially you're back where you started?
22  **A  Yes, sadly.**

217

1    Q   You also testified earlier about the budget
2   concerns that you had at the time that you were viewing
3   upgrading Mrs. Mansfield as a result of that audit.
4    A   Yes.
5    Q   Can you tell us again what were those
6   concerns specifically?
7    A   There were two primary concerns, and it was
8   most evident in the cataloging area.  Mr. Wiggins had
9   hired 64 new catalogers while he was the acting
10  associate librarian without a budget increase.  So
11  there were those 64 people to cover.  And he had also
12  upgraded all of the cataloging positions adding a
13  ladder that went beyond the 9 to 12 that had been the
14  ladder for cataloging positions, adding a 13, which
15  meant a lot of people in Cataloging were moving into
16  the 13.  So there were all of those increases that I
17  had to cover with the existing budget.
18   Q   And so those 64 people, when you say covered,
19  was there money in the budget to cover them?
20   A   No.  I had no money.
21   Q   You had no money?
22   A   I had no money.

218

1    Q   And what steps did you take to cover them?
2    A   I eliminated as many of the nonpersonnel
3   budget items as I could.  I moved -- We just didn't
4   have the kinds of contracts and consulting arrangements
5   that we would have had normally so that I could cover
6   personnel costs.  And then when people began to retire
7   after I offered financial incentives, we began looking
8   at ways we could redistribute duties within the
9   appropriate grade levels so that we could get the most
10  needed things done without adding new staff so that I
11  could cover that budget.
12   Q   Now, you were asked earlier about your
13  conversations with Mr. Wiggins and with Mr. Carroll
14  concerning Mrs. Mansfield's appointment to the acting
15  director position of cataloging and the 120-day
16  appointment.  Did you have anything to do with her
17  appointment to the acting director position?
18   A   No.
19   Q   Did you have anything to do with whether or
20  not she received pay for 120 days?
21   A   No.
22   Q   Did you have anything to do with the period

219

1   of time that she didn't get it?
2    A   No.
3    Q   Who was in charge of Library Services at the
4   time that those decisions were made?
5    A   Mr. Wiggins.
6    Q   After you spoke to Mr. Wiggins and Mr.
7   Carroll, did you have reason to believe that there was
8   anything incorrect about the manner in which Mrs.
9   Mansfield had been appointed during those 120-day
10  periods?
11   A   No.  And that was the assurance I was looking
12  for, that we had done things properly, and that was the
13  conclusion.
14   Q   So based on the information they provided,
15  you believed everything was done according to the
16  Library's regulations?
17   A   Yes.
18   Q   Now I'd like to turn to the desk audit.  In
19  your decision not to upgrade Mrs. Mansfield from a
20  GS-15 position to a senior level position as a result
21  of the desk audit, did you take into consideration Mrs.
22  Mansfield's gender?

220

1    A   No.
2    Q   Did you take into consideration any
3   individual's gender during that consideration?
4    A   No.
5    Q   I think you testified earlier that Sue Vita
6   is an SL?
7    A   Yes.
8    Q   Did you have anything to do with the
9   appointment of Mrs. Vita to the SL position?
10   A   No.
11   Q   Did you have anything to do with the
12  appointment of Barbara Tillett?
13   A   No.
14   Q   And she's an SL also?
15   A   She's also a senior level person.
16   Q   Okay.  John Byrum is a senior level?
17   A   Correct.
18   Q   Did you have anything to do with the
19  appointment of Mr. Byrum?
20   A   No.
21   Q   Steve Herman is an SL.  Did you have anything
22  to do with him?

221

1    A  No.
2    Q  Did you have anything to do with Mark
3  Dimunation?
4    A  No.
5    Q  Did you have anything to do with any of the
6  other individuals that are SLs in Library Services,
7  their appointment?
8    A  The only one is Robert Dizard.  He was
9  already a senior level in Copyright, and I did work out
10  the transfer to Library Services.
11    Q  But you didn't make him an SL?
12    A  I did not make him a senior level person.
13    Q  Have you made anyone in Library Services
14  during your tenure an SL?
15    A  No.  Anyone who wasn't already a senior level
16  person.
17    Q  Okay.  Finally, in the decision to abolish
18  the acting assistant director positions, did you make
19  that decision based upon Mrs. Mansfield's gender?
20    A  No.
21    Q  Did you terminate the position solely because
22  she complained?

222

1    A  No.
2    Q  Did you terminate that position because of
3  Mr. Herman's gender?
4    A  No.
5    Q  Or Mr. Dimunation's gender?
6    A  No.
7    MR. JAMES:  You asked my other questions, so
8  that's it.
9    MR. FREDRICKSON:  I don't have anything
10  further.  Based on my comment earlier though, I do I
11  guess reserve the right to ask additional questions
12  based on additional production of documents, but I
13  don't know that we'll need to get to that.
14    MR. JAMES:  We've agreed on that.  We'll
15  produce whatever we have, and we'll see from there.
16    MR. FREDRICKSON:  Good.
17    MR. JAMES:  We'll read.
18    (Signature having not been waived, the
19  deposition of Deanna B. Marcum was concluded at 5:30
20  p.m.)
21
22

223

1    ACKNOWLEDGMENT OF DEPONENT
2    I, Deanna B. Marcum, do hereby acknowledge
3  that I have read and examined the foregoing testimony,
4  and the same is a true, correct and complete
5  transcription of the testimony given by me and any
6  corrections appear on the attached Errata Sheet signed
7  by me.
8
9  _____    _____
10    (DATE)            (SIGNATURE)
11
12
13
14
15
16
17
18
19
20
21
22

224

1  CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2    I, Nancy Bond Rowland, Registered
3  Professional Reporter, the officer before whom the
4  foregoing proceedings were taken, do hereby certify
5  that the foregoing transcript is a true and correct
6  record of the proceedings; that said proceedings were
7  taken by me stenographically and thereafter reduced to
8  typewriting under my supervision; and that I am nether
9  counsel for, related to, nor employed by any of the
10  parties to this case and have no interest, financial or
11  otherwise, in its outcome.
12    IN WITNESS WHEREOF, I have hereunto set my
13  hand and affixed my notarial seal this 25th day of
14  February 2007.
15
16  My commission expires:
17  October 31, 2009
18
19
20  _____
21  NOTARY PUBLIC IN AND FOR THE
22  DISTRICT OF COLUMBIA

```
                                                    225
1        E R R A T A   S H E E T
2            IN RE:  Mansfield v. USA
3  RETURN BY: _____
4  PAGE  LINE  CORRECTION AND REASON
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  _____  _____
22     (DATE)          (SIGNATURE)
```

```
                                                    226
1        E R R A T A   S H E E T   C O N T I N U E D
2            IN RE:  Mansfield v. USA
3  RETURN BY: _____
4  PAGE  LINE  CORRECTION AND REASON
5   ____  ____  _____
6   ____  ____  _____
7   ____  ____  _____
8   ____  ____  _____
9   ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  _____  _____
22     (DATE)          (SIGNATURE)
```