# Exhibit 6

# Deposition of Stephen Perloff

*Mansfield v. Billington*, Civil Action No. 05-1790 (RMU/JMF)

1

IN THE UNITED STATES COURT

OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - x

JUDITH A. MANSFIELD,           :

      Plaintiff,             :   Civil Action No.

   v.                         :   05-472C

THE UNITED STATES,            :

      Defendant.             :

- - - - - - - - - - - - - - - x

                Wednesday, April 18, 2007

                Washington, D.C.


    Deposition of STEPHEN H. PERLOFF, commencing at 10:00 a.m., held at the The Library of Congress, 101 Independence Avenue, S.E., Washington, D.C., before Keith Wilkerson, a notary public in and for the District of Columbia.

2 (Pages 2 to 5)

---

Page 2

1  APPEARANCES OF COUNSEL
2
3  Attorney for the Plaintiff:
4      Webster, Fredrickson & Brackshaw
5      1775 K Street, N.W.
6      Suite 600
7      Washington, D.C. 20006
8      (202) 659-8510
9  BY: BRUCE A. FREDRICKSON, ESQ.
10     CEDAR P. CARLTON, ESQ.
11
12 Attorneys for the Defendant:
13     Office of General Counsel
14     Library of Congress
15     101 Independence Avenue, S.E.
16     Washington, D.C. 20557
17     (202) 707-7464
18 BY: JESSIE JAMES, JR., ESQ.
19     JULIA K. DOUDS, ESQ.
20
21
22 (CONTINUED)

---

Page 3

1  APPEARANCES OF COUNSEL
2          (CONTINUED)
3
4  Attorneys for the Defendant:
5      United States Department of Justice
6      Commercial Litigation/National Courts
7      1100 L Street, N.W.
8      Room 4062
9      Washington, D.C. 20005
10     (202) 301-0383
11 BY: DOUGLAS K. MICKLE, ESQ.
12
13     Office of the United States Attorney for
14     the District of Columbia
15     Judiciary Center Building
16     555 Fourth Street, N.W.
17     Room E4822
18     Washington, D.C. 20580
19     (202) 514-7161
20 BY: JANE M. LYONS, ESQ.
21
22 Also present: Judith A. Mansfield

---

Page 4

1  INDEX OF EXAMINATIONS
2
3  WITNESS                                PAGE
4  STEPHEN H. PERLOFF
5      By Mr. Mickle.................. 005
6      By Mr. Fredrickson............ 089
7
8
9  INDEX OF EXHIBITS
10
11 NO.  DESCRIPTION                      PAGE
12 55   Expert Report......................... 005

---

Page 5

1           PROCEEDINGS
2           (Library Exhibit No. 55
3           was marked for identification.)
4  Whereupon,
5      STEPHEN H. PERLOFF
6  was called for examination by counsel for Defendant
7  and, after having been duly sworn by the notary
8  public, was examined and testified as follows:
9
10     EXAMINATION BY COUNSEL FOR DEFENDANT
11     BY MR. MICKLE:
12     Q. Good morning, Mr. Perloff. How are you
13 today?
14     A. Fine. Thank you.
15     Q. My name is Doug Mickle. I'm with the
16 Department of Justice, and I'm defending the United
17 States in the case of Mansfield v. The United
18 States. I think you've met everybody here, but
19 just let me introduce them for the record. There
20 is Ms. Jane Lyons, the assistant attorney for the
21 District of Columbia in a companion case
22 Ms. Mansfield filed in District Court. Next to her

### Page 30

1 notice one thing here that I want to make clear.
2 In the last of the documents that I've listed back
3 here, I realize I didn't list something that I
4 mentioned specifically in the report, which is
5 really the position descriptions for Dimunation and
6 Steve Herman and Mr. Byrum, but I mention that
7 specifically in the report but didn't include it in
8 the list of materials.
9    Q. So your report will be updated to list
10 the position descriptions of Mr. Herman,
11 Mr. Dimunation and Mr. Who?
12    A. Byrum. I mention it here.
13    Q. But you didn't talk to any of those
14 individuals?
15    A. No, I didn't.
16    Q. And did they issue you a retention letter
17 for your services?
18    A. No.
19    Q. And I see where your compensation was $90
20 an hour.
21    A. That's correct.
22    Q. And that's your standard compensation

### Page 31

1 rate?
2    A. Yes, it is.
3    Q. And how many hours did you work on this
4 report?
5    A. I think it was 29.
6    MR. FREDRICKSON: And that's consistent
7 with my recollection, if that helps you.
8    Q. But you did have billing records, then?
9    MR. FREDRICKSON: We've got a one-page
10 invoice if you'd like to see it.
11    A. I don't keep billing records.
12    Q. How do you know you worked 29 hours?
13    A. I keep notes on pieces of paper.
14    Q. Did you take notes while preparing your
15 report?
16    A. No, not really. Sometimes I use stickies
17 as I go through to remind myself. I just throw
18 those away as I complete the report.
19    Q. And did you do any research prior to
20 issuing your expert report?
21    A. Could you be more specific when you say
22 "research"?

