# Exhibit 11

# Plaintiff's Answers to Defendant's First Set of Interrogatories, Excerpts

*Mansfield v. Billington*, Civil Action No. 05-1790 (RMU/JMF)

UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **JUDITH A. MANSFIELD** )<br>)<br>     **Plaintiff,** )<br>)<br>    v. )<br>)<br>**THE UNITED STATES,** )<br>)<br>    **Defendant.** )<br>) | **Civil Action No. 05-472C**<br>**Judge Mary Ellen Coster Williams** |

**PLAINTIFF'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1**: Identify each and every fact you intend to use during a trial or hearing in your case that supports your contention that the Library of Congress ("Library") violated the Equal Pay Act as alleged in paragraph four of your complaint.

**ANSWER** : Plaintiff objects to this interrogatory to the extent that it seeks information covered by the attorney-client privilege or the attorney work product doctrine. Plaintiff further objects to this interrogatory because it is overly broad and unduly burdensome in that Plaintiff cannot be expected to identify every single fact she will use at trial. Without waiving her objections, Plaintiff responds as follows:

      Since July 1, 1969, I have been employed by the Library of Congress in a series of jobs of increasing skill and responsibility. Beginning in 1998, and ongoing since, I have been employed in a number of jobs at the Library which require the same skill, effort, and responsibility as jobs held by male employees of the Library, but the Library has paid me less than my male counterparts for substantially equal work.

**Chief of the Arts and Sciences Cataloging Division ("ASCD Chief")**

Pursuant to a competitive selection process, I became the Chief of the Arts and Sciences Cataloging Division on May 24, 1998 at Grade GS-15. In this capacity, I reported directly to Mr. Beacher Wiggins, a male employee of the Library of Congress who served as the Director for Cataloging and who was employed by the Library of Congress as a Senior Level employee in the Library's Senior Level Executive System.

In April 2003, a position classification specialist engaged by the Library completed an audit of the eight Division Chief positions in the Cataloging Directorate within Library Services of the Library of Congress. The position classification specialist determined that the position of Chief of the Arts and Sciences Cataloging Division was substantially equal in functional responsibilities, as well as budget, staff, and nature of managerial responsibility, to two other Division Chief positions within the Cataloging Directorate which were currently Senior Level positions.

One of these Senior Level positions, Chief of the Regional and Cooperative Cataloging Division, was then held by Mr. John D. Byrum, Jr., a male who was paid substantially more than I. The Division Chief position of Mr. Byrum required substantially equal skill, effort, and responsibility as my Division Chief position.

Following the audit, on April 25, 2003, the Acting Associate Librarian for Library Services recommended that the Library reclassify the position of Chief of the Arts and Sciences Cataloging Division to the Senior Level, because this position is substantially equal to the two other Division Chief positions within the Cataloging Directorate which were graded at the Senior Level. In July, 2003, the Library's Director of Human Resources decided to delay action on the request for reclassification. To date, the Library has not made a decision on the request for reclassification. As

2

a result, I have been paid less than a male employee in a position requiring equal skill, effort, and responsibility.

Additionally, my position of Chief of ASCD requires the same skill, effort, and responsibility as Chief of Rare Book and Special Collections Division, held by Mark Dimunation, and Chief of Collections Access, Loan and Management Division, held by Steven Herman. The Library compensates Mr. Dimunation and Mr. Herman at the Senior Level for their work as chiefs, but compensates my work as Chief of ASCD at the GS-15 level.

**Acting Director for Cataloging**

In September 2002, I was promoted to the position of Acting Director for Cataloging while Mr. Wiggins was appointed Acting Associate Librarian for Library Services. Upon my promotion to Acting Director, I was moved from the GS-15 pay level to the Senior Level pay plan for a period not to exceed 120 days. At the end of the 120 day period, the Library removed me from the Senior Level pay plan and returned me to a GS-15 pay status. Nevertheless, I continued to serve as Acting Director for Cataloging and perform all the duties of the position to which I had been appointed. I performed the exact same duties as my male predecessor, Mr. Wiggins (who had been paid at the Senior Level), and the job required the same skill, effort, and responsibility as the job had required of Mr. Wiggins.

