UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDITH A. MANSFIELD )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JAMES H. BILLINGTON, )<br>LIBRARIAN OF CONGRESS, )<br>)<br>Defendant. )<br>) | Civil Action No. 05-1790 (RMU/JMF) |

**PLAINTIFF JUDITH A. MANSFIELD'S STATEMENT OF MATERIAL FACTS AT ISSUE**

Plaintiff Judith A. Mansfield, by and through counsel, sets forth the following Statement of Genuine Facts at Issue pursuant to Rule 56.1 the Local Rules of Civil Procedure. The following facts are supported by the record in each instance, and therefore, Defendant must are either concede that they are true or acknowledge that they are disputed facts at issue.

**I.    Ms. Mansfield has excelled in her work for the Library of Congress.**[1]

1.    Plaintiff Judith A. Mansfield has been employed by the Librarian of Congress (the "Librarian" or "Defendant") since July 1, 1969. (Ex. 8 ¶8.)

2.    As an employee of the Library of Congress (the "Library"), Ms. Mansfield's work performance has been consistently rated as "outstanding" or "commendable." (*See, e.g.*, Exs. 14-15.)

**Assistant Director for Bibliographic Access**

**II.   The Assistant Director for Bibliographic Access position was the same as the Director for Cataloging Position.**

3.    The Library classified the position of Director for Cataloging that Ms. Mansfield

---

[1] Statements in the headings are supported by the facts stated below or are fair inferences based on those facts.

assumed on an acting basis in 2002 at the Senior Level. (Ex. 12 ¶8.)

    4.    "Bibliographic Access" is another term for "cataloging." (Ex. 5 at 55.)

    5.    Ms. Mansfield continued to carry out the exact same duties as Assistant Director for Bibliographic Access as she had performed as Acting Director for Cataloging. (Ex. 7 at 85-88; ex. 5 at 145; ex. 12 ¶12.)

    6.    Ms. Mansfield served as Assistant Director of Bibliographic Access until April 2005. (Ex. 4 at 174-75.)

    7.    As such, Ms. Mansfield fulfilled the Director for Cataloging duties for the Library of Congress for 2.5 years. (Ex. 4 at 212.)

**III.    The Assistant Director for Bibliographic Access (Director for Cataloging) position was a Senior Level position requiring performance of senior level duties.**

    8.    The Assistant Director for Bibliographic Access position required the same level of skill, ability, and responsibility as other senior level management positions within the Library of Congress. (Ex. 7 at 90.)

    9.    In carrying out the functions of the Director for Cataloging (as Assistant Director for Bibliographic Access), Ms. Mansfield was fulfilling a role and performing duties within Library Services that had already been rated by the Library at the senior level. (Ex. 12 ¶8.)

**IV.    Ms. Mansfield was officially appointed to the Assistant Director for Bibliographic Access position.**

    10.    Ms. Mansfield's appointment to the position of Assistant Director for Bibliographic Access was official. (Exs. 22-24.)

    11.    In August, 2004, Ms. Marcum asked Jim Carroll, the head of Administrative Services

for Library Services, to take care of re-writing the position descriptions to include the assistant director duties. (Ex. 23.)

12.     Ms. Mansfield was informed that her official Library of Congress position description would be changed to include her Assistant Director for Bibliographic Access duties. (Ex. 11 at pp. 4-5.) In the Library's Annual Report for the fiscal year ending September 30, 2004, Appendix K listed the "staff changes." Included among the staff changes was the announcement that "Judy Mansfield was appointed assistant director for bibliographic access." (Ex. 24.)

13.     The Library treated Ms. Mansfield's appointment "as it would any official, non-temporary appointment." (Ex. 11 at p. 53.)

V.     **The Library paid Beacher Wiggins at the Senior Level when he served as Director for Cataloging.**

14.     In 1992, Wiggins became the Chief of the Arts and Sciences Cataloging Division and received GS-15 level pay. (Ex. 7 at 7, 19-20.)

15.     From 1995 to 1997, Wiggins served as Acting Director for Cataloging (Ex. 7 at 22.)

16.     Mr. Wiggins who was paid at the Senior Level for half his time spent as Acting Director for Cataloging. (Ex. 33.)

17.     In 1997, Wiggins took over the position of Director for Cataloging, no longer on an "acting" basis. At this point, Wiggins received an increase in his salary to the Senior Level. (Ex. 7 at 48.)