### Page 32

1    Q. But for the universe of documents that's
2 listed at page 6 of your expert report, did you
3 consider any other material?
4    A. I didn't consider any other material
5 specifically other than from my own background.
6    Q. Other than your own background that
7 you've obtained through your years of experience?
8    A. That's right.
9    Q. So you didn't have to go back and refresh
10 your recollection regarding what the regulations at
11 OPM stated or what the statutes stated?
12    A. No. I think I mention it here in the
13 list of documents that I used, that there were some
14 OPM publications that I've listed.
15    Q. Just to make sure, everything that's
16 listed on page 6, those documents were the only
17 things that you considered, as well as the PDs for
18 Herman, Dimunation and Byrum?
19    A. Yes, as far as I can recall.
20    Q. And did you author this report by
21 yourself or did you have any assistance?
22    A. No, there was no assistance at all.

### Page 33

1    Q. And I think you just told me, but just to
2 confirm, you didn't take any notes?
3    A. No. I had little sticky things.
4    Q. But they're no longer in your possession?
5    A. No. I always get rid of those. As I use
6 them I get rid of them.
7    Q. Let's get into the report, then, if we
8 can. From your report, what were the specific
9 opinions that you issued in this matter?
10    A. Can I read this?
11    Q. Please.
12    A. Well, there were several. One was that
13 Ms. Mansfield's position of record, the Chief of
14 the Arts and Science Cataloging Division, should
15 have been designated as an SL position and made
16 equal to the other comparable chief positions; that
17 when Ms. Mansfield was carrying out the full
18 responsibilities as the Acting Director of
19 Cataloging that she should have been paid as an SL
20 for that period of time; that the work that she was
21 assigned as the Assistant Director for
22 Bibliographic Access was in my mind an SL position;

**Page 78**

1  A. What she did was she pointed them out,
2  and I realized things were happening, and that was
3  the extent of walking me through it.
4  Q. Did she dispute any of the dates on that
5  time line?
6  A. Not to my knowledge.
7  Q. Did she --
8  A. Or I don't recall that she did.
9  Q. Did she dispute any of the
10  characterizations set forth on that time line?
11  A. There were really no characterizations on
12  the time line. Have you seen the same thing I
13  have?
14  Q. Yes.
15  A. Well, then you know it's titles and
16  dates. There was no substance to it.
17  Q. Did she dispute any of the information on
18  the chart that said director of arts and sciences,
19  date A to date Z?
20  A. I don't remember. I really don't
21  remember that. The dates, frankly, were not the
22  part that I was focusing on.

**Page 79**

1  Q. What were you focusing on?
2  A. Just on understanding what I was looking
3  at in terms of these different kinds of jobs.
4  Q. Well, you would agree that there was a
5  regulation in place at the Library of Congress
6  regarding the duration of temporary appointments.
7  A. Yes.
8  Q. Did you ever talk to Mr. Wiggins before
9  rendering your opinion?
10  A. No, I didn't.
11  Q. Did Ms. Mansfield ever say anything about
12  Mr. Wiggins when you had your conversation with
13  her?
14  A. I asked her did her supervisor support
15  this, and she said yes.
16  Q. And did you ask her why the supervisor
17  didn't try to get her paid for that time when she
18  was serving in the position but not designated as
19  an SL?
20  A. I didn't ask her that specifically, no.
21  Q. Why not?
22  A. It was early in the process and I hadn't

**Page 80**

1  really had a chance to look at the documents yet
2  and I didn't have a full scope of what was going
3  on. I was really just trying to get some idea of
4  what the progression of these jobs were.
5  Q. Well, let's go back into that, because I
6  was under the assumption that you had the documents
7  and then had the meeting with Mr. Fredrickson and
8  Ms. Mansfield.
9  A. I didn't look at them intensively in that
10  period.
11  Q. And then you met with Mr. Fredrickson and
12  Ms. Mansfield?
13  A. Yes.
14  Q. And then what did you do?
15  A. I went back and looked over the documents
16  again. I just didn't understand where all these
17  jobs were coming from.
18  Q. And who asked to have that meeting? Did
19  you?
20  A. No. I think Mr. Fredrickson said that
21  Judy was coming in and could I come in and talk
22  with her.