As Acting Director for Cataloging, I supervised the Chiefs of the cataloging divisions of Library Services. In this capacity, I served as the immediate supervisor of Mr. Byrum, the male Chief of the Regional and Cooperative Cataloging Division and a Senior Level employee of the Library. As the immediate supervisor of this Senior Level male employee, my work has been substantially equal to that of an employee of the opposite sex and the performance of my job required

3

at least as much (if not more) skill, effort, and responsibility as the work required of Mr. Byrum. Throughout this period, I was paid substantially less than Mr. Byrum.

At all times during which I served as Acting Director for Cataloging, including the two 120 day periods during which I was paid on the Senior Level, I was paid well below the rate of my male predecessor and other male employees who performed similar duties. In February 2004, the Library returned me to the Senior Level pay plan for a 120 day period ending in June 2004. On June 9, 2004, the Library returned me to a GS-15 pay status. However, I continued to fulfill the duties of the Director for Cataloging.

**Assistant Director for Bibliographic Access**

In August 2004, the Library realigned Library Services. I was appointed Assistant Director for Bibliographic Access. In that capacity, I continued to carry out the duties of the former Director for Cataloging position, which was a Senior Level position. I continued to supervise the cataloging chiefs including John Byrum who was paid at the Senior Level. Nevertheless, the Library did not pay me for this Senior Level work, but rather paid me at the GS-15 level.

At the same time, the Library appointed two other Assistant Directors in Library Services. Steve Herman became Assistant Director for Collections Management and Mark Dimunation became Assistant Director for Special Collections and Services. Mr. Herman and Mr. Dimunation, two male employees of the Library, were paid at the Senior Level, while I was paid at the GS-15 level even though I was doing Senior Level work. Additionally, as Assistant Director, I performed substantially equal job duties as Mr. Herman and Mr. Dimunation, and all three positions required the same skill, effort and responsibilities. I was paid far less than my male counterparts.

In August 2004, I was informed that new position descriptions would be provided for the

4

Assistant Director positions. In September 2004, when no new position description had been provided, I informed my supervisor, Mr. Wiggins, of this fact. I followed up on the initial conversation asking about the status of the position descriptions and pointing out the fact that the two male Assistant Directors were paid at the Senior Level. In yet another conversation in October 2004, I stated to Mr. Wiggins that paying me at the GS level while the two male Assistant Directors were paid at the Senior Level violated the Equal Pay Act. In subsequent conversations between October 2004 and March 2005, I stated to Mr. Wiggins that the manner in which the Library paid me in comparison to my male counterparts violated the Equal Pay Act.

On March 16, 2005, having obtained no resolution through my immediate supervisor, I hand delivered a letter dated March 15, 2005, and addressed to the Librarian of Congress in which I stated: "My compensation at a lower grade for Senior Level work is clearly unfair and illegal. My pay is lower than that of employees of the opposite sex, while performance of my work requires skill, effort, and responsibility that is equal to that of Senior Level employees of the opposite sex, working under similar conditions in the same establishment. This is a continuing violation of the Equal Pay Act of 1963, as well as a violation of Title VII of the Civil Rights Act of 1964." I requested a response within 10 business days.

Rather than remedy the unequal payment for equal work, on March 31, 2005, the Library informed me that my position of Assistant Director was abolished, along with the other two Assistant Director positions.