18.     In 1998, Ms. Mansfield became the Chief of the Arts and Sciences Cataloging Division and received GS-15 level pay. (Ex. 16.)

19.     From 2002 to 2004, Ms. Mansfield served as Acting Director for Cataloging. (Ex. 4

3

at 175-76; ex. 11 at 3-4.)

20. In 2004, Ms. Mansfield took over the position of Director for Cataloging, no longer on an "acting" basis under the new title of Assistant Director for Bibliographic Access. (Ex. 11 at pp.4-5.)

21. Ms. Mansfield did not receive Senior Level pay when she assumed the exact same position that enabled Wiggins to receive Senior Level pay. (Ex. 11 at p. 4.)

VI. **As an Assistant Director, Ms. Mansfield Had Far Greater Responsibilities Than Mr. Herman and Mr. Dimunation.**

22. The assistant director positions were created to help manage the two largest directorates within Library Services: (1) Acquisitions & Bibliographic Access and (2) Collections & Services. (Ex. 7 at 80; ex. 22 at p.2 (organizational chart).)

23. Each directorate was headed by a Director, and two assistant director positions were created within each directorate to assist the Director. (Ex. 7 at 82-84; ex. 22 at p. 2.)

24. The four assistant directors were organizationally on the same level. (*Id.*)

25. Mr. Wiggins served as the acting Assistant Director for Acquisitions. (Ex. 22 at p. 2.)

26. All the assistant directors participated in the same directors' meetings and served as part of the upper echelon of the Library Services management team. (Ex. 3 at 42-45; ex. 5 at 115-116.)

27. At the directors' meeting, these upper level mangers, including the assistant directors, all participated in the program planning, strategic planning, budget planning and sensitive personnel issues. (Ex. 3 at 54.)

28. As Mr. Herman put it, this was the "kind of place where all the action took place, the real programmatic and discussion and planning . . . " (Ex. 3 at 45.)

29. The assistant directors were performing substantially equal duties. They were in charge of several divisions each. They were in charge of their budgeting. The division chiefs reported to assistant directors. They engaged in their own high level activities in terms of strategic planning. (Ex. 4 at 192.)

30. The specific position to which Ms. Mansfield was appointed, the Assistant Director for Bibliographic Access, required the same level of skill, ability, and responsibility as other SL level managers within the Library of Congress. (Ex. 7 at 90.)

31. Believing that required the same level of skill, ability, and responsibility as other SL level managers within the Library of Congress, Mr. Wiggins went to Ms. Marcum and tried to have Ms. Mansfield's position upgraded to the Senior Level. (Ex. 7 at 105-107.)

32. Mr. Wiggins pointed out to Ms. Marcum that, of the three assistant directors, Ms. Mansfield's was the only one that was not senior level. (Ex. 7 at 106-7.)

32. Mr. Wiggins thought Ms. Mansfield was doing the senior level work that merited a senior level position, based on the work he was assigning her. (Ex. 7 at 106-7.)

33. Ms. Mansfield's position demanded far more responsibility than her male counterparts who served as assistant directors: Mr. Herman and Mr. Dimunation simply served in a coordinating capacity as assistant directors, while Ms. Mansfield managed the cataloging functions of the nine divisions within her purview. (Ex. 5 at 144-145.)

34. Ms. Mansfield did more than just coordinate but rather actually managed the day-to-day activities of the Bibliographic Access sub-directorate. (*Id.*; Ex. 7 at 116.)

35.     The responsibilities assigned to Ms. Mansfield were greater than or equal to those assigned to Mr. Herman and Mr. Dimnuation. As assistant director, Ms. Mansfield had nine divisions under her command, as did Mr. Dimunation, while Mr. Herman was assigned only four. (Ex. 22 at p. 2; ex. 3 at 48.)

36.     In terms of staff supervision, Ms. Mansfield held a far more responsible position, with 550 employees under her direction, in comparison with 260-280 employees under the direction of Mr. Herman and approximately 400 under the direction of Mr. Dimunation. (Ex. 4 at 213; ex. 3 at 48-49; ex. 1 at 52-53.)

37.     Ms. Mansfield's assistant director position was so all-consuming that another Library employee was assigned to handle her division chief duties, while this kind of assignment was not required for Mr. Herman or for Mr. Dimunation to handle their assistant director duties. (Ex. 5 at 145-146.)