**Page 81**

1  Q. Let's quickly go to the third opinion.
2  We'll come back to several of these. I just want
3  to get a general overview. The third opinion that
4  you rendered for Ms. Mansfield is this one that
5  states:
6     Based on my review of the materials
7  provided to me, I believe that the work of Ms.
8  Mansfield, serving as chief Of the Arts and
9  Sciences Cataloging Division, and compensated at
10  the GS-15 level, was at least equivalent in skill,
11  effort, and responsibilities, to the work performed
12  by John Byrum, Steve Herman, and Mark Dimunation.
13     That is on page 2 of your report. Is
14  that correct?
15  A. That's correct.
16  Q. And what was the basis for rendering this
17  opinion?
18  A. The position descriptions that were
19  available to me, and then more recently the
20  depositions of Mr. Herman and Mr. Dimunation.
21  Q. What specifically in the position
22  descriptions of those individuals did you think

**Page 82**

1  were relevant to your rendering that opinion?
2      A.  I'd have to really look to tell you, but
3  when I read them they were very comparable. There
4  were certain differences because they were all
5  doing different kinds of work at the Library, but
6  in terms of the supervision and the scope and
7  complexity of their work, the position descriptions
8  looked very comparable to me.
9      Q.  And that also goes to the policy aspect
10 of each decision?
11     A.  That's correct. And interestingly, in
12 the depositions of Mr. Herman and Mr. Dimunation,
13 when they were asked about the policy roles they
14 had, my recollection is that policies were
15 typically recommended by division chiefs and
16 submitted to the higher organizational levels for
17 acceptance or rejection or adoption.
18     Q.  Did you consider, when rendering your
19 opinion, consideration of the policy
20 recommendations as they relate to the level that a
21 position was classified at?
22     A.  Would you mind repeating that again?

**Page 83**

1      Q.  If a certain person recommends or has
2  input on policy at one level but another position
3  has input on policy, say, more at a strategic
4  level, would that have any effect on how a job is
5  classified?
6      A.  It might, depending on whether we're
7  still talking about recommendations or decisions.
8  If it's a substantial difference in the level or
9  the scope of the recommendations or the
10 implications of the recommendations, that of course
11 would have an impact.
12         MR. MICKLE: At this time why don't we
13 take a ten minute break?
14         (Recess.)
15         (Ms. Lyons leaves the deposition.)
16     Q.  I want to go back to a couple of things
17 on your expert report, Mr. Perloff. I'm sorry I'm
18 going back and forth with you.
19     A.  That's okay.
20     Q.  On page 5, under the topic that starts
21 Findings Related to the Assistant Director for
22 Bibliographic Access position, you stated, I think

**Page 84**

1  four lines from the bottom:
2         It is clear from well established Office
3  of Personnel Management (OPM) guidance that the
4  assignment of Assistant Director for Bibliographic
5  Access duties were not "collateral duties", but
6  were duties that directly impacted Ms. Mansfield's
7  pay grade and were, in fact, grade controlling.
8      A.  Yes.
9      Q.  What OPM guidance were you referring to?
10     A.  There are two. One is called the
11 Classifier's Handbook, and the other is called
12 Introduction to Position Classification Standards.
13 Those two publications together explain the
14 concepts and determine the appropriate grade for
15 positions. There's also a large body of written
16 materials that OPM has produced that are called
17 classification appeal decisions that deal with
18 these kinds of issues.
19     Q.  But you didn't review any of those
20 decisions when rendering this report, did you?
21     A.  I looked at a few, yes.
22     Q.  Well, when I asked you what you looked

**Page 85**

1  at, whether you looked at federal regulations or
2  case law or statutes, you said you didn't.
3      A.  I apologize for that.
4      Q.  Which cases did you specifically review?
5      A.  I don't remember the names actually,
6  because I just really went to the OPM website where
7  I found these two publications and searched for the
8  term "collateral duties" and looked at a few of the
9  decisions. My apologies for forgetting about that.
10     Q.  Was voluntariness an issue in reviewing
11 those critical cases that you reviewed?
12     A.  No. I didn't look at that point.
13     Q.  So in rendering your third opinion, or
14 this opinion right here on bibliographic access and
15 collateral duties, you primarily relied upon, is it
16 correct that your primary reliance was on OPM
17 guidance?
18     A.  Well, there are several things. If I can
19 explain my line of reasoning, the first benchmark
20 is the Director for Cataloging position, and in my
21 mind there was never a dispute whether it was SL or
22 shouldn't have been SL. It had been SL for a long

24 (Page 90)

```
                                                        90
 1   cataloging directorate?
 2       A.  Yes, it was.
 3           MR. FREDRICKSON: I have no further
 4   questions.
 5           MR. MICKLE: I have no further questions.
 6           (Whereupon, at 11:55 a.m. the taking of
 7   the deposition was concluded.)
 8                 (Signature not waived.)
 9                     - - -
10
11
12
13
14       _____
15           STEPHEN H. PERLOFF
16
17   Subscribed and sworn to and before me
18   this _____ day of _____, 20____.
19
20
21   _____
22       Notary Public
```