In sum, the Library has repeatedly and knowingly paid me significantly less than male employees for work requiring the same skill, effort, and responsibility. As ASCD Chief, I was paid less than my male counterpart, John Byrum, RCCD Chief, as well as two other Senior Level chiefs,

5

Mark Dimunation and Steven Herman. As Acting Director for Cataloging and then Assistant Director for Bibliographic Access, I was paid less than my predecessor, a male, Beacher Wiggins and a male subordinate, John Byrum. As Assistant Director for Bibliographic Access, I was paid less than two male counterparts, Mark Dimunation and Steve Herman and a male subordinate, John Byrum. My attempts to rectify this problem led the Library to abolish my position as Assistant Director for Bibliographic Access and demote me rather than pay me fair compensation.

See Answers to Interrogatory Nos. 2-24. See the Complaint. See documents produced.


**INTERROGATORY NO. 2**: Identify each and every fact you intend to use during a trial or hearing in your case that supports your contention that the Library's alleged violation of the Equal Pay Act has been "knowing and willful" as alleged in paragraph four of your complaint.

**ANSWER**: Plaintiff objects to this interrogatory to the extent that it seeks information covered by the attorney-client privilege or work product doctrine. Plaintiff further objects to this interrogatory because it is overly broad and unduly burdensome in that Plaintiff cannot be expected to identify every single fact she will use at trial. Without waiving her objections, Plaintiff responds as follows:

See my Answer to Interrogatory No. 1 in which I identify several instances where male employees received Senior Level pay for substantially equal work to that which I performed, while I was paid at the GS-15 level. Through the express written and oral direction of Library management, the Library knowingly made the staffing and personnel decisions that led to these disparities in pay and overall treatment.

The Library knowingly assigned the duties of Chief, Arts and Sciences Cataloging Division (ASCD), to me in 1998. My supervisor, Beacher Wiggins, repeatedly informed the Library that my

**INTERROGATORY NO. 6**: Identify each and every position you encumbered at the Library "which require the same skill, effort and responsibility as jobs held by male employees at the Library" as alleged in paragraph four of your complaint. For each position you identify include the position title, grade and series of the position; any and all facts that support your contention that the position you identify "require[d] the same skill, effort, and responsibility as jobs held by male employees" the position title, grade and series of the positions(s) to which you are drawing a comparison, and the name(s) of the male employee(s) who encumber the position(s).

**ANSWER**:  Over the course of my tenure at the Library of Congress, I held several positions that required the same or greater skill, effort, and responsibility as jobs held by male employees.  I am aware of the following positions:

My position as *Chief, Arts & Sciences Cataloging Division, GS-1410-15* required the same or substantially equal skill, effort, and responsibility of the position of *Chief, Regional & Cooperative Cataloging Division, SL-1410,* held by *John Byrum*. As Chief of ASCD, I

- Administer/oversee budget of ca. $4M

- Direct work and manage human resources of the division, which includes 7 sections and a pilot project with a total of ca. 60 staff

- Obtain resources and deal with officials to assure proper implementation of changed procedures, etc.

- Monitor progress toward division goals

- Oversee the implementation of technical policies and procedures, including international standards

- Initiate and set agenda for regularly-scheduled meetings of technical services/cataloging

15

managers from other major national libraries (Library & Archives Canada, National Library of Australia, British Library, and Deutsche Nationalbibliothek) to discuss cataloging and access matters of mutual interest.

- Play leadership role in major multi-year planning efforts, e.g., key role in developing and overseeing the Cataloging Directorate's action plan (*Bibliographic Control of Web Resources: A Library of Congress Action Plan*) that resulted from the 2000 Bicentennial Conference on Bibliographic Control for the New Millennium -- involved working with professional organizations and individuals outside of the Library of Congress

- Assume leadership/management role in directorate-wide initiatives, such as co-chairing the committee charged with planning the directorate's re-organization

- Represent Library Services and coordinate the Library Services' role in the Copyright Office Business Process Re-engineering effort, including oversight of pilot projects to improve workflows between the two organizations

- Serve on committees of professional organizations

- Give speeches to national-level and regional professional groups: ALA Copy Cataloging Discussion Group, Potomac Technical Processing Librarians.