**VII.    Ms. Mansfield's Assistant Director position was already Senior Level.**

38.     Under Mr. Wiggins' supervision, Ms. Mansfield served as the assistant director for Bibliographic Access and in that capacity she continued her role as acting Director for Cataloging. (Ex. 5 at 145.)

39.     As Ms. Marcum was aware, the Director for Cataloging was a Senior Level rated job when Ms. Mansfield performed as Acting Director for two years prior to assuming the position as Assistant Director for Bibliographic Access. (Ex 5 at 203-204; ex. 12 at ¶6.)

**VIII.   Ms. Mansfield's Division Chief Position should have been rated at the Senior Level.**

40.     Ms. Mansfield has served as the ASCD Chief since May 1998 and continues in this capacity today. (Exs. 16-17.)

41. In 2003, the Library conducted a classification review of Ms. Mansfield's ASCD Chief position, which determined that Ms. Mansfield's position was improperly classified at the GS-15 level and should be classified at the Senior Level. (Ex. 19.)

42. John Byrum, a male employee doing the same work for the Library as Chief of the Regional and Cooperative Cataloging Division, has been paid as a Senior Level employee, far more than Ms. Mansfield. (Ex. 11 at pp. 3-4; ex. 12 at ¶3.)

43. The Library ignored the findings of its classification review and made no adjustment to Ms. Mansfield's salary or grade level. (Exs. 16-17; ex. 9 ¶¶6-8; ex. 21.)

44. Ms. Mansfield's Division Chief position should have been Senior Level. Ms. Mansfield's duties were substantially similar to the division chief duties of Herman, Dimunation, and Byrum and each of these division chief positions were rated at the Senior Level. (Ex. 6. at 33, 81-82; ex. 12 at ¶3.)

45. The Library has admitted that, from 2002 through his retirement in 2006, John Byrum was paid at the Senior Level for Division Chief duties that required "substantially equal skill, effort, and responsibility" as Ms. Mansfield's Division Chief duties. (Ex. 12 ¶3.)

46. The Library administratively adjusted Mr. Herman's salary from the GS-15 level to the Senior Level when it was determined that there was an accretion of duties to his position as Chief of the Collections Management Division in Library Services in 1999. (Ex. 32.)

47. When the Library's classification review determined that Ms. Mansfield was performing Senior Level duties in her position, a position she had held since May 1998, the Library refused to upgrade her position to the Senior Level. (Ex. 7 at 125, 129-130, 157-158.)

48. The Library hired Mr. Dimunation at the Senior Level to serve as a Division Chief

in March 1998, and he was hired at salary that was more than a fifty percent increase over his then current salary. (Exs. 30-31 (his salary jumped from $61,680 to $93,357).)

49. The offer made to Mr. Dimunation provided him with a salary increase that far exceeded the normal range of a salary increase offered to an outside hire; the normal range of increase is closer to a five or ten percent increase. (Ex. 2 at 66-69.)

50. When Ms. Mansfield was appointed Chief of the Arts and Sciences Cataloging Division in the Library Services, also in 1998, after almost 30 years of service to the Library, Ms. Mansfield was not placed at the Senior Level and her salary only increased from $72,758 to $77,798. (Ex. 16.)

51. Although they both became Division Chiefs in 1998, Ms. Mansfield managed a division with a larger staff and budget than Mr. Dimunation, and yet he was given the Senior Level designation. (Ex. 20 at 2; ex. 24.)

52. Although Mr. Jeffrey Heynen served as a division chief with the Cataloging Division, he never served as Director of Cataloging (acting or otherwise) nor as an assistant director, and he never performed any senior level duties over and above his division chief duties. (Ex. 5 at 83.)

**IX.    The Library's budget could sustain increasing Ms. Mansfield's pay to the Senior Level.**

53. Ms. Mansfield was required to perform work at the Senior Level as the Assistant Director for Bibliographic Access (Ex. 7 at 172-173).

54. Ms. Mansfield had been performing Senior Level work for at least two and a half years (Ex. 7 at 68, 94; ex. 4 at 212.)

55. Ms. Mansfield performed "very well" (Ex. 7 at 61, 68, 88) and she did "very good work" at the Senior Level (Ex. 5 at 137).

56.     Mr. Wiggins, when asked how Ms. Mansfield performed as the Assistant Director for Bibliographic Access, testified: "She was excellent." (Ex. 7 at 183.)