The Regional and Cooperative Cataloging Division Chief which is graded at SL 1410 had similar duties to those described above. There was a small difference in the number of employees and consequently the size of the budget.

My position as *Acting Director for Cataloging, SL-1410* required the same skill, effort, and responsibility of the position of *Director for Cataloging, SL-1410,* held by *Beacher Wiggins.* As Acting Director for Cataloging, I performed the same duties as my predecessor, Beacher Wiggins.

Those duties were:

- Administer/oversee budget of ca. $40M

- Manage human resources/issues for 8 divisions of ca. 500 staff

- As a full member of the Library Services management team, participated in and contribute to decision-making on both policy and administrative matters, including budget.

- Oversee the establishment of technical policies and procedures, e.g., international standards and LC standards that are internationally implemented

- Oversee major national and international programs, e.g., Cataloging in Publication, Program for Cooperative Cataloging, Dewey Decimal Classification

- Lead major multi-year planning efforts, resulting in 5-year strategic plan and cycles of 2-year review

- Take lead on matters relating to national and international cataloging policy issues

- Serve on committees of professional organizations

- Give speeches to national-level professional groups.

My position as *Assistant Director for Bibliographic Access, GS-1410-15* required the same or greater skill, effort, and responsibility of the positions of *Assistant Director for Collections Management, SL-1410,* held by *Steve Herman* and *Assistant Director for Special Collections and Services, SL-1410,* held by *Mark Dimunation*. Additionally, as an extension of my work as Acting Director for Cataloging, this position required the same or greater skill, effort, and responsibility as the *Director for Cataloging* position held by Beacher Wiggins.

As Assistant Director for Bibliographic Access, I performed a broader range of more complex duties than my Assistant Director counterparts, Mark Dimunation and Steve Herman. My

Assistant Director duties were a continuation of my Acting Director duties with additional responsibilities, e.g. the inclusion of a ninth division to my span of control and an increase in my budget to $44M. Beacher Wiggins made clear in an email to the acquisitions and cataloging Chiefs, dated July 15, 2004, that he expected "... the assist directors to do more than coordinate: I expect them to manage; to have authority to make decisions; to have authority to handle personnel matters; to have budget responsibilities for their areas." My two counterparts did not have the same history in relation to their jobs. Deanna Marcum's email of August 6, 2004, specifically states she expected that "the units designated in your areas to report to you."

See Answers to Interrogatory Nos. 1-2, 11-12, 19. See documents produced.


**INTERROGATORY NO. 7**: Identify each and every position you held at the Library with "increasing skill and responsibility" as alleged in paragraph five of your complaint. For each position you identify include the time frame you encumbered the position, how you obtained the position (i.e. competitive or non-competitive appointment), the name of the appointing and/or selecting official, a detailed description of your duties and responsibilities, as why the position required "increasing skill and responsibility".

**ANSWER**: Plaintiff objects to this interrogatory because it is overly burdensome to the extent that it seeks for Plaintiff to name every single duty or responsibility she held at the Library of Congress requiring "increasing skill and responsibility." Without waiving her objection, Plaintiff responds as follows:

Over the course of my tenure at the Library of Congress, I held a series of positions requiring increasing skill and responsibility:

18

**INTERROGATORY NO. 8**: Identify each and every individual who you claim performed the same or similar duties as you but was compensated at a higher rate of pay. For each individual you identify, include in your response a detailed description of each and every same or similar duty to you that individual performed, when that individual performed each and every same or similar duty you identify, how you became aware that individual was performing same or similar duties as you but was compensated at a higher rate of pay.