57.     Ms. Mansfield effectively succeeded Mr. Wiggins as the Director for Cataloging (Ex. 7 at 56-57, 87; ex. 5 at 116, 145).

58.     Mr. Wiggins was promoted to and compensated at the Senior Level when he became the Director for Cataloging (Ex. 7 at 48.)

59.     The Library did not promote or compensate Ms. Mansfield at the Senior Level when she succeeded Mr. Wiggins. (Ex. 7 at 105 ; ex. 5 at 147-148.)

60.     All of the directors and assistant directors within Library Services after the reorganization were compensated at the Senior Level except Ms. Mansfield. (Ex. 7 at 95-96.)

61.     To compensate all of the upper management in Library Services at the Senior Level after the reorganization implemented by Ms. Marcum would have required the Library to increase the compensation of a single employee – Ms. Mansfield – out of a staff of more than 2,500 employees. (Ex. 7 at 95-96; Ex. 5 at 6.)

62.     The annual budget for the Library is half a billion dollars (Ex. 7 at 99).

63.     The annual budget for Library Services alone was $200 million, and the Acquisitions and Bibliographic Access Directorate budget in particular was $95 million. (Ex. 5 at 6, 29-30, 34.)

64.     Mr. Wiggins estimated the total budgetary impact of compensating Ms. Mansfield at the Senior Level on an annual basis to be in the range of "between $3,000 and $5,000." (Ex. 7 at 98.)

65.     Ms. Marcum believed that, with potential bonuses, the cost of paying Ms. Mansfield at the Senior Level would have been in the range of $8,000 to $13,000 per year. (Ex. 7 at 68-69.)

66. The Library paid Ms. Marcum a signing bonus of $20,000 just to come to work for the Library. (Ex. 5 at 199.)

67. The Library paid Ms. Marcum two "retention bonuses," one of $30,000 and another of $32,000, since she was first hired in 2003. (Ex. 5 at 199-200.)

68. The Library's rebuilt and redecorated Ms. Marcum's her suite of offices once she came on board. (Ex. 4 at 215.)

69. In the 2004-2005 time frame, more than one Senior Level employee within Library Services retired and was not replaced. (Ex. 5 at 211-212)

**X.   Ms. Mansfield's appointment to Assistant Director for Bibliographic Access (Director for Cataloging) was not intended to be temporary.**

70. The creation of the assistant director positions was an "open-ended" arrangement. (Ex. 3 at 73; ex. 1 at 64; Ex. 11 at p. 53.)

71. At the time that Ms. Mansfield accepted her Assistant Director duties, she was not informed that they were not permanent duties. (Ex. 11 at p. 53.)

72. Ms. Marcum did not convey to Steve Herman or Mark Dimunation that the assistant director duties would be for a limited time. (Ex. 3 at 73; ex. 1 at 64.)

73. In its Annual Report to Congress, the Library announced that Ms. Mansfield had been appointed to the position of Assistant Director for Bibliographic Access, not "acting" director or "interim" director. (Ex. 24.)

74. In her newsletter to all of Library Services, Ms. Marcum stated:

> I am pleased to announce these appointments:
> Beacher Wiggins will serve as acting Assistant Director for Acquisitions.
> Judy Mansfield is the Assistant Director for Bibliographic Access.
> Steve Herman is the Assistant Director for Collections Management.

75. Mark Dimunation is the Assistant Director for Special Collections and Services. (Ex. 22.)

76. The announcement makes no mention of the notion that these appointments are just a tentative phase in an "ongoing reorganization." (Ex. 22.)

77. The attached organizational chart for Library Services similarly contrasts the "acting" designation for Mr. Wiggins' appointment with the absence of any such qualifier attached to the other assistant director positions. (Ex. 22.)

78. All of the appointed assistant directors agree that when Ms. Marcum appointed them she did not inform them that the positions were for any limited duration. (Ex. 3 at 73; ex. 1 at 64; ex. 11 at 53.)

79. In her welcoming memo to the new assistant directors, Ms. Marcum explained that "your appointments are now official" and the position descriptions would be rewritten, but made no mention of the positions being subject to change or elimination due to an "ongoing reorganization." (Ex. 23.)

80. When informed that the assistant director positions were abolished, Mr. Herman and Mr. Dimunation were surprised and shocked. (Ex. 3 at 55-56; ex. 1 at 71.)