**ANSWER**: I am aware of the following individuals who performed the same or similar duties as me but were compensated at a higher rate of pay:

**Beacher Wiggins**: As Acting Director for Cataloging, I performed the same duties as my predecessor, Beacher Wiggins, who performed the duties from 1997-2002. I worked closely with Mr. Wiggins, including being supervised by him, over many years and thus became aware of what his duties were and what his compensation was. Those duties were:

•    Administer/oversee budget of ca. $40M

•    Manage human resources/issues for 8 divisions of ca. 500 staff

•    As a full member of the Library Services management team, participated in and contribute to decision-making on both policy and administrative matters, including budget.

•    Oversee the establishment of technical policies and procedures, e.g., international standards and LC standards that are internationally implemented

•    Oversee major national and international programs, e.g., Cataloging in Publication, Program for Cooperative Cataloging, Dewey Decimal Classification

•    Lead major multi-year planning efforts, resulting in 5-year strategic plan and cycles of 2-year review

- Take lead on matters relating to national and international cataloging policy issues

- Serve on committees of professional organizations

- Give speeches to national-level professional groups.

**Mark Dimunation, Steve Herman**, and I all became Assistant Directors on August 6, 2004 and served until April 13, 2005. We performed the same and similar duties for our respective areas of responsibility. We attended meetings together and worked together, thus I became aware of what their duties were and what their compensation was. I performed a broader range of more complex duties than my Assistant Director counterparts, Mark Dimunation and Steve Herman, since my Assistant Director duties were a continuation of my Acting Director duties with additional responsibilities, e.g. the inclusion of a ninth division to my span of control and an increase in my budget to $44M. My two counterparts did not have the same history in relation to their jobs. Deanna Marcum's email of August 6, 2004, specifically states she expected that "the units designated in your areas to report to you."

**John Byrum**: As Chief of ASCD, I performed the same and similar duties to **John Byrum**, Chief, Regional and Cooperative Cataloging Division. I worked closely with Mr. Byrum, including supervising him, over many years and thus became aware of what his duties were and what his compensation was.

- Administer/oversee budget of ca. $4M

- Direct work and manage human resources of the division, which includes 7 sections and a pilot project with a total of ca. 60 staff

- Obtain resources and deal with officials to assure proper implementation of changed procedures, etc.

40

- Monitor progress toward division goals

- Oversee the implementation of technical policies and procedures, including international standards .

- Initiate and set agenda for regularly-scheduled meetings of technical services/cataloging managers from other major national libraries (Library & Archives Canada, National Library of Australia, British Library, and Deutsche Nationalbibliothek) to discuss cataloging and access matters of mutual interest.

- Play leadership role in major multi-year planning efforts, e.g., key role in developing and overseeing the Cataloging Directorate's action plan (*Bibliographic Control of Web Resources: A Library of Congress Action Plan*) that resulted from the 2000 Bicentennial Conference on Bibliographic Control for the New Millennium -- involved working with professional organizations and individuals outside of the Library of Congress

- Assume leadership/management role in directorate-wide initiatives, such as co-chairing the committee charged with planning the directorate's re-organization

- Represent Library Services and coordinate the Library Services' role in the Copyright Office Business Process Re-engineering effort, including oversight of pilot projects to improve workflows between the two organizations

- Serve on committees of professional organizations

- Give speeches to national-level and regional professional groups: ALA Copy Cataloging Discussion Group, Potomac Technical Processing Librarians.

The Regional and Cooperative Cataloging Division Chief which is graded at SL 1410 had the same or similar duties to those described above. There was a small difference in the number of employees

41

and consequently the size of the budget.

In all cases, the pay grades of individual staff members are common knowledge. See answers to Interrogatory Nos. 1-2, 6-7, 11-12, 19. See documents produced.


**INTERROGATORY NO. 9**: Identify all Library officials or employees who you contend were responsible for setting your rate of pay during the time frame of your detail to the Acting Director of Cataloging position. Include in your response what you contend you should have been paid during the time frame of your detail to the Acting Director of Cataloging position and every and every fact you rely upon to support this contention.