XI. **Ms. Mansfield complained to Defendant of sex discrimination.**

81. On March 16, 2005, Ms. Mansfield complained directly to the Librarian that she was receiving less pay for performing the same work as her male counterparts in violation of Title VII of the Civil Rights Act and the Equal Pay Act. (Ex. 25.)

82. Ms. Mansfield explained that she had been performing work at the Senior Level for

two years, yet her position remained classified at GS15. Ms. Mansfield provided the following examples:

    a.    "From September 2002 to July 2004, I served as Acting Director for Cataloging, a Senior Level position, on detail from my permanent position as Chief, Arts and Sciences Cataloging Division (ASCD)."

    b.    "In April 2003, the Library's contract classification specialist recommended that the ASCD Chief position be classified at the Senior Level. As ASCD Chief, I have substantially the same duties as male division chiefs at the Senior Level."

    c.    "Since August 2004, I am assigned to collateral duties as Assistant Director for Bibliographic Access along with my position as ASCD Chief. There are two other male Assistant Directors in Library Services, both of whom occupy positions which are classified at the Senior Level. I directly supervise a Senior Level male employee."

(Ex. 25.)

83.    Ms. Mansfield indicated: "I want this matter to remain a private personnel matter and I want to negotiate a satisfactory resolution as expeditiously as possible. However, if I do not receive a response within 10 business days, I will assume there is no interest in resolving this matter privately." (Ex. 25.)

### XII. Defendant abolished Ms. Mansfield's position because she is a female who complained of sex discrimination.

84.    In response to Ms. Mansfield's letter, Defendant considered only three options: (1)

"end the assistant director positions"; (2) "send Ms. Mansfield back to her division " or (3) create a permanent position for Ms. Mansfield at the senior level pay grade. The Library did not even entertain leaving Ms. Mansfield in her position as Assistant Director at the GS-15 pay. (Ex. 5 at 158; James Decl. ¶6.)

85. The Library refused to pay Ms. Mansfield at the senior level for any her work as Assistant Director for Bibliographic Access or Division Chief. (Ex. 9 ¶6.)

86. The Library abolished Ms. Mansfield's position. (Ex. 9 ¶9.)

87. The Library also abolished the positions of Dimunation and Herman because "it would be much more difficult to explain keeping some of the assistant directors and eliminating one of them . . . ." (Ex. 8 ¶26; ex. 5 at 182.)

88. The Library made the decision to eliminate her Assistant Director position and the other two Assistant Director positions within two weeks of Ms. Mansfield's complaint. (Ex. 8 ¶26; ex. 9 ¶¶8-9.)

89. The Librarian subsequently returned Ms. Mansfield to her prior position as ASCD Chief. (Ex. 9 ¶¶8-9.)

90. Since her return to her ASCD Chief position, Ms. Mansfield has been paid at the GS-15 level. (Ex. 9 at ¶¶9-10.)

91. After the elimination of their Assistant Director positions, Mr. Herman and Mr. Dimunation continued to receive Senior Level. (Ex. 9 ¶18.)

**XIII. The elimination of Ms. Mansfield's position has been detrimental to her career.**

92. Ms. Mansfield's ASCD Chief position is subordinate to the Assistant Director position in the hierarchy of the Library. (Ex. 9 ¶9; Def. Mat. Facts at 12 ¶24.)

93.     As Assistant Director, Ms. Mansfield served as the immediate supervisor of the ASCD Chief, as well as the eight other Bibliographic Access division chiefs in the Acquisitions and Bibliographic Access directorate. (Ex. 9 ¶¶12-13.)

94.     In that capacity, Ms. Mansfield also managed a budget of more than $40 million and supervised a staff of 550 employees. (Ex. 9 ¶¶15-16.)

95.     By returning Ms. Mansfield to her position as a division chief, the Librarian reduced her responsibility to management of a budget of $4.4 million and supervision of a staff of approximately 75 employees. (Ex. 9 ¶¶15-16.)

96.     Furthermore, the ASCD Chief position was subordinate to Ms. Mansfield's Assistant Director position in the hierarchy of the Library.

## XIV.   Plaintiff's Response to Defendant's Statement of Facts

¶8

Contrary to Defendant's suggestion in paragraph 8, the Library clearly did not follow its own regulations because it elected to keep Ms. Mansfield in a Senior level position for more than 120 days. (Ex. 2 at 53-54.) Thus, contrary to its regulations, the Library obtained Ms. Mansfield's services for this Senior Level position, but failed to pay her at the Senior Level.