**ANSWER**:

The Library management was responsible for setting my rate of pay. I am aware of the following Library officials who were responsible for–or otherwise had influence on –setting my pay during my detail to the Acting Director for Cataloging position: Dennis Hanratty, current Director for Human Resources Services and former Director for Strategic Planning and Automation, Human Resource Services; Theresa A. Smith, former Director for Human Resource Services; Donald Scott, former Deputy Librarian of Congress; Beacher Wiggins, Director for Acquisitions and Bibliographic Access; Deanna Marcum, Associate Librarian for Library Services.

As set forth in the expert report of Dr. Richard Lurito, while I was working as the Acting Director for Cataloging and then as the Assistant Director for Bibliographic Access, I should have been paid at the Senior Level and at a rate of pay comparable to my male predecessor in the Director for Cataloging position and to the male Assistant Directors. For the specific rate of pay that I should have received while working at the Senior Level, including as the Acting Director for Cataloging,

42

**INTERROGATORY NO. 11**: Identify each and every fact to support your contention that you were paid "well below the rate of [your] male predecessor and other male employees who performed similar duties" as alleged in paragraph 13 of your complaint For each male employee you identify, include that individual's position title and grade, the number of years the employee encumbered the position, and each and every "similar duty" as compared to you performed by the employee.

**ANSWER**: Plaintiff objects to this interrogatory to the extent that it seeks information covered by the attorney-client privilege or attorney work product doctrine. Without waiving her objections, Plaintiff responds as follows:

As Acting Director for Cataloging, I performed the same duties as my predecessor, **Beacher Wiggins**. Beacher Wiggins was Director for Cataloging for five years (1997-2002). Those duties were:

- Administer/oversee budget of ca. $40M

- Manage human resources/issues for 8 divisions of ca. 500 staff

- As a full member of the Library Services management team, participated in and contribute to decision-making on both policy and administrative matters, including budget.

- Oversee the establishment of technical policies and procedures, e.g., international standards and LC standards that are internationally implemented

- Oversee major national and international programs, e.g., Cataloging in Publication, Program for Cooperative Cataloging, Dewey Decimal Classification

- Lead major multi-year planning efforts, resulting in 5-year strategic plan and cycles of 2-year review

- Take lead on matters relating to national and international cataloging policy issues

- Serve on committees of professional organizations

- Give speeches to national-level professional groups.

**Mark Dimunation**, Assistant Director for Collections and Services, SL-1410, **Steve Herman**, Assistant Director for Collections Management, SL-1410, and I, Assistant Director for Bibliographic Access, GS-1410-15, served as Assistant Directors from August 6, 2004 to April 13, 2005, a period of eight months. As Assistant Director for Bibliographic Access, I performed a broader range of more complex duties than my Assistant Director counterparts, Mark Dimunation and Steve Herman. My Assistant Director duties were a continuation of my Acting Director duties with additional responsibilities, e.g. the inclusion of a ninth division to my span of control and an increase in my budget to $44M. My two counterparts did not have the same history in relation to their jobs. Deanna Marcum's email of August 6, 2004, specifically states she expected that "the units designated in your areas to report to you."

As Chief of ASCD, I

- Administer/oversee budget of ca. $4M

- Direct work and manage human resources of the division, which includes 7 sections and a pilot project with a total of ca. 60 staff

- Obtain resources and deal with officials to assure proper implementation of changed procedures, etc.

- Monitor progress toward division goals

- Oversee the implementation of technical policies and procedures, including international standards

- Initiate and set agenda for regularly-scheduled meetings of technical services/cataloging

45

managers from other major national libraries (Library & Archives Canada, National Library of Australia, British Library, and Deutsche Nationalbibliothek) to discuss cataloging and access matters of mutual interest.