¶¶12-13

Paragraphs 12 and 13 are misleading because they imply that Ms. Mansfield had a break in service as the acting Director of Cataloging. First as Acting Director for Cataloging and then as Assistant Director for Bibliographic Access, Ms. Mansfield served as Director for Cataloging for the

Library from September 2002 through April 2005.  (Ex. 4 at 175-76; ex. 5 at 145; ex. 7 at 85-88; ex. 11 at pp.3-5.)

¶¶16-17, 25

While Ms. Marcum has testified in the context of litigation that she did not believe the Library's budget "could support the addition of any new SL positions," a jury would not be required to believe this testimony in light of the size of the budget, the Library Services funds, and the minimal budgetary impact that would have resulted from raising Ms. Mansfield's salary to the Senior Level.  (Ex. 5 at 6, 29-30, 34, 68-69; ex. 7 at 98-99.)

¶18

The implementation of Ms. Marcums' realignment of Library Services took place in July and August 2004.  (Exs. 22-24.)

¶19

Contrary to Defendant's suggestion in paragraph 19, the Assistant Director positions were treated as any non-temporary appointment or "staff change" in which announcements were included in the annual report, plans were made to re-write the assistant director official position descriptions, and only one assistant director, Beacher Wiggins, was given the title "acting."  (Ex. 11 at p. 53; exs. 22-24.)  In addition, the Defendant's citations do not support the contention that the assignment of

duties to assistant directors was in any way temporary. Nowhere in the cited passages do the words "temporary" or "temporarily" appear. Nor do any synonyms for those words appear either.

¶20

In paragraph 20, Defendant inaccurately describes the manner in which Ms. Mansfield obtained the position of Assistant Director for Bibliographic Access. In April 2004, Ms. Marcum asked Ms. Mansfield to accept the job of Assistant Director for Bibliographic Access. After speaking to Mr. Wiggins, Ms. Mansfield accepted the appointment and was officially appointed in August 2004. (Ex. 11 at p.50; exs. 22-24.)

¶23

Contrary to Defendant's statement in paragraph 23 which is misleading, upon her appointment to the Assistant Director for Bibliographic Access position, Ms. Mansfield had served in a Senior Level position for almost two years. Additionally, Ms. Mansfield held a permanent position that should have been paid at the Senior Level. (Ex. 10; ex. 11 at .p. 2-4; ex. 12 ¶¶ 3, 6; exs. 19-20.)

¶26

In paragraph 26, Defendant inaccurately summarizes the content of Ms. Mansfield's letter of March 15, 2005. (Ex. 25.) Additionally, Ms. Mansfield only submitted this letter to the Librarian of Congress to whom it is addressed. (*Id.*)

¶28

Plaintiff disputes Defendant's claim that Ms. Mansfield sought to choose the "most equitable" option in response to Ms. Mansfield's March 15, 2005 letter where there is no record support for this claim, including Defendant's citations to the record which do not support this claim.

¶29

Contrary to Defendant's statement in paragraph 29, Ms. Mansfield had raised her concerns about inequitable pay to Mr. Wiggins before March 15, 2005. (Ex. 11 at pp. 4-5.)

Respectfully submitted,

WEBSTER, FREDRICKSON, HENRICHSEN, CORREIA & PUTH, P.L.L.C.

    /s/   *Bruce A. Fredrickson*
Bruce A. Fredrickson  #933044
Cedar P. Carlton # 480255
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510
(202) 659-4082 (fax)

Attorneys for Plaintiff Mansfield

CERTIFICATE OF SERVICE

      I hereby certify that on the 4th day of December, 2007, a true and accurate copy of Plaintiff Judith A. Mansfield's Statement of Material Facts At Issue, was filed and served electronically to:

Jane M. Lyons, Esq.
Assistant United States Attorney
555 4th Street, N.W.
Room E4822
Washington, D.C. 20530

        /s/   *Cedar P. Carlton*
Cedar P. Carlton, #480255
Webster, Fredrickson, Henrichsen, Correia & Puth, P.L.L.C.
1775 K Street, N.W., Suite 600
Washington, D.C.  20006
(202) 659-8510 (tel)
(202) 659-4082 (fax)
ccarlton@wfhcplaw.com

Attorney for Plaintiff