- Play leadership role in major multi-year planning efforts, e.g., key role in developing and overseeing the Cataloging Directorate's action plan (*Bibliographic Control of Web Resources: A Library of Congress Action Plan*) that resulted from the 2000 Bicentennial Conference on Bibliographic Control for the New Millennium -- involved working with professional organizations and individuals outside of the Library of Congress

- Assume leadership/management role in directorate-wide initiatives, such as co-chairing the committee charged with planning the directorate's re-organization

- Represent Library Services and coordinate the Library Services' role in the Copyright Office Business Process Re-engineering effort, including oversight of pilot projects to improve workflows between the two organizations

- Serve on committees of professional organizations

- Give speeches to national-level and regional professional groups: ALA Copy Cataloging Discussion Group, Potomac Technical Processing Librarians.

**John Byrum**, Chief, Regional and Cooperative Cataloging Division Chief, SL-1410, had similar duties to those described above. He served as a Cataloging Directorate Division Chief from 1976 through early 2006. There was a small difference in the number of employees and consequently the size of the budget between RCCD and ASCD.

See expert Report of Dr. Richard Lurito, submitted on March 15, 2007.

See Answers to Interrogatories No. 1-2, 6-8.

46

**INTERROGATORY NO. 17**: Describe and identify each and every conversation (oral or written) you had with Deanna Marcum regarding the Assistant Director for Bibliographic Access duties. For each oral or written communication you had with Ms. Marcum include in your response the date oral or written communication occurred, the substance of what Ms. Marcum informed you about the Assistant Director for Bibliographic Access duties, and who, if anyone, saw the communication (if written) or heard the communication (if oral).

**ANSWER**: Ms. Marcum called me to her office on April 28, 2004. We were alone. She showed me a draft of an organization chart that she was considering and said that she wanted me to do the job of Assistant Director for Cataloging. I told her I would think about it and discuss it with Beacher Wiggins who was to fill the Director job over both cataloging and acquisitions. I did so and replied to her on email saying that I would do the job. She replied to me via email on May 4, 2004, 6:23 pm, saying, "This makes me extremely happy." In an email message dated August 6, 2004, Ms. Marcum informed Mark Dimunation, Steve Herman, and me (with copies to Rosa Owens and James Carroll) that she expected "the units designated in your areas to report to you."

See documents produced.

**INTERROGATORY NO. 18**: Describe and identify each and every conversation (oral or written) you had with Beacher Wiggins regarding the Assistant Director for Bibliographic Access duties. For each oral or written communication you had with Mr. Wiggins include in your response the date oral or written communication occurred, the substance of what Mr. Wiggins informed you about the Assistant Director for Bibliographic Access duties, and who, if anyone, saw the communication (if

50

written), or heard the communication (if oral).

**ANSWER**: Beacher Wiggins made clear in an email to the acquisitions and cataloging Chiefs, dated July 15, 2004, that he expected "... the assist directors to do more than coordinate: I expect them to manage; to have authority to make decisions; to have authority to handle personnel matters; to have budget responsibilities for their areas." In addition, Mr. Wiggins had drafted a position description for the duties of Assistant Director for Bibliographic Access, and submitted it to Deanna Marcum on January 13, 2005. I also had related conversations with Mr. Wiggins as described in my Answer to Interrogatory Nos. 2, 3.

See documents produced.


**INTERROGATORY NO. 19**: Describe each and every job duty you performed that was "substantially the same as Stephen Herman and Mark Dimunation as alleged in paragraph 20 of your complaint.

**ANSWER**: Plaintiff objects to this interrogatory to the extent that it seeks information covered by the attorney-client privilege or attorney work product doctrine. Without waiving her objections, Plaintiff responds as follows:

As Assistant Director for Bibliographic Access, I performed a broader range of more complex duties than my Assistant Director counterparts, Mark Dimunation and Steve Herman. My Assistant Director duties were a continuation of my Acting Director duties with additional responsibilities, e.g. the inclusion of a ninth division to my span of control and an increase in my budget to $44M. My two counterparts did not have the same history in relation to their jobs. Deanna Marcum's email of August 6, 2004, specifically states she expected that "the units

51

designated in your areas to report to you."

See also Answers to Interrogatory Nos. 1, 6,-8, 11-12.

See documents produced.


**INTERROGATORY NO. 20**: Identify the individual(s) who informed you that "new position descriptions would be provided for the Assistant Director positions" as alleged in paragraph 21 of your complaint. Include in your response each and every time you were informed that "new position descriptions would be provided for the Assistant Director positions".

**ANSWER**:  In an email message to me, Steve Herman, and Mark Dimunation (with copies to Rosa Owens and Jim Carroll) dated August 6, 2004, 11:40 am, Deanna Marcum informed us that she was "asking Jim Carroll to take care of re-writing pd's to include the assistant director duties." I also had ongoing conversations with Mr. Wiggins indicating that a new position description would be provided for me.

See Answer to Interrogatory No. 3.

See documents produced.


**INTERROGATORY NO. 21**: To the extent that you allege that the Assistant Director for Bibliographic Access duties were permanent, identify each and every fact to support this allegation. Include in your response when you were informed that the Assistant Director for Bibliographic Access duties were permanent, each and every individual who informed you that the Assistant Director for Bibliographic Access duties were permanent, and the method by which (oral or written communication) you were informed that the Assistant Director for Bibliographic Access duties were

permanent.

**ANSWER**: The Library treated my appointment to Assistant Director for Bibliographic Access as it would any official, non-temporary appointment. I was never told the duties I acquired through my the appointment were temporary. We (the three Assistant Directors) were not named "acting" Assistant Directors. We were not named "interim" Assistant Directors. We were told that PDs would be rewritten. I was never told that the appointment was temporary. For example, in a meeting with Deanna Marcum, after the appointment, I said something to the effect of "Now that I'm permanent in my position, I will feel more free to make changes." Ms. Marcum did not correct that statement or contradict me. In my experience at LC, if one is not permanently assigned to a position, one's title is labeled "interim" or "acting." Ms. Marcum did use those labels for other names/positions in the organization chart attached to the announcement of the appointments of Steve Herman, Mark Dimunation, and me to our Assistant Director positions.

See Answer to Interrogatory No. 3. See also Answers to Interrogatory Nos. 1-2, 6-8, 17-19. See documents produced.


**INTERROGATORY NO. 22**: Identify all Library officials or employees who you contend were responsible for setting your rate of pay during the time frame of you assumed the Assistant Director for Bibliographic Access duties. Include in your response what you contend you should have been paid during the time frame during which you assumed the Assistant Director for Bibliographic Access duties and each and every fact you rely upon to support this conclusion.

**ANSWER**:  The Library management was responsible for setting my rate of pay. I am aware of the following Library officials who were responsible for–or otherwise had influence on setting my pay

53

## VERIFICATION

I, Judith A. Mansfield, being duly sworn on oath, do hereby state that I have read the foregoing Plaintiff's Answers to Defendant's First Set of Interrogatories and that they are true to the best of my knowledge, information, and belief.

_Judith A. Mansfield_
Judith A. Mansfield

Subscribed and sworn to before me
this _21st_ day of March, 2007.

_Teresita V. Nolan_
Notary Public

My Commission Expires:

TERESITA V. NOLAN
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires October 31, 2010

57

CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of March, 2007, a copy of the foregoing Plaintiff's
Answers to Defendant's First Set of Interrogatories was mailed, first-class postage prepaid, to:

Douglas Mickle
Commercial Litigation Branch, Civil Division
U.S. Department of Justice
Classification Unit
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530


_Bruce A. Fredrickson / CPC_
Bruce A. Fredrickson
Webster, Fredrickson & Brackshaw
1775 K Street, N.W.
Suite 600
Washington, D.C. 20006
(202) 659-8510

Attorney for Plaintiff